# United States Court of Appeals for the Federal Circuit

---

## 2014-1771

### ETHICON ENDO-SURGERY, INC.,

*Appellant,*

v.

### COVIDIEN LP,

*Appellee.*

Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board, in No. IPR2013-00209

---

### BRIEF OF APPELLANT

---

Steven D. Maslowski
Ruben H. Munoz
Jason E. Weil
Akin Gump Strauss Hauer & Feld LLP
Two Commerce Square, Suite 4100
Philadelphia, PA 19103-7013
Phone:  (215) 965-1200
Fax: (215) 965-1210

Pratik A. Shah
Hyland Hunt
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington, DC 20036-1564
Phone: (202) 887-4000
Fax: (202) 887-4288

*Counsel for Appellant Ethicon Endo-Surgery, Inc.*

## <u>CERTIFICATE OF INTEREST</u>

Pursuant to Federal Circuit Rule 47.4, Counsel for Appellant certifies the following:

1.  The full name of every party or amicus represented by me is:

Ethicon Endo-Surgery, Inc.

2.  The name of the real party-in-interest (if the party named in the caption is not the real party in interest) represented by me is:

Ethicon Endo-Surgery, Inc.

3.  All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Ethicon, Inc.; Johnson & Johnson.

4.  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this Court are:

<u>AKIN GUMP  STRAUSS HAUER & FELD LLP:</u>  Steven D. Maslowski, Ruben H. Munoz, Jason E. Weil, Pratik A. Shah, and Hyland Hunt.


Dated:  November 26, 2014          By:     <u>/s/Steven D. Maslowski</u>
                                           Steven D. Maslowski

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST .................................................................. i

TABLE OF AUTHORITIES .....................................................................v

STATEMENT OF RELATED CASES ......................................................x

JURISDICTIONAL STATEMENT ..........................................................1

STATEMENT OF ISSUES ON APPEAL ................................................1

INTRODUCTION ......................................................................................2

STATEMENT OF THE CASE....................................................................4

I.    STATUTORY AND REGULATORY FRAMEWORK FOR INTER
      PARTES REVIEW ..........................................................................4

II.   FACTUAL BACKGROUND RELATED TO ETHICON'S
      INVENTION ....................................................................................6

      A.    Ethicon's '070 Patent ..........................................................6

      B.    The Prior Art .........................................................................8

            1.    Green does not disclose staples of multiple preformed or
                  formed heights...........................................................9

            2.    Pruitt and Viola do not teach or suggest non-parallel
                  staples.......................................................................11

      C.    The Prior Art Inventors and Covidien's Expert Worked
            Together Designing Surgical Staplers, But Did Not Arrive at
            the Invention of the '070 Patent .........................................12

      D.    Three Years After the Publication of the '070 Patent, Covidien
            Launched Its Tri-Staple Device Embodying that Invention ..............14

III.  PROCEEDINGS BEFORE THE PTO.......................................15

      A.    Covidien's Petition and Ethicon's Preliminary Response .................15

      B.    The PTAB Panel's Institution Decision ..............................16

C.    The PTAB Panel's Final Written Decision ........................................17

    1.    Claim construction .................................................................17

    2.    The combinations of the prior art .............................................18

    3.    The PTAB's determination of no objective indicia of nonobviousness .......................................................................19

SUMMARY OF ARGUMENT .............................................................................22

STANDARD OF REVIEW ....................................................................................25

ARGUMENT ...........................................................................................................26

I.    THE STATUTE REQUIRES THAT THE INSTITUTION DECISION AND FINAL DECISION IN AN INTER PARTES REVIEW BE MADE BY DIFFERENT DECISION-MAKERS .................26

    A.    The Plain Text of the Statute Prohibits the PTAB from Rendering Final Decisions Where the Director Did Not Institute Review ......................................................................................27

    B.    The Structure and Purpose of Inter Partes Review Confirm that Congress Intended a Divided Decision-Making Regime ....................31

    C.    Interpreting the Statute to Permit Consecutive Decisions by the Same Panel Creates Serious Due Process Concerns ...........................35

II.    THE PTAB'S OBVIOUSNESS ANALYSIS WAS LEGALLY FLAWED ..........................................................................................................43

    A.    The PTAB Erred in Failing to Credit the Objective Evidence Showing the Nonobviousness of the '070 Patent ...............................43

        1.    Ethicon was entitled to a presumption of nexus between the claimed invention of the '070 patent and the hugely successful Tri-Staple device ......................................................44

            (a)    Ethicon proved entitlement to a presumption of nexus ...........................................................................44

            (b)    Covidien failed to present competent evidence to rebut the presumption of nexus .......................................50

iii

(c)     Irrespective of the presumption of nexus, Ethicon
proved commercial success ...........................................52

2.     The PTAB Erred in Failing to Find a Long-Felt But
Unresolved Need for the Invention Claimed in the '070
Patent......................................................................................56

B.     The Panel's Failure to Properly Consider the Objective
Evidence led the Panel to Erroneously Determine the '070
Patent Is Obvious................................................................58

CONCLUSION .....................................................................................62

ADDENDUM

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*ArcelorMittal Fr. v. AK Steel Corp.*,
  700 F.3d 1314 (Fed. Cir. 2012) ....................................................54, 55

*Beard v. Gen. Servs. Admin.*,
  801 F.2d 1318 (Fed. Cir. 1986) ..........................................................27

*Brown & Williamson Tobacco Corp. v. Phillip Morris, Inc.*,
  229 F.3d 1120 (Fed. Cir. 2000) ....................................................44, 50

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
  467 U.S. 837 (1984)....................................................................25, 42

*Consol. Fruit-Jar Co. v. Wright*,
  94 U.S. 92 (1876)...............................................................................35

*Constant v. Advanced Micro-Devices, Inc.*,
  848 F.2d 1560 (1988)........................................................................35

*Cont'l Can Co. USA v. Monsanto Co.*,
  948 F.2d 1264 (Fed. Cir. 1991) ........................................................50

*Corley v. United States*,
  556 U.S. 303 (2009)..........................................................................29

*Crocs, Inc. v. Int'l Trade Comm'n*,
  598 F.3d 1294 (Fed. Cir. 2010) .....................................43, 47, 49, 52

*Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*,
  851 F.2d 1387 (Fed. Cir. 1988) .....................................44, 48, 49, 50

*Ecolochem, Inc. v. S. Cal. Edison Co.*,
  227 F.3d 1361 (Fed. Cir. 2000) .............................................47, 50, 56

*Fromson v. Advance Offset Plate, Inc.*,
  755 F.2d 1549 (Fed. Cir. 1985) ........................................................53

*Garcia v. Dep't of Homeland Sec.*,
  437 F.3d 1322 (Fed. Cir. 2006) ........................................................26

*In re Alappat*,
  33 F.3d 1526 (Fed. Cir. 1994) ..............................................................33

*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*,
  676 F.3d 1063 (Fed. Cir. 2012) ...........................................................33

*In re Gershon*,
  372 F.2d 535 (CCPA 1967) ..................................................................56

*In re Kao*,
  639 F.3d 1057 (Fed. Cir. 2011) ......................................................44, 54

*In re Sullivan*,
  362 F.3d 1324 (Fed. Cir. 2004) ............................................................25

*InTouch Techs., Inc. v. VGo Commc'ns*,
  751 F.3d 1327 (Fed. Cir. 2014) ......................................................51, 61

*Iron Grip Barbell Co. v. USA Sports, Inc.*,
  392 F.3d 1317 (Fed. Cir. 2004) ............................................................58

*J.T. Eaton & Co. v. Atl. Paste & Glue Co.*,
  106 F.3d 1563 (Fed. Cir. 1997) ............................................................43

*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*,
  688 F.3d 1342 (Fed. Cir. 2012) ............................................................61

*King v. St. Vincent's Hosp.*,
  502 U.S. 215 (1991) .............................................................................31

*KSR Int'l Co. v. Teleflex Inc.*,
  550 U.S. 398 (2007) .............................................................................53

*Leo Pharm. Prods., Ltd. v. Rea*,
  726 F.3d 1346 (Fed. Cir. 2013) .....................................................*passim*

*Mathews v. Eldridge*,
  424 U.S. 319 (1976) ........................................................................35, 40

*Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) .........................................................................25, 48

*NEC Corp. v. United States*,
  151 F.3d 1361 (Fed. Cir. 1998) .............................................................36, 38, 41

*Rambus Inc. v. Rea*,
  731 F.3d 1248 (Fed. Cir. 2013) .........................................................................53

*Randall Mfg. v. Rea*,
  733 F.3d 1355 (Fed. Cir. 2013) .........................................................................25

*Rosemount, Inc. v. Beckman Instruments, Inc.*,
  727 F.2d 1540 (Fed. Cir. 1984) .............................................................50, 58, 60

*Rust v. Sullivan*,
  500 U.S. 173 (1991).............................................................................................35

*St. Jude Med., Cardiology Div., Inc. v. Volcano Corp.*,
  749 F.3d 1373 (Fed. Cir. 2014) .........................................................................30

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
  723 F.3d 1363 (Fed. Cir. 2013) .........................................................................45

*Tokai Corp. v. Easton Enters., Inc.*,
  632 F.3d 1358 (Fed. Cir. 2011) .........................................................................54

*Touby v. United States*,
  500 U.S. 160 (1991).............................................................................................29

*Transcom, Inc. v. United States*,
  182 F.3d 876 (Fed. Cir. 1999) ...........................................................................42

*Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*,
  699 F.3d 1340 (Fed. Cir. 2012) .............................................................54, 55, 56

*United States v. Giordano*,
  416 U.S. 505 (1974).............................................................................................31

*United States v. Mead*,
  533 U.S. 218 (2001).............................................................................................25

*Withrow v. Larkin*,
  421 U.S. 35 (1975).......................................................................................*passim*

*Zadvydas v. Davis*,
   533 U.S. 678 (2001)..........................................................................................35

**STATUTES**

5 U.S.C.
   § 554(d) ........................................................................................................34
   § 706..............................................................................................................25
   § 706(2)(A) ...................................................................................................25
   § 706(2)(E) ...................................................................................................25

28 U.S.C.
   § 1295(a)(4)(A) ..............................................................................................1

35 U.S.C.
   § 3(b)(3) .........................................................................5, 23, 29, 30
   § 3(b)(3)(A) ..................................................................................................29
   § 3(b)(3)(B) ..................................................................................................29
   § 6(a) .............................................................................5, 23, 29
   § 6(b)(4) ..........................................................................................................5
   § 6(c) ...............................................................................5, 30
   § 311..............................................................................................................27
   § 311(b)........................................................................................4, 16
   § 312..............................................................................................................32
   § 313..............................................................................................................32
   § 314(a) ...........................................................................*passim*
   § 314(b).......................................................................4, 27, 28, 30
   § 314(c)..........................................................................................................28
   § 314(d)..........................................................................28, 30, 36
   § 315(a) ...........................................................................................................4
   § 315(c)..........................................................................................4, 28
   § 315(d)...........................................................................................................4
   § 316(a)(8) ....................................................................................................32
   § 316(b)...........................................................................................................4
   § 316(c)..........................................................................5, 6, 28, 30
   § 316(e)..........................................................................................................18
   § 318(a) ..........................................................................5, 27, 28, 29
   § 325(d)..........................................................................................................28

## OTHER AUTHORITIES

37 C.F.R. § 42.2 ..................................................................................42

37 C.F.R. § 42.4(a)............................................................................*passim*

37 C.F.R. § 42.51 ...............................................................................49

37 C.F.R. § 42.100(b) .........................................................................32

37 C.F.R. § 42.107 ..............................................................................16

37 C.F.R. § 42.107 (a).........................................................................37

37 C.F.R. § 42.107(c)..............................................................16, 32, 37

37 C.F.R. § 42.108 .................................................................................6

37 C.F.R. § 42.120 ..............................................................................26

37 C.F.R. § 90.3(a)(1) ...........................................................................1

77 Fed. Reg. 48,612 (Aug. 14, 2012) ...................................................49

157 Cong. Rec. S1360 (daily ed. Mar. 8, 2011) ...................................32

Fed. R. Evid. 801(c) ............................................................................16

H.R. Rep. No. 112-98 (2011), *reprinted in* 2011 U.S.C.C.A.N. 67 ........33

## STATEMENT OF RELATED CASES

Appellant is not aware of any other case pending in this Court or any other court that will directly affect or be directly affected by the decision in the present appeal. Appellant notes that the present appeal raises issues that may impact other *inter partes* review proceedings pending at the U.S. Patent & Trademark Office.

# JURISDICTIONAL STATEMENT

This appeal arises from the June 9, 2014 final written decision of the Patent Trial and Appeal Board in *inter partes* review No. IPR2013-00209. Ethicon Endo-Surgery, Inc. ("Ethicon") filed a notice of appeal on August 5, 2014, within the time limit specified by 37 C.F.R. § 90.3(a)(1). This Court has jurisdiction over Ethicon's appeal under 28 U.S.C. § 1295(a)(4)(A).

# STATEMENT OF ISSUES ON APPEAL

1.    Was it error for the same three-member PTAB panel to both institute and finally decide the IPR proceeding given that the America Invents Act provides for a different decision-maker for each determination?

2.    Did the PTAB err in determining that the '070 patent claims were obvious when, *inter alia*, it:

    a)    failed to provide Ethicon a presumption of nexus after Ethicon presented unrebutted testimony showing commercial success;

    b)    held that, as a matter of law, commercial success cannot be shown where the individual elements of the claimed invention are in the prior art; and

    c)    held that to show a long-felt but unresolved need, Ethicon had to prove unsuccessful attempts by those of skill in the art to make and use the exact invention embodied in the '070 patent claims?

# INTRODUCTION

Ethicon appeals from a final written decision in an *inter partes* review ("IPR") before the United States Patent & Trademark Office ("PTO") Patent Trial and Appeal Board ("PTAB") in favor of Covidien LP ("Covidien") holding all claims of Ethicon's U.S. Patent No. 8,317,070 ("the '070 patent") invalid as obvious.

The '070 patent is directed to a surgical stapler with a unique combination of features, including staples with non-parallel legs of different *preformed* heights that the stapler forms into staples with different *formed* heights. The claimed invention improves upon decades of prior art by allowing surgeons to staple a broader range of tissue thicknesses. Covidien's commercial embodiment of Ethicon's invention became an overwhelming success. Nonetheless, the PTAB held all claims of the '070 patent invalid as obvious in view of three primary prior art references, each a patent or patent application assigned to Appellee Covidien.

The final written decision that invalidated Ethicon's '070 patent resulted from an IPR process that violated the relevant statute. In 2011, Congress passed the America Invents Act ("AIA"), which created the IPR process. That law divided IPR decision-making authority between the Director of the PTO and a panel of the PTAB. Under the statute, the Director is to determine whether to institute an IPR, and a panel of the PTAB is to then conduct each instituted IPR

and decide it on the merits. But there was no such separation here. A three-member PTAB panel considered evidence from only Covidien's expert, issued a 24-page written opinion concluding that Covidien had established a "reasonable likelihood" of success on the merits, and instituted the IPR. That same panel then conducted the IPR and rendered a final decision that in essence held that Ethicon had not changed the panel's mind. This structurally flawed process violated the statute's plain terms.

The PTO's unauthorized process tainted the outcome of this IPR. The PTAB panel, after crafting its institution opinion, was predisposed to rule in Covidien's favor. This led the panel effectively to flip the burden of proof in its final merits determination. Among other errors, the PTAB failed to afford Ethicon the legally required presumption of nexus between its objective evidence of nonobviousness and a commercial embodiment of the claimed invention. Accordingly, the panel substituted its own pre-institution judgment in place of a review of all of the evidence and fell squarely into the well-recognized trap of hindsight bias.

The Board's decision should be reversed.

## STATEMENT OF THE CASE

I.   **STATUTORY AND REGULATORY FRAMEWORK FOR *INTER PARTES* REVIEW**

In the AIA, Congress established *inter partes* review as a procedure for a third party to administratively challenge an issued patent as unpatentable "on a ground that could be raised under section 102 or 103" but "only on the basis of prior art consisting of patents or printed publications." 35 U.S.C. § 311(b).

Congress required that *inter partes* review proceed in two stages. First, the Director of the PTO must determine whether the review is to be instituted. 35 U.S.C. § 314(a) states that "[t]he Director may not authorize an inter partes review to be instituted unless the Director determines that the information presented in the petition . . . and any response . . . shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition." The Director is given a 3-month period after receiving the information presented to determine whether to institute an IPR. *Id.* § 314(b).[1]

_____

[1] The AIA authorizes the Director to take other specific actions related to IPR proceedings. For example, the Director may decide to join another party to an IPR and determine how the IPR will proceed. 35 U.S.C. § 315(c), (d). The Director must prescribe regulations relating to the conduct of the IPR, *id.* § 315(a), and "shall consider the effect of any such regulation on the economy, the integrity of the patent system, the efficient administration of the Office, and the ability of the Office to timely complete proceedings instituted under this chapter," *id.* § 316(b).

Once instituted, the second stage of the IPR involves the PTAB conducting the proceeding. The PTAB's responsibilities with respect to IPRs are enumerated by statute, including in Section 316(c):

> (c) PATENT TRIAL AND APPEAL BOARD.—The Patent Trial and Appeal Board shall, in accordance with section 6, conduct each inter partes review instituted under this chapter.

*Id.* § 316(c). Section 6 of Title 35, as referenced in this section, establishes the PTAB and enumerates its four functions, one of which is to "conduct inter partes reviews . . . pursuant to chapter[] 31." *Id.* § 6(b)(4). Section 6 further specifies that "[e]ach . . . inter partes review shall be heard by at least 3 members of the [PTAB]." *Id.* § 6(c). Section 318(a) specifies that "[i]f an inter partes review is instituted and not dismissed under this chapter, the [PTAB] shall issue a final written decision with respect to the patentability of any patent claim challenged by the petitioner and any new claim added under section 316(d)." *Id.* § 318(a).

Although Section 3 of Title 35 authorizes the Director to delegate the powers vested in the Office to others, it does so only for officers and employees of the PTO who are hired or appointed by the Director. *Id.* § 3(b)(3). Judges of the PTAB are not hired by the Director, but rather are appointed by the Secretary of Commerce. *Id.* § 6(a).

Instead of promulgating regulations that carry out the statute's mandate that the Director decide whether to institute an IPR and that the PTAB "conduct each

inter partes review instituted," *id.* § 316(c), the PTO promulgated a regulation specifying that "[t]he Board institutes the trial on behalf of the Director."  37 C.F.R. § 42.4(a); *see also* 37 C.F.R. § 42.108.  The Director abrogated Congress's intended decisional separation by delegating her duty to institute review to the body that was intended only to conduct such reviews once instituted.

## II.    FACTUAL BACKGROUND RELATED TO ETHICON'S INVENTION

### A.    Ethicon's '070 Patent

The '070 Patent, titled "Surgical Stapling Devices that Produce Formed Staples Having Different Lengths," was filed on February 28, 2007 and was issued on November 27, 2012.  A59–163.  The '070 Patent is a continuation-in-part of an application filed on August 31, 2005.  A59.

The '070 Patent generally relates to surgical staplers used to staple, secure, and seal tissue during surgeries.  The '070 Patent discloses various embodiments of such staplers, and exemplary embodiments of such staplers are shown below (some with only the working end shown):



A74; A119; A139; A145.    Depending on the surgical procedure performed, different instruments may be used.

The '070 Patent describes a unique combination of features for use in such staplers.  Among the features described and claimed in the '070 Patent are the use of non-parallel staples with different ***preformed*** heights, as well as configurations that result in staples with different ***formed*** heights.   A161 (25:21–26:30).   As shown below, a close-up of Figure 93 discloses non-parallel staples with different preformed heights, and Figure 95 discloses staples with different formed heights.



FIG. 93

FIG. 95

A146 (coloring added); A148 (coloring added).

The '070 Patent has 14 claims, including two independent claims—claims 1 and 8. All claims of the '070 patent have certain common elements, including (1) a plurality of staples with prongs that extend "non-parallelly" from the main portion of the staple, *i.e.*, non-parallel staples; (2) a first quantity of staples that has a different pre-deformation height than a second quantity of staples; and (3) a first quantity of staples that has a different formed staple length than a second quantity of staples. A162 (27:50–28:6; 28:35–60). Independent claim 8 is similar to independent claim 1 in many respects, but, among other differences, claim 8 requires a "non-pivotable anvil" instead of a "circular anvil." *Id.* (28:35–60). Claims 2–7 each depend directly from claim 1 and are directed to additional features, *id.* (28:7–34), and claims 9–14 each depend directly from claim 8 and are directed to additional features, A162–63 (28:61–30:8).

## B.     The Prior Art

The primary prior art applied by the panel, each of which is a Covidien reference, falls into two categories. The first category of prior art includes U.S.

Patent No. 3,494,533 ("Green"), which discloses non-parallel staples, but *not* staples of different preformed heights or staples of different formed heights.  The second category includes two references, U.S. Patent No. 4,941,623 ("Pruitt") and International Application No. WO 2003/09474 ("Viola"), which are each directed to staplers utilizing parallel staples of different preformed heights that result in staples of different formed heights.[2]  Pruitt and Viola do not disclose non-parallel staples.

### 1.     Green does not disclose staples of multiple preformed or formed heights

Of the three Covidien references at issue, Green was filed first—almost fifty years ago—in 1966.  The patent, titled "Surgical Stapler for Stitching Body Organs," issued on February 10, 1970 to United States Surgical Corporation (now Covidien).  A437–63; A453; A922.

Green discloses a right-angle surgical stapler, with non-parallel staples that are all of the same preformed and formed heights.  Green recognizes that a surgical stapler is very different from other types of staplers:

> [T]he stapling of live tissue is quite distinct from the stapling of non-live materials, such as paper, cardboard, etc.; wherein the squeezing pressures exerted upon the material layers during and after the stapling operation may vary over a wide range without damaging said

---

[2] Ethicon disagrees that Viola teaches staples of different formed heights, but that issue is not relevant to this appeal as Ethicon admits that Pruitt does provide such teaching.  Thus, the teachings of Pruitt and Viola are equivalent for purposes of this appeal.

layers of non-live materials. In the stapling of live tissue layers, on the other hand, the stapler may only squeeze the interfacing tissue layers together within a limited range of pressing forces, since, obviously, live tissue is quite susceptible to injury.

A453 (1:56–2:1).

Green also describes the precision necessary for surgical staplers in that "the final or bent-up shape of the staple in the case of live tissues must be very accurately predetermined so as to provide positive and firm holding together of the interfacing tissue layers without, however, the staple itself unduly tearing or otherwise injuring the tissue layers." *Id.* (2:1–6). Green further states that "[s]urgical staplers necessarily must be very accurately designed and manufactured in accordance with very close tolerances, these requirements being necessitated by the smallness of the parts and by the high level of reliability imposed by the medical environment in which such instruments are used." *Id.* (2:49–54).

Green discloses staples that have non-parallel legs. A444; A459 (13:71–74).

Green states that:

As a further aspect of preventing staples from extending outwardly of the cartridge slots, it is also important that the staples not fall out of said slots either during shipment of the cartridge assembly or during manipulation of the instrument. It is an object of this invention, therefore, to provide a staple shape whereby the staples themselves will resiliently press against the end walls which define the cartridge slots and thereby be firmly held therein.

A454 (3:65–73).

"Green does not disclose a number of limitations of the '070 Patent claims." A924.   Most importantly, "Green does not disclose use of staples of different preformed heights or resulting staples of different formed heights."   *Id.*

### 2.    Pruitt and Viola do not teach or suggest non-parallel staples

Covidien filed the application that led to Pruitt on December 26, 1989— more than two decades after it filed the Green application.   A262–84.   Pruitt is titled "Stapling Process and Device for Use on the Mesentery of the Abdomen," and it was issued on July 17, 1990.   *Id.*; A920.

Pruitt discloses a right-angle stapler with staples of different preformed heights that result in staples of different formed heights.   As stated by Pruitt:

> [The invention] relates to a stapler for applying two, three or four rows of staples of the same crown size with at least one row varying in prong size from the size of prongs in the other row or rows and designed to be applied to the fatty tissue of the mesenteries so as to seal off the blood vessels of varying size therein.

A275 (1:23–28; 1:28–32).

Although Green—which discloses non-parallel staples—was filed decades before Pruitt, Covidien failed to disclose the use of non-parallel staples in Pruitt. A13 ("Pruitt do[es] not teach the use of staples with non-parallel legs . . . ."); A921.

Covidien similarly failed to disclose non-parallel staples when it filed the application that led to Viola on May 13, 2002—two decades after it filed the Pruitt application.   A285–334.   Viola is titled "Surgical Stapler and Disposable Loading

Unit Having Different Size Staples" and was published on November 20, 2003. A285; A913.

Viola purportedly relates to "surgical staplers, and to disposable loading units for surgical staplers" that include "a cartridge housing a plurality of different-sized surgical fasteners for applying to body tissue during a surgical stapling procedure." A287 (1:9–12).  Viola states:

> The use of different-sized staples as disclosed herein provides several advantages, such as tissue joining or welding, short-term hemostasis and sealing, substantially reducing or preventing staple line bleeding, substantially decreasing leakage rates in lung tissue, and providing short and long-term tissue strength, i.e., anastomotic strength, and hemostasis.

A293 (7:9–12).

Although Covidien again disclosed the use of staples of different preformed heights to form staples of different formed heights in Viola, it still did not combine those features with the use of non-parallel staples.  A13 ("Viola . . . do[es] not teach the use of staples with non-parallel legs . . . ."); A920.

## C.    The Prior Art Inventors and Covidien's Expert Worked Together Designing Surgical Staplers, But Did Not Arrive at the Invention of the '070 Patent

The primary prior art in this case presents a unique situation.  As discussed, all of the references belong to the very party now alleging invalidity—Covidien. A920; A954.  Moreover, some of the inventors of that prior art, including Mr. Green (whose patent discloses non-parallel staples) and Mr. Viola (whose patent,

12

like Pruitt's patent before him, discloses the use of staples of different preformed and formed heights), worked together at Covidien to design surgical staplers. A954; A1344; A1353–57.

Even more noteworthy is the relationship of Covidien's IPR expert, Mr. Henry Bolanos, to the inventors of the prior art. Mr. Bolanos spent twelve years designing surgical staplers at Covidien, obtaining at least 80–90 patents on such instruments and rising to the position of Vice President of Research and Development. A579–81; A1316–17, A1330–31; A1344–46. Mr. Bolanos worked with Messrs. Green and Viola on surgical staplers, even obtaining patents on that technology that name all three as co-inventors. A954; A1355–57; A1041; A1067; A1079. In fact, Mr. Bolanos admitted that the environment at Covidien was a collaborative one where all engineers "knew of or were associated with the design work that was going on related to surgical staplers." A1347–48. According to Mr. Bolanos, he and Mr. Green were "the concept people" at Covidien, A1342–44, Mr. Green was also considered to be "a genius," and Mr. Viola would be "in the top ten, perhaps" of the most creative people during Mr. Bolanos's tenure at Covidien. A1339; A1355–56; A2273–74.

Messrs. Bolanos, Green, and Viola worked together to design surgical staplers at Covidien for years, having full knowledge of the company's patents

13

disclosing the individual elements the '070 patent. Messrs. Bolanos, Green, and Viola never came up with the invention reflected in Ethicon's '070 Patent.

**D. Three Years After the Publication of the '070 Patent, Covidien Launched Its Tri-Staple Device Embodying that Invention**

Ethicon was the first to invent a surgical stapler with the combination of elements in the claims of the '070 patent. That invention was disclosed to the public when the '070 patent published on August 23, 2007. Three years later, Covidien launched a line of surgical staplers—its "Tri-Staple" device—that includes the combination of elements in claims 8 and 10 of the '070 patent. Specifically, the Tri-Staple is a stapling device that has a fixed anvil and staples having (1) non-parallel legs, (2) different *preformed* heights, and (3) different *formed* heights. A965; A1119–25.

The sales volume for Covidien's Tri-Staple technology has been immense. A965–71. Covidien reported that sales of the Tri-Staple reached $1 billion in January of 2013, less than three years after launching the device. A1126–27. More recent information shows that sales have eclipsed the $1.5 billion mark. A965–66. Covidien's 2012 Annual Report states that the Tri-Staple products "are on track to be Covidien's most successful product line ever." A1146; A1159.

Covidien advertises the features of the '070 patent claims in public statements and marketing literature about the Tri-Staple device. A966–68. For example, Covidien has acknowledged that Tri-Staple is a "first-of-its-kind

technology that enables surgeons to use staplers in a broader range of tissue thicknesses than ever before." A1126. Covidien's advertising states that "[t]he benefits delivered by Tri-Staple technology are achieved due to its *graduated compression design and progressive staple heights*, which provide less stress on tissue during compression and clamping, the potential for greater perfusion into the staple line and the ability to manage tissue variability." A1126 (emphasis added) (footnotes omitted). Numerous other Covidien marketing pieces similarly point to the claimed features of the '070 patent as the point of differentiation. A967–68; A1144–45; A1287–97. Surgeons have also touted the staple features of the Tri-Staple device as an "incredible innovation." A1126.

## III. PROCEEDINGS BEFORE THE PTO

### A. Covidien's Petition and Ethicon's Preliminary Response

On March 25, 2013, Covidien filed its IPR petition. A164. In that petition, Covidien contended that all claims of the '070 patent should be cancelled based on 36 different grounds. A173–175. Covidien introduced the declaration of its expert, Mr. Bolanos, as evidence supporting its petition. A464. Covidien cited Mr. Bolanos's declaration (Ex. 1010) 149 times in its petition to support its claim construction and invalidity arguments. *See, e.g.*, A179; A186. Neither Covidien nor Mr. Bolanos disclosed or discussed Covidien's Tri-Staple device, much less

the tremendous success it was enjoying in the marketplace on account of the features claimed in the '070 patent.

On June 21, 2013, pursuant to 37 C.F.R. § 42.107, Ethicon filed its Preliminary Response.  A757–86.  Ethicon explained that, under a proper claim construction, each of the references lacked material claim elements and that, even under Covidien's construction, there was no motivation to combine the references. A777–784.  Ethicon was not permitted to introduce its own testimonial evidence in its preliminary response to rebut Mr. Bolanos's declaration.  37 C.F.R. § 42.107(c). Nor was Ethicon allowed to introduce any affirmative testimonial evidence explaining the objective evidence of nonobviousness at that point.  *Id.*

### B.    The PTAB Panel's Institution Decision

On August 26, 2013, in a 24-page opinion, a three-member panel of the PTAB instituted the IPR at issue in this appeal.  A24–47.  First, the panel construed three claim terms.  A29–34.  Based on those constructions, 18 of Covidien's 36 grounds of invalidity failed.  A35.  Notwithstanding the statutory requirement that requests to cancel a patent's claims in an IPR may be made "only on the basis of prior art . . . patents or printed publications," 35 U.S.C. § 311(b), the panel reviewed and credited the hearsay declaration of Covidien's expert, Mr.

Bolanos.[3]   A36–44.   In view of the three cited references *and* Mr. Bolanos's

testimony, the panel decided to institute review of each claim based on its finding

of a "reasonable likelihood" of success on two of Covidien's non-redundant

grounds.  A35–45.

### C.    The PTAB Panel's Final Written Decision

Following institution, Ethicon was permitted to file its evidence, Covidien

replied, and an oral hearing was held on April 10, 2014.  In a 23-page final written

decision dated June 9, 2014, the same PTAB panel that instituted review then

rejected Ethicon's evidence, including its overwhelming evidence on the objective

indicia of nonobviousness, and held all claims of the '070 patent invalid as

obvious.  A1–23.

### 1.    Claim construction

Consistent with its institution decision, the panel construed three claim terms

and reached the identical constructions.  A6–9.  "[T]wo prongs extend non-

parallelly from the main portion" was construed to mean that "the extension of two

prongs of a staple are non-parallel relative to each other in extending from the

---

[3] Pursuant to PTO regulations, Mr. Bolanos was not made available for cross examination, nor was Ethicon permitted to submit any substantive evidence rebutting his testimony prior to the panel's decision to institute.  37 C.F.R. § 42.107(c).  Accordingly, at that stage of the proceeding, Mr. Bolanos' declaration amounted to nothing more than unsubstantiated hearsay.  *See* Fed. R. Evid. 801(c) ("'Hearsay' means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement.").

main portion of the staple." A7. "[F]ormed staple length" was construed as "referencing the distance or 'height' that the prongs extend from the main portion of the staple when the staple is formed." A7–8. "[N]on-pivotable anvil" was construed to mean "an anvil that does not rotate or swing about a short rod or shaft." A8–9.

### 2.    The combinations of the prior art

The panel held each claim of the '070 patent obvious in view of two separate combinations of prior art. A22. The first combination was Green (non-parallel staples) with at least Pruitt (different preformed and formed heights), and the second combination was Green with at least Viola (different preformed and formed heights). Even though the statute specifies that the petitioner bears the burden of proof in these proceedings, 35 U.S.C. § 316(e), the panel effectively shifted the burden to Ethicon.

In keeping with its decision to institute, the panel decided that "one of skill in the art would have had reason to combine the prior art to arrive at the claimed invention." A10–12. The panel concluded that the prior art did not teach away from arriving at the claimed invention. A12–13. In so doing, the panel failed to give proper weight to Ethicon's evidence showing that the only reference teaching non-parallel staples, Green, taught away from a combination with the other references' teachings. In particular, Ethicon's expert explained that Green's

18

disclosure of the difficulties with surgical staplers, including that surgical staplers necessarily must be very accurately designed and manufactured in accordance with very close tolerances and that staple formation had to be accurately predetermined, leads one of ordinary skill in the art away from thinking that Green's non-parallel staples could ever advantageously vary in their dimensions.  A923–24.  Ethicon's expert, Mr. Ortiz, then testified extensively about why one would be led away from using Green's non parallel staples.  A928–56.

Nonetheless, the panel credited Covidien's expert testimony that "alignment and the proper application of force were considerations commonly taken into account when designing staplers."  A13.  In particular, the panel determined that Ethicon had not demonstrated that the prior art "would have led one of ordinary skill in the art to conclude that Green's non-parallel staples were unsuitable for use in the Viola or Pruitt stapling devices," and effectively decided obviousness in Covidien's favor at that point.  *Id.*

### 3.  The PTAB's determination of no objective indicia of nonobviousness

Ethicon presented further evidence on two of the objective indicia of nonobviousness:  (i) commercial success and (ii) long-felt, but unresolved need.  A962–74.  Yet instead of considering the effect of that evidence, the panel rejected it because "the objective indicia argued by [Ethicon] do not establish a nexus with the claimed subject matter."  A16.

Consistent with this Court's precedent, Ethicon had sought the benefit of a presumption that a nexus exists between the patented invention and the commercial success enjoyed by Covidien because Covidien's products fall squarely within the challenged claims. A17; A877; A876–885; A2276–82. Although Covidien did not introduce any countervailing evidence on the issue, the panel concluded "Patent Owner has not shown sufficient credible evidence that the sales of the Tri-Staple devices are the result of the claimed invention, rather than other features of the Tri-Staple devices." A19. The panel also faulted Ethicon's commercial success evidence because "as [Ethicon] admitted, all of the elements of the claimed invention are found in the prior art." *Id.*

Ethicon also was the only party to introduce evidence on long-felt but unresolved need. This evidence consisted of Covidien's product literature, A1100–18; A1287–97, which states that Covidien's Tri-Staple device was developed to "fulfill the unmet needs of surgeons across different surgical specialties," and the device "enables surgeons to . . . handle a broader range of tissue thickness." A1101; A1288; A972–73. The panel, however, faulted Ethicon for failing to "direct[] [the panel's] attention to evidence that there was a widespread attempt by skilled workers in the art for a long period of time to use non-parallel staples with different pre-formed heights to create staples with different formed heights, and that all such attempts failed to achieve successful use

20

of such staples." A21.  The panel also held that Ethicon's evidence of long-felt but unresolved need was insufficient "because it does not indicate that the 'unmet need' is a persistent one recognized by those of ordinary skill in the art." *Id.*

## SUMMARY OF ARGUMENT

A panel of three PTAB judges reviewed Covidien's petition seeking institution of an IPR, credited the hearsay declaration of Covidien's expert without accepting any evidence from Ethicon, wrote a detailed opinion concluding that Covidien had a reasonable likelihood of prevailing, and ordered the institution of an IPR. Only after that one-sided decision did the same panel conduct an IPR "trial" and render a final determination on the merits—unsurprisingly, in Covidien's favor again. That structurally flawed process violated the statute and led to legal errors in the obviousness analysis, each an independent ground for reversal.

1.    The PTO contravened the statute by having the same panel of the PTAB both institute and adjudicate the IPR. An IPR requires two distinct determinations. First, the Director must determine whether an IPR is warranted. Second, a panel of the PTAB must conduct and decide the IPR. Congress unambiguously vested the authority to make those two determinations in two different decision-makers.

In this IPR proceeding, however, the PTO did not divide authority as the law requires. Neither the Director nor her proper delegee instituted the IPR. Instead, the same panel that decided to institute the proceeding also resolved the case on the merits. That procedure violates the statute's plain terms, which clearly assign the

critical institution decision to the Director, 35 U.S.C. § 314(a), and preclude the Director from delegating that authority to a panel of the PTAB, *id.* §§ 3(b)(3), 6(a). The structure and purpose of the IPR process confirm the natural reading of the statute's text: Congress set up a carefully delineated, bifurcated process with two separate evidentiary records in an effort to ensure the institution decision operated as a rigorous threshold determination preceding any review by the PTAB.

If there were any doubt as to the statute's meaning, it would have to be resolved in favor of divided decision-making. That is because the current procedure runs a serious risk of depriving patent owners like Ethicon of the impartial decision-maker that the Due Process Clause guarantees.

2. The PTO's rules governing institution proceedings led the PTAB panel to make a determination—based on a hearsay declaration of Covidien's expert—that there was a reasonable likelihood that Ethicon's patent claims were invalid. It was only after that determination that Ethicon was permitted to introduce its countervailing evidence, including objective evidence showing both commercial success and long-felt need. That evidence demonstrated a prime example of an invention where the real-world facts compel a conclusion of nonobviousness. But by that point it was too late; the Board had prejudged the merits. As a result, the Board made three primary legal errors, misapplied the burden of proof, and improperly rejected Ethicon's evidence of non-obviousness.

*First*, the panel failed to afford Ethicon the presumption of nexus between its objective evidence of nonobviousness and a commercial embodiment of the invention. Although Covidien charges more for its Tri-Staple surgical stapler, which embodies claims 8 and 10 of the '070 patent, it now easily outsells Covidien's earlier generation stapling device (the Covidien "Legacy device"). The law *presumes* that such uncontroverted commercial success is connected to the claimed features. Rather than accord Ethicon that presumption of nexus, however, the panel turned the presumption on its head and required Ethicon to prove the success was *not* due to some other factor.

*Second*, regardless of the presumption, the PTAB held that Ethicon could not prove commercial success because "all of the elements of the claimed invention are found in the prior art." A19. That misstates the law, which requires an analysis of the patented product combining those elements as a whole.

*Third*, the PTAB legally erred in its analysis of long-felt but unresolved need. That analysis required the PTAB to first identify the problem in the art, *i.e.*, the need for staplers that work on tissues of multiple thicknesses. The PTAB instead required Ethicon to demonstrate a need to solve the problem of making the exact device claimed in the '070 patent. When the problem is correctly framed, the only evidence in the record shows that problem had existed, unmet, for decades.

## STANDARD OF REVIEW

Under 5 U.S.C. § 706, this Court reviews *de novo* all issues of law, including issues of statutory construction. However, where Congress has delegated to the agency the power "to speak with the force of law," *United States v. Mead*, 533 U.S. 218, 229 (2001), this Court applies the framework established by *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

"Whether a claimed invention would have been obvious is a question of law, based on factual determinations . . . ." *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013). On appeal, this Court reviews the PTAB's compliance with the legal standards governing obviousness de novo and the underlying factual determinations for substantial evidence. *Id.* Moreover, the Board's action must be set aside when it is "arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or otherwise not in accordance with law." *In re Sullivan*, 362 F.3d 1324, 1327 (Fed. Cir. 2004); 5 U.S.C. § 706(2)(A), (E). The arbitrary and capricious analysis requires reviewing courts to ensure that the agency's ultimate result was not only permissible but was "the product of reasoned decisionmaking." *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983).

# ARGUMENT

## I.   THE STATUTE REQUIRES THAT THE INSTITUTION DECISION AND FINAL DECISION IN AN *INTER PARTES* REVIEW BE MADE BY DIFFERENT DECISION-MAKERS

The statute governing *inter partes* review expressly divides decision-making authority between the Director, who institutes review, and a panel of the PTAB, which makes the final decision on the merits.  In this IPR, the same PTAB panel made both determinations, under a regulation purporting to permit a PTAB panel to "institute[] the trial on behalf of the Director."  37 C.F.R. § 42.4(a).  That procedure violated the law.  The statutory text plainly precludes the PTAB panel from rendering both the institution and final decisions.  Instead, the statute permits the PTAB to make final decisions only when the *Director* has instituted review. The structure and purpose of the *inter partes* review process confirm the divided decision-making mandated by the statute's plain terms.  And if there were any doubt, the serious constitutional questions raised by the procedures the PTO has implemented require resolving the meaning of the statute in favor of the bifurcated process that Congress intended.[4]

---

[4] Ethicon did not include in its filings before the PTAB its challenge to the PTAB's non-bifurcated decision-making procedure because the PTAB is bound by the regulation and therefore could not alter that procedure.  *See Garcia v. Dep't of Homeland Sec.*, 437 F.3d 1322, 1343 (Fed. Cir. 2006).  Moreover, Ethicon was bound to comply with the regulations governing the content of patent owners' filings, which do not provide an opportunity to raise such a challenge.  *See* 37 C.F.R. § 42.120.  These issues do not fall within the PTAB's expertise or

### A.    The Plain Text of the Statute Prohibits the PTAB from Rendering Final Decisions Where the Director Did Not Institute Review

In the AIA, Congress created a new *inter partes* review procedure permitting a third party to challenge an issued patent as unpatentable on certain grounds.  35 U.S.C. § 311.  In order to obtain such review, however, the challenger must satisfy a critical threshold step:  the decision by the Director "to institute an inter partes review."  *Id.* § 314(b).  "The Director may not authorize an inter partes review to be instituted unless the Director determines that . . . there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged . . . ."  *Id.* § 314(a).  Only "[i]f an inter partes review is instituted . . . under [chapter 31]" may the PTAB "issue a final written decision with respect to the patentability of any patent claim challenged."  *Id.* § 318(a).

This critical threshold requirement was not met in this case because the Director never instituted an *inter partes* review.  Rather, the same PTAB panel issued a final written decision regarding patentability based on its own decision to institute an IPR, pursuant to the PTO regulation providing that "[t]he Board institutes the trial on behalf of the Director."  37 C.F.R. § 42.4(a).  But this approach is directly contrary to the statute, which requires the Director to institute

---

discretion, and including them would have been futile in light of the PTAB's inability to address them.  *See Beard v. Gen. Servs. Admin.*, 801 F.2d 1318, 1321 (Fed. Cir. 1986).

an IPR and authorizes the PTAB panel only to conduct IPRs that the Director has in fact instituted.

Congress repeated six times in the statute its intent that the Director make the institution decision: (1) "The *Director may not authorize* an inter partes review to be instituted unless *the Director determines*" that the institution standard is met, 35 U.S.C. § 314(a) (emphasis added); (2) "The *Director shall determine* whether to institute an inter partes review . . . within 3 months," *id.* § 314(b) (emphasis added); (3) notification must be made of "the *Director's determination* under subsection (a)," *id.* § 314(c) (emphasis added); (4) the "*determination by the Director* whether to institute" is final, *id.* § 314(d) (emphasis added); (5) the Director may join parties "[i]f *the Director institutes* an inter partes review," *id.* § 315(c) (emphasis added); and (6) "*[i]n determining whether to institute or order a proceeding under . . . chapter 31, the Director* may take into account whether . . . the same prior art or arguments previously were presented," *id.* § 325(d) (emphasis added).

The AIA is equally clear as to who "conduct[s] each inter partes review" and "issue[s] a final written decision"—the "Patent Trial and Appeal Board"—but only with respect to an IPR "instituted under [chapter 31]." *Id.* §§ 316(c), 318(a). The statute manifestly does not assign the institution function to the PTAB.

While some delegation of the Director's duties is authorized by statute, the Director is not permitted to delegate the duty to institute IPRs to the PTAB. Although the Director need not review every IPR petition personally, she may delegate her authority only in a manner consistent with any "specific limitation on [her] delegation authority." *See Touby v. United States*, 500 U.S. 160, 169 (1991). Here, there are two such limits.

As an initial matter, the statute permitting the Director to delegate "the powers vested in the Office" cabins that delegation authority to those officers whom the Director has appointed. 35 U.S.C. § 3(b)(3). Specifically, the statute authorizes the Director to "appoint . . . officers, employees (including attorneys), and agents," *id.* § 3(b)(3)(A), and then provides that the Director may "define the . . . authority . . . of *such officers and employees* and delegate to *them* such of the powers vested in the Office," *id.* § 3(b)(3)(B) (emphasis added). But the Director does not appoint the administrative patent judges—the Secretary of Commerce does. *Id.* § 6(a). Accordingly, they are beyond the limits of the delegation provision.

Moreover, in the context of the *inter partes* review provisions, the term "Director" cannot be read to include the PTAB as delegee, because such a reading would render a nullity Congress's considered choice to specify two different decision-makers for the institution and final decisions. *See Corley v. United States*,

556 U.S. 303, 314 (2009) ("[O]ne of the most basic interpretive canons [is] that [a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." (internal quotation marks omitted) (last alteration in original)).   Congress delineated a decision-making scheme whereby the Director would "determine whether to institute an inter partes review under this chapter," 35 U.S.C. § 314(b), and a panel consisting of at least three PTAB judges would "conduct each inter partes review instituted under this chapter" and decide the merits of the IPR proceeding only after that separate institution decision by the Director was rendered, *id.* §§ 6(c), 316(c), 318(a).

This Court has recognized that the AIA creates a divided process between two decision-makers.   As this Court explained when deciding whether 35 U.S.C. § 314(d) prohibits appeal of a decision not to institute, "[t]he statute separates the Director's decision to 'institute' the review, § 314, on one hand, from the Board's 'conduct' of the review 'instituted' by the Director, § 316(c), and the Board's subsequent 'written decision,' § 318, on the other." *St. Jude Med., Cardiology Div., Inc. v. Volcano Corp.*, 749 F.3d 1373, 1375 (Fed. Cir. 2014).

Even if the term "Director" could, in isolation, bear a reading that included the PTAB—which it cannot, 35 U.S.C. § 3(b)(3)—it plainly cannot bear that reading in the present statutory context, where Congress has expressly assigned

each decision-maker different functions in carrying out the *inter partes* review process.  *See King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) ("[T]he meaning of statutory language, plain or not, depends on context.").  Here, the *inter partes* review provisions prohibit any delegation of the institution decision to the PTAB, even independent of other statutory limits on the Director's authority to delegate to administrative patent judges.  *See United States v. Giordano*, 416 U.S. 505, 514 (1974) (holding that where the statute expressly permitted wiretap applications to be authorized only by the Attorney General or any Assistant Attorney General specially designated, the statute "fairly read, was intended to limit the power to authorize wiretap applications" to the named positions notwithstanding a general provision permitting delegation of any Attorney General functions).

### B.    The Structure and Purpose of *Inter Partes* Review Confirm that Congress Intended a Divided Decision-Making Regime

The structure and purpose of the *inter partes* review process confirm that Congress intended that a panel of the PTAB would render a final decision only once a different decision-maker—the Director—had determined to institute review. Two structural components of *inter partes* review in particular buttress this conclusion.

*First*, the AIA establishes a process whereby institution decisions and final decisions are made on different evidentiary records.  The Director makes her

decision to institute review based on only the petitioner's evidence and any preliminary response that the patent owner elects to submit "set[ting] forth reasons why no inter partes review should be instituted based upon the failure of the petition to meet any requirement of [chapter 31]." 35 U.S.C. § 313; *id.* § 314(a) (limiting the Director's institution decision to consideration of "the petition . . . and any response filed under section 313); *id.* § 312 (requiring the petition to identify "the evidence that supports the grounds for the challenge to each claim").

In its implementing regulations, the PTO has (a) adopted a broadest reasonable interpretation ("BRI") approach to claim construction that excludes from consideration the prosecution history of the patent (limiting it to only the text of the specification and claims themselves), 37 C.F.R. § 42.100(b), and (b) further limited the permissible subject of the patent owner's preliminary response to exclude any substantive evidence, including expert declarations or other rebuttal testimonial evidence, 37 C.F.R. § 42.107(c). Thus, as a practical matter, the decision to institute is made on a very broad reading of the claims and on the basis of the petitioner's evidence alone.

In contrast, the PTAB panel makes its final written decision of patentability based on evidence presented by both the petitioner and patent owner. 35 U.S.C. § 316(a)(8) (requiring the Director to promulgate rules providing patent owner an opportunity to introduce testimonial evidence and expert opinions after an IPR has

been instituted). Congress's provision for divided decision-making is consistent with this evidentiary structure: under the statute as enacted, the PTAB panel is supposed to review the issues for the first time on the basis of the full evidentiary record. That procedure comports with this Court's case law that in an adversarial proceeding, the decision-maker must consider all of the evidence before ultimately deciding obviousness. *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1075–77 (Fed. Cir. 2012).

*Second*, divided decision-making is consistent with Congress's intent to establish the Director's institution decision as a rigorous "threshold" determination that is an independent gatekeeping requirement before any review by the PTAB. 35 U.S.C. § 314(a). Notably, Congress elevated the standard for institution of IPR from the "substantial new question of patentability" standard used in the reexamination proceedings that existed prior to the enactment of the AIA to a "reasonable likelihood of success" standard. *See* H.R. Rep. No. 112-98, at 45, 47 (2011), *reprinted in* 2011 U.S.C.C.A.N. 67, 75, 77. The heightened standard was "[a]mong the most important protections for patent owners added by the [AIA]." 157 Cong. Rec. S1360, S1375 (daily ed. Mar. 8, 2011) (statement of Sen. Jon Kyl). So, too, was Congress's placement of that threshold decision in a forum independent from the final decision-maker. *See In re Alappat*, 33 F.3d 1526, 1579 (Fed. Cir. 1994) (Plager, J., concurring) (Divided decision-making "avoid[s]

having the agency activities of investigation, prosecution, and adjudication combined in the same person or office.").

As the Supreme Court has recognized, "[t]he issue is substantial, it is not new, and legislators and others concerned with the operations of administrative agencies have given much attention to whether and to what extent distinctive administrative functions should be performed by the same persons." *Withrow v. Larkin*, 421 U.S. 35, 51 (1975); *see also* 5 U.S.C. § 554(d) (prohibiting an "employee or agent engaged in the performance of investigative or prosecuting functions for an agency in a case" from "participat[ing] or advis[ing] in the decision"). Congress's considered choice to make institution both a rigorous *and* independent threshold determination must be given effect.

The procedures that the PTO actually followed ignore this carefully crafted, bifurcated IPR structure. Lacking an independent threshold determination on institution, the PTAB panel rendered a decision based on its own conclusion that institution was warranted, *i.e.*, that Covidien had a "reasonable likelihood" of success. And rather than coming to the final adjudication on the full record with fresh eyes, the PTAB panel relied largely on Covidien's expert declaration that it had reviewed before seeing any of Ethicon's countervailing evidence.

**C.    Interpreting the Statute to Permit Consecutive Decisions by the Same Panel Creates Serious Due Process Concerns**

The PTAB's procedures not only depart from the statute, but they create a serious risk that the PTAB prejudged this case before Ethicon had an opportunity to submit its evidence, thereby depriving Ethicon of its due process right to an impartial decision-maker.  Accordingly, even if there were any ambiguity in the statute (which there is not), this Court should interpret the statute to avoid that risk. *See, e.g., Zadvydas v. Davis*, 533 U.S. 678, 699 (2001) ("interpreting the statute to avoid a serious constitutional threat"); *Rust v. Sullivan*, 500 U.S. 173, 191 (1991) ("[A] statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score." (internal quotation marks omitted)).  Because the PTO's atextual interpretation of the statute creates a risk of prejudgment by the PTAB that is "too high to be constitutionally tolerable," *Withrow*, 421 U.S. at 47, it fails for that additional reason.

Ethicon was constitutionally entitled to an impartial adjudicator.  "A patent for an invention is as much property as a patent for land." *Consol. Fruit-Jar Co. v. Wright*, 94 U.S. 92, 96 (1876).  Accordingly, a patent may not be judicially or administratively invalidated without providing the patentee due process of law. *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1565 (1988); *see also Mathews v. Eldridge*, 424 U.S. 319, 332–33 (1976).  "'A fair trial in a fair tribunal

is a basic requirement of due process,'" and this "applies to administrative proceedings as well as judicial trials." *NEC Corp. v. United States*, 151 F.3d 1361, 1371 (Fed. Cir. 1998) (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)).

Because the *inter partes* review process as implemented by the PTO involves successive determinations by the same decision-maker of the same underlying question—here, the invalidity of a patent based on obviousness—the due process concerns here extend beyond the mere combination of investigative and adjudicatory functions. *See Withrow*, 421 U.S. at 58, 58 n.25 ("Allowing a decisionmaker to review and evaluate his own prior decisions raises problems that are not present" in a case addressing the "combination of investigative and adjudicative functions . . . without more.").

The decision to institute an IPR is more than simply an "investigative" function.  It is an adjudicative one, because the agency has delegated it (improperly) to an adjudicative body, 37 C.F.R. § 42.4(a), and it involves issuance of a "determination" that is "final and non-appealable."  35 U.S.C. § 314(d).  And unlike a Supreme Court *certiorari* decision, for example, the PTAB panel's decision necessitates a preliminary adjudication *of the merits*, *i.e.*, reasonable likelihood of success.  *Id.* § 314(a).  Here, the PTAB supported its decision to institute with a 24-page opinion delving into the merits of the issues.  A24–47. Although the decision to institute did not, as a legal matter, finally resolve the

merits of Covidien's petition, the PTAB treated it as effectively doing so, subject to Ethicon's ability to convince the panel—against a heavy thumb on the scale—to reconsider its earlier view. For example, in its institution decision, the panel relied on Covidien's expert to conclude that it was "persuaded that a skilled artisan would have had adequate reason to implement non-parallel prongs onto the pre-deformed staples of Pruitt." A43. In its final decision, the panel adhered to its conclusion that "one of skill in the art would have been motivated to modify the staple devices of Viola and Pruitt to use Green's stables [sic] with non-parallel or 'outwardly flaring' legs," A10, again crediting Covidien's expert despite Ethicon's overwhelming evidence to the contrary, A12.

Moreover, because the institution determination involves a record based on testimonial evidence from only the patent challenger, the PTAB must make its first decision based on a wholly one-sided record. *See, e.g.*, 37 C.F.R. § 42.107(a), (c) (restricting patent owner's "preliminary response to the petition" to "setting forth the reasons why no *inter partes* review should be instituted under 35 U.S.C. 314" and precluding "new testimony evidence beyond that already of record"). That adjudication goes beyond "[t]he mere exposure to evidence presented in nonadversary investigative procedures." *Withrow*, 421 U.S. at 55. The panel is not only exposed to the evidence, but it must use that one-sided evidence to support its written decision that the petition presents a "reasonable likelihood" of

success.   This procedure runs a much greater risk of prejudgment than only

conducting an investigation or making a preliminary determination based on

evidence from both sides.  The combination of dual decisions and the initial, one-

sided record mean that the "processes utilized by the Board" as a whole "contain

an unacceptable risk of bias."  *Id.* at 54.

   In practice, the data thus far available confirm that "the risk of unfairness is

intolerably high."  *Id.* at 58.  Institution decisions almost invariably result in final

decisions of unpatentability, as the PTAB issues a final decision **upholding a claim**

**only about 8% of the time** after deciding to institute review.[5]  *Cf. NEC Corp.*, 151

F.3d at 1373–74 (declining to find unconstitutional prejudgment when the statute

required the Department of Commerce to conduct its investigation in two stages

and "it is not uncommon for Commerce to modify its position between the

preliminary determination and the final determination").

   Indeed, Ethicon is not alone in being concerned about the unfairness of IPR

proceedings to patent owners.   Numerous professional and trade groups have

recently filed comments with the PTO stating the same concern.  The American

Intellectual Property Law Association (AIPLA) commented on the "actual or

---

[5] *See* U.S. PTO, AIA Trial Roundtables Slides, Denver, CO, at slide 9 (May 8, 2014),   *available    at*   www.uspto.gov/ip/boards/bpai/ptab_roundtable__slides_ may_update__20140503.pdf (reporting that out of 1900 instituted claims, only 144 (8%) were found patentable by the PTAB, with the remainder found unpatentable, cancelled, disclaimed, or settled).

perceived bias against the patent owner" in IPRs because the administrative patent judges are "put in the position of defending their prior decision to institute the trial" which they made on "an incomplete and preliminary record."[6] The Pharmaceutical Research and Manufacturers of America (PhRMA) similarly stated that "the rules and practices governing the PTAB's trial proceedings for [IPR] . . . do not appear to provide sufficient fairness and due process to patent holders" thereby "unfairly skew[ing] IPR . . . proceedings against patent owners."[7]   As noted by PhRMA, the concerns about unfairness have only been underscored in view of statements by the Chief Judge of the PTAB that to some extent, "the purpose of these [IPR] proceedings is 'death squads,' which is to say, to identify some limited number of patents and claims where the claims are unpatentable and make sure they are removed" and that "[i]f [the PTAB] weren't, in part, doing some 'death squadding,' we wouldn't be doing what the statute calls on us to do."[8] The results from the PTO's implementation of IPR proceedings under the AIA demonstrate that bias "may lurk in the way particular procedures actually work in practice." *Withrow*, 421 U.S. at 54.

---

[6] Am. Intellectual Prop. Law Ass'n, Comments on PTAB Trial Proceedings, at 20 (Oct. 16, 2014), *available at* http://www.uspto.gov/ip/boards/bpai/aipla_20141016.pdf; *see also* Pharm. Research & Mfrs. of Am., Comments, Docket No. PTO-P-2014-0031, at 3 (Oct. 16, 2014) ("PhRMA Comments"), *available at* http://www.uspto.gov/ip/boards/bpai/phrma_20141016.pdf (The "statistics suggest that the PTAB's trial proceedings do not appear to provide a neutral forum.").

[7] PhRMA Comments at 3–5.

[8] *See id.* at 3–4.

Applying the due-process balancing test of *Mathews v. Eldridge*, 424 U.S. 319 (1976), the risk of bias present here counsels in favor of the very procedural safeguards contemplated by Congress.   Under *Mathews*, "identification of the specific dictates of due process generally requires consideration of three distinct factors."  *Id.* at 335.  The first factor is "the private interest that will be affected by the official action."  *Id.*  That interest is substantial in this context, because the IPR process can result (like here) in the deprivation of an issued patent.  The second factor, too, weighs in favor of enforcing bifurcated decision-making, as the current system creates unnecessary "risk[s] of an erroneous deprivation" of a patent.  *Id.* In the context of this statute, Congress recognized that requiring bifurcated decision-making has a high "probable value" as an "additional . . . procedural safeguard[]."  *Id.*  Finally, the third factor is the government's interest, "including the . . . fiscal and administrative burdens that the additional or substitute procedural requirement would entail."  *Id.*  Here, that factor weighs heavily in favor of Ethicon because assigning the institution decision to a decision-maker other than the final adjudicatory PTAB panel is precisely what Congress intended.  On a practical level, the only potential administrative "burden" would be the resources required for a fresh assessment of the case before a final decision, rather than a repackaged version of the institution decision; but that is what the statute contemplates.

40

Finally, as discussed below, *see infra* § II, the absence of that additional procedural safeguard caused an erroneous deprivation here, reflected in three critical legal errors that improperly shifted the burden of proof to Ethicon and led the PTAB to disregard Ethicon's evidence. Those errors reflect the serious constitutional questions raised by the Board's dual-adjudication procedures. *Cf. Withrow*, 421 U.S. at 54 n.21 (recognizing that a party can establish a due process violation on the basis of evidence of prejudgment in the record); *NEC Corp.*, 151 F.3d at 1373 (holding a party "can prevail on its claim of prejudgment" if it establishes "that the decision maker is not capable of judging a particular controversy fairly" (internal quotation marks omitted)).

Viewed from any angle, the procedures instituted by the PTO run a serious risk of falling short of the constitutional mark. In *NEC Corp.*, this Court noted the importance of flexibility in evaluating administrative decision-making because, in part, Congress had *required* the same agency decision-maker to make both the preliminary and final determinations and to publish its preliminary determination. 151 F.3d at 1373 (concluding the "antidumping system is a good example of the need for such flexibility" because by statute Commerce's investigation must "proceed[] in two stages"). Here, however, where the single decision-maker procedure is contrary to the statutory design, the agency should not be afforded the same "flexibility."

In any event, because the statute's plain text, structure, and purpose all condemn the procedure followed here, this Court need not rely on the constitutional avoidance tie-breaker to rule for Ethicon. Because Congress established a bifurcated process that comports with due process, this Court may simply reverse this case on the basis that the final decision of the Board was improper. *See Transcom, Inc. v. United States*, 182 F.3d 876, 880 (Fed. Cir. 1999) ("[W]e need not address Transcom's argument that the lack of notice . . . violated Transcom's rights under the due process clause of the Fifth Amendment to the Constitution, because we hold that Commerce's conduct in this case violated Commerce's statutory and regulatory notice obligations . . . .").

Nor is the PTO's regulation purporting to delegate the institution decision to the PTAB entitled to any deference.[9] Because "Congress has directly spoken to the precise question at issue," this Court "must give effect to the unambiguously expressed intent of Congress." *Chevron,* 467 U.S. at 842–43. All of the "traditional tools of statutory construction," *id.* at 843 n.9—including text, structure, and purpose—point in the same direction: the institution decision must

---

[9] Even if the regulation were not directly contrary to the statute, it would not help the PTO here. Although the regulation (impermissibly) purports to delegate the Director's authority to institute to the Board, 37 C.F.R. § 42.4(a), it also defines the "Board" for IPR petition purposes as "a Board member or employee acting with the authority of the Board," 37 C.F.R. § 42.2, not a "panel of the Board" as the term is defined for final written decisions, *id.*, and as issued the institution decision in this case.

be determined by the Director, not the PTAB panel.  Accordingly, the PTO's regulation and the procedure followed in this case violate the statute.  That requires reversal.

## II.    THE PTAB'S OBVIOUSNESS ANALYSIS WAS LEGALLY FLAWED

The PTAB's flawed IPR procedure was not only contrary to the statute, but it generated a flawed result directly contrary to this Court's case law.  While giving lip service to Covidien's burden of proof, the PTAB essentially required Ethicon to prove nonobviousness.  Tellingly, the PTAB failed to credit Ethicon's *unrebutted* evidence on the objective indicia of nonobviousness.  Covidien should have been held to its burden to prove obviousness by a preponderance of the evidence in view of *all* of the evidence, but it was not.  The PTAB's obviousness determination cannot stand for that independent reason.

### A.    The PTAB Erred in Failing to Credit the Objective Evidence Showing the Nonobviousness of the '070 Patent

This Court has repeatedly recognized that the objective evidence of nonobviousness may often be the most probative evidence in the record.  *Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1310 (Fed. Cir. 2010).  In fact, "the objective indicia of nonobviousness are crucial in avoiding the trap of hindsight when reviewing, what otherwise seems like, a combination of known elements." *Leo Pharm. Prods., Ltd. v. Rea*, 726 F.3d 1346, 1358 (Fed. Cir. 2013); *J.T. Eaton*

*& Co. v. Atl. Paste & Glue Co.*, 106 F.3d 1563, 1571–72 (Fed. Cir. 1997). Here, however, the panel failed to properly consider the evidence on the objective indicia of nonobviousness and fell directly into the trap of hindsight bias in order to support its institution decision.

> **1.    Ethicon was entitled to a presumption of nexus between the claimed invention of the '070 patent and the hugely successful Tri-Staple device**

Ethicon proved that Covidien's Tri-Staple device was the invention of the '070 patent and that the device had enormous sales in the marketplace. At that point, the PTAB should have accorded Ethicon a presumption of nexus for commercial success. Its failure to do so—or even to acknowledge this Court's precedent in that area—was legal error.

> **(a)    Ethicon proved entitlement to a presumption of nexus**

For the PTO to afford substantial weight to Ethicon's evidence of commercial success, Ethicon had to show a nexus between that evidence and the patented invention. *In re Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011).

Ethicon satisfied this burden of showing a prima facie nexus by proving that Covidien's Tri-Staple device embodies the invention of the '070 patent and is commercially successful in the marketplace. *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988); *see also Brown & Williamson Tobacco Corp. v. Phillip Morris, Inc.*, 229 F.3d 1120, 1130 (Fed. Cir.

2000) ("[I]f the marketed product embodies the claimed features, and is coextensive with them, then a nexus is presumed and the burden shifts to the party asserting obviousness to present evidence to rebut the presumed nexus."). A patentee demonstrates that a product is coextensive with its claims by presenting expert testimony that the product meets the claim limitations. *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 723 F.3d 1363, 1372 (Fed. Cir. 2013) (citing *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 876 F. Supp. 2d 295, 406 (S.D.N.Y. 2012) ("Dr. Grant testified that, based on the data he had seen from Copaxone® certificates, analysis, and calculations, Copaxone® meets the . . . limitations of the asserted claims.")).

Ethicon's expert, Mr. Ortiz, explained that he reviewed Covidien's product literature and analyzed Covidien's Tri-Staple devices. A963–65. Based on that analysis, Mr. Ortiz concluded that the Tri-Staple device has the claimed features of claims 8 and 10 of the '070 patent. *Id.*; A1119–25. Covidien introduced no evidence in response—its expert stayed silent and Covidien failed to cross-examine Mr. Ortiz on the issue.

The Board seemed to accept Mr. Ortiz's testimony, criticizing only the fact that Mr. Ortiz did not "examine" Covidien's previous commercial device. A18–19. But Mr. Ortiz *did* testify that he "analyzed how the Tri-Staple compares to [Covidien's] previous products," such as "the Endo GIA and Endo GIA II staplers

45

and reloads (collectively the 'Covidien legacy devices')," and he testified about his understanding of the differences between Covidien's earlier Legacy devices and the Tri-Staple device. A968–69. Specifically, Mr. Ortiz's testimony was that the earlier Legacy devices do **not** have all of the claimed features in the '070 patent. A969.

Moreover, the exhibits Mr. Ortiz attached to his declaration directly compare the staples used in the Legacy devices with the staples used in the Tri-Staple device. A1145. These exhibits show that the Legacy devices use staples having legs with the same height, while the Tri-Staple device uses staples with legs of different heights, as required by the '070 patent. *Id.* Accordingly, the *only* evidence in the record indicating whether the Tri-Staple device embodies the '070 patent and the Legacy device does not, is Mr. Ortiz's testimony.

Instead of introducing evidence on this point, Covidien presented only attorney argument that its products do not have the "non-pivotable anvil" called for by claims 8 and 10. A1442. This argument directly contradicts the evidence of record, including Covidien's own product descriptions, which state that the Tri-Staple device has a "fixed anvil." *See, e.g.*, A1102. In any event, the Board's final written decision did not even address Covidien's argument; the Board's discussion of whether the product embodied the claimed features consisted only of Mr. Ortiz's testimony. A18–19.

Ethicon introduced further evidence—also undisputed by Covidien—proving that the Tri-Staple products have been commercially successful. Covidien has realized over $1.5 billion in sales of the products since its launch in 2010. A966; A972. Covidien not only admitted in its 2012 Annual Report that the products are successful, but went so far as to acknowledge that they are "on track to be Covidien's *most successful product line ever*." A1159 (emphasis added). And although Covidien charges more for the Tri-Staple device as compared to Covidien's Legacy device (which does not use staples with different heights), A968–70; A1145, the Tri-Staple device now easily outsells the Legacy device. A971; A1299–1301. In sum, the record shows that the Tri-Staple device embodies the invention claimed in claims 8 and 10. The record also shows that the Tri-Staple device was *overwhelmingly* successful in the marketplace.

In the face of unchallenged evidence that the Tri-Staple device practices the claimed invention in the '070 patent, and has been commercially successful, this Court's precedent required the panel to find that Ethicon made a prima facie showing of nexus. *Crocs*, 598 F.3d at 1310–11 ("A prima facie case of nexus is made when the patentee shows both that there is commercial success, and that the product that is commercially successful is the invention disclosed and claimed in the patent."); *Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1377 (Fed. Cir. 2000) ("[A] presumption arises that the patented invention is commercially

47

successful '[w]hen a patentee can demonstrate commercial success, usually shown by significant sales in a relevant market, and that the successful product is the invention disclosed and claimed in the patent.'" (quoting *J.T. Eaton & Co.*, 106 F.3d at 1571)).

Contrary to Ethicon's urging, the panel did not apply the presumption of nexus.  A877.  In fact, in its final written decision the panel did not even acknowledge that this law existed.  Instead, the panel faulted Ethicon for not proving that the commercial success is not due to some other factor.  A19.  But that is not the law.  *Demaco Corp.*, 851 F.2d at 1394 ("A patentee is not required to prove as part of its prima facie case that the commercial success of the patented invention is *not* due to factors other than the patented invention." (emphasis in original)).  Ethicon should not have been required to offer "proof of the negative" before the panel would consider its objective evidence of nonobviousness.  *Id.*  The deficiencies in the Board's reasoning process, as it is set forth in its written decision, require reversal under the arbitrary and capricious test because the Board's decision did not consider or even acknowledge the relevant burdens articulated in this Court's case law.  *See State Farm*, 463 U.S. at 43 (holding that an agency decision fails the arbitrary and capricious test if the agency "entirely failed to consider an important aspect of the problem").

The availability of a presumption in proceedings of this kind is extremely important, as permitted discovery is practically non-existent, 37 C.F.R. § 42.51, and much of the commercial information relating to the need for and success of the Covidien products practicing the '070 patent remained with Covidien, which chose to remain silent on the topic. Moreover, the PTO rejected calls from the profession to require petitioners to come forward with initial disclosures of such information, opting instead to limit mandatory disclosures and permit disclosure where the parties consent. 77 Fed. Reg. 48,612, 48,638 (Aug. 14, 2012) (responses to comments 112 and 113). Absent consent, a patent owner must move for such discovery. 37 C.F.R. § 42.51. Lacking those protections, as demonstrated in this case, justice demands that appropriate burdens and presumptions be recognized.

After Ethicon proved a prima facie nexus between the claimed invention of the '070 patent and the evidence of commercial success, the burden of production should have shifted to Covidien to rebut that nexus with evidence that the product's commercial success was due to some other factor. *Crocs*, 598 F.3d at 1311; *Demaco Corp.*, 851 F.2d at 1393. Upon Covidien's election not to make any effort to rebut the presumption of nexus, the commercial success of the '070 patent's invention should have been deemed established.

**(b)    Covidien failed to present competent evidence to rebut the presumption of nexus**

To rebut the presumption of nexus, Covidien had to provide actual evidence that commercial success was due to some other factor—"argument and conjecture are insufficient." *Demaco Corp.*, 851 F.2d at 1393; *Rosemount, Inc. v. Beckman Instruments, Inc.*, 727 F.2d 1540, 1546 (Fed. Cir. 1984) ("Beckman's . . . conjecture that some of the commercial success here proven may have been due to elements in non-asserted claims [is] inadequate . . . ."); *see also Brown & Williamson Tobacco Corp.*, 229 F.3d at 1130 ("The presumed nexus cannot be rebutted with mere argument; evidence must be put forth."). To prevail, Covidien had to prove that the commercial success came from some feature other than the claimed invention. In fact, this burden could not be met merely by pointing to other *possible* features that contributed to the commercial success of the Tri-Staple; Covidien had to show that the '070 patent claimed invention did not contribute to the success. *See Ecolochem*, 227 F.3d at 1365, 1378 ("[Challenger] had the burden of disproving that the improved filtration process contributed to the success of the invention . . . ."); *Cont'l Can Co. USA v. Monsanto Co.*, 948 F.2d 1264, 1273 (Fed. Cir. 1991).

Covidien's attempt to rebut the nexus between its product and the '070 patent amounts to only seven sentences of attorney argument in its reply brief. A1442–43. Covidien failed to provide any actual *evidence* to support a contention

that features other than the claimed features contributed to the commercial success of the Tri-Staple device.  Nowhere did Covidien or its expert, Mr. Bolanos, even make a conclusory statement that features other than the claimed features contributed to the Tri-Staple's commercial success.  Mr. Bolanos's failure to address the objective evidence of nonobviousness renders Covidien's evidence insufficient to support a conclusion of obviousness.  *See InTouch Techs., Inc. v. VGo Commc'ns*, 751 F.3d 1327, 1352 (Fed. Cir. 2014) (reversing denial of JMOL as to validity because, *inter alia*, expert failed to guard against hindsight by considering objective evidence of nonobviousness).

Nonetheless, the Board stated in its final written decision that "[Covidien] contends . . . that the commercial success of the Tri-Staple devices is attributable to unclaimed features, such as ergonomic design, precise articulation, and reloads that provide simpler selection and reduced inventory."  A19 (citing to page 15 of Covidien's Reply).  Covidien *never* made such a statement in its Reply.  On page 15, Covidien pointed out only that Covidien's marketing literature discusses other features of the Tri-Staple device, not that those other features were responsible for the outstanding commercial success of its product.  A1443.  But even if Covidien had included such attorney argument, that would not be *evidence* sufficient to rebut the presumption.

Covidien's lack of any real attempt to rebut the presumption of nexus is on all fours with *Crocs*, 598 F.3d 1294. There, the patentee established its prima facie case of nexus by showing commercial success of a product covered by the claims, and the burden of production then shifted to the accused infringer. *Id.* at 1310–11. This Court determined that the accused infringer failed to overcome the prima facie case of commercial success because, like here, the challenger made no effort to rebut the presumption:

> The record discloses little or no evidence to rebut th[e] prima facie case of nexus. This court is aware that many market forces unrelated to the inventiveness of the patent may influence commercial success, but the intervenors must make a convincing case that those market forces indeed were the likely cause of the success. This record does not show any effort to make that rebuttal case.

*Id.* at 1311.

Covidien made no effort to overcome the prima facie case of commercial success that Ethicon established. Nonetheless, the PTAB failed to find that Ethicon proved commercial success.

### (c)    Irrespective of the presumption of nexus, Ethicon proved commercial success

Regardless of the presumption, Ethicon proved a nexus between the commercial success of the Tri-Staple device and the clamed invention of the '070 patent. The panel erred by concluding otherwise.

The PTAB determined that Ethicon's evidence of commercial success was insufficient because "as [Ethicon] admitted, all of the elements of the claimed invention are found in the prior art."  A19.  It is not the law that commercial success cannot be proven where "all of the elements of the claimed invention are found in the prior art."  If it were, no invention could ever be found to be a commercial success because every invention is a combination of old elements.  *See Fromson v. Advance Offset Plate, Inc.*, 755 F.2d 1549, 1556 n.3 (Fed. Cir. 1985) ("Only God works from nothing.  Men must work with old elements."  (internal quotation marks omitted)).

Although there is no nexus between evidence of commercial success and a claimed invention if the commercial success relates exclusively to a feature in the prior art, "the obviousness inquiry centers on whether 'the claimed invention as a whole' would have been obvious."  *Rambus Inc. v. Rea*, 731 F.3d 1248, 1257–58 (Fed. Cir. 2013) (quoting 35 U.S.C. § 103) ("[T]he Board should be careful to parse the evidence that relates only to the prior art functionality and the evidence that touted Rambus's patented design as a whole."); *cf. KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007) ("[A] patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art.").

Accordingly, to determine whether a patentee has proved nexus, or whether a defendant has rebutted a prima facie showing of nexus, this Court does not merely ask whether each claimed element was in the prior art. Instead, this Court compares the evidence showing the success of the patented combination to the evidence showing the success of prior art products. *See ArcelorMittal Fr. v. AK Steel Corp.*, 700 F.3d 1314, 1326 (Fed. Cir. 2012) ("[W]hether there is a nexus here depends upon a comparison between cold-rolled steel produced by the patented process and cold-rolled steel produced by alternative processes to see if the former achieved material commercial success over and above the latter."); *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1350 (Fed. Cir. 2012) (evidence showed dual-activity rigs commanded a market premium over prior art single-activity rigs); *In re Kao*, 639 F.3d at 1069–70; *Tokai Corp. v. Easton Enters., Inc.*, 632 F.3d 1358, 1370 (Fed. Cir. 2011).

Ethicon proved that the combination of features claimed in the '070 patent achieved commercial success well beyond what was available in the prior art. The Covidien Legacy devices did *not* include the entire combination of features of claims 8 and 10 of the '070 patent such as a fixed anvil and non-parallel staples with multiple preformed heights which, when fired, resulted in staples with multiple formed heights. A968–69. Ethicon provided evidence showing that Covidien charges a premium for the Tri-Staple devices as compared to the

Covidien Legacy device; in some cases as high as 28% more for the Tri-Staple device. A970. Although Covidien charges higher prices for the Tri-Staple devices, it now sells more Tri-Staple devices (yellow line below) than it sells Covidien Legacy devices (blue line below):



A971; A1299. Covidien provided no evidence in response.

Ethicon proved that the claimed combination of features in the Tri-Staple device has achieved commercial success over and above the Covidien Legacy devices that were available in the prior art. *See ArcelorMittal*, 700 F.3d at 1326. The unrebutted evidence shows that the Tri-Staple device commands a market premium over the Covidien Legacy devices that do not have the combination of features of the '070 patent. *See Transocean*, 699 F.3d at 1350. By erroneously

contending that commercial success cannot be proven where "all of the elements of the claimed invention are found in the prior art," the PTAB's obviousness analysis was, again, legally flawed.  A19.

### 2.    The PTAB Erred in Failing to Find a Long-Felt But Unresolved Need for the Invention Claimed in the '070 Patent

The PTAB's erroneous evaluation of the objective indicia of nonobviousness was not limited to commercial success.  The PTAB also misapplied this Court's law regarding whether there was a long-felt, but unresolved need for the invention of the '070 patent.  Under the correct legal analysis, the Tri-Staple device satisfied a long-felt need, confirming the invention was not obvious.

To determine whether there was a long-felt unmet need for the invention in question, this Court analyzes the problem to be solved based on the real world problems that confronted skilled artisans.  *See, e.g.*, *Leo Pharm. Prods.*, 726 F.3d at 1359 ("need for a single formulation to treat psoriasis"); *Transocean*, 699 F.3d at 1354 ("need for greater drilling efficiency"); *Ecolochem*, 227 F.3d at 1376–77 ("need to create an ambient temperature deoxygenation process for use in . . . nuclear power facilities" when patent covered a specific process of making deoxygenated water).  A problem must be recognized by workers in the industry before a need to solve that problem can be considered long-felt and unmet.  *In re Gershon*, 372 F.2d 535, 538 (CCPA 1967).

Importantly, the question is not whether there was a long-felt need to develop the patentee's *exact invention*. The panel thus erred by framing the question as whether the industry faced the problem of "us[ing] non-parallel staples with different pre-formed heights to create staples with different formed heights." A21. But neither party contended that artisans were trying to solve that problem. Instead, the evidence of record showed that skilled artisans faced the problem of developing a stapler that could staple tissues of different thicknesses. A20; A972–73; A1288. The Board's improper framing of the long-felt need demonstrates a lack of reasoned decisionmaking; its decision requires reversal under the arbitrary and capricious standard.

When the long-felt but unmet need question is correctly framed, the Board's analysis falls apart. The need for staplers that can work on tissues of multiple thicknesses has existed for decades. The primary reference that Covidien relies on—the Green patent issued to one of Covidien's own engineers in 1970—expressly identified and purported to solve that unmet need. A453 (1:51–2:15). But Covidien's own documents state that such a need remained unmet until the time of Ethicon's patent and Covidien's resulting Tri-Staple device. A972–73; A1288 ("[Covidien's Tri-Staple device has] been developed with intent to fulfill the unmet needs of surgeons across different surgical specialties. Covidien's revolutionary new [Tri-Staple device] enables surgeons to . . . handle a broader

range of tissue thickness and applications with outstanding clinical performance.").

Where there was in fact a long-felt need, the intervening length of time between publication of the prior art references and the claimed invention can qualify as objective evidence of nonobviousness. *Leo Pharm. Prods.*, 726 F.3d at 1359. To be clear, "[a]bsent a showing of long-felt need or the failure of others, the mere passage of time without the claimed invention is not evidence of nonobviousness." *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004). But where a long-felt need is shown—and especially when that need is clear from the very prior art relied upon—a lengthy period of time between publication of prior art references and the claimed invention "speaks volumes to the nonobviousness" of the patent-in-suit. *Leo Pharm. Prods.*, 726 F.3d at 1359.

Ethicon's evidence showed the existence of a long-felt, but unresolved need. Covidien, again, provided no evidence in response. The PTAB continued its misapplication of this Court's law and erroneously determined that Ethicon's evidence was insufficient.

### B. The Panel's Failure to Properly Consider the Objective Evidence led the Panel to Erroneously Determine the '070 Patent Is Obvious

"Appeals in patent cases should not be mere games played with pieces of paper called references and the patent in suit. Lawsuits arise out of the affairs of people, real people facing real problems." *Rosemount*, 727 F.2d at 1544. But, by

failing to properly consider the objective indicia of nonobviousness, the PTAB used improper hindsight bias to combine the teachings of Covidien's own references—even though Covidien itself never did so until years after Ethicon's '070 patent published.

Both Ethicon and Covidien introduced evidence related to whether one of ordinary skill in the art would have found it obvious to combine staples of different preformed and formed heights with non-parallel legs. Ethicon's expert, Mr. Ortiz, provided extensive testimony on the alternative solutions and the substantial issues related to force and misalignment of the staples that result from this combination. A929–32; A940–41; A954. Covidien's expert contended that one of skill would have used non-parallel staples. A575–76; A2033–34.

The panel heard no live testimony, and the burden of proving obviousness remained with Covidien. But instead of determining whether Covidien had proved its case, the panel simply stated that "[w]e agree with Petitioner and find that Patent Owner's evidence is entitled to less weight than Petitioner's evidence as to this issue." A11; A15. The PTAB concluded that "it would have been obvious to try non-parallel staples when designing stapling devices, such as those disclosed in Viola and Pruitt." A15. Then, the PTAB refused to consider Ethicon's unrebutted objective evidence of nonobviousness because of the PTAB's legal errors. But this Court's precedent mandates that *all* relevant evidence bearing on the issue of

obviousness be considered before a final determination is made. At bottom, if all of the appropriate evidence of record is considered—as it should be under the law—Covidien failed to introduce sufficient evidence to support a conclusion of obviousness and the panel's legal conclusion was incorrect.

Once all evidence of record is properly considered, the PTAB's obviousness ruling cannot stand. The objective evidence of nonobviousness, including commercial success and long-felt but unresolved need, show that what might "otherwise seem[] like a combination of known elements," is nonobvious. *Leo Pharm. Prods.*, 726 F.3d at 1358.

The very surgical stapler work of Covidien's testifying expert proves this point. Covidien's expert, Mr. Bolanos, worked with the very inventors of the prior art, including Messrs. Green and Viola. A954; A1355–57. In fact, Mr. Bolanos admitted that they "started the design [of surgical staplers] with the premise that [they] would be using non-parallel staples." A2033. Yet that group of skilled artisans—the very group who put the elements into the art—never combined those elements to create the claimed invention. The PTAB failed to credit these real world facts evidencing nonobviousness. *See Rosemount*, 727 F.2d at 1546 (Fed. Cir. 1984) (noting that the facts of real world experience supported nonobviousness of the claimed invention: "[t]he art now extolled by [defendant] was available to

all skilled in the art, including [defendant's] own development staff, yet the solution . . . was not obvious to any of them").

In the end, the PTAB was predisposed to reaffirm its institution decision and erroneously concluded that the '070 patent claims were obvious based on the mere existence of the elements in the art and a purported motivation to combine that was tenuous, at best.  In fact, the PTAB's decision shows that it rejected *all* evidence submitted after the institution decision, including all of Ethicon's evidence on the objective indicia of nonobviousness—even though Covidien failed to address the objective indicia in its petition and its expert remained silent on the issue throughout the entire IPR.  As a matter of law, Covidien failed to introduce evidence sufficient to prove obviousness.  *See InTouch Techs.*, 751 F.3d at 1352; *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1360 (Fed. Cir. 2012) ("[T]he obviousness inquiry requires examination of all four Graham factors . . . .").

The ultimate conclusion as to whether a claim would have been obvious is a question of law.  Where there are no unresolved questions of fact, this Court is free to determine "whether, in light of the prior art references and objective indicia of nonobviousness, the claimed invention would have been obvious to a person of ordinary skill in the art at a time just before the time of invention." *Leo Pharm. Prods.*, 726 F.3d at 1353; *see id.* at 1359 (reversing the Board's claim construction

and its obviousness determination). "Viewed through the lens of the objective indicia, as opposed to the hindsight lens used by the Board," the '070 patent would not have been obvious over the cited prior art references. *Id.*

## CONCLUSION

The final written decision of the Patent Trial and Appeal Board should be reversed.

Dated: November 26, 2014      Respectfully submitted,

By: */s/ Steven D. Maslowski*
    Steven D. Maslowski
    Ruben H. Munoz
    Jason Weil
    AKIN GUMP STRAUSS HAUER & FELD LLP
    Two Commerce Square
    2001 Market Street, Suite 4100
    Philadelphia, PA 19103-7013
    Phone:  (215) 965-1200
    Fax:  (215) 965-1210

    Pratik A. Shah
    Hyland Hunt
    AKIN GUMP STRAUSS HAUER & FELD LLP
    1333 New Hampshire Avenue, N.W.
    Washington, DC 20036-1564
    Phone: (202) 887-4000
    Fax: (202) 887-4288

    *Counsel for Appellant*
    *Ethicon Endo-Surgery, Inc.*

# ADDENDUM

# TABLE OF CONTENTS

Page

Patent Trial and Appeal Board, Final Written Decision, (June 9, 2014)....……..A1

U.S. Patent No. 8,317,070 (November 27, 2012)……………………………..A59

Trials@uspto.gov
571-272-7822

Paper No. 29
Entered:  June 9, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE
————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD
————————

COVIDIEN LP
Petitioner

v.

ETHICON ENDO-SURGERY, INC.
Patent Owner
————————

Case IPR2013-00209
Patent 8,317,070
————————

Before SALLY C. MEDLEY, JOSIAH C. COCKS, and
GEORGIANNA W. BRADEN, *Administrative Patent Judges*.

BRADEN, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

IPR2013-00209
Patent 8,317,070

# I. INTRODUCTION

## A. Background

Covidien LP ("Petitioner") filed a Petition (Paper 1, "Pet.") on March 25, 2013, requesting *inter partes* review of claims 1-14 of U.S. Patent No.8,317,070 (Ex. 1001, "the '070 patent") pursuant to 35 U.S.C. §§ 311-319.  On August 26, 2013, we granted the Petition, and instituted this *inter partes* review of claims 1-14 on fewer than all of the grounds of unpatentability alleged.  Paper 7, "Dec. to Inst.".  After institution of trial, the Patent Owner, Ethicon Endo-Surgery, Inc. ("Patent Owner"), filed a Patent Owner Response (Paper 17, "Resp.") to the Petition.  Petitioner filed a Reply (Paper 21) to the Patent Owner Response.

Counsel for both Petitioner and Patent Owner were present and presented argument at an oral hearing held on April 10, 2014. [1]

The Board has jurisdiction under 35 U.S.C. § 6(c).  In this final written decision, issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73, we determine Petitioner has shown by a preponderance of the evidence that all challenged claims are unpatentable under 35 U.S.C. § 103.

## B. The '070 Patent

The '070 patent discloses surgical stapling devices that are "capable of producing staples of different formed lengths" when the staples are applied, for instance, to tissue. (Ex. 1001, Abstract; col. 2, ll. 28-30.) According to the '070 patent:

> Whenever a transsection of tissue is across an area of varied tissue composition, it would be advantageous for the

---

[1] A transcript of the oral hearing is included in the record.  Paper 28.

> staples that are closest to the cut line to have one formed height that is less than the formed height of those staples that are farthest from the cut line.  In practice, the rows of inside staples serve to provide a hemostatic barrier, while the outside rows of staples with larger formed heights provide a cinching effect where the tissue transitions from the tightly compressed hemostatic section to the non-compressed adjacent section.

*Id.* at col. 2, ll. 4-12.  The '070 patent further discloses the use of staples with two prongs that extend from the main portion of the staple body, as shown in Figure 81, reproduced below.  *Id.* at col. 27, ll. 57-58; Figures 81, 93.



FIG. 81

> Figure 81 illustrates an embodiment of a staple with two prongs that extend from the main portion of the staple body.

Claims 1 and 8 are the only independent claims in the '070 patent and are reproduced below (some paragraphing added):

1. A surgical stapling device comprising an end effector that comprises:

> a circular anvil having a staple forming surface;

a plurality of staples facing the staple forming surface of the anvil, each staple comprising a main portion and two prongs, wherein the two prongs each comprise a first end and a second end, wherein the first ends are connected to opposite ends of the main portion, and wherein the two prongs extend non-parallelly from the main portion; and

a staple driver assembly comprising a plurality of staple drivers, wherein each staple driver supports one of the plurality of staples and is configured such that, when the staple driver assembly is actuated, each staple driver drives the staple into the staple forming surface of the anvil,

wherein a first quantity of the staples have a first pre-deformation height, measured from a lower surface of the main portion to the second end of the first prong, and a second quantity of the staples have a second pre-deformation height, measured from a lower surface of the main portion to the second end of the first prong,

wherein the first height is less than the second height, such that when the staple driver assembly is actuated, the first quantity of staples have a different formed staple length than the second quantity of staples.

8. A surgical stapling device comprising:

a non-pivotable anvil having a staple forming surface; and

a staple cartridge facing the anvil, wherein the staple cartridge comprises:

a plurality of staples facing the staple forming surface of the anvil, each staple comprising a main portion and two prongs, wherein the two prongs each comprise a first end and a second end, wherein the first ends are connected to opposite ends of the main portion, and wherein the two prongs extend non-parallelly from the main portion; and

IPR2013-00209
Patent 8,317,070

a plurality of staple drivers, wherein each staple driver supports one of the plurality of staples and is configured such that, when the staple drivers are actuated, each staple driver drives the staple into the staple forming surface of the anvil,

wherein a first quantity of the staples have a first pre-deformation height, measured from a lower surface of the main portion to the second end of the first prong, and a second quantity of the staples have a second pre-deformation height, measured from a lower surface of the main portion to the second end of the first prong,

wherein the first height is less than the second height, such that when the staple driver assembly is actuated, the first quantity of staples have a different formed staple length than the second quantity of staples.

### C. Prior Art References Alleged to Support Unpatentability

The following table summarizes the prior art references asserted in the instituted grounds:

| Name | Description | Date | Exhibit |
|------|-------------|------|---------|
| Pruitt | US 4,941,623 | July 17, 1990 | Ex. 1003 |
| Viola | International Publ. No. WO 2003/094747 A1 | Nov. 20, 2003 | Ex. 1004 |
| Burdorff | US 5,697,543 | Dec. 16, 1997 | Ex. 1005 |
| Conta | US 4,304,236 | Dec. 8, 1981 | Ex. 1006 |
| Green | US 3,494,533 | Feb. 10, 1970 | Ex. 1009 |

IPR2013-00209
Patent 8,317,070

*D. Grounds of Unpatentability Instituted*

The following table summarizes the challenges to patentability that were instituted for *inter partes* review:

| Claim | Grounds | Reference(s) |
|---|---|---|
| Claim 1-5, 7, 8, and 10-13 | § 103 | Viola and Green |
| Claim 6, 11, and 14 | § 103 | Viola, Green, and Pruitt |
| Claim 9 | § 103 | Viola, Green, and Burdorff |
| Claim 8 and 10-14 | § 103 | Pruitt and Green |
| Claim 9 | § 103 | Pruitt, Green, and Burdorff |
| Claims 1-7 | § 103 | Pruitt, Green, and Conta |

## II.    ANALYSIS

*A. Claim Construction*

In an *inter partes* review, claim terms in an unexpired patent are given their broadest reasonable construction in light of the specification of the patent in which they appear.  37 C.F.R. § 42.100(b); Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,766 (Aug. 14, 2012).  Claim terms also are given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art in the context of the entire disclosure.  *In re Translogic Tech, Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007).

If an inventor acts as his or her own lexicographer, the definition must be set forth in the specification with reasonable clarity, deliberateness, and

IPR2013-00209
Patent 8,317,070

precision. *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998). Neither Petitioner nor Patent Owner contends that the Specification of the '070 patent, as filed, coined a new meaning for any term, different from the ordinary recognized meaning for any term.

    1. *"two prongs extend non-parallelly from the main portion"*

The phrase "two prongs extend non-parallelly from the main portion," which is recited in both independent claims, was construed initially for purposes of the Decision to Institute to mean that the extension of two prongs of a staple are non-parallel relative to each other in extending from the main portion of the staple. Dec. to Inst. 7-9; *see also* Decision on Petitioner's Request for Rehearing, Paper 10. Petitioner asserts that the Specification for the '070 patent does not support such a construction, because nowhere in the patent is there a description of staples with two prongs that are non-parallel relative to each other. Petitioner's Request for Rehearing, Paper 9; Tr. 6-7. However, we reject Petitioner's position and find that Figures 81 (reproduced *supra*) and 93 of the '070 patent illustrate staples with non-parallel legs. Therefore, we are not persuaded that a change in claim construction from that issued in the Decision to Institute is merited.

    2. *"formed staple length"*

Each of claims 1 and 8 requires a plurality of staples identifiable as a "first quantity" of staples having a "first pre-deformation height" and a "second quantity" having a "second pre-deformation height." Those claims further recite that "when the staple driver assembly is actuated, the first quantity of staples have a different formed staple length than the second quantity of staples."

The terms "height" and "length" are understood generally as being terms that are not necessarily the same in designating measurements of a given structure. However, as discussed in the Decision to Institute, those terms are used throughout the Specification of the '070 patent to designate the same dimension in connection with the extension of prongs of a staple. Dec. to Inst. 9-10. For instance, prongs 225 shown in Figure 12 are designated as having a "length 'P'," which is the dimension of the prongs extending from the main portion 223. Ex. 1001, col. 11, ll. 20-22; *see also* col. 16, ll. 14-16 (describing "prong lengths 'P'"). Elsewhere in the Specification, the dimension "P" for the prongs is designated "prong heights." *Id.* at 19, ll. 25-26. Similarly, in connection with "formed staples" the terms "formed lengths" and "formed heights" are each used in reference to the extension of the prongs from the main portion of the staple after it has been formed. *E.g.*, *id.* at col. 2, ll. 39-44; col. 16, ll. 54-64; col. 19; ll. 65-67. Accordingly, as set forth in the Decision to Institute, in the context of the '070 patent, the "formed staple length" is understood as referencing the distance or "height" that the prongs extend from the main portion of the staple when the staple is formed.

3. *"non-pivotable anvil"*

Independent claim 8 includes recitation of a "non-pivotable anvil." As is understood from the '070 patent, an "anvil" is a structure having a surface against which staples are driven or fired so as to configure the staple into a "form[ed]"condition. Ex. 1001, Abstract; col. 1, ll. 45-58.

In the Decision to Institute, we determined that the broadest reasonable interpretation consistent with the Specification of the '070 patent is an anvil that does not rotate or swing about a short rod or shaft. Dec. to

IPR2013-00209
Patent 8,317,070

Inst. 11. During the course of the trial, neither party challenged our construction of the claim term. Therefore, we see no reason to alter the construction set forth in the Decision to Institute.

### B. Claims 1-14 – Alleged Obviousness over Viola, Pruitt, and/or Green

Petitioner asserts that claims 1-14 of the '070 patent are unpatentable under 35 U.S.C. § 103(a) over the prior art, specifically arguing that the claims are unpatentable over various combinations of Viola, Pruitt, and/or Green. Pet. 4-5, 58-59. "Section 103(a) [of 35 U.S.C.] forbids issuance of a patent when 'the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.'" *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). To establish obviousness of a claimed invention, all the claim limitations must be taught or suggested by the prior art. *See CFMT, Inc. v. Yieldup Int'l Corp.*, 349 F.3d 1333, 1342 (Fed. Cir. 2003); *In re Royka*, 490 F.2d 981, 985 (CCPA 1974).

Patent Owner disputes Petitioner's contention that the challenged claims would have been obvious. According to Patent Owner, the prior art fails to teach all of the limitations of the claims, and, specifically, "Viola fails to disclose staples with multiple *formed* heights as required by all claims of the '070 Patent." Resp. 10. However, Patent Owner's argument is contradictory to Patent Owner's characterization of Viola in a proceeding before the European Patent Office. *See, e.g.*, Reply 4; Ex. 1024 at 1; Ex. 1025 at 2; Ex. 1026; Ex. 1027 at 2. Furthermore, during the oral hearing, counsel for Patent Owner admitted that all the recited elements of the patent claims are found in the asserted prior art. Tr. 23-24. Given Patent

IPR2013-00209
Patent 8,317,070

Owner's admission regarding the prior art, there is no factual dispute that the cited references teach all of the recited elements.

Despite the teaching of all the claim elements in the prior art, Patent Owner maintains that one of skill in the art would not have arrived at the claimed subject matter, because (1) there was no reason to combine the cited prior art references, and (2) the prior art teaches away from the claimed invention.  Resp. 21; Tr. 23-24, 26-27.  Petitioner argues, to the contrary, that non-parallel staples were well-known in the art, and it would have been obvious to try such staples with the staple devices of Viola or Pruitt.  Pet. 58. According to Petitioner, combining non-parallel staples with the staple devices of Viola or Pruitt would have constituted the mere substitution of one known element for another, and would have yielded predictable results. *Id*.

### 1. *Reason to Combine Teachings of the Prior Art*

In making an obviousness determination, "it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does."  *KSR*, 550 U.S. at 418.  Patent Owner contends that "the evidence fail[s] to show a specific reason why one of ordinary skill in the art would have combined Green with Viola or Pruitt to arrive at the claimed invention."  Resp. 21.  However, Petitioner argues that one of skill in the art would have been motivated to modify the staple devices of Viola and Pruitt to use Green's stables with non-parallel or "outwardly flaring" legs in order to securely hold staples within corresponding retention slots of a staple cartridge.  Pet. 59 (citing Ex. 1009 at col. 13, l. 71-col. 14, l. 4 and Ex. 1010 ¶ 108).

Contrary to Petitioner's argument, Patent Owner contends there are multiple problems with using non-parallel staples, and any benefit bestowed by retaining staples in a staple cartridge would be outweighed by "the overall undesirability of non-parallel staples."  Resp. 38.  Mr. Ortiz, expert for Patent Owner, testified that alternative methods existed for retaining staples in a staple cartridge (Ex. 2004 ¶¶ 76-78), so one of skill in the art would not have to rely on non-parallel legs to ensure that staples do not fall out of a staple cartridge.  However, Mr. Ortiz testified he had not used the alternative methods he opined on (Ex. 1023 at 72, ll. 11-14 and 64, ll. 19-21); rather, Mr. Ortiz used non-parallel staples "maybe 50 or 75 percent of the time" in his practice (*id*. at 56, ll. 10-15).  Mr. Bolanos, expert for Petitioner, testified about the reasons why a skilled artisan would have used staples with non-parallel legs, and stated that he routinely used such staples in his practice.  Ex. 1010 ¶ 108; Ex. 1031 ¶ 4-5.  Additionally, Mr. Kelly, an expert for Patent Owner in a lawsuit in Germany, testified that the "problem of keeping staples in their pockets is generally solved . . . by bending the tips of the legs of the unloaded staples slightly outward," i.e., having staple legs that are non-parallel.  Ex. 1033 at 2.

According to Petitioner, the testimony of Mr. Ortiz and Mr. Kelly contradict Patent Owner's contention that non-parallel staples were not beneficial and would not have been used by one of skill in the art.  Reply 6.  We agree with Petitioner and find that Patent Owner's evidence is entitled to less weight than Petitioner's evidence as to this issue.  Although Mr. Ortiz originally testified that one of ordinary skill in the art would not have been motivated to use staples having non-parallel legs (Ex. 2004 ¶¶ 75, 79, 88), he also testified later, under cross-examination, that he himself used non-

IPR2013-00209
Patent 8,317,070

parallel staples in practice a majority of the time (Ex. 1023 at 56, ll. 10-15).
We find his testimony to be less persuasive than Petitioner's expert
testimony of Mr. Bolanos, especially in light of the testimony by Mr. Kelly
in the German lawsuit that the "problem of keeping staples in their pockets
is generally solved . . . by bending the tips of the legs of the unloaded staples
slightly outward," i.e., by having staple legs that are non-parallel. For all of
these reasons, Petitioner has shown, with supporting evidence, that one of
skill in the art would have had reason to combine the prior art to arrive at the
claimed invention.

### 2. *Teach Away from the Claimed Invention*

A reference does not teach away if it merely expresses a general
preference for an alternative invention, but does not "criticize, discredit, or
otherwise discourage" investigation into the claimed invention. *DePuy
Spine Inc. v. Medtronic Sofamor Danek,* 567 F.3d 1314, 1327 (Fed. Cir.
2009) (quoting *In re Fulton*, 391 F.3d 1195, 1201 (Fed Cir. 2004)). "[I]n
general, a reference will teach away if it suggests that the line of
development flowing from the reference's disclosure is unlikely to be
productive of the result sought by the applicant." *In re Gurley*, 27 F.3d 551,
553 (Fed. Cir. 1994).

Patent Owner contends that one of skill in the art would have been led
away from using non-parallel staples as disclosed by Green, because
(1) surgical staplers need precise alignment of staples (Resp. 23-32), and
(2) additional force is required to fire non-parallel staples (*id*. 32-38).

Petitioner argues, to the contrary, that the use of non-parallel staples
may involve factors such as alignment and force, but such factors would
have been understood by those skilled in the art. Reply at 8. According to

IPR2013-00209
Patent 8,317,070

Mr. Bolanos, expert for Petitioner, alignment and the proper application of force were considerations commonly taken into account when designing staplers.  Ex. 1031 ¶ 7.  Furthermore, Mr. Ortiz, Patent Owner's expert, testified later, under cross-examination, that the alignment and force analysis he described in his declaration were known to one of skill in the art.  *See, e.g.,* Ex. 1023 at 142:22-143:4, 126:17-127:6, 136:24-137:18.

Therefore, we are not persuaded by Patent Owner's argument that certain attributes of non-parallel staples (such as ensuring precise alignment and requiring additional force) would dissuade one of ordinary skill in the art from using such staples.  Patent Owner has not directed us to where in Viola or Pruitt there is the suggestion that use of staples with non-parallel legs was unlikely to work.  Although Viola and Pruitt do not teach the use of staples with non-parallel legs, the references do not teach away from the use of staples with non-parallel legs.  Moreover, Patent Owner has not rebutted Petitioner's showing by demonstrating that the disclosures in Viola, Pruitt, or Green would have led one of ordinary skill in the art to conclude that Green's non-parallel staples were unsuitable for use in the Viola or Pruitt stapling devices.

Therefore, we reject Patent Owner's argument that a skilled artisan would not have found it obvious to use staples with non-parallel legs with staple devices of Viola or Pruitt because the prior art teaches away from the claimed invention.

### 3. *Obvious to Try Known and Predictable Elements in the Prior Art such as Staples with Non-Parallel Legs*

In *KSR*, 550 U.S. at 421, the Supreme Court explained that "obvious to try" may apply when "there are a finite number of identified, predictable

solutions" to a known problem. The Court explained that when the path has been identified and "leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense." *Id.* The Federal Circuit elaborated that the identified path must "present a finite (and small in the context of the art) number of options easily traversed to show obviousness." *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F. 3d 1358, 1364 (Fed. Cir. 2008).

Petitioner contends that one of skill in the art would have understood that the devices in Pruitt and Viola could use, or be modified to use, staples with non-parallel legs. Pet. 58; Ex. 1010 ¶ 108. According to Petitioner, staples with non-parallel legs were well known at the time of the alleged invention of the '070 patent (Pet. 58-59), and, in fact, practitioners in the field had the limited option of using staples with parallel legs or non-parallel legs (Tr. 4-5; Reply 6 (citing Ex. 1032 at 50)). Patent Owner contends that the use of non-parallel staples was not obvious. According to Patent Owner, if the use of non-parallel staples was obvious, then Petitioner would have used them prior to the filing of the '070 patent, and would have advertised their use of such staples. Resp. 43-44; Tr. 21-23. Patent Owner also contends that the prior art would have discussed the use of non-parallel staples. Tr. 21-23.

First, "[i]n many fields there may be little discussion of obvious techniques or combinations, and market demand, rather than scientific literature, may often drive design trends." *KSR*, 550 U.S. at 402. Thus, we give little weight to the absence of advertising by Petitioner of its use of non-parallel staples.

Second, as disclosed in Green, the prior art does discuss the use of non-parallel staples. Ex. 1009. That disclosure is inconsistent with the position taken by Patent Owner that such staples were not known to be used.

Finally, as discussed above, Mr. Ortiz used non-parallel staples "maybe 50 or 75 percent of the time" in his practice (Ex. 1023 at 56, ll. 10-15). Mr. Bolanos, expert for Petitioner, worked for Petitioner and testified that when designing staplers he started with a design premised on non-parallel staples. Ex. 1031 ¶ 4. The testimony of the experts indicates that those of skill in the art knew of non-parallel staples and frequently used such staples. Furthermore, Patent Owner's expert witness testified in a German lawsuit that a person skilled in the art knew that he could choose between two different staple shapes, namely between U-shaped or parallel staples on the one hand, and V-shaped or non-parallel staples, on the other. Reply 6 (citing Ex. 1032 at 50).

Therefore, given the prevalence of non-parallel staples, and the fact that those in the field had but two choices for staple designs, we find it would have been obvious to try non-parallel staples when designing stapling devices, such as those disclosed in Viola and Pruitt. Additionally, the limited choice of two staple designs further supports our finding that a person of skill in the art would have had reason to combine the non-parallel staple of Green with the stapling devices in Viola and Pruitt.

## C. Secondary Considerations of Non-Obviousness

Patent Owner contends that Petitioner has failed to meet its burden of showing unpatentability, because the objective indicia of nonobviousness indicate that the claimed subject matter would not have been obvious. Resp. 48-59; Tr. 29. Objective indicia constitute independent evidence of non-

IPR2013-00209
Patent 8,317,070

obviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966) (holding that tactual inquiries for an obviousness determination include secondary considerations based on evaluation and crediting of objective evidence of nonobviousness); *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1378 (Fed. Cir. 2012). Notwithstanding what the teachings of the prior art would have suggested to one with ordinary skill in the art at the time of Patent Owner's invention, the totality of the evidence submitted, including objective evidence of nonobviousness, may lead to a conclusion that the claimed invention would not have been obvious to one with ordinary skill in the art. *In re Piasecki*, 745 F.2d 1468, 1471-1472 (Fed. Cir. 1984).

Secondary consideration factors include (1) unexpected results, (2) commercial success, (3) satisfaction of long-felt need, (4) failure of others, and (5) copying by others. *E.g.*, *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 291 (Fed. Cir. 1985); *Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 894 (Fed. Cir. 1984). Patent Owner has alleged (1) commercial success, and (2) satisfaction of long-felt but unresolved need. Resp. 48-59. However, as discussed below, the objective indicia argued by Patent Owner do not establish a nexus with the claimed subject matter.

There must be a demonstrated "nexus" between the merits of the claimed invention and the evidence of secondary considerations before that evidence is accorded substantial weight in an obviousness determination. *Simmons Fastener Corp. v. Illinois Tool Works, Inc.*, 739 F.2d 1573, 1575 (Fed. Cir. 1984); *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1539 (Fed. Cir. 1983); *see also In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996); *In re Fielder*, 471 F.2d 640, 642 (CCPA 1973). "Nexus" is a legally and

IPR2013-00209
Patent 8,317,070

factually sufficient connection between the objective evidence and the claimed invention, such that the objective evidence should be considered in determining nonobviousness. *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988). In the absence of an established nexus with the claimed invention, secondary consideration factors, such as commercial success and satisfaction of a long-felt but unresolved need, are not entitled to much, if any, weight, and generally have no bearing on the legal issue of obviousness. *See In re Vamco Machine & Tool, Inc.*, 752 F.2d 1564, 1577 (Fed. Cir. 1985).

### 1. Commercial Success of Petitioner's Tri-Staple Devices

Patent Owner argues that the commercial success of Petitioner's Tri-Staple devices establishes the requisite nexus with the claims of the '070 patent, and indicates the non-obviousness of the claims. Resp. 52. Specifically, Patent Owner contends that high sales volume of the Tri-Staple products can be mapped to the practice of at least claims 8 and 10 of the '070 patent. *Id.*; Ex. 2004 ¶¶ 130-131. When the patent is said to cover a feature or component of a product, Patent Owner has the burden of showing that the commercial success derives from the feature, in this case use of non-parallel staples and staples of different preformed and formed heights. *See Tokai Corp. v. Easton Enters., Inc.*, 632 F. 3d 1358, 1369 (Fed. Cir. 2011). In other words, in order to establish a proper nexus, Patent Owner must offer proof that the sales were a direct result of the unique characteristics of the claimed invention—as opposed to other economic and commercial factors unrelated to the quality of the patented subject matter. *See In re Huang*, 100 F. 3d 135, 140 (Fed. Cir. 1996). Furthermore, if commercial success is due to an element in the prior art, no nexus exists. *Ormco Corp. v. Align Tech.,*

IPR2013-00209
Patent 8,317,070

*Inc.,* 463 F.3d 1299, 1312 (Fed. Cir. 2006); *see also Richdel, Inc. v. Sunspool Corp.,* 714 F.2d 1573, 1580 (Fed.Cir.1983) (holding claimed invention obvious where patent holder "failed to show that such commercial success . . . was due to anything disclosed in the patent in suit which was not readily available in the prior art").

In arguing for commercial success, Patent Owner relies heavily on marketing material and a 2012 Annual Report to Shareholders from Petitioner that describe Petitioner's Tri-Staple devices and tout the devices as being some of the most successful products for Petitioner.  Resp. 55 (citing Ex. 2013, Ex. 2016, Ex. 2019, Ex. 2020, and Ex. 2024).  Patent Owner compares the sales for the Tri-Staple devices to products Petitioner previously offered for sale (Petitioner's "legacy devices"), and argues, directing attention to evidence, that as sales for the Tri-Staple devices increased, sales for the legacy devices decreased.  *Id.* at 56-57.  According to Patent Owner, the evidence shows that Petitioner charges a premium for the Tri-Staple devices compared to the legacy products, and despite the higher price, Petitioner now sells more of the Tri-Staple devices than it sells of the legacy devices.  *Id.* at 56.

Patent Owner's expert, Mr. Ortiz, testified that he examined Petitioner's Tri-Staple device, and based on his examination, declared that the device practiced the invention of at least claims 8 and 10 of the '070 patent.  Ex. 2004 ¶ 130.  Mr. Ortiz also testified that he analyzed how the Tri-Staple devices compared to the legacy products and "under[stood] that the Covidien legacy devices did not include all of the following features in one device: non-parallel staples with multiple pre-formed heights which, when fired, resulted in staples with multiple formed heights."  *Id.* at ¶ 136.

IPR2013-00209
Patent 8,317,070

However, Mr. Ortiz did not testify that he examined Petitioner's legacy products. According to Mr. Ortiz, "the combination of features [of claims 8 and 10 of the '070 patent] results in a 'truly innovative surgical stapling platform' that Covidien has priced at a premium compared to devices not containing the combination of the patented features." *Id.* at ¶ 140. Patent Owner, thus, concludes that the increased sales for the Tri-Staple devices over the legacy devices is "due to the fact that the [Tri-Staple] devices contain the combination of features in claims 8 and 10 of the '070 Patent." Resp. 57; Ex. 2004 ¶ 140.

Petitioner contends, to the contrary, that the commercial success of the Tri-Staple devices is attributable to unclaimed features, such as ergonomic design, precise articulation, and reloads that provide simpler selection and reduced inventory. Reply 15. Therefore, according to Petitioner, any success enjoyed by the Tri-Staple devices is not due to the claimed invention. Tr. 46.

We have considered Patent Owner's Exhibits 2016, 2019, 2020, and 2024, which purport to show that the Tri-Staple devices include the features of claims 1-14. We also have reviewed the testimony of Mr. Ortiz at Exhibit 2004 in detail. First, Patent Owner has not shown sufficient credible evidence that the sales of the Tri-Staple devices are the result of the claimed invention, rather than other features of the Tri-Staple devices. Second, as Patent Owner admitted, all of the elements of the claimed invention are found in the prior art. Tr. 23-24. Therefore, the objective evidence regarding commercial success cited by the Patent Owner does not overcome the strong case of obviousness established by Petitioner by a preponderance of the evidence.

IPR2013-00209
Patent 8,317,070

> ## 2. Long-Felt but Unresolved Need for the Invention of the '070 Patent

Patent Owner argues that a long-felt but unresolved need for the invention of the '070 patent indicates the non-obviousness of the claims of '070 patent. Resp. 58. Specifically, Patent Owner contends that Petitioner admits in its own document that there was a long-felt but unresolved need for the invention of the '070 patent. *Id.* Patent Owner cites to a marketing brochure from Petitioner, which states:

> With significant investments into research and development over the years, *Endo GIA Reloads with Tri-Staple Technology and ENDO GIA Ultra Universal staplers have been developed with intent to fulfill the unmet needs of surgeons across different surgical specialties.* Covidien's revolutionary new Endo Stapling system enables surgeons to operate with confidence to handle a broader range of tissue thickness and applications with outstanding clinical performance.

*Id.* (citing Ex. 2020) (emphasis in original).

Mr. Ortiz, expert for Patent Owner, testified there was an unmet need for a stapling device that "enables surgeons to operate with confidence to handle a broader range of tissue thickness and applications with outstanding clinical performance." Ex. 2004 ¶ 142. According to Patent Owner, this "unmet need was satisfied with a device that included a 'fixed anvil' and 'improved tissue clamping' (resulting from the use of different preformed and formed non-parallel staples) – all as required by the claims of the '070 Patent." Resp. 59 (citing Ex. 2004 ¶ 144).

Petitioner contends the long-felt need of surgeons that is satisfied by the Tri-Staple devices is not attributable to the claimed features, but instead may be due to unclaimed features, such as ergonomic design, precise

articulation, and reloads that provide simpler selection and reduced inventory.  Reply 15.

Satisfaction of a long-felt but unresolved need is not evidence of nonobviousness, unless it is shown that widespread efforts of skilled workers having knowledge of the prior art had failed to find a solution to the problem.  *In re Allen*, 324 F.2d 993, 997 (CCPA 1963); *Toledo Pressed Steel Co. v. Standard Parts, Inc.*, 307 U.S. 350, 356 (1939).  Patent Owner has not directed our attention to evidence that there was a widespread attempt by skilled workers in the art for a long period of time to use non-parallel staples with different pre-formed heights to create staples with different formed heights, and that all such attempts failed to achieve successful use of such staples.

Furthermore, even if we consider Petitioner's brochure to be an admission against interest, the brochure fails to establish the existence of a "long-felt and unresolved" need in the industry, because it does not indicate that the "unmet need" is a persistent one recognized by those of ordinary skill in the art.  *See In re Gershon*, 372 F. 2d 535, 539 (CCPA 1967).  Thus, Petitioner's brochure does not support the assertion that there was a long-felt but unresolved need in the industry for Patent Owner's invention.

Therefore, we find that Patent Owner's arguments concerning the long-felt but unresolved need for the invention of the '070 patent do not overcome Petitioner's showing of obviousness.

IPR2013-00209
Patent 8,317,070

## III.    CONCLUSION

We have considered the record before us in this *inter partes* review proceeding.  We conclude that Petitioner has met its burden of proof, by a preponderance of the evidence, in showing that:

(1) claims 1-5, 7, 8, and 10-13 of the '070 patent are unpatentable under 35 U.S.C. § 103(a) over Viola and Green;

(2) claims 6, 11, and 14 of the '070 patent are unpatentable under 35 U.S.C. § 103(a) over Viola, Green, and Pruitt;

(3) claim 9 of the '070 patent is unpatentable under 35 U.S.C. § 103(a) over Viola, Green, and Burdorff;

(4) claims 8 and 10-14 of the '070 patent are unpatentable under 35 U.S.C. § 103(a) over Pruitt and Green;

(5) claim 9 of the '070 patent is unpatentable under 35 U.S.C. § 103(a) over Pruitt, Green, and Burdorff; and

(6) claims 1-7 of the '070 patent are unpatentable under 35 U.S.C. § 103(a) over Pruitt, Green, and Conta.

This is a final written decision.

## IV.    ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1-14 of the '070 patent are determined to be UNPATENTABLE;

FURTHER ORDERED that because this is a final written decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2013-00209
Patent 8,317,070

For PETITIONER:

Kathleen A. Daley
kathleen.daley@finnegan.com

Naveen Modi
naveen.modi@finnegan.com

For PATENT OWNER:

Steven D. Maslowski
smaslowski@akingump.com

Ruben H. Munoz
rmunoz@akingump.com



US008317070B2

(12) **United States Patent**
Hueil et al.

(10) **Patent No.:** **US 8,317,070 B2**
(45) **Date of Patent:** **Nov. 27, 2012**

(54) **SURGICAL STAPLING DEVICES THAT PRODUCE FORMED STAPLES HAVING DIFFERENT LENGTHS**

(75) Inventors: **Joseph C. Hueil**, Loveland, OH (US); **Jeffrey S. Swayze**, Hamilton, OH (US); **Frederick E. Shelton, IV**, New Vienna, OH (US)

(73) Assignee: **Ethicon Endo-Surgery, Inc.**, Cincinnati, OH (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1109 days.

(21) Appl. No.: **11/711,979**

(22) Filed: **Feb. 28, 2007**

(65) **Prior Publication Data**

US 2007/0194081 A1      Aug. 23, 2007

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 11/216,562, filed on Aug. 31, 2005, now Pat. No. 7,669,746.

(51) **Int. Cl.**
**A61B 17/072**      (2006.01)
(52) **U.S. Cl.** .................................. **227/175.1**; 227/180.1
(58) **Field of Classification Search** ................... 227/19, 227/175.1, 180.1
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 66,052 | A | 6/1867 | Smith |
| 2,037,727 | A | 4/1936 | La Chapelle |
| 2,214,870 | A | 9/1940 | West |
| 2,441,096 | A | 5/1948 | Happe |
| 2,526,902 | A | 10/1950 | Rublee |
| 2,804,848 | A | 9/1957 | O'Farrell et al. |
| 2,808,482 | A | 10/1957 | Zanichkowsky et al. |
| 2,853,074 | A | 9/1958 | Olson |
| 3,032,769 | A | 5/1962 | Palmer |
| 3,075,062 | A | 1/1963 | Iaccarino |
| 3,078,465 | A | 2/1963 | Bobrov |
| 3,266,494 | A | 8/1966 | Brownrigg et al. |
| 3,269,630 | A | 8/1966 | Fleischer |
| 3,357,296 | A | 12/1967 | Lefever |
| 3,490,675 | A | 1/1970 | Green et al. |
| 3,551,987 | A | 1/1971 | Wilkinson |

(Continued)

FOREIGN PATENT DOCUMENTS

| CA | 2458946 A1 | 3/2003 |
|---|---|---|

(Continued)

OTHER PUBLICATIONS

Office Action issued on Oct. 17, 2006 in U.S. Appl. No. 11/216,562.

(Continued)

*Primary Examiner* — Rinaldi Rada
*Assistant Examiner* — Nathaniel Chukwurah

(57) **ABSTRACT**

A surgical stapling device that comprises an end effector. According to various embodiments, the end effector comprises a circular anvil having a staple forming surface and a plurality of staples facing the staple forming surface of the anvil. The end effector also comprises a staple driver assembly comprising a plurality of staple drivers. Each staple driver supports one of the plurality of staples and is configured such that, when the staple driver assembly is actuated, each staple driver drives the staple into the staple forming surface of the anvil. A first quantity of the plurality of staple drivers has a first height and a second quantity of the plurality of staple drivers has a second height, wherein the first height is less than the second height.

**14 Claims, 75 Drawing Sheets**



**COVIDIEN EXHIBIT 1001**

US 8,317,070 B2

Page 2

### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,598,943 A | 8/1971 | Barrett |
| 3,643,851 A | 2/1972 | Green et al. |
| 3,662,939 A | 5/1972 | Bryan |
| 3,717,294 A | 2/1973 | Green |
| 3,734,207 A | 5/1973 | Fishbein |
| 3,740,994 A | 6/1973 | DeCarlo, Jr. |
| 3,751,902 A | 8/1973 | Kingsbury et al. |
| 3,819,100 A | 6/1974 | Noiles et al. |
| 3,821,919 A | 7/1974 | Knohl |
| 3,892,228 A | 7/1975 | Mitsui |
| 3,894,174 A | 7/1975 | Cartun |
| 3,940,844 A | 3/1976 | Colby et al. |
| RE28,932 E | 8/1976 | Noiles et al. |
| 4,129,059 A | 12/1978 | Van Eck |
| 4,213,562 A | 7/1980 | Garrett et al. |
| 4,250,436 A | 2/1981 | Weissman |
| 4,261,244 A | 4/1981 | Becht et al. |
| 4,272,662 A | 6/1981 | Simpson |
| 4,275,813 A | 6/1981 | Noiles |
| 4,289,133 A | 9/1981 | Rothfuss |
| 4,305,539 A | 12/1981 | Korolkov et al. |
| 4,317,451 A | 3/1982 | Cerwin et al. |
| 4,321,002 A | 3/1982 | Froehlich |
| 4,331,277 A | 5/1982 | Green |
| 4,340,331 A | 7/1982 | Savino |
| 4,347,450 A | 8/1982 | Colligan |
| 4,349,028 A | 9/1982 | Green |
| 4,353,371 A | 10/1982 | Cosman |
| 4,379,457 A | 4/1983 | Gravener et al. |
| 4,380,312 A | 4/1983 | Landrus |
| 4,383,634 A | 5/1983 | Green |
| 4,396,139 A | 8/1983 | Hall et al. |
| 4,402,445 A | 9/1983 | Green |
| 4,408,692 A | 10/1983 | Sigel et al. |
| 4,415,112 A | 11/1983 | Green |
| 4,428,376 A | 1/1984 | Mericle |
| 4,429,695 A | 2/1984 | Green |
| 4,442,964 A | 4/1984 | Becht |
| 4,451,743 A | 5/1984 | Suzuki et al. |
| 4,454,887 A | 6/1984 | Krüger |
| 4,467,805 A | 8/1984 | Fukuda |
| 4,475,679 A | 10/1984 | Fleury, Jr. |
| 4,485,816 A | 12/1984 | Krumme |
| 4,489,875 A | 12/1984 | Crawford et al. |
| 4,500,024 A | 2/1985 | DiGiovanni et al. |
| 4,505,273 A | 3/1985 | Braun et al. |
| 4,505,414 A | 3/1985 | Filipi |
| 4,506,671 A | 3/1985 | Green |
| 4,520,817 A | 6/1985 | Green |
| 4,522,327 A | 6/1985 | Korthoff et al. |
| 4,526,174 A | 7/1985 | Froehlich |
| 4,527,724 A | 7/1985 | Chow et al. |
| 4,530,453 A | 7/1985 | Green |
| 4,548,202 A | 10/1985 | Duncan |
| 4,565,189 A | 1/1986 | Mabuchi |
| 4,566,620 A | 1/1986 | Green et al. |
| 4,573,469 A | 3/1986 | Golden et al. |
| 4,573,622 A | 3/1986 | Green et al. |
| 4,576,167 A | 3/1986 | Noiles et al. |
| 4,580,712 A | 4/1986 | Green |
| 4,589,416 A | 5/1986 | Green |
| 4,591,085 A | 5/1986 | Di Giovanni |
| 4,604,786 A | 8/1986 | Howie, Jr. |
| 4,605,001 A | 8/1986 | Rothfuss et al. |
| 4,606,343 A | 8/1986 | Conta et al. |
| 4,607,638 A | 8/1986 | Crainich |
| 4,608,981 A | 9/1986 | Rothfuss et al. |
| 4,610,250 A | 9/1986 | Green |
| 4,610,383 A | 9/1986 | Rothfuss et al. |
| 4,619,262 A | 10/1986 | Taylor |
| 4,629,107 A | 12/1986 | Fedotov et al. |
| 4,632,290 A | 12/1986 | Green et al. |
| 4,633,874 A | 1/1987 | Chow et al. |
| 4,641,076 A | 2/1987 | Linden |
| 4,646,722 A | 3/1987 | Silverstein et al. |
| 4,655,222 A | 4/1987 | Florez et al. |
| 4,663,874 A | 5/1987 | Sano et al. |
| 4,664,305 A | 5/1987 | Blake, III et al. |
| 4,665,916 A | 5/1987 | Green |
| 4,667,674 A | 5/1987 | Korthoff et al. |
| 4,671,445 A | 6/1987 | Barker et al. |
| 4,676,245 A | 6/1987 | Fukuda |
| 4,693,248 A | 9/1987 | Failla |
| 4,709,120 A | 11/1987 | Pearson |
| 4,715,520 A | 12/1987 | Roehr, Jr. et al. |
| 4,719,917 A | 1/1988 | Barrows et al. |
| 4,728,020 A | 3/1988 | Green et al. |
| 4,728,876 A | 3/1988 | Mongeon et al. |
| 4,729,260 A | 3/1988 | Dudden |
| 4,741,336 A | 5/1988 | Failla et al. |
| 4,752,024 A | 6/1988 | Green et al. |
| 4,754,909 A | 7/1988 | Barker et al. |
| 4,767,044 A  * | 8/1988 | Green ............................ 227/19 |
| 4,777,780 A | 10/1988 | Holzwarth |
| 4,787,387 A | 11/1988 | Burbank, III et al. |
| 4,790,225 A | 12/1988 | Moody et al. |
| 4,805,617 A | 2/1989 | Bedi et al. |
| 4,805,823 A | 2/1989 | Rothfuss |
| 4,809,695 A | 3/1989 | Gwathmey et al. |
| 4,817,847 A | 4/1989 | Redtenbacher et al. |
| 4,819,853 A | 4/1989 | Green |
| 4,821,939 A | 4/1989 | Green |
| 4,827,911 A | 5/1989 | Broadwin et al. |
| 4,844,068 A | 7/1989 | Arata et al. |
| 4,869,414 A | 9/1989 | Green et al. |
| 4,869,415 A | 9/1989 | Fox |
| 4,880,015 A | 11/1989 | Nierman |
| 4,892,244 A | 1/1990 | Fox et al. |
| 4,915,100 A | 4/1990 | Green |
| 4,930,503 A | 6/1990 | Pruitt |
| 4,938,408 A | 7/1990 | Bedi et al. |
| 4,941,623 A | 7/1990 | Pruitt |
| 4,944,443 A | 7/1990 | Oddsen et al. |
| 4,955,959 A | 9/1990 | Tompkins et al. |
| 4,978,049 A | 12/1990 | Green |
| 4,986,808 A | 1/1991 | Broadwin et al. |
| 4,988,334 A | 1/1991 | Hornlein et al. |
| 5,002,553 A | 3/1991 | Shiber |
| 5,009,661 A | 4/1991 | Michelson |
| 5,014,899 A | 5/1991 | Presty et al. |
| 5,015,227 A | 5/1991 | Broadwin et al. |
| 5,027,834 A | 7/1991 | Pruitt |
| 5,031,814 A | 7/1991 | Tompkins et al. |
| 5,040,715 A | 8/1991 | Green et al. |
| 5,042,707 A | 8/1991 | Taheri |
| 5,061,269 A | 10/1991 | Muller |
| 5,062,563 A | 11/1991 | Green et al. |
| 5,065,929 A | 11/1991 | Schulze et al. |
| 5,071,052 A | 12/1991 | Rodak et al. |
| 5,071,430 A | 12/1991 | de Salis et al. |
| 5,080,556 A | 1/1992 | Carreno |
| 5,083,695 A | 1/1992 | Foslien et al. |
| 5,084,057 A | 1/1992 | Green et al. |
| 5,088,979 A | 2/1992 | Filipi et al. |
| 5,088,997 A | 2/1992 | Delahuerga et al. |
| 5,094,247 A | 3/1992 | Hernandez et al. |
| 5,100,420 A | 3/1992 | Green et al. |
| 5,104,025 A | 4/1992 | Main et al. |
| 5,106,008 A | 4/1992 | Tompkins et al. |
| 5,111,987 A | 5/1992 | Moeinzadeh et al. |
| 5,116,349 A | 5/1992 | Aranyi |
| 5,129,570 A | 7/1992 | Schulze et al. |
| 5,137,198 A | 8/1992 | Nobis et al. |
| 5,139,513 A | 8/1992 | Segato |
| 5,156,315 A | 10/1992 | Green et al. |
| 5,156,614 A | 10/1992 | Green et al. |
| 5,158,567 A | 10/1992 | Green |
| 5,163,598 A | 11/1992 | Peters et al. |
| 5,171,247 A | 12/1992 | Hughett et al. |
| 5,171,249 A | 12/1992 | Stefanchik et al. |
| 5,188,111 A | 2/1993 | Yates et al. |
| 5,190,517 A | 3/1993 | Zieve et al. |
| 5,195,968 A | 3/1993 | Lundquist et al. |
| 5,197,648 A | 3/1993 | Gingold |
| 5,200,280 A | 4/1993 | Karasa |
| 5,205,459 A | 4/1993 | Brinkerhoff et al. |
| 5,207,697 A | 5/1993 | Carusillo et al. |

US 8,317,070 B2

Page 3

| | | | | | | |
|---|---|---|---|---|---|
| 5,211,649 A | 5/1993 | Kohler et al. | 5,397,324 A | 3/1995 | Carroll et al. |
| 5,217,457 A | 6/1993 | Delahuerga et al. | 5,403,312 A | 4/1995 | Yates et al. |
| 5,217,428 A | 6/1993 | Rexroth | 5,405,072 A | 4/1995 | Zlock et al. |
| 5,219,111 A | 6/1993 | Bilotti et al. | 5,405,344 A | 4/1995 | Williamson et al. |
| 5,221,036 A | 6/1993 | Takase | 5,407,293 A | 4/1995 | Crainich |
| 5,221,281 A | 6/1993 | Klicek | 5,409,498 A | 4/1995 | Braddock et al. |
| 5,222,963 A | 6/1993 | Brinkerhoff et al. | 5,411,508 A | 5/1995 | Bessler et al. |
| 5,222,975 A | 6/1993 | Crainich | 5,413,267 A | 5/1995 | Solyntjes et al. |
| 5,222,976 A | 6/1993 | Yoon | 5,413,268 A | 5/1995 | Green et al. |
| 5,223,675 A | 6/1993 | Taft | 5,413,272 A | 5/1995 | Green et al. |
| 5,234,447 A | 8/1993 | Kaster et al. | 5,415,334 A | 5/1995 | Williamson, IV et al. |
| 5,236,440 A | 8/1993 | Hlavacek | 5,415,335 A | 5/1995 | Knodell, Jr. |
| 5,240,163 A | 8/1993 | Stein et al. | 5,417,361 A | 5/1995 | Williamson, IV |
| 5,242,457 A | 9/1993 | Akopov et al. | 5,421,829 A | 6/1995 | Olichney et al. |
| 5,244,462 A | 9/1993 | Delahuerga et al. | 5,422,567 A | 6/1995 | Matsunaga |
| 5,246,156 A | 9/1993 | Rothfuss et al. | 5,423,809 A | 6/1995 | Klicek |
| 5,246,443 A | 9/1993 | Mai | 5,425,745 A | 6/1995 | Green et al. |
| 5,253,793 A | 10/1993 | Green et al. | 5,431,322 A | 7/1995 | Green et al. |
| 5,258,009 A | 11/1993 | Conners | 5,431,668 A | 7/1995 | Burbank, III et al. |
| 5,259,366 A | 11/1993 | Reydel et al. | 5,433,721 A | 7/1995 | Hooven et al. |
| 5,260,637 A | 11/1993 | Pizzi | 5,438,302 A | 8/1995 | Goble |
| 5,263,629 A | 11/1993 | Trumbull et al. | 5,441,193 A | 8/1995 | Gravener |
| 5,263,973 A | 11/1993 | Cook | 5,441,494 A | 8/1995 | Ortiz |
| 5,268,622 A | 12/1993 | Philipp | 5,445,304 A | 8/1995 | Plyley et al. |
| 5,271,543 A | 12/1993 | Grant et al. | 5,445,644 A | 8/1995 | Pietrafitta et al. |
| 5,271,544 A | 12/1993 | Fox et al. | 5,447,417 A | 9/1995 | Kuhl et al. |
| RE34,519 E | 1/1994 | Fox et al. | 5,447,513 A | 9/1995 | Davison et al. |
| 5,275,323 A | 1/1994 | Schulze et al. | 5,449,355 A | 9/1995 | Rhum et al. |
| 5,275,608 A | 1/1994 | Forman et al. | 5,449,365 A | 9/1995 | Green et al. |
| 5,281,216 A | 1/1994 | Klicek | 5,452,836 A | 9/1995 | Huitema et al. |
| 5,282,806 A | 2/1994 | Haber et al. | 5,454,827 A | 10/1995 | Aust et al. |
| 5,282,829 A | 2/1994 | Hermes | 5,456,401 A | 10/1995 | Green et al. |
| 5,297,714 A | 3/1994 | Kramer | 5,458,579 A | 10/1995 | Chodorow et al. |
| 5,304,204 A | 4/1994 | Bregen | 5,462,215 A | 10/1995 | Viola et al. |
| 5,307,976 A | 5/1994 | Olson et al. | 5,464,300 A | 11/1995 | Crainich |
| 5,309,927 A | 5/1994 | Welch | 5,465,894 A | 11/1995 | Clark et al. |
| 5,312,023 A | 5/1994 | Green et al. | 5,465,895 A | 11/1995 | Knodel et al. |
| 5,312,329 A | 5/1994 | Beaty et al. | 5,465,896 A | 11/1995 | Allen et al. |
| 5,314,424 A | 5/1994 | Nicholas | 5,466,020 A | 11/1995 | Page et al. |
| 5,318,221 A | 6/1994 | Green et al. | 5,467,911 A | 11/1995 | Tsuruta et al. |
| 5,330,502 A | 7/1994 | Hassler et al. | 5,470,006 A | 11/1995 | Rodak |
| 5,332,142 A | 7/1994 | Robinson et al. | 5,470,007 A | 11/1995 | Plyley et al. |
| 5,333,422 A | 8/1994 | Warren et al. | 5,472,132 A | 12/1995 | Savage et al. |
| 5,334,183 A | 8/1994 | Wuchinich | 5,472,442 A | 12/1995 | Klicek |
| 5,339,799 A | 8/1994 | Kami et al. | 5,473,204 A | 12/1995 | Temple |
| 5,341,724 A | 8/1994 | Vatel | 5,474,057 A | 12/1995 | Makower et al. |
| 5,342,395 A | 8/1994 | Jarrett et al. | 5,474,566 A | 12/1995 | Alesi et al. |
| 5,342,396 A | 8/1994 | Cook | 5,476,206 A | 12/1995 | Green et al. |
| 5,344,060 A | 9/1994 | Gravener et al. | 5,476,479 A | 12/1995 | Green et al. |
| 5,350,400 A | 9/1994 | Esposito et al. | 5,478,003 A | 12/1995 | Green et al. |
| 5,352,235 A | 10/1994 | Koros et al. | 5,478,354 A | 12/1995 | Tovey et al. |
| 5,352,238 A | 10/1994 | Green et al. | 5,480,089 A | 1/1996 | Blewett |
| 5,354,303 A | 10/1994 | Spaeth et al. | 5,480,409 A | 1/1996 | Riza |
| 5,356,006 A | 10/1994 | Alpern et al. | 5,482,197 A | 1/1996 | Green et al. |
| 5,358,510 A | 10/1994 | Luscombe et al. | 5,484,095 A | 1/1996 | Green et al. |
| 5,359,231 A | 10/1994 | Flowers et al. | 5,484,398 A | 1/1996 | Stoddard |
| D352,780 S | 11/1994 | Glaeser et al. | 5,484,451 A | 1/1996 | Akopov et al. |
| 5,360,428 A | 11/1994 | Hutchinson, Jr. | 5,485,947 A | 1/1996 | Olson et al. |
| 5,364,003 A | 11/1994 | Williamson, IV | 5,485,952 A | 1/1996 | Fontayne |
| 5,366,134 A | 11/1994 | Green et al. | 5,487,499 A | 1/1996 | Sorrentino et al. |
| 5,366,479 A | 11/1994 | McGarry et al. | 5,487,500 A | 1/1996 | Knodel et al. |
| 5,370,645 A | 12/1994 | Klicek et al. | 5,489,058 A | 2/1996 | Plyley et al. |
| 5,372,596 A | 12/1994 | Klicek et al. | 5,489,256 A | 2/1996 | Adair |
| 5,372,602 A | 12/1994 | Burke | 5,496,312 A | 3/1996 | Klicek |
| 5,374,277 A | 12/1994 | Hassler | 5,496,317 A | 3/1996 | Goble et al. |
| 5,379,933 A | 1/1995 | Green et al. | 5,497,933 A | 3/1996 | DeFonzo et al. |
| 5,381,782 A | 1/1995 | DeLaRama et al. | 5,503,320 A | 4/1996 | Webster et al. |
| 5,382,247 A | 1/1995 | Cimino et al. | 5,503,635 A | 4/1996 | Sauer et al. |
| 5,383,880 A | 1/1995 | Hooven | 5,503,638 A | 4/1996 | Cooper et al. |
| 5,383,881 A | 1/1995 | Green et al. | 5,505,363 A | 4/1996 | Green et al. |
| 5,383,888 A | 1/1995 | Zvenyatsky et al. | 5,509,596 A | 4/1996 | Green et al. |
| 5,383,895 A | 1/1995 | Holmes et al. | 5,509,916 A | 4/1996 | Taylor |
| 5,389,098 A | 2/1995 | Tsuruta et al. | 5,511,564 A | 4/1996 | Wilk |
| 5,391,180 A | 2/1995 | Tovey et al. | 5,514,129 A | 5/1996 | Smith |
| 5,392,979 A | 2/1995 | Green et al. | 5,514,157 A | 5/1996 | Nicholas et al. |
| 5,395,033 A | 3/1995 | Kuramoto et al. | 5,518,163 A | 5/1996 | Hooven |
| 5,395,030 A | 3/1995 | Byrne et al. | 5,518,164 A | 5/1996 | Hooven |
| 5,395,312 A | 3/1995 | Desai | 5,520,678 A | 5/1996 | Heckele et al. |
| 5,397,046 A | 3/1995 | Savage et al. | 5,520,700 A | 5/1996 | Beyar et al. |

**A61**

US 8,317,070 B2

Page 4

| | | |
|---|---|---|
| 5,522,817 A | 6/1996 | Sander et al. |
| 5,527,320 A | 6/1996 | Carruthers et al. |
| 5,529,235 A | 6/1996 | Boiarski et al. |
| D372,086 S | 7/1996 | Grasso et al. |
| 5,531,744 A | 7/1996 | Nardella et al. |
| 5,533,521 A | 7/1996 | Granger |
| 5,533,581 A | 7/1996 | Barth et al. |
| 5,533,661 A | 7/1996 | Main et al. |
| 5,535,934 A | 7/1996 | Boiarski et al. |
| 5,535,935 A * | 7/1996 | Vidal et al. ................ 227/175.2 |
| 5,535,937 A | 7/1996 | Boiarski et al. |
| 5,540,375 A | 7/1996 | Bolanos et al. |
| 5,541,376 A | 7/1996 | Ladtkow et al. |
| 5,542,594 A | 8/1996 | McKean et al. |
| 5,543,119 A | 8/1996 | Sutter et al. |
| 5,547,117 A | 8/1996 | Hamblin et al. |
| 5,549,637 A | 8/1996 | Cooper et al. |
| 5,549,637 A | 8/1996 | Crainich |
| 5,553,675 A | 9/1996 | Pitzen et al. |
| 5,553,765 A | 9/1996 | Knodel et al. |
| 5,554,169 A | 9/1996 | Green et al. |
| 5,556,416 A | 9/1996 | Clark et al. |
| 5,558,665 A | 9/1996 | Kieturakis |
| 5,558,671 A | 9/1996 | Yates |
| 5,560,530 A | 10/1996 | Bolanos et al. |
| 5,560,532 A | 10/1996 | DeFonzo et al. |
| 5,562,239 A | 10/1996 | Boiarski et al. |
| 5,562,241 A | 10/1996 | Knodel et al. |
| 5,562,682 A | 10/1996 | Oberlin et al. |
| 5,562,701 A | 10/1996 | Huitema et al. |
| 5,562,702 A | 10/1996 | Huitema et al. |
| 5,564,615 A | 10/1996 | Bishop et al. |
| 5,569,161 A | 10/1996 | Ebling et al. |
| 5,571,090 A | 11/1996 | Sherts |
| 5,571,100 A | 11/1996 | Goble et al. |
| 5,571,116 A | 11/1996 | Bolanos et al. |
| 5,573,543 A | 11/1996 | Akopov et al. |
| 5,574,431 A | 11/1996 | McKeown et al. |
| 5,575,789 A | 11/1996 | Bell et al. |
| 5,575,799 A | 11/1996 | Bolanos et al. |
| 5,575,803 A | 11/1996 | Cooper et al. |
| 5,577,654 A | 11/1996 | Bishop |
| 5,579,978 A | 12/1996 | Green et al. |
| 5,580,067 A | 12/1996 | Hamblin et al. |
| 5,582,611 A | 12/1996 | Tsuruta et al. |
| 5,582,617 A | 12/1996 | Klieman et al. |
| 5,584,425 A | 12/1996 | Savage et al. |
| 5,586,711 A | 12/1996 | Plyley et al. |
| 5,588,579 A | 12/1996 | Schnut et al. |
| 5,588,580 A | 12/1996 | Paul et al. |
| 5,588,581 A | 12/1996 | Conlon et al. |
| 5,591,170 A | 1/1997 | Spievack et al. |
| 5,591,187 A | 1/1997 | Dekel |
| 5,597,107 A | 1/1997 | Knodel et al. |
| 5,599,151 A | 2/1997 | Daum et al. |
| 5,599,344 A | 2/1997 | Paterson |
| 5,599,350 A | 2/1997 | Schulze et al. |
| 5,601,224 A | 2/1997 | Bishop et al. |
| 5,603,443 A | 2/1997 | Clark et al. |
| 5,605,272 A | 2/1997 | Witt et al. |
| 5,605,273 A | 2/1997 | Hamblin et al. |
| 5,607,094 A | 3/1997 | Clark et al. |
| 5,607,095 A | 3/1997 | Smith et al. |
| 5,607,450 A | 3/1997 | Zvenyatsky et al. |
| 5,609,285 A | 3/1997 | Grant et al. |
| 5,611,709 A | 3/1997 | McAnulty |
| 5,613,966 A | 3/1997 | Makower et al. |
| 5,618,294 A | 4/1997 | Aust et al. |
| 5,618,303 A | 4/1997 | Marlow et al. |
| 5,620,289 A | 4/1997 | Curry |
| 5,624,452 A | 4/1997 | Yates |
| 5,626,587 A | 5/1997 | Bishop et al. |
| 5,628,446 A | 5/1997 | Geiste et al. |
| 5,628,743 A | 5/1997 | Cimino |
| 5,630,539 A | 5/1997 | Plyley et al. |
| 5,630,540 A | 5/1997 | Blewett |
| 5,630,782 A | 5/1997 | Adair |
| 5,632,432 A | 5/1997 | Schulze et al. |
| 5,632,433 A | 5/1997 | Grant et al. |
| 5,634,584 A | 6/1997 | Okorocha et al. |
| 5,636,779 A | 6/1997 | Palmer |
| 5,636,780 A | 6/1997 | Green et al. |
| 5,639,008 A | 6/1997 | Gallagher et al. |
| 5,643,291 A | 7/1997 | Pier et al. |
| 5,645,209 A | 7/1997 | Green et al. |
| 5,647,526 A | 7/1997 | Green et al. |
| 5,647,869 A | 7/1997 | Goble et al. |
| 5,649,937 A | 7/1997 | Bito et al. |
| 5,651,491 A | 7/1997 | Heaton et al. |
| 5,653,373 A | 8/1997 | Green et al. |
| 5,653,374 A | 8/1997 | Young et al. |
| 5,653,677 A | 8/1997 | Okada et al. |
| 5,653,721 A | 8/1997 | Knodel et al. |
| 5,655,698 A | 8/1997 | Yoon |
| 5,657,921 A | 8/1997 | Young et al. |
| 5,658,281 A | 8/1997 | Heard |
| 5,658,300 A | 8/1997 | Bito et al. |
| 5,662,258 A | 9/1997 | Knodel et al. |
| 5,662,260 A | 9/1997 | Yoon |
| 5,662,662 A | 9/1997 | Bishop et al. |
| 5,667,517 A | 9/1997 | Hooven |
| 5,667,527 A | 9/1997 | Cook |
| 5,669,544 A | 9/1997 | Schulze et al. |
| 5,669,904 A | 9/1997 | Platt, Jr. et al. |
| 5,669,907 A | 9/1997 | Platt, Jr. et al. |
| 5,669,918 A | 9/1997 | Balazs et al. |
| 5,673,840 A | 10/1997 | Schulze et al. |
| 5,673,841 A | 10/1997 | Schulze et al. |
| 5,673,842 A | 10/1997 | Bittner et al. |
| 5,678,748 A | 10/1997 | Plyley et al. |
| 5,680,981 A | 10/1997 | Mililli et al. |
| 5,680,982 A | 10/1997 | Schulze et al. |
| 5,680,983 A | 10/1997 | Plyley et al. |
| 5,683,349 A | 11/1997 | Makower et al. |
| 5,685,474 A | 11/1997 | Seeber |
| 5,688,270 A | 11/1997 | Yates et al. |
| 5,690,269 A | 11/1997 | Bolanos et al. |
| 5,692,668 A | 12/1997 | Schulze et al. |
| 5,693,042 A | 12/1997 | Boiarski et al. |
| 5,693,051 A | 12/1997 | Schulze et al. |
| 5,695,494 A | 12/1997 | Becker |
| 5,695,504 A | 12/1997 | Gifford, III et al. |
| 5,697,543 A | 12/1997 | Burdorff |
| 5,697,943 A | 12/1997 | Sauer et al. |
| 5,700,270 A | 12/1997 | Peyser et al. |
| 5,702,387 A | 12/1997 | Arts et al. |
| 5,702,408 A | 12/1997 | Wales et al. |
| 5,702,409 A | 12/1997 | Rayburn et al. |
| 5,704,087 A | 1/1998 | Strub |
| 5,704,534 A | 1/1998 | Huitema et al. |
| 5,706,997 A | 1/1998 | Green et al. |
| 5,706,998 A | 1/1998 | Plyley et al. |
| 5,707,392 A | 1/1998 | Kortenbach |
| 5,709,334 A | 1/1998 | Sorrentino et al. |
| 5,709,680 A | 1/1998 | Yates et al. |
| 5,711,472 A | 1/1998 | Bryan |
| 5,713,128 A | 2/1998 | Schrenk et al. |
| 5,713,505 A | 2/1998 | Huitema |
| 5,713,895 A | 2/1998 | Lontine et al. |
| 5,715,987 A | 2/1998 | Kelley et al. |
| 5,715,988 A | 2/1998 | Palmer |
| 5,716,366 A | 2/1998 | Yates |
| 5,718,359 A | 2/1998 | Palmer et al. |
| 5,718,360 A | 2/1998 | Green et al. |
| 5,718,548 A | 2/1998 | Cotellessa |
| 5,720,744 A | 2/1998 | Eggleston et al. |
| D393,067 S | 3/1998 | Geary et al. |
| 5,725,536 A | 3/1998 | Oberlin et al. |
| 5,725,554 A | 3/1998 | Simon et al. |
| 5,728,121 A | 3/1998 | Bimbo et al. |
| 5,730,758 A | 3/1998 | Allgeyer |
| 5,732,871 A | 3/1998 | Clark et al. |
| 5,732,872 A | 3/1998 | Bolduc et al. |
| 5,735,445 A | 4/1998 | Vidal et al. |
| 5,735,848 A | 4/1998 | Yates et al. |
| 5,735,874 A | 4/1998 | Measamer et al. |
| 5,738,474 A | 4/1998 | Blewett |
| 5,738,648 A | 4/1998 | Lands et al. |

US 8,317,070 B2

Page 5

| 5,743,456 A | 4/1998 | Jones et al. |
| 5,747,953 A | 5/1998 | Philipp |
| 5,749,889 A | 5/1998 | Bacich et al. |
| 5,749,893 A | 5/1998 | Vidal et al. |
| 5,752,644 A | 5/1998 | Bolanos et al. |
| 5,752,965 A | 5/1998 | Francis et al. |
| 5,755,717 A | 5/1998 | Yates et al. |
| 5,758,814 A | 6/1998 | Gallagher et al. |
| 5,762,255 A | 6/1998 | Chrisman et al. |
| 5,762,256 A | 6/1998 | Mastri et al. |
| 5,766,188 A | 6/1998 | Igaki |
| 5,766,205 A | 6/1998 | Zvenyatsky et al. |
| 5,769,892 A | 6/1998 | Kingwell |
| 5,772,578 A | 6/1998 | Heimberger et al. |
| 5,772,659 A | 6/1998 | Becker et al. |
| 5,776,130 A | 7/1998 | Buysse et al. |
| 5,779,130 A | 7/1998 | Alesi et al. |
| 5,779,131 A | 7/1998 | Knodel et al. |
| 5,779,132 A | 7/1998 | Knodel et al. |
| 5,782,396 A | 7/1998 | Mastri et al. |
| 5,782,397 A | 7/1998 | Koukline |
| 5,782,749 A | 7/1998 | Riza |
| 5,782,859 A | 7/1998 | Nicholas et al. |
| 5,784,934 A | 7/1998 | Izumisawa |
| 5,785,232 A | 7/1998 | Vidal et al. |
| 5,787,897 A | 8/1998 | Kieturakis |
| 5,792,135 A | 8/1998 | Madhani et al. |
| 5,792,165 A | 8/1998 | Klieman et al. |
| 5,794,834 A | 8/1998 | Hamblin et al. |
| 5,796,188 A | 8/1998 | Bays |
| 5,797,536 A | 8/1998 | Smith et al. |
| 5,797,537 A | 8/1998 | Oberlin et al. |
| 5,797,538 A | 8/1998 | Heaton et al. |
| 5,797,906 A | 8/1998 | Rhum et al. |
| 5,797,959 A | 8/1998 | Castro et al. |
| 5,799,857 A | 9/1998 | Robertson et al. |
| 5,807,378 A | 9/1998 | Jensen et al. |
| 5,807,393 A | 9/1998 | Williamson, IV et al. |
| 5,809,441 A | 9/1998 | McKee |
| 5,810,811 A | 9/1998 | Yates et al. |
| 5,810,855 A | 9/1998 | Rayburn et al. |
| 5,813,813 A | 9/1998 | Daum et al. |
| 5,814,057 A | 9/1998 | Oi et al. |
| 5,817,084 A | 10/1998 | Jensen |
| 5,817,091 A | 10/1998 | Nardella et al. |
| 5,817,093 A | 10/1998 | Williamson, IV et al. |
| 5,817,109 A | 10/1998 | McGarry et al. |
| 5,817,119 A | 10/1998 | Klieman et al. |
| 5,820,009 A | 10/1998 | Melling et al. |
| 5,823,066 A | 10/1998 | Huitema et al. |
| 5,826,776 A | 10/1998 | Schulze et al. |
| 5,827,271 A | 10/1998 | Buysse et al. |
| 5,829,662 A | 11/1998 | Allen et al. |
| 5,833,690 A | 11/1998 | Yates et al. |
| 5,833,695 A | 11/1998 | Yoon |
| 5,833,696 A | 11/1998 | Whitfield et al. |
| 5,836,503 A | 11/1998 | Ehrenfels et al. |
| 5,836,960 A | 11/1998 | Kolesa et al. |
| 5,839,639 A | 11/1998 | Sauer et al. |
| 5,843,132 A | 12/1998 | Ilvento |
| 5,846,254 A | 12/1998 | Schulze et al. |
| 5,849,011 A | 12/1998 | Jones et al. |
| 5,855,311 A | 1/1999 | Hamblin et al. |
| 5,855,583 A | 1/1999 | Wang et al. |
| 5,860,975 A | 1/1999 | Goble et al. |
| 5,865,361 A | 2/1999 | Milliman et al. |
| 5,868,760 A | 2/1999 | McGuckin, Jr. |
| 5,871,135 A | 2/1999 | Williamson, IV et al. |
| 5,873,885 A | 2/1999 | Weidenbenner |
| 5,876,401 A | 3/1999 | Schulze et al. |
| 5,878,193 A | 3/1999 | Wang et al. |
| 5,878,937 A | 3/1999 | Green et al. |
| 5,878,938 A | 3/1999 | Bittner et al. |
| 5,891,160 A | 4/1999 | Williamson, IV et al. |
| 5,893,506 A | 4/1999 | Powell |
| 5,894,979 A | 4/1999 | Powell |
| 5,897,562 A | 4/1999 | Bolanos et al. |
| 5,899,914 A | 5/1999 | Zirps et al. |
| 5,901,895 A | 5/1999 | Heaton et al. |
| 5,902,312 A | 5/1999 | Frater et al. |
| 5,904,693 A | 5/1999 | Dicesare et al. |
| 5,906,625 A | 5/1999 | Bito et al. |
| 5,908,402 A | 6/1999 | Blythe |
| 5,908,427 A | 6/1999 | McKean et al. |
| 5,911,353 A | 6/1999 | Bolanos et al. |
| 5,915,616 A | 6/1999 | Viola et al. |
| 5,918,791 A | 7/1999 | Sorrentino et al. |
| 5,919,198 A | 7/1999 | Graves, Jr. et al. |
| 5,928,256 A | 7/1999 | Riza |
| 5,931,847 A | 8/1999 | Bittner et al. |
| 5,931,853 A | 8/1999 | McEwen et al. |
| 5,937,951 A | 8/1999 | Izuchukwu et al. |
| 5,938,667 A | 8/1999 | Peyser et al. |
| 5,941,442 A | 8/1999 | Geiste et al. |
| 5,944,172 A | 8/1999 | Hannula |
| 5,944,715 A | 8/1999 | Goble et al. |
| 5,948,030 A | 9/1999 | Miller et al. |
| 5,951,552 A | 9/1999 | Long et al. |
| 5,951,574 A | 9/1999 | Stefanchik et al. |
| 5,954,259 A | 9/1999 | Viola et al. |
| 5,964,774 A | 10/1999 | McKean et al. |
| 5,988,479 A | 11/1999 | Palmer |
| 6,003,517 A | 12/1999 | Sheffield et al. |
| 6,004,319 A | 12/1999 | Goble et al. |
| 6,010,054 A | 1/2000 | Johnson et al. |
| 6,012,494 A | 1/2000 | Balazs |
| 6,013,076 A | 1/2000 | Goble et al. |
| 6,015,406 A | 1/2000 | Goble et al. |
| 6,017,356 A | 1/2000 | Frederick et al. |
| 6,022,352 A | 2/2000 | Vandewalle |
| 6,024,741 A | 2/2000 | Williamson, IV et al. |
| 6,024,748 A | 2/2000 | Manzo et al. |
| 6,027,501 A | 2/2000 | Goble et al. |
| 6,032,849 A | 3/2000 | Mastri et al. |
| 6,033,378 A | 3/2000 | Lundquist et al. |
| 6,033,399 A | 3/2000 | Gines |
| 6,033,427 A | 3/2000 | Lee |
| 6,039,733 A | 3/2000 | Buysse et al. |
| 6,039,734 A | 3/2000 | Goble |
| 6,045,560 A | 4/2000 | McKean et al. |
| 6,050,472 A | 4/2000 | Shibata |
| 6,053,390 A | 4/2000 | Green et al. |
| 6,056,746 A | 5/2000 | Goble et al. |
| 6,063,097 A | 5/2000 | Oi et al. |
| 6,063,098 A | 5/2000 | Houser et al. |
| 6,068,627 A | 5/2000 | Orszulak et al. |
| 6,071,233 A | 6/2000 | Ishikawa et al. |
| 6,074,386 A | 6/2000 | Goble et al. |
| 6,077,286 A | 6/2000 | Cuschieri et al. |
| 6,079,606 A | 6/2000 | Milliman et al. |
| 6,082,577 A | 7/2000 | Coates et al. |
| 6,083,234 A | 7/2000 | Nicholas et al. |
| 6,083,242 A | 7/2000 | Cook |
| 6,086,600 A | 7/2000 | Kortenbach |
| 6,090,106 A | 7/2000 | Goble et al. |
| 6,093,186 A | 7/2000 | Goble |
| 6,099,537 A | 8/2000 | Sugai et al. |
| 6,099,551 A | 8/2000 | Gabbay |
| 6,102,271 A | 8/2000 | Longo et al. |
| 6,109,500 A | 8/2000 | Alli et al. |
| 6,117,158 A | 9/2000 | Measamer et al. |
| 6,119,913 A | 9/2000 | Adams et al. |
| 6,123,241 A | 9/2000 | Walter et al. |
| H1904 H | 10/2000 | Yates et al. |
| 6,126,058 A | 10/2000 | Adams et al. |
| 6,126,670 A | 10/2000 | Walker et al. |
| 6,131,789 A | 10/2000 | Schulze et al. |
| 6,132,368 A | 10/2000 | Cooper |
| 6,139,546 A | 10/2000 | Koenig et al. |
| 6,155,473 A | 12/2000 | Tompkins et al. |
| 6,156,056 A | 12/2000 | Kearns et al. |
| 6,159,146 A | 12/2000 | El Gazayerli |
| 6,159,200 A | 12/2000 | Verdura et al. |
| 6,162,208 A | 12/2000 | Hipps |
| 6,165,175 A | 12/2000 | Wampler et al. |
| 6,168,605 B1 | 1/2001 | Measamer et al. |
| 6,171,316 B1 | 1/2001 | Kovac et al. |
| 6,171,330 B1 | 1/2001 | Benchetrit |

US 8,317,070 B2

Page 6

| | | |
|---|---|---|
| 6,174,308 B1 | 1/2001 | Goble et al. |
| 6,179,776 B1 | 1/2001 | Adams et al. |
| 6,181,105 B1 | 1/2001 | Cutolo et al. |
| 6,193,129 B1 | 2/2001 | Bittner et al. |
| 6,197,042 B1 | 3/2001 | Ginn et al. |
| 6,202,914 B1 | 3/2001 | Geiste et al. |
| 6,214,028 B1 | 4/2001 | Yoon et al. |
| 6,220,368 B1 | 4/2001 | Ark et al. |
| 6,223,835 B1 | 5/2001 | Habedank et al. |
| 6,228,081 B1 | 5/2001 | Goble |
| 6,228,084 B1 | 5/2001 | Kirwan, Jr. |
| 6,231,565 B1 | 5/2001 | Tovey et al. |
| 6,234,178 B1 | 5/2001 | Goble et al. |
| 6,241,139 B1 | 6/2001 | Milliman et al. |
| 6,241,723 B1 | 6/2001 | Heim et al. |
| 6,249,076 B1 | 6/2001 | Madden et al. |
| 6,250,532 B1 | 6/2001 | Green et al. |
| 6,258,107 B1 | 7/2001 | Balázs et al. |
| 6,261,286 B1 | 7/2001 | Goble et al. |
| 6,264,086 B1 | 7/2001 | McGuckin, Jr. |
| 6,264,087 B1 | 7/2001 | Whitman |
| 6,270,508 B1 | 8/2001 | Klieman et al. |
| 6,273,897 B1 | 8/2001 | Dalessandro et al. |
| 6,277,114 B1 | 8/2001 | Bullivant et al. |
| 6,293,942 B1 | 9/2001 | Goble et al. |
| 6,296,640 B1 | 10/2001 | Wampler et al. |
| 6,302,311 B1 | 10/2001 | Adams et al. |
| 6,306,134 B1 | 10/2001 | Goble et al. |
| 6,309,403 B1 | 10/2001 | Minor et al. |
| 6,315,184 B1 | 11/2001 | Whitman |
| 6,320,123 B1 | 11/2001 | Reimers |
| 6,324,339 B1 | 11/2001 | Hudson et al. |
| 6,325,799 B1 | 12/2001 | Goble |
| 6,325,810 B1 | 12/2001 | Hamilton et al. |
| 6,330,965 B1 | 12/2001 | Milliman et al. |
| 6,331,181 B1 | 12/2001 | Tierney et al. |
| 6,331,761 B1 | 12/2001 | Kumar et al. |
| 6,336,926 B1 | 1/2002 | Goble |
| 6,346,077 B1 | 2/2002 | Taylor et al. |
| 6,352,503 B1 | 3/2002 | Matsui et al. |
| 6,358,224 B1 | 3/2002 | Tims et al. |
| 6,364,877 B1 | 4/2002 | Goble et al. |
| 6,364,888 B1 | 4/2002 | Niemeyer et al. |
| 6,387,113 B1 | 5/2002 | Hawkins et al. |
| 6,387,114 B2 | 5/2002 | Adams |
| 6,398,781 B1 | 6/2002 | Goble et al. |
| 6,398,797 B2 | 6/2002 | Bombard et al. |
| 6,406,440 B1 | 6/2002 | Stefanchik |
| 6,409,724 B1 | 6/2002 | Penny et al. |
| H2037 H | 7/2002 | Yates et al. |
| 6,416,486 B1 | 7/2002 | Wampler |
| 6,416,509 B1 | 7/2002 | Goble et al. |
| RE37,814 E | 8/2002 | Allgeyer |
| 6,436,097 B1 | 8/2002 | Nardella |
| 6,436,107 B1 | 8/2002 | Wang et al. |
| 6,436,122 B1 | 8/2002 | Frank et al. |
| 6,439,446 B1 | 8/2002 | Perry et al. |
| 6,440,146 B2 | 8/2002 | Nicholas et al. |
| 6,443,973 B1 | 9/2002 | Whitman |
| 6,468,275 B1 | 10/2002 | Wampler et al. |
| 6,471,106 B1 | 10/2002 | Reining |
| 6,482,200 B2 | 11/2002 | Shippert |
| 6,485,490 B2 | 11/2002 | Wampler et al. |
| 6,488,196 B1 | 12/2002 | Fenton, Jr. |
| 6,488,197 B1 | 12/2002 | Whitman |
| 6,491,201 B1 | 12/2002 | Whitman |
| 6,491,690 B1 | 12/2002 | Goble et al. |
| 6,492,785 B1 | 12/2002 | Kasten et al. |
| 6,494,896 B1 | 12/2002 | D'Alessio et al. |
| 6,503,257 B2 | 1/2003 | Grant et al. |
| 6,503,259 B2 | 1/2003 | Huxel et al. |
| 6,505,768 B2 | 1/2003 | Whitman |
| 6,510,854 B2 | 1/2003 | Goble |
| 6,511,468 B1 | 1/2003 | Cragg et al. |
| 6,517,535 B2 | 2/2003 | Edwards |
| 6,517,565 B1 | 2/2003 | Whitman et al. |
| 6,522,101 B2 | 2/2003 | Malackowski |
| 6,543,456 B1 | 4/2003 | Freeman |
| 6,547,786 B1 | 4/2003 | Goble |
| 6,550,546 B2 | 4/2003 | Thurler et al. |
| 6,551,333 B2 | 4/2003 | Kuhns et al. |
| 6,554,861 B2 | 4/2003 | Knox et al. |
| 6,558,379 B1 | 5/2003 | Batchelor et al. |
| 6,565,560 B1 | 5/2003 | Goble et al. |
| 6,569,085 B2 | 5/2003 | Kortenbach et al. |
| 6,569,171 B2 | 5/2003 | DeGuillebon et al. |
| 6,578,751 B2 | 6/2003 | Hartwick |
| 6,582,427 B1 | 6/2003 | Goble et al. |
| 6,588,643 B2 | 7/2003 | Bolduc et al. |
| 6,592,597 B2 | 7/2003 | Grant et al. |
| 6,596,432 B2 | 7/2003 | Kawakami et al. |
| D478,665 S | 8/2003 | Isaacs et al. |
| D478,986 S | 8/2003 | Johnston et al. |
| 6,601,749 B2 | 8/2003 | Sullivan et al. |
| 6,602,252 B2 | 8/2003 | Mollenauer |
| 6,605,078 B2 | 8/2003 | Adams |
| 6,605,669 B2 | 8/2003 | Awokola et al. |
| 6,616,686 B2 | 9/2003 | Coleman et al. |
| 6,619,529 B2 | 9/2003 | Green et al. |
| 6,620,166 B1 | 9/2003 | Wenstrom, Jr. et al. |
| 6,629,630 B2 | 10/2003 | Adams |
| 6,629,974 B2 | 10/2003 | Penny et al. |
| 6,629,988 B2 | 10/2003 | Weadock |
| 6,636,412 B2 | 10/2003 | Smith |
| 6,638,108 B2 | 10/2003 | Tachi |
| 6,638,285 B2 | 10/2003 | Gabbay |
| 6,644,532 B2 | 11/2003 | Green et al. |
| 6,648,816 B2 | 11/2003 | Irion et al. |
| D484,243 S | 12/2003 | Ryan et al. |
| D484,595 S | 12/2003 | Ryan et al. |
| D484,596 S | 12/2003 | Ryan et al. |
| 6,656,193 B2 | 12/2003 | Grant et al. |
| 6,666,875 B1 | 12/2003 | Sakurai et al. |
| 6,669,073 B2 | 12/2003 | Milliman et al. |
| D484,977 S | 1/2004 | Ryan et al. |
| 6,676,660 B2 | 1/2004 | Wampler et al. |
| 6,679,410 B2 | 1/2004 | Würsch et al. |
| 6,681,978 B2 | 1/2004 | Geiste et al. |
| 6,681,979 B2 | 1/2004 | Whitman |
| 6,682,528 B2 | 1/2004 | Frazier et al. |
| 6,685,727 B2 | 2/2004 | Fisher et al. |
| 6,695,199 B2 | 2/2004 | Whitman |
| 6,698,643 B2 | 3/2004 | Whitman |
| 6,704,210 B1 | 3/2004 | Myers |
| 6,705,503 B1 | 3/2004 | Pedicini et al. |
| 6,716,223 B2 | 4/2004 | Leopold et al. |
| 6,716,232 B1 | 4/2004 | Vidal et al. |
| 6,716,233 B1 | 4/2004 | Whitman |
| 6,723,087 B2 | 4/2004 | O'Neill et al. |
| 6,723,091 B2 | 4/2004 | Goble et al. |
| 6,726,697 B2 | 4/2004 | Nicholas et al. |
| 6,740,030 B2 | 5/2004 | Martone et al. |
| 6,747,121 B2 | 6/2004 | Gogolewski |
| 6,749,560 B1 | 6/2004 | Konstorum et al. |
| 6,752,768 B2 | 6/2004 | Burdorff et al. |
| 6,752,816 B2 | 6/2004 | Culp et al. |
| 6,755,195 B1 | 6/2004 | Lemke et al. |
| 6,755,338 B2 | 6/2004 | Hahnen et al. |
| 6,758,846 B2 | 7/2004 | Goble et al. |
| 6,761,685 B2 | 7/2004 | Adams et al. |
| 6,767,352 B2 | 7/2004 | Field et al. |
| 6,767,356 B2 | 7/2004 | Kanner et al. |
| 6,769,594 B2 | 8/2004 | Orban, III |
| 6,773,438 B1 | 8/2004 | Knodel et al. |
| 6,780,151 B2 | 8/2004 | Grabover et al. |
| 6,780,180 B1 | 8/2004 | Goble et al. |
| 6,783,524 B2 | 8/2004 | Anderson et al. |
| 6,786,382 B1 | 9/2004 | Hoffman |
| 6,786,864 B2 | 9/2004 | Matsuura et al. |
| 6,786,896 B1 | 9/2004 | Madhani et al. |
| 6,790,173 B2 | 9/2004 | Saadat et al. |
| 6,793,652 B1 | 9/2004 | Whitman et al. |
| 6,805,273 B2 | 10/2004 | Bilotti et al. |
| 6,806,808 B1 | 10/2004 | Watters et al. |
| 6,808,525 B2 | 10/2004 | Latterell et al. |
| 6,814,741 B2 | 11/2004 | Bowman et al. |
| 6,817,508 B1 | 11/2004 | Racenet et al. |
| 6,817,509 B2 | 11/2004 | Geiste et al. |

US 8,317,070 B2

Page 7

| | | | | | | |
|---|---|---|---|---|---|---|
| 6,817,974 B2 | 11/2004 | Cooper et al. | 7,070,559 B2 | 7/2006 | Adams et al. |
| 6,821,273 B2 | 11/2004 | Mollenauer | 7,071,287 B2 | 7/2006 | Rhine et al. |
| 6,827,725 B2 | 12/2004 | Batchelor et al. | 7,075,770 B1 | 7/2006 | Smith |
| 6,828,902 B2 | 12/2004 | Casden | 7,077,856 B2 | 7/2006 | Whitman |
| 6,830,174 B2 | 12/2004 | Hillstead et al. | 7,080,769 B2 | 7/2006 | Vresh et al. |
| 6,832,998 B2 | 12/2004 | Goble | 7,081,114 B2 | 7/2006 | Rashidi |
| 6,834,001 B2 | 12/2004 | Myono | 7,083,073 B2 | 8/2006 | Yoshie et al. |
| 6,835,199 B2 | 12/2004 | McGuckin, Jr. et al. | 7,083,075 B2 | 8/2006 | Swayze et al. |
| 6,843,403 B2 | 1/2005 | Whitman | 7,083,571 B2 | 8/2006 | Wang et al. |
| 6,843,789 B2 | 1/2005 | Goble | 7,087,071 B2 | 8/2006 | Nicholas et al. |
| 6,846,307 B2 | 1/2005 | Whitman et al. | 7,090,637 B2 | 8/2006 | Danitz et al. |
| 6,846,308 B2 | 1/2005 | Whitman et al. | 7,090,673 B2 | 8/2006 | Dycus et al. |
| 6,846,309 B2 | 1/2005 | Whitman et al. | 7,090,684 B2 | 8/2006 | McGuckin, Jr. et al. |
| 6,849,071 B2 | 2/2005 | Whitman et al. | 7,094,202 B2 | 8/2006 | Nobis et al. |
| RE38,708 E | 3/2005 | Bolanos et al. | 7,097,089 B2 | 8/2006 | Marczyk |
| 6,866,178 B2 | 3/2005 | Adams et al. | 7,098,794 B2 | 8/2006 | Lindsay et al. |
| 6,866,671 B2 | 3/2005 | Tierney et al. | 7,104,741 B2 | 9/2006 | Krohn |
| 6,872,214 B2 | 3/2005 | Sonnenschein et al. | 7,108,695 B2 | 9/2006 | Witt et al. |
| 6,874,669 B2 | 4/2005 | Adams et al. | 7,108,701 B2 | 9/2006 | Evens et al. |
| 6,877,647 B2 | 4/2005 | Green et al. | 7,108,709 B2 | 9/2006 | Cummins |
| 6,878,106 B1 | 4/2005 | Herrmann | 7,111,769 B2 | 9/2006 | Wales et al. |
| 6,893,435 B2 | 5/2005 | Goble | 7,112,214 B2 | 9/2006 | Peterson et al. |
| 6,905,057 B2 | 6/2005 | Swayze et al. | RE39,358 E | 10/2006 | Goble |
| 6,905,497 B2 | 6/2005 | Truckai et al. | 7,114,642 B2 | 10/2006 | Whitman |
| 6,913,608 B2 | 7/2005 | Liddicoat et al. | 7,118,582 B1 | 10/2006 | Wang et al. |
| 6,913,613 B2 | 7/2005 | Schwarz et al. | 7,121,446 B2 | 10/2006 | Arad et al. |
| 6,923,803 B2 | 8/2005 | Goble | 7,122,028 B2 | 10/2006 | Looper et al. |
| 6,929,641 B2 | 8/2005 | Goble et al. | 7,128,253 B2 | 10/2006 | Mastri et al. |
| 6,931,830 B2 | 8/2005 | Liao | 7,128,254 B2 | 10/2006 | Shelton, IV et al. |
| 6,939,358 B2 | 9/2005 | Palacios et al. | 7,128,748 B2 | 10/2006 | Mooradian et al. |
| 6,942,662 B2 | 9/2005 | Goble et al. | 7,131,445 B2 | 11/2006 | Amoah |
| 6,945,444 B2 | 9/2005 | Gresham et al. | 7,133,601 B2 | 11/2006 | Phillips et al. |
| 6,953,138 B1 | 10/2005 | Dworak et al. | 7,140,527 B2 | 11/2006 | Ehrenfels et al. |
| 6,953,139 B2 | 10/2005 | Milliman et al. | 7,140,528 B2 | 11/2006 | Shelton, IV |
| 6,959,851 B2 | 11/2005 | Heinrich | 7,143,923 B2 | 12/2006 | Shelton, IV et al. |
| 6,959,852 B2 | 11/2005 | Shelton, IV et al. | 7,143,924 B2 | 12/2006 | Scirica et al. |
| 6,960,163 B2 | 11/2005 | Ewers et al. | 7,143,925 B2 | 12/2006 | Shelton, IV et al. |
| 6,960,220 B2 | 11/2005 | Marino et al. | 7,143,926 B2 | 12/2006 | Shelton, IV et al. |
| 6,964,363 B2 | 11/2005 | Wales et al. | 7,147,138 B2 | 12/2006 | Shelton, IV |
| 6,966,907 B2 | 11/2005 | Goble | 7,147,139 B2 | 12/2006 | Schwemberger et al. |
| 6,966,909 B2 | 11/2005 | Marshall et al. | 7,147,637 B2 | 12/2006 | Goble |
| 6,972,199 B2 | 12/2005 | Lebouitz et al. | 7,147,650 B2 | 12/2006 | Lee |
| 6,974,462 B2 | 12/2005 | Sater | 7,150,748 B2 | 12/2006 | Ebbutt et al. |
| 6,978,921 B2 | 12/2005 | Shelton, IV et al. | 7,153,300 B2 | 12/2006 | Goble |
| 6,981,628 B2 | 1/2006 | Wales | 7,156,863 B2 | 1/2007 | Sonnenschein et al. |
| 6,981,941 B2 | 1/2006 | Whitman et al. | 7,159,750 B2 | 1/2007 | Racenet et al. |
| 6,981,978 B2 | 1/2006 | Gannoe | 7,160,299 B2 | 1/2007 | Baily |
| 6,984,203 B2 | 1/2006 | Tartaglia et al. | 7,161,036 B2 | 1/2007 | Oikawa et al. |
| 6,984,231 B2 | 1/2006 | Goble et al. | 7,168,604 B2 | 1/2007 | Milliman et al. |
| 6,986,451 B1 | 1/2006 | Mastri et al. | 7,172,104 B2 | 2/2007 | Scirica et al. |
| 6,988,649 B2 | 1/2006 | Shelton, IV et al. | 7,179,223 B2 | 2/2007 | Motoki et al. |
| 6,988,650 B2 | 1/2006 | Schwemberger et al. | 7,179,267 B2 | 2/2007 | Nolan et al. |
| 6,990,796 B2 | 1/2006 | Schnipke et al. | 7,182,239 B1 | 2/2007 | Myers |
| 6,997,931 B2 | 2/2006 | Sauer et al. | 7,188,758 B2 | 3/2007 | Viola et al. |
| 7,000,818 B2 | 2/2006 | Shelton, IV et al. | 7,195,627 B2 | 3/2007 | Amoah et al. |
| 7,000,819 B2 | 2/2006 | Swayze et al. | 7,204,835 B2 | 4/2007 | Latterell et al. |
| 7,001,380 B2 | 2/2006 | Goble | 7,207,233 B2 | 4/2007 | Wadge |
| 7,001,408 B2 | 2/2006 | Knodel et al. | 7,207,471 B2 | 4/2007 | Heinrich et al. |
| 7,008,435 B2 | 3/2006 | Cummins | 7,207,472 B2 | 4/2007 | Wukusick et al. |
| 7,018,390 B2 | 3/2006 | Turovskiy et al. | 7,208,005 B2 | 4/2007 | Frecker et al. |
| 7,025,743 B2 | 4/2006 | Mann et al. | 7,210,609 B2 | 5/2007 | Leiboff et al. |
| 7,029,435 B2 | 4/2006 | Nakao | 7,211,081 B2 | 5/2007 | Goble |
| 7,032,798 B2 | 4/2006 | Whitman et al. | 7,211,084 B2 | 5/2007 | Goble et al. |
| 7,032,799 B2 | 4/2006 | Viola et al. | 7,213,736 B2 | 5/2007 | Wales et al. |
| 7,033,356 B2 | 4/2006 | Latterell et al. | 7,214,224 B2 | 5/2007 | Goble |
| 7,036,680 B1 | 5/2006 | Flannery | 7,217,285 B2 | 5/2007 | Vargas et al. |
| 7,037,344 B2 | 5/2006 | Kagan et al. | 7,220,260 B2 | 5/2007 | Fleming et al. |
| 7,044,352 B2 | 5/2006 | Shelton, IV et al. | 7,220,272 B2 | 5/2007 | Weadock |
| 7,044,353 B2 | 5/2006 | Mastri et al. | 7,225,963 B2 | 6/2007 | Scirica |
| 7,048,687 B1 | 5/2006 | Reuss et al. | 7,225,964 B2 | 6/2007 | Mastri et al. |
| 7,052,494 B2 | 5/2006 | Goble et al. | 7,234,624 B2 | 6/2007 | Gresham et al. |
| 7,055,730 B2 | 6/2006 | Ehrenfels et al. | 7,235,089 B1 | 6/2007 | McGuckin, Jr. |
| 7,055,731 B2 | 6/2006 | Shelton, IV et al. | 7,235,302 B2 | 6/2007 | Jing et al. |
| 7,056,284 B2 | 6/2006 | Martone et al. | 7,237,708 B1 | 7/2007 | Guy et al. |
| 7,056,330 B2 | 6/2006 | Gayton | 7,241,288 B2 | 7/2007 | Braun |
| 7,059,508 B2 | 6/2006 | Shelton, IV et al. | 7,246,734 B2 | 7/2007 | Shelton, IV |
| 7,063,712 B2 | 6/2006 | Vargas et al. | 7,247,161 B2 | 7/2007 | Johnston et al. |
| 7,066,944 B2 | 6/2006 | Laufer et al. | 7,252,660 B2 | 8/2007 | Kunz |
| 7,070,083 B2 | 7/2006 | Jankowski | 7,255,696 B2 | 8/2007 | Goble et al. |

US 8,317,070 B2

Page 8

| | | |
|---|---|---|
| 7,258,262 B2 | 8/2007 | Mastri et al. |
| 7,260,431 B2 | 8/2007 | Libbus et al. |
| 7,265,374 B2 | 9/2007 | Lee et al. |
| 7,267,679 B2 | 9/2007 | McGuckin, Jr. et al. |
| 7,278,562 B2 | 10/2007 | Mastri et al. |
| 7,278,563 B1 | 10/2007 | Green |
| 7,278,994 B2 | 10/2007 | Goble |
| 7,282,048 B2 | 10/2007 | Goble et al. |
| 7,295,907 B2 | 11/2007 | Lu et al. |
| 7,296,724 B2 | 11/2007 | Green et al. |
| 7,297,149 B2 | 11/2007 | Vitali et al. |
| 7,300,450 B2 | 11/2007 | Vleugels et al. |
| 7,303,106 B2 | 12/2007 | Milliman et al. |
| 7,303,107 B2 | 12/2007 | Milliman et al. |
| 7,303,108 B2 | 12/2007 | Shelton, IV |
| 7,303,556 B2 | 12/2007 | Metzger |
| 7,322,975 B2 | 1/2008 | Goble et al. |
| 7,324,572 B2 | 1/2008 | Chang |
| 7,328,829 B2 | 2/2008 | Arad et al. |
| 7,330,004 B2 | 2/2008 | DeJonge et al. |
| 7,334,717 B2 | 2/2008 | Rethy et al. |
| 7,336,184 B2 | 2/2008 | Smith et al. |
| 7,338,513 B2 | 3/2008 | Lee et al. |
| 7,348,763 B1 | 3/2008 | Reinhart et al. |
| 7,351,258 B2 | 4/2008 | Ricotta et al. |
| 7,364,060 B2 | 4/2008 | Milliman |
| 7,377,928 B2 | 5/2008 | Zubik et al. |
| 7,388,217 B2 | 6/2008 | Buschbeck et al. |
| 7,397,364 B2 | 7/2008 | Govari |
| 7,398,907 B2 | 7/2008 | Racenet et al. |
| 7,398,908 B2 | 7/2008 | Holsten et al. |
| 7,404,508 B2 | 7/2008 | Smith et al. |
| 7,404,509 B2 | 7/2008 | Ortiz et al. |
| 7,418,078 B2 | 8/2008 | Blanz et al. |
| 7,419,080 B2 | 9/2008 | Smith et al. |
| 7,422,136 B1 | 9/2008 | Marczyk |
| 7,424,965 B2 | 9/2008 | Racenet et al. |
| 7,431,188 B1 | 10/2008 | Marczyk |
| 7,431,694 B2 | 10/2008 | Stefanchik et al. |
| 7,434,715 B2 | 10/2008 | Shelton, IV et al. |
| 7,434,717 B2 | 10/2008 | Shelton, IV et al. |
| 7,438,209 B2 | 10/2008 | Hess et al. |
| 7,439,354 B2 | 10/2008 | Lenges et al. |
| 7,441,685 B1 | 10/2008 | Boudreaux |
| 7,455,208 B2 | 11/2008 | Wales et al. |
| 7,461,767 B2 | 12/2008 | Viola et al. |
| 7,464,847 B2 | 12/2008 | Viola et al. |
| 7,472,814 B2 | 1/2009 | Mastri et al. |
| 7,473,253 B2 | 1/2009 | Dycus et al. |
| 7,481,349 B2 | 1/2009 | Holsten et al. |
| 7,481,824 B2 | 1/2009 | Boudreaux et al. |
| 7,485,133 B2 | 2/2009 | Cannon et al. |
| 7,490,749 B2 | 2/2009 | Schall et al. |
| 7,494,039 B2 | 2/2009 | Racenet et al. |
| 7,494,499 B2 | 2/2009 | Nagase et al. |
| 7,506,790 B2 | 3/2009 | Shelton, IV |
| 7,510,107 B2 | 3/2009 | Timm et al. |
| 7,524,320 B2 | 4/2009 | Tierney et al. |
| 7,530,985 B2 | 5/2009 | Takemoto et al. |
| 7,546,940 B2 | 6/2009 | Milliman et al. |
| 7,547,312 B2 | 6/2009 | Bauman et al. |
| 7,549,564 B2 | 6/2009 | Boudreaux |
| 7,552,854 B2 | 6/2009 | Wixey et al. |
| 7,556,185 B2 | 7/2009 | Viola |
| 7,556,186 B2 | 7/2009 | Milliman |
| 7,563,862 B2 | 7/2009 | Sieg et al. |
| 7,566,300 B2 | 7/2009 | Devierre et al. |
| 7,568,604 B2 | 8/2009 | Ehrenfels et al. |
| 7,568,619 B2 | 8/2009 | Todd et al. |
| 7,575,144 B2 | 8/2009 | Ortiz et al. |
| 7,588,175 B2 | 9/2009 | Timm et al. |
| 7,588,176 B2 | 9/2009 | Timm et al. |
| 7,597,229 B2 | 10/2009 | Boudreaux et al. |
| 7,600,663 B2 | 10/2009 | Green |
| 7,604,150 B2 | 10/2009 | Boudreaux |
| 7,604,151 B2 | 10/2009 | Hess et al. |
| 7,611,038 B2 | 11/2009 | Racenet et al. |
| 7,615,003 B2 | 11/2009 | Stefanchik et al. |
| 7,624,902 B2 | 12/2009 | Marczyk et al. |
| 7,631,793 B2 | 12/2009 | Rethy et al. |
| 7,641,092 B2 | 1/2010 | Kruszynski et al. |
| 7,641,093 B2 | 1/2010 | Doll et al. |
| 7,651,498 B2 | 1/2010 | Shifrin et al. |
| 7,658,311 B2 | 2/2010 | Boudreaux |
| 7,665,646 B2 | 2/2010 | Prommersberger |
| 7,669,747 B2 | 2/2010 | Weisenburgh, II et al. |
| 7,673,782 B2 | 3/2010 | Hess et al. |
| 7,674,255 B2 | 3/2010 | Braun |
| 7,682,307 B2 | 3/2010 | Danitz et al. |
| 7,686,826 B2 | 3/2010 | Lee et al. |
| 7,691,098 B2 | 4/2010 | Wallace et al. |
| 7,699,204 B2 | 4/2010 | Viola |
| 7,717,312 B2 | 5/2010 | Beetel |
| 7,721,930 B2 | 5/2010 | McKenna et al. |
| 7,721,931 B2 | 5/2010 | Shelton, IV et al. |
| 7,721,936 B2 | 5/2010 | Shalton, IV et al. |
| 7,722,610 B2 | 5/2010 | Viola et al. |
| 7,726,537 B2 | 6/2010 | Olson et al. |
| 7,726,538 B2 | 6/2010 | Holsten et al. |
| 7,731,072 B2 | 6/2010 | Timm et al. |
| 7,735,703 B2 | 6/2010 | Morgan et al. |
| 7,738,971 B2 | 6/2010 | Swayze et al. |
| 7,743,960 B2 | 6/2010 | Whitman et al. |
| 7,744,627 B2 | 6/2010 | Orban, III et al. |
| 7,753,245 B2 | 7/2010 | Boudreaux et al. |
| 7,766,209 B2 | 8/2010 | Baxter, III et al. |
| 7,766,894 B2 | 8/2010 | Weitzner et al. |
| 7,771,396 B2 | 8/2010 | Stefanchik et al. |
| 7,776,060 B2 | 8/2010 | Mooradian et al. |
| 7,780,054 B2 | 8/2010 | Wales |
| 7,780,055 B2 | 8/2010 | Scirica et al. |
| 7,780,685 B2 | 8/2010 | Hunt et al. |
| 7,784,662 B2 | 8/2010 | Wales et al. |
| 7,793,812 B2 | 9/2010 | Moore et al. |
| 7,798,386 B2 | 9/2010 | Schall et al. |
| 7,803,151 B2 | 9/2010 | Whitman |
| 7,806,891 B2 | 10/2010 | Nowlin et al. |
| 7,810,692 B2 | 10/2010 | Hall et al. |
| 7,810,693 B2 | 10/2010 | Broehl et al. |
| 7,815,565 B2 | 10/2010 | Stefanchik et al. |
| 7,819,296 B2 | 10/2010 | Hueil et al. |
| 7,819,297 B2 | 10/2010 | Doll et al. |
| 7,819,298 B2 | 10/2010 | Hall et al. |
| 7,819,299 B2 | 10/2010 | Shelton, IV et al. |
| 7,824,401 B2 | 11/2010 | Manzo et al. |
| 7,828,794 B2 | 11/2010 | Sartor |
| 7,828,808 B2 | 11/2010 | Hinman et al. |
| 7,832,408 B2 | 11/2010 | Shelton, IV et al. |
| 7,832,611 B2 | 11/2010 | Boyden et al. |
| 7,832,612 B2 | 11/2010 | Baxter, III et al. |
| 7,836,400 B2 | 11/2010 | May et al. |
| 7,837,080 B2 | 11/2010 | Schwemberger |
| 7,845,533 B2 | 12/2010 | Marczyk et al. |
| 7,845,534 B2 | 12/2010 | Viola et al. |
| 7,846,149 B2 | 12/2010 | Jankowski |
| 7,857,185 B2 | 12/2010 | Swayze et al. |
| 7,857,186 B2 | 12/2010 | Baxter, III et al. |
| 7,861,906 B2 | 1/2011 | Doll et al. |
| 7,866,527 B2 | 1/2011 | Hall et al. |
| 7,870,989 B2 | 1/2011 | Viola et al. |
| 7,887,530 B2 | 2/2011 | Zemlok et al. |
| 7,900,805 B2 | 3/2011 | Shelton, IV et al. |
| 7,905,380 B2 | 3/2011 | Shelton, IV et al. |
| 7,905,381 B2 | 3/2011 | Baxter, III et al. |
| 7,909,191 B2 | 3/2011 | Baker et al. |
| 7,909,221 B2 | 3/2011 | Viola et al. |
| 7,913,891 B2 | 3/2011 | Doll et al. |
| 7,918,377 B2 | 4/2011 | Measamer et al. |
| 7,922,061 B2 | 4/2011 | Shelton, IV et al. |
| 7,922,063 B2 | 4/2011 | Zemlok et al. |
| 7,934,630 B2 | 5/2011 | Shelton, IV et al. |
| 7,942,303 B2 | 5/2011 | Shah |
| 7,950,560 B2 | 5/2011 | Zemlok et al. |
| 7,954,682 B2 | 6/2011 | Giordano et al. |
| 7,954,684 B2 | 6/2011 | Boudreaux |
| 7,954,686 B2 | 6/2011 | Baxter, III et al. |
| 7,959,050 B2 | 6/2011 | Smith et al. |
| 7,959,051 B2 | 6/2011 | Smith et al. |

**A66**

US 8,317,070 B2

Page 9

| | | | | | | |
|---|---|---|---|---|---|---|
| 7,967,180 B2 | 6/2011 | Scirica | 2005/0085693 A1 | 4/2005 | Belson et al. |
| 7,972,298 B2 | 7/2011 | Wallace et al. | 2005/0103819 A1 | 5/2005 | Racenet et al. |
| 7,980,443 B2 | 7/2011 | Scheib et al. | 2005/0107814 A1 | 5/2005 | Johnston et al. |
| 8,002,795 B2 | 8/2011 | Beetel | 2005/0107824 A1 | 5/2005 | Hillstead et al. |
| 8,011,551 B2 | 9/2011 | Marczyk et al. | 2005/0113820 A1 | 5/2005 | Goble et al. |
| 8,020,743 B2 | 9/2011 | Shelton, IV | 2005/0119525 A1 | 6/2005 | Takemoto |
| 8,056,787 B2 | 11/2011 | Boudreaux et al. | 2005/0119669 A1 | 6/2005 | Demmy |
| 8,066,167 B2 | 11/2011 | Measamer et al. | 2005/0124855 A1 | 6/2005 | Jaffe et al. |
| D650,074 S | 12/2011 | Hunt et al. | 2005/0125009 A1 | 6/2005 | Perry et al. |
| 8,083,120 B2 | 12/2011 | Shelton, IV et al. | 2005/0131173 A1 | 6/2005 | McDaniel et al. |
| 8,113,410 B2 | 2/2012 | Hall et al. | 2005/0131211 A1 | 6/2005 | Bayley et al. |
| 8,136,712 B2 | 3/2012 | Zingman | 2005/0131390 A1 | 6/2005 | Heinrich et al. |
| 8,141,762 B2 | 3/2012 | Bedi et al. | 2005/0131436 A1 | 6/2005 | Johnston et al. |
| 8,157,145 B2 | 4/2012 | Shelton, IV et al. | 2005/0131437 A1 | 6/2005 | Johnston et al. |
| 8,157,153 B2 | 4/2012 | Shelton, IV et al. | 2005/0131457 A1 | 6/2005 | Douglas et al. |
| 8,161,977 B2 | 4/2012 | Shelton, IV et al. | 2005/0137454 A1 | 6/2005 | Saadat et al. |
| 8,167,185 B2 | 5/2012 | Shelton, IV et al. | 2005/0137455 A1 | 6/2005 | Ewers et al. |
| 8,172,124 B2 | 5/2012 | Hess et al. | 2005/0143759 A1 | 6/2005 | Kelly |
| 8,186,560 B2 | 5/2012 | Hess et al. | 2005/0145671 A1 | 7/2005 | Viola |
| 8,196,795 B2 | 6/2012 | Moore et al. | 2005/0145675 A1 | 7/2005 | Hartwick et al. |
| 8,196,796 B2 | 6/2012 | Shelton, IV et al. | 2005/0154258 A1 | 7/2005 | Tartaglia et al. |
| 2002/0022836 A1 | 2/2002 | Goble et al. | 2005/0165419 A1 | 7/2005 | Sauer et al. |
| 2002/0029036 A1 | 3/2002 | Goble et al. | 2005/0165435 A1 | 7/2005 | Johnston et al. |
| 2002/0117534 A1 | 8/2002 | Green et al. | 2005/0169974 A1 | 8/2005 | Tenerz et al. |
| 2002/0134811 A1 | 9/2002 | Napier et al. | 2005/0171522 A1 | 8/2005 | Christopherson |
| 2002/0165541 A1 | 11/2002 | Whitman | 2005/0177181 A1 | 8/2005 | Kagan et al. |
| 2003/0093103 A1 | 5/2003 | Malackowski et al. | 2005/0182298 A1 | 8/2005 | Ikeda et al. |
| 2003/0105478 A1 | 6/2003 | Whitman et al. | 2005/0184121 A1 | 8/2005 | Heinrich |
| 2003/0130677 A1 | 7/2003 | Whitman et al. | 2005/0187545 A1 | 8/2005 | Hooven et al. |
| 2003/0139741 A1 | 7/2003 | Goble et al. | 2005/0187572 A1 | 8/2005 | Johnston et al. |
| 2003/0153908 A1 | 8/2003 | Goble et al. | 2005/0187576 A1 | 8/2005 | Whitman et al. |
| 2003/0178465 A1* | 9/2003 | Bilotti et al. ............. 227/180.1 | 2005/0189397 A1 | 9/2005 | Jankowski |
| 2003/0195387 A1 | 10/2003 | Kortenbach et al. | 2005/0192609 A1 | 9/2005 | Whitman et al. |
| 2003/0205029 A1 | 11/2003 | Chapolini et al. | 2005/0192628 A1 | 9/2005 | Viola |
| 2003/0216732 A1 | 11/2003 | Truckai et al. | 2005/0203550 A1 | 9/2005 | Laufer et al. |
| 2003/0220660 A1 | 11/2003 | Kortenbach et al. | 2005/0216055 A1 | 9/2005 | Scirica et al. |
| 2004/0002726 A1 | 1/2004 | Nunez et al. | 2005/0228224 A1 | 10/2005 | Okada et al. |
| 2004/0006340 A1 | 1/2004 | Latterell et al. | 2005/0230453 A1 | 10/2005 | Viola |
| 2004/0006372 A1 | 1/2004 | Racenet et al. | 2005/0240222 A1 | 10/2005 | Shipp |
| 2004/0030333 A1 | 2/2004 | Goble | 2005/0245965 A1 | 11/2005 | Orban, III et al. |
| 2004/0034369 A1 | 2/2004 | Beane et al. | 2005/0251128 A1 | 11/2005 | Amoah |
| 2004/0034369 A1 | 2/2004 | Sauer et al. | 2005/0256522 A1 | 11/2005 | Francischelli et al. |
| 2004/0044364 A1 | 3/2004 | DeVries et al. | 2005/0261676 A1 | 11/2005 | Hall et al. |
| 2004/0068161 A1 | 4/2004 | Couvillon, Jr. | 2005/0261677 A1 | 11/2005 | Hall et al. |
| 2004/0068307 A1 | 4/2004 | Goble | 2005/0263562 A1 | 12/2005 | Shelton, IV et al. |
| 2004/0078037 A1 | 4/2004 | Batchelor et al. | 2005/0263563 A1 | 12/2005 | Racenet et al. |
| 2004/0093024 A1 | 5/2004 | Lousararian et al. | 2005/0274768 A1 | 12/2005 | Cummins et al. |
| 2004/0094597 A1 | 5/2004 | Whitman et al. | 2006/0004407 A1 | 1/2006 | Hiles et al. |
| 2004/0097087 A1 | 5/2004 | Pugsley et al. | 2006/0008787 A1 | 1/2006 | Hayman et al. |
| 2004/0101822 A1 | 5/2004 | Weisner et al. | 2006/0011699 A1 | 1/2006 | Olson et al. |
| 2004/0108357 A1 | 6/2004 | Milliman et al. | 2006/0015009 A1 | 1/2006 | Jaffe et al. |
| 2004/0111081 A1 | 6/2004 | Whitman et al. | 2006/0020247 A1 | 1/2006 | Kagan et al. |
| 2004/0115022 A1 | 6/2004 | Albertson et al. | 2006/0025811 A1 | 2/2006 | Shelton, IV |
| 2004/0116952 A1 | 6/2004 | Sakurai et al. | 2006/0025812 A1 | 2/2006 | Shelton, IV |
| 2004/0122471 A1 | 6/2004 | Toby et al. | 2006/0025813 A1 | 2/2006 | Shelton et al. |
| 2004/0147909 A1 | 7/2004 | Johnston et al. | 2006/0047275 A1 | 3/2006 | Goble |
| 2004/0164123 A1 | 8/2004 | Racenet et al. | 2006/0047303 A1 | 3/2006 | Ortiz et al. |
| 2004/0167572 A1 | 8/2004 | Roth et al. | 2006/0047307 A1 | 3/2006 | Ortiz et al. |
| 2004/0173659 A1 | 9/2004 | Green et al. | 2006/0047308 A1 | 3/2006 | Ortiz et al. |
| 2004/0181219 A1 | 9/2004 | Goble et al. | 2006/0049229 A1 | 3/2006 | Milliman et al. |
| 2004/0186470 A1 | 9/2004 | Goble et al. | 2006/0052825 A1 | 3/2006 | Ransick et al. |
| 2004/0222268 A1 | 11/2004 | Bilotti et al. | 2006/0060630 A1 | 3/2006 | Shelton, IV et al. |
| 2004/0230214 A1 | 11/2004 | Donofrio et al. | 2006/0079735 A1 | 4/2006 | Martone et al. |
| 2004/0232201 A1 | 11/2004 | Wenchell et al. | 2006/0085031 A1 | 4/2006 | Bettuchi |
| 2004/0243151 A1 | 12/2004 | Demmy et al. | 2006/0085033 A1 | 4/2006 | Criscuolo et al. |
| 2004/0243163 A1 | 12/2004 | Casiano et al. | 2006/0086032 A1 | 4/2006 | Valencic et al. |
| 2004/0243176 A1 | 12/2004 | Hahnen et al. | 2006/0100643 A1 | 5/2006 | Laufer et al. |
| 2004/0254566 A1 | 12/2004 | Plicchi et al. | 2006/0108393 A1 | 5/2006 | Heinrich et al. |
| 2004/0254608 A1 | 12/2004 | Huitema et al. | 2006/0111711 A1 | 5/2006 | Goble |
| 2004/0267310 A1 | 12/2004 | Racenet et al. | 2006/0111723 A1 | 5/2006 | Chapolini et al. |
| 2005/0023324 A1 | 2/2005 | Doll et al. | 2006/0122636 A1 | 6/2006 | Bailly et al. |
| 2005/0032324 A1 | 2/2005 | Malone et al. | 2006/0142772 A1 | 6/2006 | Ralph et al. |
| 2005/0033537 A1 | 2/2005 | Braun | 2006/0149163 A1 | 7/2006 | Hibner et al. |
| 2005/0054046 A1 | 3/2005 | Krzyzanowski | 2006/0151567 A1 | 7/2006 | Roy |
| 2005/0059997 A1 | 3/2005 | Bauman et al. | 2006/0161185 A1 | 7/2006 | Saadat et al. |
| 2005/0070929 A1 | 3/2005 | Dalessandro et al. | 2006/0173470 A1 | 8/2006 | Oray et al. |
| 2005/0070958 A1 | 3/2005 | Swayze et al. | 2006/0180634 A1 | 8/2006 | Shelton, IV et al. |
| 2005/0072827 A1 | 4/2005 | Mollenauer | 2006/0183246 A1 | 8/2006 | Wiesner et al. |
| 2005/0080454 A1 | 4/2005 | Drews et al. | 2006/0190028 A1 | 8/2006 | Wales et al. |

US 8,317,070 B2

Page 10

| | | | | | | |
|---|---|---|---|---|---|---|
| 2006/0200123 A1 | 9/2006 | Ryan | 2007/0288044 A1 | 12/2007 | Jinno et al. |
| 2006/0212069 A1 | 9/2006 | Shelton, IV | 2007/0295780 A1 | 12/2007 | Shelton et al. |
| 2006/0217729 A1 | 9/2006 | Eskridge et al. | 2008/0015598 A1 | 1/2008 | Prommersberger |
| 2006/0226196 A1 | 10/2006 | Hueil et al. | 2008/0029570 A1 | 2/2008 | Shelton et al. |
| 2006/0235469 A1 | 10/2006 | Viola | 2008/0029571 A1 | 2/2008 | Shelton et al. |
| 2006/0241655 A1 | 10/2006 | Viola | 2008/0029572 A1 | 2/2008 | Shelton et al. |
| 2006/0241692 A1 | 10/2006 | McGuckin, Jr. et al. | 2008/0029573 A1 | 2/2008 | Shelton et al. |
| 2006/0244460 A1 | 11/2006 | Weaver | 2008/0029574 A1 | 2/2008 | Shelton et al. |
| 2006/0245971 A1 | 11/2006 | Burns et al. | 2008/0029575 A1 | 2/2008 | Shelton et al. |
| 2006/0258904 A1 | 11/2006 | Stefanchik et al. | 2008/0029576 A1 | 2/2008 | Shelton et al. |
| 2006/0259073 A1 | 11/2006 | Miyamoto et al. | 2008/0029577 A1 | 2/2008 | Shelton et al. |
| 2006/0264927 A1 | 11/2006 | Ryan | 2008/0030170 A1 | 2/2008 | Dacquay et al. |
| 2006/0264929 A1 | 11/2006 | Goble et al. | 2008/0035701 A1 | 2/2008 | Racenet et al. |
| 2006/0271042 A1 | 11/2006 | Latterell et al. | 2008/0041916 A1 | 2/2008 | Milliman et al. |
| 2006/0271102 A1 | 11/2006 | Bosshard et al. | 2008/0041917 A1 | 2/2008 | Racenet et al. |
| 2006/0278680 A1 | 12/2006 | Viola et al. | 2008/0078800 A1 | 4/2008 | Hess et al. |
| 2006/0278681 A1 | 12/2006 | Viola et al. | 2008/0078801 A1 | 4/2008 | Shelton et al. |
| 2006/0289602 A1 | 12/2006 | Wales et al. | 2008/0078802 A1 | 4/2008 | Hess et al. |
| 2006/0291981 A1 | 12/2006 | Viola et al. | 2008/0078803 A1 | 4/2008 | Shelton et al. |
| 2007/0023476 A1 | 2/2007 | Whitman et al. | 2008/0078804 A1 | 4/2008 | Shelton et al. |
| 2007/0023477 A1 | 2/2007 | Whitman et al. | 2008/0078805 A1 | 4/2008 | Omaits et al. |
| 2007/0027468 A1 | 2/2007 | Wales et al. | 2008/0078806 A1 | 4/2008 | Omaits et al. |
| 2007/0027469 A1 | 2/2007 | Smith et al. | 2008/0078807 A1 | 4/2008 | Hess et al. |
| 2007/0034666 A1 | 2/2007 | Holsten et al. | 2008/0078808 A1 | 4/2008 | Hess et al. |
| 2007/0034668 A1 | 2/2007 | Holsten et al. | 2008/0082114 A1 | 4/2008 | McKenna et al. |
| 2007/0045379 A1 | 3/2007 | Shelton, IV | 2008/0082115 A1 | 4/2008 | Morgan et al. |
| 2007/0055219 A1 | 3/2007 | Whitman et al. | 2008/0082124 A1 | 4/2008 | Hess et al. |
| 2007/0070574 A1 | 3/2007 | Nerheim et al. | 2008/0082125 A1 | 4/2008 | Murray et al. |
| 2007/0073340 A1 | 3/2007 | Shelton, IV et al. | 2008/0082126 A1 | 4/2008 | Murray et al. |
| 2007/0073341 A1 | 3/2007 | Smith | 2008/0083813 A1 | 4/2008 | Zemlok et al. |
| 2007/0075114 A1 | 4/2007 | Shelton, IV et al. | 2008/0114385 A1 | 5/2008 | Byrum et al. |
| 2007/0078484 A1 | 4/2007 | Talarico et al. | 2008/0129253 A1 | 6/2008 | Shue et al. |
| 2007/0083234 A1 | 4/2007 | Shelton, IV et al. | 2008/0140115 A1 | 6/2008 | Stopek |
| 2007/0084897 A1 | 4/2007 | Shelton, IV et al. | 2008/0167522 A1 | 7/2008 | Giordano et al. |
| 2007/0102452 A1 | 5/2007 | Shelton, IV et al. | 2008/0167672 A1 | 7/2008 | Giordano et al. |
| 2007/0102453 A1 | 5/2007 | Morgan et al. | 2008/0169328 A1 | 7/2008 | Shelton |
| 2007/0102472 A1 | 5/2007 | Shelton, IV | 2008/0169329 A1 | 7/2008 | Shelton et al. |
| 2007/0102473 A1 | 5/2007 | Shelton, IV et al. | 2008/0169330 A1 | 7/2008 | Shelton et al. |
| 2007/0102474 A1 | 5/2007 | Shelton, IV et al. | 2008/0169331 A1 | 7/2008 | Shelton et al. |
| 2007/0102475 A1 | 5/2007 | Ortiz et al. | 2008/0169332 A1 | 7/2008 | Shelton et al. |
| 2007/0102476 A1 | 5/2007 | Shelton, IV et al. | 2008/0169333 A1 | 7/2008 | Shelton et al. |
| 2007/0106317 A1 | 5/2007 | Shelton, IV et al. | 2008/0172087 A1 | 7/2008 | Fuchs et al. |
| 2007/0114261 A1 | 5/2007 | Ortiz et al. | 2008/0183193 A1 | 7/2008 | Omori et al. |
| 2007/0131732 A1 | 6/2007 | Holsten et al. | 2008/0197167 A1 | 8/2008 | Viola et al. |
| 2007/0135803 A1 | 6/2007 | Belson | 2008/0228029 A1 | 9/2008 | Mikkaichi et al. |
| 2007/0158316 A1 | 7/2007 | Mason, II et al. | 2008/0251568 A1 | 10/2008 | Zemlok et al. |
| 2007/0158385 A1 | 7/2007 | Hueil et al. | 2008/0255413 A1 | 10/2008 | Zemlok et al. |
| 2007/0170225 A1 | 7/2007 | Shelton, IV et al. | 2008/0262654 A1 | 10/2008 | Omori et al. |
| 2007/0173806 A1 | 7/2007 | Orszulak et al. | 2008/0283570 A1 | 11/2008 | Boyden et al. |
| 2007/0173813 A1 | 7/2007 | Odom | 2008/0290134 A1 | 11/2008 | Bettuchi et al. |
| 2007/0175949 A1 | 8/2007 | Shelton, IV et al. | 2008/0296346 A1 | 12/2008 | Shelton, IV et al. |
| 2007/0175950 A1 | 8/2007 | Shelton, IV et al. | 2008/0308602 A1 | 12/2008 | Timm et al. |
| 2007/0175951 A1 | 8/2007 | Shelton, IV et al. | 2008/0308603 A1 | 12/2008 | Shelton et al. |
| 2007/0175952 A1 | 8/2007 | Shelton, IV et al. | 2008/0308608 A1 | 12/2008 | Prommersberger |
| 2007/0175953 A1 | 8/2007 | Shelton, IV et al. | 2008/0314960 A1 | 12/2008 | Marczyk et al. |
| 2007/0175955 A1 | 8/2007 | Shelton, IV et al. | 2009/0001121 A1 | 1/2009 | Hess et al. |
| 2007/0175956 A1 | 8/2007 | Swayze et al. | 2009/0001122 A1 | 1/2009 | Prommersberger et al. |
| 2007/0175957 A1 | 8/2007 | Shelton, IV et al. | 2009/0001124 A1 | 1/2009 | Hess et al. |
| 2007/0175958 A1 | 8/2007 | Shelton, IV et al. | 2009/0001130 A1 | 1/2009 | Hess et al. |
| 2007/0175959 A1 | 8/2007 | Shelton, IV et al. | 2009/0005807 A1 | 1/2009 | Hess et al. |
| 2007/0175960 A1 | 8/2007 | Shelton, IV et al. | 2009/0005808 A1 | 1/2009 | Hess et al. |
| 2007/0175961 A1 | 8/2007 | Shelton, IV et al. | 2009/0005809 A1 | 1/2009 | Hess et al. |
| 2007/0175962 A1 | 8/2007 | Shelton, IV et al. | 2009/0012556 A1 | 1/2009 | Boudreaux et al. |
| 2007/0175964 A1 | 8/2007 | Shelton, IV et al. | 2009/0020958 A1 | 1/2009 | Soul |
| 2007/0179476 A1 | 8/2007 | Shelton, IV et al. | 2009/0054908 A1 | 2/2009 | Zand et al. |
| 2007/0181632 A1 | 8/2007 | Milliman | 2009/0057369 A1 | 3/2009 | Smith et al. |
| 2007/0194079 A1 | 8/2007 | Hueil et al. | 2009/0090763 A1 | 4/2009 | Zemlok et al. |
| 2007/0194080 A1 | 8/2007 | Swayze et al. | 2009/0108048 A1 | 4/2009 | Zemlok et al. |
| 2007/0194082 A1 | 8/2007 | Morgan et al. | 2009/0114701 A1 | 5/2009 | Zemlok et al. |
| 2007/0203510 A1 | 8/2007 | Bettuchi | 2009/0143805 A1 | 6/2009 | Palmer et al. |
| 2007/0213750 A1 | 9/2007 | Weadock | 2009/0149871 A9 | 6/2009 | Kagan et al. |
| 2007/0221700 A1 | 9/2007 | Ortiz et al. | 2009/0157067 A1 | 6/2009 | Kane et al. |
| 2007/0221701 A1 | 9/2007 | Ortiz et al. | 2009/0206125 A1 | 8/2009 | Huitema et al. |
| 2007/0225562 A1 | 9/2007 | Spivey et al. | 2009/0206126 A1 | 8/2009 | Huitema et al. |
| 2007/0233053 A1 | 10/2007 | Shelton, IV et al. | 2009/0206131 A1 | 8/2009 | Weisenburgh, II et al. |
| 2007/0246505 A1 | 10/2007 | Pace-Floridia et al. | 2009/0206132 A1 | 8/2009 | Hueil et al. |
| 2007/0260278 A1 | 11/2007 | Wheeler et al. | 2009/0206133 A1 | 8/2009 | Morgan et al. |
| 2007/0262116 A1 | 11/2007 | Hueil et al. | 2009/0206137 A1 | 8/2009 | Hall et al. |
| 2007/0270784 A1 | 11/2007 | Smith et al. | 2009/0206139 A1 | 8/2009 | Hall et al. |

US 8,317,070 B2

Page 11

| | | | | | | |
|---|---|---|---|---|---|---|
| 2009/0206141 A1 | 8/2009 | Huitema et al. | 2011/0132964 A1 | 6/2011 | Weisenburgh, II et al. |
| 2009/0206142 A1 | 8/2009 | Huitema et al. | 2011/0132965 A1 | 6/2011 | Moore et al. |
| 2009/0206143 A1 | 8/2009 | Huitema et al. | 2011/0144430 A1 | 6/2011 | Spivey et al. |
| 2009/0209946 A1 | 8/2009 | Swayze et al. | 2011/0147433 A1 | 6/2011 | Shelton, IV et al. |
| 2009/0209979 A1 | 8/2009 | Yates et al. | 2011/0147434 A1 | 6/2011 | Hueil et al. |
| 2009/0209990 A1 | 8/2009 | Yates et al. | 2011/0155780 A1 | 6/2011 | Boudreaux |
| 2009/0218384 A1 | 9/2009 | Aranyi | 2011/0155781 A1 | 6/2011 | Swensgard et al. |
| 2009/0242610 A1 | 10/2009 | Shelton, IV et al. | 2011/0155785 A1 | 6/2011 | Laurent et al. |
| 2009/0255974 A1 | 10/2009 | Viola | 2011/0155787 A1 | 6/2011 | Baxter, III et al. |
| 2009/0255975 A1 | 10/2009 | Zemlok et al. | 2011/0163147 A1 | 7/2011 | Laurent et al. |
| 2009/0255976 A1 | 10/2009 | Marczyk et al. | 2011/0174863 A1 | 7/2011 | Shelton, IV et al. |
| 2009/0255977 A1 | 10/2009 | Zemlok | 2011/0192882 A1 | 8/2011 | Hess et al. |
| 2009/0255978 A1 | 10/2009 | Viola et al. | 2011/0226837 A1 | 9/2011 | Baxter, III et al. |
| 2009/0292283 A1 | 11/2009 | Odom | 2011/0233258 A1 | 9/2011 | Boudreaux |
| 2009/0308907 A1 | 12/2009 | Nalagatla et al. | 2011/0253766 A1 | 10/2011 | Baxter, III et al. |
| 2010/0012704 A1 | 1/2010 | Tarinelli Racenet et al. | 2011/0275901 A1 | 11/2011 | Shelton, IV |
| 2010/0023024 A1 | 1/2010 | Zeiner et al. | 2011/0276083 A1 | 11/2011 | Shelton, IV et al. |
| 2010/0049084 A1 | 2/2010 | Nock et al. | 2011/0288573 A1 | 11/2011 | Yates et al. |
| 2010/0069942 A1 | 3/2010 | Shelton, IV | 2011/0290851 A1 | 12/2011 | Shelton, IV |
| 2010/0072254 A1 | 3/2010 | Aranyi et al. | 2011/0290853 A1 | 12/2011 | Shelton, IV et al. |
| 2010/0076474 A1 | 3/2010 | Yates et al. | 2011/0290854 A1 | 12/2011 | Timm et al. |
| 2010/0076475 A1 | 3/2010 | Yates et al. | 2011/0290855 A1 | 12/2011 | Moore et al. |
| 2010/0089970 A1 | 4/2010 | Smith et al. | 2011/0290856 A1 | 12/2011 | Shelton, IV et al. |
| 2010/0089972 A1 | 4/2010 | Marczyk | 2011/0290857 A1 | 12/2011 | Shelton, IV et al. |
| 2010/0108741 A1 | 5/2010 | Hessler et al. | 2011/0295242 A1 | 12/2011 | Spivey et al. |
| 2010/0127042 A1 | 5/2010 | Shelton, IV | 2011/0295269 A1 | 12/2011 | Swensgard et al. |
| 2010/0133317 A1 | 6/2010 | Shelton, IV et al. | 2011/0295270 A1 | 12/2011 | Giordano et al. |
| 2010/0133318 A1 | 6/2010 | Boudreaux | 2011/0295295 A1 | 12/2011 | Shelton, IV et al. |
| 2010/0163598 A1 | 7/2010 | Belzer | 2012/0024934 A1 | 2/2012 | Shelton, IV et al. |
| 2010/0179382 A1 | 7/2010 | Shelton, IV et al. | 2012/0024935 A1 | 2/2012 | Shelton, IV et al. |
| 2010/0181364 A1 | 7/2010 | Shelton, IV et al. | 2012/0024936 A1 | 2/2012 | Baxter, III et al. |
| 2010/0193566 A1 | 8/2010 | Scheib et al. | 2012/0029272 A1 | 2/2012 | Shelton, IV et al. |
| 2010/0193567 A1 | 8/2010 | Scheib et al. | 2012/0029544 A1 | 2/2012 | Shelton, IV et al. |
| 2010/0193568 A1 | 8/2010 | Scheib et al. | 2012/0029547 A1 | 2/2012 | Shelton, IV et al. |
| 2010/0193569 A1 | 8/2010 | Yates et al. | 2012/0061448 A1 | 3/2012 | Zingman |
| 2010/0198220 A1 | 8/2010 | Boudreaux et al. | 2012/0071711 A1 | 3/2012 | Shelton, IV et al. |
| 2010/0200637 A1 | 8/2010 | Beetel | 2012/0071866 A1 | 3/2012 | Kerr et al. |
| 2010/0213241 A1 | 8/2010 | Bedi et al. | 2012/0074196 A1 | 3/2012 | Shelton, IV et al. |
| 2010/0222901 A1 | 9/2010 | Swayze et al. | 2012/0074198 A1 | 3/2012 | Huitema et al. |
| 2010/0224669 A1 | 9/2010 | Shelton, IV et al. | 2012/0074200 A1 | 3/2012 | Schmid et al. |
| 2010/0243707 A1 | 9/2010 | Olson et al. | 2012/0074201 A1 | 3/2012 | Baxter, III et al. |
| 2010/0243708 A1 | 9/2010 | Aranyi et al. | 2012/0080332 A1 | 4/2012 | Shelton, IV et al. |
| 2010/0243709 A1 | 9/2010 | Hess et al. | 2012/0080333 A1 | 4/2012 | Woodard, Jr. et al. |
| 2010/0264193 A1 | 10/2010 | Huang et al. | 2012/0080334 A1 | 4/2012 | Shelton, IV et al. |
| 2010/0264194 A1 | 10/2010 | Huang et al. | 2012/0080335 A1 | 4/2012 | Shelton, IV et al. |
| 2010/0276471 A1 | 11/2010 | Whitman | 2012/0080336 A1 | 4/2012 | Shelton, IV et al. |
| 2010/0294827 A1 | 11/2010 | Boyden et al. | 2012/0080337 A1 | 4/2012 | Shelton, IV et al. |
| 2010/0294829 A1 | 11/2010 | Giordano et al. | 2012/0080338 A1 | 4/2012 | Shelton, IV et al. |
| 2010/0301095 A1 | 12/2010 | Shelton, IV et al. | 2012/0080339 A1 | 4/2012 | Shelton, IV et al. |
| 2010/0305552 A1 | 12/2010 | Shelton, IV et al. | 2012/0080340 A1 | 4/2012 | Shelton, IV et al. |
| 2010/0308100 A1 | 12/2010 | Boudreaux | 2012/0080344 A1 | 4/2012 | Shelton, IV |
| 2010/0312261 A1 | 12/2010 | Suzuki et al. | 2012/0080345 A1 | 4/2012 | Morgan et al. |
| 2011/0006099 A1 | 1/2011 | Hall et al. | 2012/0080477 A1 | 4/2012 | Leimbach et al. |
| 2011/0006101 A1 | 1/2011 | Hall et al. | 2012/0080478 A1 | 4/2012 | Morgan et al. |
| 2011/0006103 A1 | 1/2011 | Laurent et al. | 2012/0080479 A1 | 4/2012 | Shelton, IV |
| 2011/0011914 A1 | 1/2011 | Baxter, III et al. | 2012/0080480 A1 | 4/2012 | Woodard, Jr. et al. |
| 2011/0011915 A1 | 1/2011 | Shelton, IV | 2012/0080481 A1 | 4/2012 | Widenhouse et al. |
| 2011/0017801 A1 | 1/2011 | Zemlok et al. | 2012/0080482 A1 | 4/2012 | Schall et al. |
| 2011/0022032 A1 | 1/2011 | Zemlok et al. | 2012/0080483 A1 | 4/2012 | Riestenberg et al. |
| 2011/0024477 A1 | 2/2011 | Hall | 2012/0080484 A1 | 4/2012 | Morgan et al. |
| 2011/0024478 A1 | 2/2011 | Shelton, IV | 2012/0080485 A1 | 4/2012 | Woodard, Jr. et al. |
| 2011/0024479 A1 | 2/2011 | Swensgard et al. | 2012/0080486 A1 | 4/2012 | Shelton, IV et al. |
| 2011/0036887 A1 | 2/2011 | Zemlok et al. | 2012/0080487 A1 | 4/2012 | Woodard, Jr. et al. |
| 2011/0042441 A1 | 2/2011 | Shelton, IV et al. | 2012/0080488 A1 | 4/2012 | Shelton, IV et al. |
| 2011/0060363 A1 | 3/2011 | Hess et al. | 2012/0080489 A1 | 4/2012 | Shelton, IV et al. |
| 2011/0068145 A1 | 3/2011 | Bedi et al. | 2012/0080490 A1 | 4/2012 | Shelton, IV et al. |
| 2011/0068148 A1 | 3/2011 | Hall et al. | 2012/0080491 A1 | 4/2012 | Shelton, IV et al. |
| 2011/0084112 A1 | 4/2011 | Kostrzewski | 2012/0080493 A1 | 4/2012 | Shelton, IV et al. |
| 2011/0084115 A1 | 4/2011 | Bedi et al. | 2012/0080496 A1 | 4/2012 | Schall et al. |
| 2011/0087276 A1 | 4/2011 | Bedi et al. | 2012/0080498 A1 | 4/2012 | Shelton, IV et al. |
| 2011/0101065 A1 | 5/2011 | Milliman | 2012/0080499 A1 | 4/2012 | Schall et al. |
| 2011/0114697 A1 | 5/2011 | Baxter, III et al. | 2012/0080500 A1 | 4/2012 | Morgan et al. |
| 2011/0114698 A1 | 5/2011 | Baxter, III et al. | 2012/0080501 A1 | 4/2012 | Morgan et al. |
| 2011/0114699 A1 | 5/2011 | Baxter, III et al. | 2012/0080502 A1 | 4/2012 | Morgan et al. |
| 2011/0114700 A1 | 5/2011 | Baxter, III et al. | 2012/0080503 A1 | 4/2012 | Woodard, Jr. et al. |
| 2011/0118761 A1 | 5/2011 | Baxter, III et al. | 2012/0083833 A1 | 4/2012 | Shelton, IV et al. |
| 2011/0125176 A1 | 5/2011 | Yates et al. | 2012/0083834 A1 | 4/2012 | Shelton, IV et al. |
| 2011/0125177 A1 | 5/2011 | Yates et al. | 2012/0083835 A1 | 4/2012 | Shelton, IV et al. |
| 2011/0132963 A1 | 6/2011 | Giordano et al. | | | |

A69

US 8,317,070 B2

Page 12

| | | |
|---|---|---|
| 2012/0083836 A1 | 4/2012 | Shelton, IV et al. |
| 2012/0132450 A1 | 5/2012 | Timm et al. |
| 2012/0138660 A1 | 6/2012 | Shelton, IV |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2512960 A1 | 1/2006 |
| CA | 2514274 A1 | 1/2006 |
| CN | 1868411 A | 11/2006 |
| CN | 1915180 A | 2/2007 |
| CN | 101095621 A | 1/2008 |
| DE | 273689 C | 5/1914 |
| DE | 1775926 A | 1/1972 |
| DE | 3036217 A1 | 4/1982 |
| DE | 3210466 A1 | 9/1983 |
| DE | 9412228 | 9/1994 |
| DE | 19509116 A1 | 9/1996 |
| DE | 19851291 A1 | 1/2000 |
| DE | 19924311 A1 | 11/2000 |
| DE | 69328576 T2 | 1/2001 |
| DE | 10052679 A1 | 5/2001 |
| DE | 20112837 U1 | 10/2001 |
| DE | 20121753 U1 | 4/2003 |
| DE | 10314072 A1 | 10/2004 |
| DE | 202007003114 U1 | 6/2007 |
| EP | 0122046 A1 | 10/1984 |
| EP | 0070230 B1 | 10/1985 |
| EP | 0387980 B1 | 10/1985 |
| EP | 0033548 B1 | 5/1986 |
| EP | 0276104 A2 | 7/1988 |
| EP | 0248844 B1 | 1/1993 |
| EP | 0545029 A1 | 6/1993 |
| EP | 0277959 B1 | 10/1993 |
| EP | 0233940 B1 | 11/1993 |
| EP | 0261230 B1 | 11/1993 |
| EP | 0639349 A2 | 2/1994 |
| EP | 0324636 B1 | 3/1994 |
| EP | 0593920 A1 | 4/1994 |
| EP | 0427949 B1 | 6/1994 |
| EP | 0523174 B1 | 6/1994 |
| EP | 0600182 A2 | 6/1994 |
| EP | 0310431 B1 | 11/1994 |
| EP | 0375302 B1 | 11/1994 |
| EP | 0376562 B1 | 11/1994 |
| EP | 0630612 A1 | 12/1994 |
| EP | 0634144 A1 | 1/1995 |
| EP | 0646356 A2 | 4/1995 |
| EP | 0646357 A1 | 4/1995 |
| EP | 0653189 A2 | 5/1995 |
| EP | 0669104 A1 | 8/1995 |
| EP | 0511470 B1 | 10/1995 |
| EP | 0679367 A2 | 11/1995 |
| EP | 0392547 B1 | 12/1995 |
| EP | 0685204 A1 | 12/1995 |
| EP | 0364216 B1 | 1/1996 |
| EP | 0699418 A1 | 3/1996 |
| EP | 0702937 A1 | 3/1996 |
| EP | 0705571 A1 | 4/1996 |
| EP | 0711611 A2 | 5/1996 |
| EP | 0484677 B2 | 6/1996 |
| EP | 0541987 B1 | 7/1996 |
| EP | 0667119 B1 | 7/1996 |
| EP | 0708618 B1 | 3/1997 |
| EP | 0770355 A1 | 5/1997 |
| EP | 0503662 B1 | 6/1997 |
| EP | 0447121 B1 | 7/1997 |
| EP | 0625077 B1 | 7/1997 |
| EP | 0633749 B1 | 8/1997 |
| EP | 0710090 B1 | 8/1997 |
| EP | 0578425 B1 | 9/1997 |
| EP | 0625335 B1 | 11/1997 |
| EP | 0552423 B1 | 1/1998 |
| EP | 0592244 B1 | 1/1998 |
| EP | 0648476 B1 | 1/1998 |
| EP | 0649290 B1 | 3/1998 |
| EP | 0598618 B1 | 9/1998 |
| EP | 0676173 B1 | 9/1998 |
| EP | 0678007 B1 | 9/1998 |
| EP | 0603472 B1 | 11/1998 |
| EP | 0605351 B1 | 11/1998 |
| EP | 0878169 A1 | 11/1998 |
| EP | 0879742 A1 | 11/1998 |
| EP | 0695144 B1 | 12/1998 |
| EP | 0722296 B1 | 12/1998 |
| EP | 0760230 B1 | 2/1999 |
| EP | 0623316 B1 | 3/1999 |
| EP | 0650701 B1 | 3/1999 |
| EP | 0537572 B1 | 6/1999 |
| EP | 0923907 A1 | 6/1999 |
| EP | 0843906 B1 | 3/2000 |
| EP | 0552050 B1 | 5/2000 |
| EP | 0833592 B1 | 5/2000 |
| EP | 0830094 B1 | 9/2000 |
| EP | 1034747 A1 | 9/2000 |
| EP | 1034748 A1 | 9/2000 |
| EP | 0694290 B1 | 11/2000 |
| EP | 1050278 A1 | 11/2000 |
| EP | 1053719 A1 | 11/2000 |
| EP | 1053720 A1 | 11/2000 |
| EP | 1055339 A1 | 11/2000 |
| EP | 1055400 A1 | 11/2000 |
| EP | 1080694 A1 | 3/2001 |
| EP | 1090592 A1 | 4/2001 |
| EP | 1095627 A1 | 5/2001 |
| EP | 1256318 B1 | 5/2001 |
| EP | 0806914 B1 | 9/2001 |
| EP | 0768840 B1 | 12/2001 |
| EP | 0908152 B1 | 1/2002 |
| EP | 0872213 B1 | 5/2002 |
| EP | 0862386 B1 | 6/2002 |
| EP | 0949886 B1 | 9/2002 |
| EP | 1238634 A2 | 9/2002 |
| EP | 0858295 B1 | 12/2002 |
| EP | 0656188 B1 | 1/2003 |
| EP | 1284120 A1 | 2/2003 |
| EP | 1287788 A1 | 3/2003 |
| EP | 0717966 B1 | 4/2003 |
| EP | 0869742 B1 | 5/2003 |
| EP | 0829235 B1 | 6/2003 |
| EP | 0887046 B1 | 7/2003 |
| EP | 0852480 B1 | 8/2003 |
| EP | 0891154 B1 | 9/2003 |
| EP | 0813843 B1 | 10/2003 |
| EP | 0873089 B1 | 10/2003 |
| EP | 0856326 B1 | 11/2003 |
| EP | 1374788 A1 | 1/2004 |
| EP | 0741996 B1 | 2/2004 |
| EP | 0814712 B1 | 2/2004 |
| EP | 1402837 A1 | 3/2004 |
| EP | 0705570 B1 | 4/2004 |
| EP | 0959784 B1 | 4/2004 |
| EP | 1407719 A2 | 4/2004 |
| EP | 1086713 B1 | 5/2004 |
| EP | 0996378 B1 | 6/2004 |
| EP | 1426012 A1 | 6/2004 |
| EP | 0833593 B2 | 7/2004 |
| EP | 1442694 A1 | 8/2004 |
| EP | 0888749 B1 | 9/2004 |
| EP | 0959786 B1 | 9/2004 |
| EP | 1459695 A1 | 9/2004 |
| EP | 1473819 A1 | 11/2004 |
| EP | 1477119 A1 | 11/2004 |
| EP | 1479345 A1 | 11/2004 |
| EP | 1479347 A1 | 11/2004 |
| EP | 1479348 A1 | 11/2004 |
| EP | 0754437 B2 | 12/2004 |
| EP | 1025807 B1 | 12/2004 |
| EP | 1001710 B1 | 1/2005 |
| EP | 1520521 A1 | 4/2005 |
| EP | 1520523 A1 | 4/2005 |
| EP | 1520525 A1 | 4/2005 |
| EP | 1522264 A1 | 4/2005 |
| EP | 1523942 A2 | 4/2005 |
| EP | 1550408 A1 | 7/2005 |
| EP | 1557129 A1 | 7/2005 |
| EP | 1064883 B1 | 8/2005 |
| EP | 1067876 B1 | 8/2005 |
| EP | 0870473 B1 | 9/2005 |
| EP | 1157666 B1 | 9/2005 |

**US 8,317,070 B2**

Page 13

| | | | | | | | |
|----|------------|----|---------|----|----------------|----|---------|
| EP | 0880338 | B1 | 10/2005 | EP | 1535565 | B1 | 10/2010 |
| EP | 1158917 | B1 | 11/2005 | EP | 1702570 | B1 | 10/2010 |
| EP | 1344498 | B1 | 11/2005 | EP | 1785098 | B1 | 10/2010 |
| EP | 1330989 | B1 | 12/2005 | EP | 1627605 | B1 | 12/2010 |
| EP | 0771176 | B2 | 1/2006 | EP | 1813205 | B1 | 6/2011 |
| EP | 1621138 | A2 | 2/2006 | EP | 1785102 | B1 | 1/2012 |
| EP | 1621139 | A2 | 2/2006 | FR | 999646 | A | 2/1952 |
| EP | 1621141 | A2 | 2/2006 | FR | 1112936 | A | 3/1956 |
| EP | 1621145 | A2 | 2/2006 | FR | 2765794 | A | 1/1999 |
| EP | 1621151 | A2 | 2/2006 | GB | 939929 | A | 10/1963 |
| EP | 1034746 | B1 | 3/2006 | GB | 1210522 | A | 10/1970 |
| EP | 1632191 | A2 | 3/2006 | GB | 1217159 | A | 12/1970 |
| EP | 1065981 | B1 | 5/2006 | GB | 1339394 | A | 12/1973 |
| EP | 1082944 | B1 | 5/2006 | GB | 2109241 | A | 6/1983 |
| EP | 1652481 | A2 | 5/2006 | GB | 2272159 | A | 5/1994 |
| EP | 1382303 | B1 | 6/2006 | GB | 2284242 | A | 5/1995 |
| EP | 1253866 | B1 | 7/2006 | GB | 2336214 | A | 10/1999 |
| EP | 1032318 | B1 | 8/2006 | GB | 2425903 | A | 11/2006 |
| EP | 1045672 | B1 | 8/2006 | JP | S 58500053 | A | 1/1983 |
| EP | 1617768 | B1 | 8/2006 | JP | 61-98249 | A | 5/1986 |
| EP | 1693015 | A2 | 8/2006 | JP | 3-12126 | A | 1/1991 |
| EP | 1400214 | B1 | 9/2006 | JP | 5-212039 | A | 8/1993 |
| EP | 1702567 | A2 | 9/2006 | JP | 6007357 | A | 1/1994 |
| EP | 1129665 | B1 | 11/2006 | JP | 7051273 | A | 2/1995 |
| EP | 1400206 | B1 | 11/2006 | JP | 8033641 | A | 2/1996 |
| EP | 1721568 | A1 | 11/2006 | JP | 8229050 | A | 9/1996 |
| EP | 1256317 | B1 | 12/2006 | JP | 2000033071 | A | 2/2000 |
| EP | 1285633 | B1 | 12/2006 | JP | 2000171730 | A | 6/2000 |
| EP | 1728473 | A1 | 12/2006 | JP | 2000287987 | A | 10/2000 |
| EP | 1728475 | A2 | 12/2006 | JP | 2000325303 | A | 11/2000 |
| EP | 1479346 | B1 | 1/2007 | JP | 2001-514541 | A | 9/2001 |
| EP | 1484024 | B1 | 1/2007 | JP | 2001286477 | A | 10/2001 |
| EP | 1754445 | A2 | 2/2007 | JP | 2002143078 | A | 5/2002 |
| EP | 1759812 | A1 | 3/2007 | JP | 2002369820 | A | 12/2002 |
| EP | 1767163 | A1 | 3/2007 | JP | 2004-344663 | | 12/2004 |
| EP | 1769756 | A1 | 4/2007 | JP | 2005-028149 | A | 2/2005 |
| EP | 1769758 | A1 | 4/2007 | JP | 200505322 | T | 2/2005 |
| EP | 1581128 | B1 | 5/2007 | JP | 2005103293 | A | 4/2005 |
| EP | 1785097 | A2 | 5/2007 | JP | 2005131163 | A | 5/2005 |
| EP | 1790293 | A2 | 5/2007 | JP | 2005131164 | A | 5/2005 |
| EP | 1800610 | A1 | 6/2007 | JP | 2005131173 | A | 5/2005 |
| EP | 1300117 | B1 | 8/2007 | JP | 2005131211 | A | 5/2005 |
| EP | 1813199 | A1 | 8/2007 | JP | 2005131212 | A | 5/2005 |
| EP | 1813201 | A1 | 8/2007 | JP | 2005137423 | A | 6/2005 |
| EP | 1813203 | A2 | 8/2007 | JP | 2005152416 | A | 6/2005 |
| EP | 1813207 | A1 | 8/2007 | JP | 2005-523105 | A | 8/2005 |
| EP | 1813209 | A1 | 8/2007 | JP | 2005524478 | A | 8/2005 |
| EP | 1487359 | B1 | 10/2007 | JP | 2006-281405 | A | 10/2006 |
| EP | 1599146 | B1 | 10/2007 | RU | 2008830 | C1 | 3/1994 |
| EP | 1839596 | A1 | 10/2007 | RU | 2187249 | C2 | 8/2002 |
| EP | 1402821 | B1 | 12/2007 | RU | 2225170 | C2 | 3/2004 |
| EP | 1872727 | A1 | 1/2008 | SU | 189517 | A | 1/1967 |
| EP | 1897502 | A1 | 3/2008 | SU | 328636 | A | 9/1972 |
| EP | 1330201 | B1 | 6/2008 | SU | 886900 | A1 | 12/1981 |
| EP | 1702568 | B1 | 7/2008 | SU | 1009439 | A | 4/1983 |
| EP | 1943957 | A2 | 7/2008 | SU | 1333319 | A2 | 8/1987 |
| EP | 1943976 | A2 | 7/2008 | SU | 1377053 | A1 | 2/1988 |
| EP | 1593337 | B1 | 8/2008 | SU | 1561964 | A1 | 5/1990 |
| EP | 1970014 | A1 | 9/2008 | SU | 1722476 | A1 | 3/1992 |
| EP | 1980213 | A2 | 10/2008 | WO | WO 82/02824 | A1 | 9/1982 |
| EP | 1759645 | B1 | 11/2008 | WO | WO 91/15157 | A1 | 10/1991 |
| EP | 1990014 | A2 | 11/2008 | WO | WO 92/20295 | A1 | 11/1992 |
| EP | 1693008 | B1 | 12/2008 | WO | WO 92/21300 | A1 | 12/1992 |
| EP | 1759640 | B1 | 12/2008 | WO | WO 93/08755 | A1 | 5/1993 |
| EP | 2000102 | A2 | 12/2008 | WO | WO 93/13718 | A1 | 7/1993 |
| EP | 1736104 | B1 | 3/2009 | WO | WO 93/14690 | A1 | 8/1993 |
| EP | 1749486 | B1 | 3/2009 | WO | WO 93/15648 | A1 | 8/1993 |
| EP | 2039316 | A2 | 3/2009 | WO | WO 93/15850 | A1 | 8/1993 |
| EP | 1721576 | B1 | 4/2009 | WO | WO 93/19681 | A1 | 10/1993 |
| EP | 1733686 | B1 | 4/2009 | WO | WO 94/00060 | A1 | 1/1994 |
| EP | 2044890 | A1 | 4/2009 | WO | WO 94/11057 | A1 | 5/1994 |
| EP | 1550413 | B1 | 6/2009 | WO | WO 94/12108 | A1 | 6/1994 |
| EP | 1745748 | B1 | 8/2009 | WO | WO 94/18893 | A1 | 9/1994 |
| EP | 2090256 | A2 | 8/2009 | WO | WO 94/22378 | A1 | 10/1994 |
| EP | 1813208 | B1 | 11/2009 | WO | WO 94/23659 | A1 | 10/1994 |
| EP | 1607050 | B1 | 12/2009 | WO | WO 95/02369 | A1 | 1/1995 |
| EP | 1566150 | B1 | 4/2010 | WO | WO 95/03743 | A1 | 2/1995 |
| EP | 1813206 | B1 | 4/2010 | WO | WO 95/06817 | A1 | 3/1995 |
| EP | 1769754 | B1 | 6/2010 | WO | WO 95/09576 | A1 | 4/1995 |

**A71**

US 8,317,070 B2

Page 14

| | | |
|---|---|---|
| WO | WO 95/09577 A1 | 4/1995 |
| WO | WO 95/14436 A1 | 6/1995 |
| WO | WO 95/17855 A1 | 7/1995 |
| WO | WO 95/18383 A1 | 7/1995 |
| WO | WO 95/18572 A1 | 7/1995 |
| WO | WO 95/19739 A1 | 7/1995 |
| WO | WO 95/20360 A1 | 8/1995 |
| WO | WO 95/23557 A1 | 9/1995 |
| WO | WO 95/24865 A1 | 9/1995 |
| WO | WO 95/25471 A3 | 9/1995 |
| WO | WO 95/26562 A1 | 10/1995 |
| WO | WO 95/29639 A1 | 11/1995 |
| WO | WO 96/04858 A1 | 2/1996 |
| WO | WO 96/19151 A1 | 6/1996 |
| WO | WO 96/19152 A1 | 6/1996 |
| WO | WO 96/20652 A1 | 7/1996 |
| WO | WO 96/21119 A1 | 7/1996 |
| WO | WO 96/22055 A1 | 7/1996 |
| WO | WO 96/23448 A1 | 8/1996 |
| WO | WO 96/24301 A1 | 8/1996 |
| WO | WO 96/27337 A1 | 9/1996 |
| WO | WO 96/31155 A1 | 10/1996 |
| WO | WO 96/35464 A1 | 11/1996 |
| WO | WO 96/39085 A1 | 12/1996 |
| WO | WO 96/39086 A1 | 12/1996 |
| WO | WO 96/39087 A1 | 12/1996 |
| WO | WO 96/39088 A1 | 12/1996 |
| WO | WO 96/39089 A1 | 12/1996 |
| WO | WO 97/00646 A1 | 1/1997 |
| WO | WO 97/00647 A1 | 1/1997 |
| WO | WO 97/06582 A1 | 2/1997 |
| WO | WO 97/10763 A1 | 3/1997 |
| WO | WO 97/10764 A1 | 3/1997 |
| WO | WO 97/11648 A2 | 4/1997 |
| WO | WO 97/11649 A1 | 4/1997 |
| WO | WO 97/15237 A1 | 5/1997 |
| WO | WO 97/24073 A1 | 7/1997 |
| WO | WO 97/24993 A1 | 7/1997 |
| WO | WO 97/30644 A1 | 8/1997 |
| WO | WO 97/34533 A1 | 9/1997 |
| WO | WO 97/37598 A1 | 10/1997 |
| WO | WO 97/39688 A2 | 10/1997 |
| WO | WO 98/17180 A1 | 4/1998 |
| WO | WO 98/27880 A1 | 7/1998 |
| WO | WO 98/30153 A1 | 7/1998 |
| WO | WO 98/47436 A1 | 10/1998 |
| WO | WO 99/03407 A1 | 1/1999 |
| WO | WO 99/03408 A1 | 1/1999 |
| WO | WO 99/03409 A1 | 1/1999 |
| WO | WO 99/12483 A1 | 3/1999 |
| WO | WO 99/12487 A1 | 3/1999 |
| WO | WO 99/12488 A1 | 3/1999 |
| WO | WO 99/15086 A1 | 4/1999 |
| WO | WO 99/15091 A1 | 4/1999 |
| WO | WO 99/23933 A2 | 5/1999 |
| WO | WO 99/23959 A1 | 5/1999 |
| WO | WO 99/25261 A1 | 5/1999 |
| WO | WO 99/29244 A1 | 6/1999 |
| WO | WO 99/34744 A1 | 7/1999 |
| WO | WO 99/45849 A1 | 9/1999 |
| WO | WO 99/48430 A1 | 9/1999 |
| WO | WO 99/51158 A1 | 10/1999 |
| WO | WO 00/24322 A1 | 5/2000 |
| WO | WO 00/24330 A1 | 5/2000 |
| WO | WO 00/41638 A1 | 7/2000 |
| WO | WO 00/48506 A1 | 8/2000 |
| WO | WO 00/53112 A2 | 9/2000 |
| WO | WO 00/54653 A1 | 9/2000 |
| WO | WO 00/57796 A1 | 10/2000 |
| WO | WO 00/64365 A1 | 11/2000 |
| WO | WO 00/72762 A1 | 12/2000 |
| WO | WO 00/72765 A1 | 12/2000 |
| WO | WO 01/03587 A1 | 1/2001 |
| WO | WO 01/05702 A1 | 1/2001 |
| WO | WO 01/10482 A1 | 2/2001 |
| WO | WO 01/35845 A1 | 5/2001 |
| WO | WO 01/54594 A1 | 8/2001 |
| WO | WO 01/58371 A1 | 8/2001 |
| WO | WO 01/62158 A2 | 8/2001 |
| WO | WO 01/62161 A1 | 8/2001 |
| WO | WO 01/62162 A1 | 8/2001 |
| WO | WO 01/62164 A2 | 8/2001 |
| WO | WO 01/62169 A1 | 8/2001 |
| WO | WO 01/78605 A2 | 10/2001 |
| WO | WO 01/91646 A1 | 12/2001 |
| WO | WO 02/07608 A2 | 1/2002 |
| WO | WO 02/07618 A1 | 1/2002 |
| WO | WO 02/17799 A1 | 3/2002 |
| WO | WO 02/19920 A1 | 3/2002 |
| WO | WO 02/19932 A1 | 3/2002 |
| WO | WO 02/30297 A2 | 4/2002 |
| WO | WO 02/32322 A2 | 4/2002 |
| WO | WO 02/36028 A1 | 5/2002 |
| WO | WO 02/43571 A2 | 6/2002 |
| WO | WO 02/058568 A1 | 8/2002 |
| WO | WO 02/060328 A1 | 8/2002 |
| WO | WO 02/067785 A2 | 9/2002 |
| WO | WO 02/098302 A1 | 12/2002 |
| WO | WO 03/000138 A2 | 1/2003 |
| WO | WO 03/001329 A1 | 1/2003 |
| WO | WO 03/013363 A1 | 2/2003 |
| WO | WO 03/015604 A2 | 2/2003 |
| WO | WO 03/020106 A2 | 3/2003 |
| WO | WO 03/020139 A2 | 3/2003 |
| WO | WO 03/024339 A1 | 3/2003 |
| WO | WO 03/079909 A3 | 3/2003 |
| WO | WO 03/030743 A2 | 4/2003 |
| WO | WO 03/037193 A1 | 5/2003 |
| WO | WO 03/047436 A3 | 6/2003 |
| WO | WO 03/057048 A1 | 7/2003 |
| WO | WO 03/057058 A1 | 7/2003 |
| WO | WO 2003/055402 A1 | 7/2003 |
| WO | WO 03/063694 A1 | 8/2003 |
| WO | WO 03/077769 A1 | 9/2003 |
| WO | WO 03/08126 A1 | 10/2003 |
| WO | WO 03/088845 A2 | 10/2003 |
| WO | WO 2003/079911 A1 | 10/2003 |
| WO | WO 03/090630 A2 | 11/2003 |
| WO | WO 03/094743 A1 | 11/2003 |
| WO | WO 03/094745 A1 | 11/2003 |
| WO | WO 03/094746 A1 | 11/2003 |
| WO | WO 03/094747 A1 | 11/2003 |
| WO | WO 03/101313 A1 | 12/2003 |
| WO | WO 03/105702 A2 | 12/2003 |
| WO | WO 2003/105698 A2 | 12/2003 |
| WO | WO 2004/006980 A2 | 1/2004 |
| WO | WO 2004/011037 A2 | 2/2004 |
| WO | WO 2004/019769 A1 | 3/2004 |
| WO | WO 2004/021868 A2 | 3/2004 |
| WO | WO 2004/028585 A2 | 4/2004 |
| WO | WO 2004/032754 A2 | 4/2004 |
| WO | WO 2004/032760 A2 | 4/2004 |
| WO | WO 2004/032762 A1 | 4/2004 |
| WO | WO 2004/032763 A2 | 4/2004 |
| WO | WO 2004/034875 A2 | 4/2004 |
| WO | WO 2004/047626 A1 | 6/2004 |
| WO | WO 2004/047653 A2 | 6/2004 |
| WO | WO 2004/049956 A2 | 6/2004 |
| WO | WO 2004/052426 A2 | 6/2004 |
| WO | WO 2004/056276 A1 | 7/2004 |
| WO | WO 2004/056277 A1 | 7/2004 |
| WO | WO 2004/062516 A1 | 7/2004 |
| WO | WO 2004/078050 A2 | 9/2004 |
| WO | WO 2004/078051 A2 | 9/2004 |
| WO | WO 2004/086987 A1 | 10/2004 |
| WO | WO 2004/096015 A2 | 11/2004 |
| WO | WO 2004/096057 A2 | 11/2004 |
| WO | WO 2004/103157 A2 | 12/2004 |
| WO | WO 2004/105593 A1 | 12/2004 |
| WO | WO 2004/105621 A1 | 12/2004 |
| WO | WO 2004/112618 A2 | 12/2004 |
| WO | WO 2004/112652 A2 | 12/2004 |
| WO | WO 2005/027983 A2 | 3/2005 |
| WO | WO 2005/037329 A2 | 4/2005 |
| WO | WO 2005/044078 A2 | 5/2005 |
| WO | WO 2005/055846 A1 | 6/2005 |
| WO | WO 2005/072634 A2 | 8/2005 |
| WO | WO 2005/078892 A1 | 8/2005 |

**US 8,317,070 B2**

Page 15

| WO | WO 2005/079675 | A2 | 9/2005 |
| WO | WO 2005/096954 | A2 | 10/2005 |
| WO | WO 2005/112806 | A2 | 12/2005 |
| WO | WO 2005/112808 | A1 | 12/2005 |
| WO | WO 2005/115251 | A2 | 12/2005 |
| WO | WO 2005/117735 | A1 | 12/2005 |
| WO | WO 2005/122936 | A1 | 12/2005 |
| WO | WO 2006/027014 | A1 | 3/2006 |
| WO | WO 2006/044490 | A2 | 4/2006 |
| WO | WO 2006/044581 | A2 | 4/2006 |
| WO | WO 2006/044810 | A2 | 4/2006 |
| WO | WO 2006/051252 | A1 | 5/2006 |
| WO | WO 2006/059067 | A1 | 6/2006 |
| WO | WO 2006/083748 | A1 | 8/2006 |
| WO | WO 2006/092563 | A1 | 9/2006 |
| WO | WO 2006/092565 | A1 | 9/2006 |
| WO | WO 2006/115958 | A1 | 11/2006 |
| WO | WO 2006/125940 | A1 | 11/2006 |
| WO | WO 2006/132992 | A1 | 12/2006 |
| WO | WO 2007/002180 | A2 | 1/2007 |
| WO | WO 2007/016290 | A2 | 2/2007 |
| WO | WO 2007/018898 | A2 | 2/2007 |
| WO | WO 2007/098220 | A2 | 8/2007 |
| WO | WO 2007/121579 | A1 | 11/2007 |
| WO | WO 2007/137304 | A2 | 11/2007 |
| WO | WO 2007/139734 | A2 | 12/2007 |
| WO | WO 2007/142625 | A2 | 12/2007 |
| WO | WO 2007/147439 | A1 | 12/2007 |
| WO | WO 2008/021969 | A2 | 2/2008 |
| WO | WO 2008/039270 | A1 | 4/2008 |
| WO | WO 2008/045383 | A2 | 4/2008 |
| WO | WO 2008/089404 | A2 | 7/2008 |
| WO | WO 2008/109125 | A1 | 9/2008 |
| WO | WO 2010/063795 | A1 | 6/2010 |

### OTHER PUBLICATIONS

Office Action issued on Mar. 14, 2007 in U.S. Appl. No. 11/216,562.
Office Action issued on Jun. 21, 2007 in U.S. Appl. No. 11/216,562.
Disclosed Anonymously, "Motor-Driven Surgical Stapler Improvements," Research Disclosure Database No. 526041, Published: Feb. 2008.
C.C. Thompson et al., "Peroral Endoscopic Reduction of Dilated Gastrojejunal Anastomosis After Roux-en-Y Gastric Bypass: A Possible New Option for Patients with Weight Regain," Surg Endosc (2006) vol. 20, pp. 1744-1748.
U.S. Appl. No. 11/824,251, filed Jun. 29, 2007.
U.S. Appl. No. 12/038,939, filed Feb. 28, 2008.
U.S. Appl. No. 11/652,165, filed Jan. 11, 2007.
U.S. Appl. No. 11/824,446, filed Jun. 29, 2007.
U.S. Appl. No. 11/824,389, filed Jun. 29, 2007.
U.S. Appl. No. 11/824,415, filed Jun. 29, 2007.
U.S. Appl. No. 11/824,274, filed Jun. 29, 2007.
U.S. Appl. No. 11/824,275, filed Jun. 29, 2007.
U.S. Appl. No. 11/823,988, filed Jun. 29, 2007.
U.S. Appl. No. 11/824,079, filed Jun. 29, 2007.
U.S. Appl. No. 11/824,524, filed Jun. 29, 2007.
U.S. Appl. No. 11/824,298, filed Jun. 29, 2007.
U.S. Appl. No. 11/824,252, filed Jun. 29, 2007.
Examination Report for European Patent Application No. 08250671.8, dated Mar. 24, 2009 (6 pages).
European Search Report, Application No. 08250668.4, dated May 4, 2009 (7 pages).
Partial European Search Report, Application No. 08250661.9, dated May 7, 2009 (6 pages).
European Search Report, Application No. 08250667.6, dated May 14, 2009 (6 pages).
Partial European Search Report, Application No. 08250664.3, dated May 7, 2009 (6 pages).
European Search Report, Application No. 10178489.0, dated Nov. 29, 2010 (7 pages).
European Search Report, Application No. 10179946.8, dated Dec. 2, 2010 (7 pages).
European Search Report, Application 08250671.8, dated May 19, 2008 (9 pages).
European Search Report, Application 06254511.6, dated Jan. 24, 2007 (8 pages).
Examination Report for European Patent Application No. 06254511.6, dated Feb. 13, 2008 (5 pages).
European Search Report, Application No. 08250661.9, dated Jul. 28, 2009 (12 pages).
European Search Report, Application No. 11161037.4, dated Sep. 6, 2011 (9 pages).
B.R. Coolman, DVM, MS et al., "Comparison of Skin Staples With Sutures for Anastomosis of the Small Intestine in Dogs," Abstract; http://www.blackwell-synergy.com/doi/abs/10.1053/jvet.2000.7539?cookieSet=1&journalCode=vsu which redirects to http://www3.interscience.wiley.com/journal/119040681/abstract?CRETRY=1&SRETRY=0; [online] accessed: Sep. 22, 2008 (2 pages).
The Sodem Aseptic Battery Transfer Kit, Sodem Systems, (2000), 3 pages.
"Biomedical Coatings," Fort Wayne Metals, Research Products Corporation, obtained online at www.fwmetals.com on Jun. 21, 2010 (1 page).
Van Meer et al., "A Disposable Plastic Compact Wrist for Smart Minimally Invasive Surgical Tools," LAAS/CNRS (Aug. 2005).
Breedveld et al., "A New, Easily Miniaturized Sterrable Endoscope," IEEE Engineering in Medicine and Biology Magazine (Nov./Dec. 2004).
D. Tuite, Ed., "Get the Lowdown on Ultracapacitors," Nov. 15, 2007; [online] URL: http://electronicdesign.com/Articles/Print.cfm?ArticleID=17465, accessed Jan. 15, 2008 (5 pages).
Datasheet for Panasonic TK Relays Ultra Low Profile 2 A Polarized Relay, Copyright Matsushita Electric Works, Ltd. (Known of at least as early as Aug. 17, 2010), 5 pages.
ASTM procedure D2240-00, "Standard Test Method for Rubber Property-Durometer Hardness," (Published Aug. 2000).
ASTM procedure D2240-05, "Standard Test Method for Rubber Property-Durometer Hardness," (Published Apr. 2010).
U.S. Appl. No. 12/031,368, filed Feb. 14, 2008.
U.S. Appl. No. 12/031,542, filed Feb. 14, 2008.
U.S. Appl. No. 12/031,556, filed Feb. 14, 2008.
U.S. Appl. No. 12/031,573, filed Feb. 14, 2008.
U.S. Appl. No. 13/118,241, filed May 27, 2011.
U.S. Appl. No. 13/488,903, filed Jun. 5, 2012.
U.S. Appl. No. 13/310,107, filed Dec. 2, 2011.
U.S. Appl. No. 13/369,561, filed Feb. 9, 2012.
U.S. Appl. No. 13/369,569, filed Feb. 9, 2012.
U.S. Appl. No. 13/369,584, filed Feb. 9, 2012.
U.S. Appl. No. 13/369,588, filed Feb. 9, 2012.
U.S. Appl. No. 13/369,594, filed Feb. 9, 2012.
U.S. Appl. No. 13/369,601, filed Feb. 9, 2012.
U.S. Appl. No. 13/369,609, filed Feb. 9, 2012.
U.S. Appl. No. 13/369,629, filed Feb. 9, 2012.
U.S. Appl. No. 13/369,666, filed Feb. 9, 2012.
U.S. Appl. No. 13/372,195, filed Feb. 13, 2012.
U.S. Appl. No. 13/424,648, filed Mar. 20, 2012.
U.S. Appl. No. 13/486,175, filed Jun. 1, 2012.
U.S. Appl. No. 13/480,263, filed May 24, 2012.

* cited by examiner

**A73**





FIG. 3



FIG. 4



FIG. 5



FIG. 6



FIG. 7



FIG. 8



FIG. 9



FIG. 10

FIG. 11



FIG. 12

FIG. 14

FIG. 13



FIG. 14A



FIG. 15



FIG. 15A



FIG. 17

FIG. 16

FIG. 16A



FIG. 18



FIG. 19



FIG. 19A

Case: 14-1771    Document: 18    Page: 129    Filed: 11/26/2014



FIG. 20



FIG. 21



FIG. 22

A89



FIG. 23



FIG. 24



FIG. 25



FIG. 26



FIG. 27



FIG. 28



FIG. 29



FIG. 32

Case: 14-1771    Document: 18    Page: 136    Filed: 11/26/2014



FIG. 31



FIG. 30



FIG. 33



FIG. 34





FIG. 36

FIG. 37



FIG. 38

FIG. 39



FIG. 40

FIG. 41

Case: 14-1771    Document: 18    Page: 142    Filed: 11/26/2014



FIG. 42



FIG. 43



FIG. 44



FIG. 45



FIG. 46



FIG. 47



FIG. 48



FIG. 49



FIG. 50



FIG. 51



FIG. 52



FIG. 54

FIG. 53



FIG. 55



FIG. 56



FIG. 57



FIG. 58

FIG. 59

FIG. 60



FIG. 61



FIG. 62



FIG. 63



FIG. 64



FIG. 65



FIG. 66



FIG. 67



FIG. 68



FIG. 69



FIG. 70



FIG. 71



FIG. 72



FIG. 73



FIG. 74



FIG. 75



FIG. 76



FIG. 77



FIG. 78



FIG. 79



FIG. 80



FIG. 81



FIG. 82          FIG. 83



FIG. 84



FIG. 85

Case: 14-1771    Document: 18    Page: 180    Filed: 11/26/2014



FIG. 86

A140



FIG. 88

FIG. 87



FIG. 89



FIG. 90

Case: 14-1771    Document: 18    Page: 184    Filed: 11/26/2014



FIG. 91



FIG. 92



FIG. 93



FIG. 94



FIG. 95

US 8,317,070 B2

**1**

# SURGICAL STAPLING DEVICES THAT PRODUCE FORMED STAPLES HAVING DIFFERENT LENGTHS

## CROSS-REFERENCE TO RELATED APPLICATIONS

The present application is a continuation-in-part under 35 U.S.C. §120 of U.S. patent application Ser. No. 11/216,562, filed Aug. 31, 2005, now U.S. Pat. No. 7,669,746, entitled "Staple Cartridges For Forming Staples Having Differing Formed Staple Heights," by F. Shelton, which is incorporated herein by reference.

The present application is also related to the following, concurrently-filed U.S. patent applications, which are incorporated herein by reference:

(1) U.S. patent application Ser. No. 11/711,977, now U.S. Pat. No. 7,673,781, "Surgical Stapling Device With Staple Driver That Supports Multiple Wire Diameter Staples," by J. Swayze et al;

(2) U.S. patent application Ser. No. 11/714,049, now U.S. Publication No. 2007/0194082, "Surgical Stapling Device With Anvil Having Staple Forming Pockets Of Varying Depth," by J. Morgan et al.;

(3) U.S. patent application Ser. No. 11/712,315, now U.S. Pat. No. 7,500,979, "Surgical Stapling Device With Multiple Stacked Actuator Wedge Cams For Driving Staple Drivers," by J. Hueil et al.; and

(4) U.S. patent application Ser. No. 11/711,975, now U.S. Publication No. 2007/0194079, "Surgical Stapling Device With Staple Drivers Of Different Height," by J. Hueil et al.

## FIELD OF THE INVENTION

The present invention relates in general to stapling instruments that are capable of applying lines of staples and, more particularly, to improvements relating to staple cartridges for use with surgical stapling instruments that are capable of applying lines of staples having differing formed staple heights to tissue while simultaneously cutting the tissue.

## BACKGROUND OF THE INVENTION

Surgical staplers have been used in the prior art to simultaneously make a longitudinal incision in tissue and apply lines of staples on opposing sides of the incision. Such instruments commonly include a pair of cooperating jaw members that, if the instrument is intended for endoscopic or laparoscopic applications, are capable of passing through a cannula passageway. One of the jaw members receives a staple cartridge having at least two laterally spaced rows of staples. The other jaw member defines an anvil having staple-forming pockets aligned with the rows of staples in the cartridge. The instrument includes a plurality of reciprocating wedges that, when driven distally, pass through openings in the staple cartridge and engage drivers supporting the staples to effect the firing of the staples toward the anvil.

An example of a surgical stapler suitable for endoscopic applications is described in U.S. Patent Application No. US 2004/0232196 A1, the disclosure of which is herein incorporated by reference in its entirety. In use, a clinician is able to close the jaw members of the stapler upon tissue to position the tissue prior to firing. Once the clinician has determined that the jaw members are properly gripping tissue, the clinician can then fire the surgical stapler, thereby severing and stapling the tissue. The simultaneous severing and stapling

**2**

avoids complications that may arise when performing such actions sequentially with different surgical tools that respectively only sever or staple.

Whenever a transsection of tissue is across an area of varied tissue composition, it would be advantageous for the staples that are closest to the cut line to have one formed height that is less than the formed height of those staples that are farthest from the cut line. In practice, the rows of inside staples serve to provide a hemostatic barrier, while the outside rows of staples with larger formed heights provide a cinching effect where the tissue transitions from the tightly compressed hemostatic section to the non-compressed adjacent section. In other applications, it may be useful for the staples in a single line of staples to have differing formed heights. U.S. Pat. Nos. 4,941,623 and 5,027,834 to Pruitt disclose surgical stapler and cartridge arrangements that employ staples that have different prong lengths to ultimately achieve lines of staples that have differing formed heights. Likewise, WO 2003/094747A1 discloses a surgical stapler and cartridge that has six rows of staples wherein the outer two rows of staples comprise staples that are larger than the staples employed in the inner two rows and middle rows of staples. Thus, all of these approaches require the use of different sizes of staples in the same cartridge.

## BRIEF SUMMARY OF THE INVENTION

In one general aspect, the present invention is directed to surgical stapling devices that are capable of producing staples of different formed lengths. For example, in such a device that also cuts the tissue being stapled, the inside rows of staples closest to the longitudinal incision line could have a formed height that is less than the formed height of the outer rows of staples. That way, the inside rows of staples may provide a hemostatic barrier, while the outside rows of staples with larger formed heights may provide a cinching effect where the tissue transitions from the tightly compressed hemostatic section to the non-compressed adjacent section.

According to various implementations, the staple cartridge may have staple drivers of different heights to product staples having different formed lengths. The staples driven by the shorter staple drivers would have longer formed lengths (assuming no other differences that would affect the formed heights of the staples). Also, the staple forming pockets in the anvil may have different depths. Staples formed in deeper pockets would tend to be longer than staples formed in shallow pockets. In addition, some of the staple forming pockets may be formed in compliant material portions of the anvil. Staples formed in such pockets would tend to be longer than staples formed in a non-compliant (or less compliant) portion of the anvil. Additionally, the channel may have internal steps that would produce staples having different formed heights. Staples formed with staple drivers starting at a lower step would have a longer formed length that stapled formed with staple drivers starting at a higher step. Also, staples with different wire diameters may be used. Thicker staples would tend to produce staples with longer formed lengths. In that connection, embodiments of the present invention are directed to staple pushers that can accommodate staples of varying wire thicknesses. Also, staples of differing materials could be used. Staples made of stronger, less compliant materials, would tend to produce longer formed staples.

According to other embodiments, the surgical stapling device may comprise a plurality of stacked wedge band sets. Each stacked wedge band set may comprise a number of wedge bands stacked one on another. The wedge bands may be actuated in succession in order to drive the staples in

US 8,317,070 B2

**3**

successive stages. That is, for example, in an embodiment having three wedge bands in a stack, the first wedge band may be actuated first to partially deploy the staples, the second wedge band in stack may be actuated next to begin to form the staples, and the third wedge band in the stack may be actuated last to finish the formation of the staples. To produce staples having different formed heights, the heights of the stacks (corresponding to the cumulative height of the wedge bands in the stacks) may be different, for example.

The techniques used to create formed staples of different heights could be used in a variety of different surgical stapling devices. For example, the stapling devices could be devices that cut the clamped tissue or devices that include no cutting instrument. The surgical staplers may be, for example, endocutters, open linear stapler devices, or circular staplers.

BRIEF DESCRIPTION OF THE FIGURES

The accompanying drawings, which are incorporated in and constitute a part of this specification, illustrate by way of example embodiments of the invention, and, together with the general description of the invention given above, and the detailed description of the embodiments given below, serve to explain the principles of the present invention, wherein:

FIG. **1** depicts a partially cut away side elevation view of a surgical stapling and severing instrument in an open position according to various embodiments of the present invention;

FIG. **2** depicts a cross-sectional side elevation detail view along the line **2-2** of FIG. **1** of an end effector of the surgical stapling and severing instrument according to various embodiments of the present invention;

FIG. **3** depicts an enlarged side elevation view of the firing bar of the surgical stapling and severing instrument of FIG. **2** according to various embodiments of the present invention;

FIG. **4** depicts an enlarged front view of the firing bar of the surgical stapling and severing instrument of FIG. **2** according to various embodiments of the present invention;

FIG. **5** depicts a cross-sectional side elevation detail view of an alternative end effector for the surgical stapling and severing instrument of FIG. **1**, incorporating a firing bar that lacks a middle pin for preventing pinching of the end effector, according to various embodiments of the present invention;

FIG. **6** depicts a side elevational view of a handle portion of a proximal end of the surgical stapling and severing instrument of FIG. **1** with a left side removed to expose interior parts in an unclamped, unfired ("start") position according to various embodiments of the present invention;

FIG. **7** depicts a perspective, exploded view of the handle portion of the proximal end of the surgical stapling and severing instrument of FIG. **1** according to various embodiments of the present invention;

FIG. **8** depicts a side elevational view of the handle portion of the proximal end of the surgical stapling and severing instrument of FIG. **1** with the left side removed to expose interior parts in the closed ("clamped") position according to various embodiments of the present invention;

FIG. **9** depicts a side elevational view of the handle portion of proximal end of surgical stapling and severing instrument of FIG. **1** with the left side removed to expose interior parts in the stapled and severed ("fired") position according to various embodiments of the present invention;

FIG. **10** depicts a plan view of a staple cartridge installed in an end effector according to various embodiments of the present invention;

FIG. **11** is an enlarged plan view of a portion of a staple cartridge according to various embodiments of the present invention;

**4**

FIG. **12** is a side view of a staple that may be employed with various embodiments of the present invention;

FIG. **13** is a front elevational view of one inside double driver supporting two staples thereon according to various embodiments of the present invention;

FIG. **14** is a top view of the inside double driver and staples of FIG. **13** according to various embodiments of the present invention;

FIG. **14**A is an elevational view of the inside double driver of FIG. **13** within a portion of a staple cartridge mounted in the end effector and also illustrating a corresponding portion of the anvil when in a closed position according to various embodiments of the present invention;

FIG. **15** is a right side elevational view of the inside double driver and staples of FIGS. **13** and **14** according to various embodiments of the present invention;

FIG. **15**A is another side elevational view of the inside double driver of FIG. **15** wherein corresponding portions of the cartridge tray and anvil are illustrated in broken lines to depict the relationships therebetween according to various embodiments of the present invention;

FIG. **16** is a front elevational view of one outside single driver supporting a staple thereon according to various embodiments of the present invention;

FIG. **16**A is another front view of the outside single driver of FIG. **16** with portions of the cartridge tray and anvil shown to illustrate the relationships therebetween according to various embodiments of the present invention;

FIG. **17** is a top view of the outside single driver and staple of FIG. **16** according to various embodiments of the present invention;

FIG. **18** is an isometric exploded view of the implement portion of the surgical stapling and severing instrument of FIG. **1** according to various embodiments of the present invention;

FIG. **19** is a section view taken along line **19-19** of FIG. **10** showing the cross-sectional relationship between the firing bar, elongate channel, wedge sled, staple drivers, staples and staple cartridge according to various embodiments of the present invention;

FIG. **19**A is another cross-sectional view of an end effector showing the cross-sectional relationship between the firing bar, elongate channel, wedge sled, staple drivers, staples, staple cartridge and anvil according to various embodiments of the present invention;

FIG. **20** is a perspective view of one wedge sled according to various embodiments of the present invention;

FIG. **21** is a side elevational view of an inside sled cam of the wedge sled depicted in FIG. **20** according to various embodiments of the present invention;

FIG. **22** is a side elevational view of an outside sled cam of the wedge sled depicted in FIG. **20** according to various embodiments of the present invention;

FIG. **23** is an isometric view of the end effector at the distal end of the surgical stapling and severing instrument of FIG. **1** with the anvil in the up or open position with the cartridge largely removed exposing a single staple driver and a double staple driver as exemplary and the wedge sled in its start position against a middle pin of the firing bar according to various embodiments of the present invention;

FIG. **24** is an isometric view of the end effector at the distal end of the surgical stapling and severing instrument of FIG. **1** with the anvil in the up or open position exposing the staple cartridge and cutting edge of the firing bar according to various embodiments of the present invention;

FIG. **25** is an isometric view of the distal end of the surgical stapling and severing instrument of FIG. **1** with the anvil in

US 8,317,070 B2

5                                                              6

the up or open position with the staple cartridge completely removed and a portion of an elongate channel removed to expose a lowermost pin of the firing bar according to various embodiments of the present invention;

FIG. **26** is a side elevation view in section showing a mechanical relationship between the anvil, elongate channel, and staple cartridge in the closed position of the surgical stapling and severing instrument of FIG. **1**, the section generally taken along lines **26-26** of FIG. **24** to expose wedge sled, staple drivers and staples but also depicting the firing bar along the longitudinal centerline according to various embodiments of the present invention;

FIG. **27** is a cross-sectional view of a portion of a staple cartridge wherein an outside cam of a wedge is adjacent to an outside single driver according to various embodiments of the present invention;

FIG. **28** is a cross-sectional view of a portion of a staple cartridge wherein an outside cam of a wedge sled is engaging three outside single drivers according to various embodiments of the present invention;

FIG. **29** is a diagrammatic representation of lines of staples installed on each side of a cut line using a surgical stapling and severing instrument according to various embodiments of the present invention;

FIG. **30** depicts a staple formed by one inside driver according to various embodiments of the present invention;

FIG. **31** depicts another staple formed by one outside driver according to various embodiments of the present invention;

FIG. **32** is a diagrammatic representation of lines of staples installed on each side of a cut line using a surgical stapling and severing instrument according to various embodiments of the present invention;

FIG. **33** is a diagrammatic representation of lines of staples installed on each side of a cut line using a surgical stapling and severing instrument according to various embodiments of the present invention;

FIG. **34** is a diagrammatic representation of lines of staples installed on each side of a cut line using a surgical stapling and severing instrument according to various embodiments of the present invention;

FIG. **35** is a side elevation section view of the surgical stapling and severing instrument of FIG. **1** taken along the longitudinal centerline of the end effector in a partially closed but unclamped position gripping tissue according to various embodiments of the present invention;

FIG. **36** depicts a partially cut away side elevational view of the surgical stapling and severing instrument of FIG. **1** in the closed or clamped position according to various embodiments of the present invention;

FIG. **37** depicts a side elevation view of the surgical stapling and severing instrument of FIG. **1** in the closed or clamped position with tissue properly compressed according to various embodiments of the present invention;

FIG. **38** depicts a view in centerline section of the distal end of the surgical stapling and severing instrument of FIG. **1** in a partially fired position according to various embodiments of the present invention;

FIG. **39** depicts a partially cut away side elevation view of the surgical stapling and severing instrument of FIG. **1** in a partially fired position according to various embodiments of the present invention;

FIG. **40** depicts a view in centerline section of the distal end of the surgical stapling and severing instrument of FIG. **1** in a fully fired position according to various embodiments of the present invention;

FIG. **41** is a partially cut-away side elevational view of the surgical stapling and severing instrument of FIG. **1** in a full fired position according to various embodiments of the present invention;

FIGS. **42-44** depict aspects of an end effector having a sled with multiple sled cams where one sled cam is taller than another according to various embodiments of the present invention;

FIG. **45** depicts aspects of an end effector with staple forming pockets having varying depths according to various embodiments of the present invention;

FIGS. **46-47** depict a double staple driver having staples of different pre-formation lengths according to various embodiments of the present invention;

FIG. **48** depicts a side-view of an end effector having a double staple driver having different staple driver heights according to various embodiments of the present invention;

FIG. **49-50** depict a side-view of an end effector having staple forming pockets of varying depths according to various embodiments of the present invention;

FIGS. **51-62** depict aspects of a surgical stapling device having stacks of actuatable wedge bands according to various embodiments of the present invention;

FIGS. **63-69** depict aspects of an open linear surgical stapling device according to various embodiments of the present invention;

FIGS. **70-77** depicts cross-sectional front views of an end effector according to various embodiments of the present invention;

FIGS. **78-83** depict staple drivers that can accommodate staple having different wire diameters according to various embodiments of the present invention;

FIGS. **84-89** depict a circular surgical stapling device according to various embodiments of the present invention; and

FIGS. **90-95** depict another surgical stapling device according to embodiments of the present invention.

DETAILED DESCRIPTION OF THE INVENTION

Turning to the figures, wherein like numerals denote like components throughout the several views, FIGS. **1** and **2** depict one embodiment of a surgical stapling and severing instrument **10** that is capable of practicing the unique benefits of the present invention. It should be recognized, however, that the unique and novel aspects of the present invention may be advantageously employed in connection with a variety of other staplers and stapler instruments without departing from the spirit and scope of the present invention. Accordingly, the scope of protection afforded to the various embodiments of the present invention should not be limited to use only with the specific type of surgical stapling and severing instruments described herein.

As can be seen in FIGS. **1** and **2**, the surgical stapling and severing instrument **10** incorporates an end effector **12** having an actuator or E-beam firing mechanism ("firing bar") **14** that advantageously controls the spacing of the end effector **12**. In particular, an elongate channel **16** and a pivotally translatable anvil **18** are maintained at a spacing that assures effective stapling and severing. The problems are avoided associated with varying amounts of tissue being captured in the end effector **12**.

It will be appreciated that the terms "proximal" and "distal" are used herein with reference to a clinician gripping a handle of an instrument. Thus, the end effector **12** is distal with respect to the more proximal handle portion **20**. It will be further appreciated that for convenience and clarity, spatial

US 8,317,070 B2

7 8

terms such as "vertical" and "horizontal" are used herein with respect to the drawings. However, surgical instruments are used in many orientations and positions, and these terms are not intended to be limiting and absolute.

The surgical and stapling and severing instrument 10 includes a handle portion 20 that is connected to an implement portion 22, the latter further comprising a shaft 23 distally terminating in the end effector 12. The handle portion 20 includes a pistol grip 24 toward which a closure trigger 26 is pivotally drawn by the clinician to cause clamping, or closing, of the anvil 18 toward the elongate channel 16 of the end effector 12. A firing trigger 28 is farther outboard of the closure trigger 26 and is pivotally drawn by the clinician to cause the stapling and severing of clamped tissue in the end effector 12.

In practice, closure trigger 26 is actuated first. Once the clinician is satisfied with the positioning of the end effector 12, the clinician may draw back the closure trigger 26 to its fully closed, locked position proximate to the pistol grip 24. Then, the firing trigger 28 is actuated. The firing trigger 28 springedly returns when the clinician removes pressure. A release button 30 when depressed on the proximal end of the handle portion 20 releases any locked closure trigger 26.

A closure sleeve 32 encloses a frame 34, which in turn encloses a firing drive member 36 that is positioned by the firing trigger 28. The frame 34 connects the handle portion 20 to the end effector 12. With the closure sleeve 32 withdrawn proximally by the closure trigger 26 as depicted, the anvil 18 springedly opens, pivoting away from the elongate channel 16 and translating proximally with the closure sleeve 32. The elongate channel 16 receives a staple cartridge 37.

With particular reference to FIGS. 2-4, the firing bar 14 includes three vertically spaced pins that control the spacing of the end effector 12 during firing. In particular, an upper pin 38 is staged to enter an anvil pocket 40 near the pivot between the anvil 18 and elongate channel 16. When fired with the anvil 18 closed, the upper pin 38 advances distally within a longitudinal anvil slot 42 extending distally through anvil 18. Any minor upward deflection in the anvil 18 is overcome by a downward force imparted by the upper pin 38. Firing bar 14 also includes a lowermost pin, or firing bar cap, 44 that upwardly engages a channel slot 45 in the elongate channel 16, thereby cooperating with the upper pin 38 to draw the anvil 18 and the elongate channel 16 slightly closer together in the event of excess tissue clamped therebetween. The firing bar 14 advantageously includes a middle pin 46 that passes through a firing drive slot 47 formed in a lower surface of the cartridge 300 and an upward surface of the elongate channel 16, thereby driving the staples therein as described below. The middle pin 46, by sliding against the elongate channel 16, advantageously resists any tendency for the end effector 12 to be pinched shut at its distal end. To illustrate an advantage of the middle pin 46, FIG. 5 depicts an alternative end effector 12' that lacks a middle pin on a firing bar 14'. In this depiction, the end effector 12' is allowed to pinch shut at its distal end, which tends to impair inserted staple formation.

Returning to FIGS. 2-4, a distally presented cutting edge 48 between the upper and middle pins 38, 46 on the firing bar 14 traverses through a proximally presented, vertical slot 49 in the cartridge 37 to sever clamped tissue. The affirmative positioning of the firing bar 14 with regard to the elongate channel 16 and anvil 18 assure that an effective cut is performed. The affirmative vertical spacing provided by the E-Beam firing bar 14 is suitable for the limited size available for endoscopic devices. Moreover, the E-Beam firing bar 14 enables fabrication of an anvil 15 with a camber imparting a vertical deflection at its distal end, similar to the position depicted in FIG. 5. This cambered anvil 15 advantageously assists in achieving the desired gap in the end effector 12 even with an anvil 15 having a reduced thickness, which may be more suited to the size limitations of an endoscopic device.

With reference to FIGS. 6-9, the handle portion 20 is comprised of first and second base sections 50 and 52, which are molded from a polymeric material such as a glass-filled polycarbonate. The first base section 50 is provided with a plurality of cylindrically-shaped pins 54. The second base section 52 includes a plurality of extending members 56, each having a hexagonal-shaped opening 58. The cylindrically-shaped pins 54 are received within the hexagonal-shaped openings 58 and are frictionally held therein for maintaining the first and second base sections 50 and 52 in assembly.

A rotating knob 60 has a bore 62 extending completely through it for engaging and rotating the implement portion 22 about its longitudinal axis. The rotating knob 60 includes an inwardly protruding boss 64 extending along at least a portion of the bore 62. The protruding boss 64 is received within a longitudinal slot 66 formed at a proximal portion of the closure sleeve 32 such that rotation of the rotating knob 60 effects rotation of the closure sleeve 32. It will be appreciated that the boss 64 further extends through frame 34 and into contact with a portion of the firing drive member 36 to effect their rotation as well. Thus, the end effector 12 (not shown in FIGS. 6-9) rotates with the rotating knob 60.

A proximal end 68 of the frame 34 passes proximally through the rotating knob 60 and is provided with a circumferential notch 70 that is engaged by opposing channel securement members 72 extending respectively from the base sections 50 and 52. Only the channel securement member 72 extending from the base section 52 is shown. The channel securement members 72, extending from the base sections 50, 52 serve to secure the frame 34 to the handle portion 20 such that the frame 34 does not move longitudinally relative to the handle portion 20.

The closure trigger 26 has a handle section 74, a gear segment section 76, and an intermediate section 78. A bore 80 extends through the intermediate section 78. A cylindrical support member 82 extending from the second base section 52 passes through the bore 80 for pivotally mounting the closure trigger 26 on the handle portion 20. A second cylindrical support member 83 extending from the second base section 52 passes through a bore 81 of firing trigger 28 for pivotally mounting on the handle portion 20. A hexagonal opening 84 is provided in the cylindrical support member 83 for receiving a securement pin (not shown) extending from the first base section 50.

A closure yoke 86 is housed within the handle portion 20 for reciprocating movement therein and serves to transfer motion from the closure trigger 26 to the closure sleeve 32. Support members 88 extending from the second base section 52 and securement member 72, which extends through a recess 89 in the yoke 86, support the yoke 86 within the handle portion 20.

A proximal end 90 of the closure sleeve 32 is provided with a flange 92 that is snap-fitted into a receiving recess 94 formed in a distal end 96 of the yoke 86. A proximal end 98 of the yoke 86 has a gear rack 100 that is engaged by the gear segment section 76 of the closure trigger 26. When the closure trigger 26 is moved toward the pistol grip 24 of the handle portion 20, the yoke 86 and, hence, the closure sleeve 32 move distally, compressing a spring 102 that biases the yoke 86 proximally. Distal movement of the closure sleeve 32 effects pivotal translation movement of the anvil 18 distally and toward the elongate channel 16 of the end effector 12 and proximal movement effects closing, as discussed below.

US 8,317,070 B2

9      10

The closure trigger **26** is forward biased to an open position by a front surface **130** interacting with an engaging surface **128** of the firing trigger **28**. Clamp first hook **104** that pivots top to rear in the handle portion **20** about a pin **106** restrains movement of the firing trigger **28** toward the pistol grip **24** until the closure trigger **26** is clamped to its closed position. Hook **104** restrains firing trigger **28** motion by engaging a lockout pin **107** in firing trigger **28**. The hook **104** is also in contact with the closure trigger **26**. In particular, a forward projection **108** of the hook **104** engages a member **10** on the intermediate section **78** of the closure trigger **26**, the member **100** being outward of the bore **80** toward the handle section **74**. Hook **104** is biased toward contact with member **110** of the closure trigger **26** and engagement with lockout pin **107** in firing trigger **28** by a release spring **112**. As the closure trigger **26** is depressed, the hook **104** is moved top to rear, compressing the release spring **112** that is captured between a rearward projection **114** on the hook **104** and a forward projection **116** on the release button **30**. As the yoke **86** moves distally in response to proximal movement of the closure trigger **26**, an upper latch arm **118** of the release button **30** moves along an upper surface **120** on the yoke **86** until dropping into an upwardly presented recess **122** in a proximal, lower portion of the yoke **86**. The release spring **112** urges the release button **30** outward, which pivots the upper latch arm **118** downwardly into engagement with the upwardly presented recess **122**, thereby locking the closure trigger **26** in a tissue clamping position, such as depicted in FIG. **8**.

The latch arm **118** can be moved out of the recess **122** to release the anvil **18** by pushing the release button **30** inward. Specifically, the upper latch arm **118** pivots upward about pin **123** of the second base section **52**. The yoke **86** is then permitted to move proximally in response to return movement of the closure trigger **26**.

A firing trigger return spring **124** is located within the handle portion **20** with one end attached to pin **106** of the second base section **52** and the other end attached to a pin **126** on the firing trigger **28**. The firing return spring **124** applies a return force to the pin **126** for biasing the firing trigger **28** in a direction away from the pistol grip **24** of the handle portion **20**. The closure trigger **26** is also biased away from pistol grip **24** by engaging surface **128** of firing trigger **28** biasing front surface **130** of closure trigger **26**.

As the closure trigger **26** is moved toward the pistol grip **24**, its front surface **130** engages with the engaging surface **128** on the firing trigger **28** causing the firing trigger **28** to move to its "firing" position. When in its firing position, the firing trigger **28** is located at an angle of approximately 45° to the pistol grip **24**. After staple firing, the spring **124** causes the firing trigger **28** to return to its initial position. During the return movement of the firing trigger **28**, its engaging surface **128** pushes against the front surface **130** of the closure trigger **26** causing the closure trigger **26** to return to its initial position. A stop member **132** extends from the second base section **52** to prevent the closure trigger **26** from rotating beyond its initial position.

The surgical stapling and severing instrument **10** additionally includes a reciprocating section **134**, a multiplier **136** and a drive member **138**. The reciprocating section **134** comprises a wedge sled in the implement portion **22** (not shown in FIGS. **6**-**9**) and a metal drive rod **140**. The drive member **138** includes first and second gear racks **141** and **142**. A first notch **144** is provided on the drive member **138** intermediate the first and second gear racks **141**, **142**. During return movement of the firing trigger **28**, a tooth **146** on the firing trigger **28** engages with the first notch **144** for returning the drive member **138** to its initial position after staple firing. A second notch

**148** is located at a proximal end of the metal drive rod **140** for locking the metal drive rod **140** to the upper latch arm **118** of the release button **30** in its unfired position. The multiplier **136** comprises first and second integral pinion gears **150** and **152**. The first integral pinion gear **150** is engaged with a first gear rack **154** provided on the metal drive rod **140**. The second integral pinion gear **152** is engaged with the first gear rack **141** on the drive member **138**. The first integral pinion gear **150** has a first diameter and the second integral pinion gear **152** has a second diameter which is smaller than the first diameter.

FIGS. **6**, **8** and **9** depict respectively the handle portion **20** in the start position (open and unfired), a clamped position (closed and unfired) and a fired position. The firing trigger **28** is provided with a gear segment section **156**. The gear segment section **156** engages with the second gear rack **142** on the drive member **138** such that motion of the firing trigger **28** causes the drive member **138** to move back and forth between a first drive position, shown in FIG. **8**, and a second drive position, shown in FIG. **9**. In order to prevent staple firing before tissue clamping has occurred, the upper latch arm **118** on the release button **39** is engaged with the second notch **148** on the drive member **138** such that the metal drive rod **140** is locked in its proximal-most position, as depicted in FIG. **6**. When the upper latch arm **118** falls into the recess **122**, the upper latch arm **118** disengages with the second notch **148** to permit distal movement of the metal drive rod **140**, as depicted in FIG. **9**.

Because the first gear rack **141** on the drive member **138** and the gear rack **154** on the metal drive rod **140** are engaged with the multiplier **136**, movement of the firing trigger **28** causes the metal drive rod **140** to reciprocate between a first reciprocating position, shown in FIG. **8**, and a second reciprocating position, shown in FIG. **9**. Since the diameter of the first pinion gear **150** is greater than the diameter of the second pinion gear **152**, the multiplier **136** moves the reciprocating section **134** a greater distance than the drive member **138** is moved by the firing trigger **28**. The diameters of the first and second pinion gears **150** and **152** may be changed to permit the length of the stroke of the firing trigger **28** and the force required to move it to be varied. It will be appreciated that the handle portion **20** is illustrative and that other actuation mechanisms may be employed. For instance, the closing and firing motions may be generated by automated means.

One embodiment of an end effector **12** of the surgical stapling and severing instrument **10** is depicted in further detail in FIGS. **18**, **19**, and **23-26**. As described above, the handle portion **20** produces separate and distinct closing and firing motions that actuate the end effector **12**. The end effector **12** advantageously maintains the clinical flexibility of this separate and distinct closing and firing (i.e., stapling and severing). In addition, the end effector **12** introduces the aforementioned ability to affirmatively maintain the closed spacing during firing after the clinician positions and clamps the tissue. Both features procedurally and structurally enhance the ability of the surgical stapling and severing instrument **10** by ensuring adequate spacing for instances where an otherwise inadequate amount of tissue is clamped and to enhance the clamping in instances where an otherwise excessive amount of tissue has been clamped.

FIG. **10** depicts a staple cartridge embodiment **300** of the present invention installed in the end effector **12** with the firing bar **14** in its unfired, proximal position. The staple cartridge **300** has a cartridge body **302** that is divided by an elongated slot **310** that extends from a proximal end **304** of the cartridge **300** towards a tapered outer tip **306**. A plurality of staple-receiving channels **320a-320f** are formed within the staple cartridge body **302** and are arranged in six laterally

US 8,317,070 B2

11                                                    12

spaced longitudinal rows **500**, **502**, **504**, **506**, **508**, **510**, with three rows on each side of the elongated slot **310**. Positioned within the staple-receiving channels **320a**-**320f** are the staples **222**. See FIGS. **10** and **11**.

The cartridge **300** further includes four laterally spaced longitudinal rows of staple drivers **330a**, **330b**, **370a**, and **370b** as shown in FIG. **11**. The "first" inside staple drivers **330a** are slidably mounted within corresponding channels **320b** and **320c** such that each driver **330a** supports two staples **222**, one in a channel **320b** and one in a channel **320c**. Likewise, the "second" inside drivers **330b** are slidably mounted within channels **320d** and **320e** such that each driver **330b** supports two staples **222**, one in a channel **320d** and one in a channel **320e**. The "outside" drivers **370a** and **370b** are slidably mounted within the staple-receiving channels **320a** and **320f**, respectively. Each of the outside drivers **370a** and **370b** supports a single staple **222**. Drivers **370a** are referred to herein as "first" outside drivers and drivers **370b** are referred to herein as "second" outside drivers.

FIG. **12** illustrates a staple **222** that may be used in connection with the various embodiments of the present invention. The staple **222** includes a main portion **223** and two prongs **225**. The prongs **225** each have a length "P" and the main portion has a width "W". The reader will appreciate that a variety of different types of staples may be employed. For example, for a vascular staple, "P" may be approximately 0.102 inches; for a regular staple, "P" may be approximately 0.134 inches; and for a thick tissue staple, "P" may be approximately 0.160 inches. "W" may be approximately 0.012 inches. Other sizes of staples **222** may be employed in the manners discussed below.

The inside staple drivers **330a** located on one side of the elongated slot **310** are referred to herein as "first" inside staple drivers and the inside staple drivers **330b** located on the other side of the elongated slot **310** are referred to herein as "second" inside staple drivers. As will be discussed in further detail below, in one embodiment, the second inside staple drivers **330b** are identical to the first inside staple drivers **330a**, except for their orientation in their respective channels in the cartridge body **302**.

FIGS. **13**-**15** illustrate one embodiment of a "first" inside double driver **330a** for supporting and driving staples **222**. As can be seen in those Figures, the staple driver **330a** has a primary driver portion **340** and a secondary driver portion **350** that is connected to the first primary portion **340** by a central base member **360**. The primary driver portion **340** has a primary driver base **342** that has a groove **343** therein adapted to mate with a corresponding vertically extending tongue (not shown) in the cartridge body **302** for guiding and stabilizing the driver **330a** as it moves within its respective channel. The primary driver portion **340** further has a first forward support column **344** and a first rearward support column **346** protruding upward from the first driver base **342**. The first forward support column **344** has a first forward staple-receiving groove **345** therein and the first rearward support column **346** has a first rearwardly staple-receiving groove **347** therein. See FIGS. **13**-**15**. The first forward support column **344** and the first rearward support column **346** are spaced from each other and collectively form a first staple cradle **348** for supporting the main portion **223** of the staple **222** therein in an upright position (i.e., prongs facing the anvil). Similarly, the secondary driver portion **350** has a secondary driver base **352** and a secondary forward support column **354** and a secondary rearward support column **356** protruding out from the second driver base **352**. The secondary forward support column **354** has a secondary forward staple-receiving groove **355** therein and the secondary rearward support column **356** has a sec-

ondary rearward staple-receiving groove **357** therein. The secondary forward support column **354** and the secondary rearward support column **356** are spaced from each other and collectively form a secondary staple cradle **358** for supporting the main portion **223** of another staple **222** therein.

As can be seen in FIGS. **13** and **15**, the central base member **360** has an angled rearwardly facing edge **362** adapted to be engaged by a corresponding sled cam as will be discussed in further detail below. As can be seen in FIGS. **13** and **14**, in this embodiment, the secondary forward support column **354** of the secondary driver portion is oriented relative to the first rearward support column **346** such that the staple **222** that is supported in the secondary staple cradle **358** is longitudinally offset from the staple **222** in the first staple cradle **348**. The reader will appreciate that the first inside drivers **330a** are each installed in one orientation into a corresponding pair of channels **320b** and **320c** located on one side of the elongated slot **310** in the cartridge body **302**. The second inside staple drivers **330b** (located on the opposite side of the elongated slot **310** from the first inside staple drivers **330a**) comprise inside drivers **330a** rotated 180 degrees so that their respective angled surfaces **363** face towards the proximal end **304** of the cartridge **300** to enable them to be installed in pairs of corresponding channels **320d** and **320e**. Thus, in this embodiment, only one inside driver configuration is employed which thereby eliminates the need for two different inside staple driver configurations for channels on each side of the elongated slot **310**.

FIGS. **16** and **17** illustrate one embodiment of a "first" outside staple driver **370a**. As can be seen in those Figures, a first outside staple driver **370a** has a second base **372** that has an angled rearwardly facing portion **374**. Protruding upward from the second base **372** is a second forward support column **375** that has a second forward staple-receiving groove **376** therein. A second rearward support column **377** also protrudes upward from the second base **372** in a spaced-apart relationship with respect to the second forward support column **375**. The second rearward support column **377** has a second rearward staple-receiving groove **378** therein. The support columns **375**, **377** collectively form a second staple cradle **379** that is configured to support a staple **222** therein in an upright position as illustrated in FIGS. **16** and **17**. The staple drivers **370a** also have a laterally protruding rib **371** which is received in a corresponding groove (not shown) in the cartridge body **302** for guiding and stabilizing the driver **370a** as it moves within its respective channel.

The reader will appreciate that a first outside driver **370a** is installed in one orientation into a corresponding channel **320a** on one side of the elongated slot **310**. A second outside staple driver **370b** (to be located on the opposite side of the elongated slot **310** from the first outside staple drivers **370a**) comprises an outside driver **370a** rotated 180 degrees so that the angled surface **374'** thereon faces toward the proximal end **304** of the cartridge **300** to enable it to be installed in a corresponding channel **320f** in the cartridge body **302**. Thus, in this embodiment, only one outside staple driver configuration is employed which avoids the need for two different outside staple driver configurations for channels on each side of the elongated slot **310**. FIGS. **19** and **19A** illustrate in cross-section one embodiment of a staple cartridge of the present invention mounted within one type of end effector **12**. The end effector **12** in this embodiment employs a "stepped" anvil **18** of the type illustrated in FIGS. **23**-**25**. In other embodiments, however, the bottom surface of the anvil is planar and not stepped. Other As can be seen in FIGS. **19A**, and **23**-**25**, the anvil **18** has a central portion **19** that is offset or not coplanar with the two lateral side portions **21**, **23**.

**A154**

US 8,317,070 B2

13

Accordingly, in this embodiment, the upper surface **306** of the cartridge **300** is provided with a recessed central portion **307** and two lateral side portions **309** that are adapted to closely mate with the corresponding portions **19**, **21**, **23**, respectively, of the anvil **18**, when the anvil **18** is in the closed position. See FIG. **19**A.

As can be seen in FIG. **24**, in this embodiment, the under surfaces **200** of anvil **18** are provided with a series of forming pockets **202** that may be arranged in rows that correspond to the rows of channels in the cartridge **300**. That is, row **205** of pockets **202** may correspond to channel row **500**. Row **207** of pockets may correspond to channel row **502**. Row **209** of pockets **202** may correspond to channel row **504**. Row **211** of pockets **202** may correspond to channel row **506**. Row **213** of pockets **202** may correspond to channel row **508**. Row **215** of pockets **202** may correspond to channel row **510**. Each pocket **202** has at least one forming surface **203** therein that is adapted to contact the ends of the staple prongs **225** being driven therein to thereby cause the prongs **225** to bend inwardly toward each other. In one embodiment, each pocket **202** has two intersecting arcuate forming surfaces **203** that are oriented as shown in FIG. **14**A. Each arcuate forming surface has an apex **203'** that defines a maximum pocket depth "Z". However other forming pocket configurations could be employed.

Returning to FIGS. **18** and **19**, it can be seen that in one embodiment, the cartridge body **302** is mounted within the cartridge tray **224**. As illustrated in FIG. **19**, the cartridge body **302** is formed with two inside longitudinally extending slots **390** and two outside longitudinally extending slots **392**. Slots **390** and **392** extend from the proximal end **304** of the cartridge to its tapered outer tip **306** (shown in FIG. **10**). This embodiment further includes a wedge sled **400** that slidably supported on the cartridge tray **224**. One wedge sled embodiment **400** includes a pair of inside sled cams **410**, wherein one inside sled cam **410** corresponds to one of the inside longitudinally extending slots **390** and wherein the other inside sled cam **410** corresponds to the other inside longitudinally extending slot **390**. See FIG. **19**. The wedge sled **400** further includes a pair of outside sled cams **420**, wherein one outside sled cam **420** corresponds to one of the outside longitudinally extending slots **392** and the other outside sled cam **420** corresponds to the other outside longitudinally extending slot **392** as shown in FIG. **19**. When assembled, the cartridge tray **224** holds the wedge sled **400** and the drivers **330**_a_, **330**_b_, **370**_a_, **370**_b_ inside the cartridge body **302**.

As can be seen in FIG. **18**, the elongate channel **16** has a proximally placed attachment cavity **226** that receives a channel anchoring member **228** on the distal end of the frame **34** for attaching the end effector **12** to the handle portion **20**. The elongate channel **16** also has an anvil cam slot **230** that pivotally receives an anvil pivot **232** of the anvil **18**. The closure sleeve **32** that encompasses the frame **34** includes a distally presented tab **234** that engages an anvil feature **236** proximate but distal to the anvil pivot **232** on the anvil **18** to thereby effect opening and closing of the anvil **18**. The firing driver member **36** is shown as being assembled from the firing bar **14** attached to a firing connector **238** by pins **240**, which in turn is rotatingly and proximally attached to the metal drive rod **140**. The firing bar **14** is guided at a distal end of the frame **34** by a slotted guide **239** inserted therein.

FIGS. **20-23** illustrate one embodiment of the wedge sled **400** of the present invention. As can be seen in FIGS. **20** and **23**, the wedge sled **400** includes a central spacer portion **402** that extends between the inside sled cams **410**. A pusher block **404** is formed on the central spacer portion **402** for engagement with the middle pin **46** of the firing bar **14**. A side profile

14

of one embodiment of an inside sled cam **410** is depicted in FIG. **21**. As can be seen in that Figure, the inside sled cam **410** has a bottom surface **412**, and a first camming surface **414** that forms an angle "G" with the bottom surface **412** and a second camming surface **415** that extends to a top surface **416**. In one embodiment, for example, the angle "G" may be 35 degrees and the angle "G'" may be 20 degrees. The height of the inside sled cam **410** (the distance between the bottom surface **412** and the top surface **416**) is represented as "first" sled cam height "H". In one embodiment, distance "H' is approximately 0.173 inches and the length of the top surface **416** may vary from embodiment to embodiment. As will be further evident as the present Detailed Description proceeds, the first sled cam height represents the vertical distance that the inside sled cams **410** will drive the corresponding inside drivers **330**_a_, **330**_b_ toward the anvil **18** during operation.

The wedge sled **400** further comprises lateral spacer portions **406** that extend between the inside sled cams **410** and the outside sled cams **420** as shown in FIGS. **20** and **23**. A side profile of one embodiment of an outside sled cam **420** is depicted in FIG. **22**. In this embodiment, the outside sled cam **420** has a bottom surface **422** and a first camming surface **424** that forms an angle "I" with respect to the bottom surface **422** and a second camming surface **425** that to a top surface **426**. In one embodiment, angle "I" may be approximately 35 degrees and angle "I'" may be approximately 20 degrees. The height of the outside sled cam **420** (the distance between the bottom surface **412** and the top surface **416**) is represented as the "second" sled cam height "J". In one embodiment, distance "J' is approximately 0.163 inches. The second sled cam height represents the vertical distance that the outside sled cams **420** will drive the corresponding outside drivers **370**_a_, **370**_b_ toward the anvil **18** during operation. The reader will understand that the above-recited dimensions are illustrative of one embodiment and may vary for other embodiments.

With particular reference to FIG. **23**, a portion of the staple cartridge **300** is removed to expose portions of the elongate channel **16**, such as recesses **212**, **214** and to expose some components of the staple cartridge **300** in their unfired position. In particular, the cartridge body **302** (shown in FIG. **18**) has been removed. The wedge sled **400** is shown at its proximal, unfired position with a pusher block **404** contacting the middle pin **46** (not shown in FIG. **23**) of the firing bar **14**. The wedge sled **400** is in longitudinal sliding contact upon the cartridge tray **224** and includes wedges sled cams **410**, **420** that force upward the double drivers **330**_a_, **330**_b_ and the single drivers **370**_b_, **370**_b_ as the wedge sled **400** moves distally. Staples **222** (not shown in FIG. **23**) resting upon the drivers **330**_a_, **330**_b_, **370**_a_, **370**_b_ are thus also forced upward into contact with the anvil forming pockets **202** in anvil **18** to form closed staples. Also depicted is the channel slot **45** in the elongate channel **16** that is aligned with the elongated slot **310** in the staple cartridge **300**.

FIG. **24** depicts the end effector **12**, which is in an open position by a retracted closure sleeve **32**, with a staple cartridge **300** installed in the elongate channel **16**. The firing bar **14** is at its proximal position, with the upper pin **38** aligned in a non-interfering fashion with the anvil pocket **40**. The anvil pocket **40** is shown as communicating with the longitudinal anvil slot **42** in the anvil **18**. The distally presented cutting edge **48** of the firing bar **14** is aligned with and proximally from removed from the vertical slot **49** in the staple cartridge **300**, thereby allowing removal of a spent cartridge and insertion of an unfired cartridge, which may be "snapfit" into the elongate channel **16**. Specifically, in this embodiment, exten-

**15**

sion features **316**, **318** of the staple cartridge **300** engage recesses **212**, **214**, respectively (shown in FIG. **23**) of the elongate channel **16**.

FIG. **25** depicts the end effector **12** of FIG. **23** with all of the staple cartridge **300** removed to show the middle pin **46** of the firing bar **14** as well as portion of the elongate channel **16** removed adjacent to the channel slot **45** to expose the firing bar cap **44**. In addition, portions of the shaft **23** are removed to expose a proximal portion of the firing bar **14**. Projecting downward from the anvil **18** near the pivot is a pair of opposing tissue stops **244** which serve to prevent tissue from being positioned too far up into the end effector **12** during clamping. FIG. **26** depicts the end effector **12** in a closed position with the firing bar **14** in an unfired position. The upper pin **38** is in the anvil pocket **40** and is vertically aligned with the anvil slot **42** for distal longitudinal movement of the firing bar **14** during firing. The middle pin **46** is positioned to push the wedge sled **400** distally so that the sled cams **410**, **420** contact and lift double drivers **330***a*, **330***b* and the single drivers **370***a*, **370***b*, respectively, to drive them upwardly toward the anvil **18**.

As can be appreciated from reference to FIGS. **14**A, **15**A and **19**A, in one embodiment of the present invention, the distance between the bottom of the first staple-receiving grooves **345**, **347** forming the first staple cradle **349** and the apex **203'** of forming surfaces **203** of the corresponding forming pocket **202** of anvil **18**, when the anvil **18** is in the closed position and when the inside driver **330***a*, **330***b* is supported on the cartridge tray **224**, is referred to herein as the first staple forming distance "A". The distance between the bottom of the secondary staple-receiving grooves **345**, **347** forming the secondary staple cradle **349** and the apex **203'** of the forming surface **203** of the corresponding forming pocket **202** in the anvil **18** when the anvil **18** is in the closed position and the inside driver **330***a*, **330***b* is supported on the cartridge tray **224** is referred to herein as the secondary staple forming distance "B". In one embodiment, the first staple forming distance "A" and the secondary staple forming distance "B" are substantially equal to each other. In other embodiments, those distances "A" and "B" may differ from each other.

As illustrated in FIGS. **16**A and **19**A the distance between the bottom of the second staple-receiving grooves **376**, **378** that form the second staple cradle **379** and the apex **203'** of the forming surface **203** of a corresponding forming pocket **202** in anvil **18** when the anvil **18** is in the closed position and the outside drivers **370***a*, **370***b* are supported on the cartridge channel **224**, is referred to herein as a "second" staple forming distance "C".

FIGS. **27** and **28** illustrate the forming of staples supported on some of the first outside drivers **370***a*. In FIG. **27**, one of the outside sled cams **420** of the wedge sled **400** is initially contacting one of the outside drivers **370***a*. As the wedge sled **400** continues in the driving direction represented by arrow "K" in FIG. **28**, the outside sled cam **420** causes the outside drivers **370***a* drive the staples **222** supported thereby into the staple forming pockets **202** in the anvil **18**. Likewise, as the wedge sled **400** is driven in the driving direction "K", the inside sled cams **410** contact the inside drivers **330***a*, **330***b* and causes them to drive the staples **222** supported thereby into the corresponding staple forming pockets **202** in the anvil **18**.

As indicated above, in some applications involving an area of varied tissue composition, it can be desirable to form rows of staples wherein the formed (final) heights of the staples in a row that is the farthest distance away from the cut line are greater than the formed (final) heights of those staples in the row that is closest to the cut line. In other applications, it may be desirable for the formed heights of the staples in a single row to increase (or decrease) from staple to staple. Another

**16**

clinical benefit would be to have the formed heights of the staples in the outermost rows larger than formed heights of the staples in the inside rows. The various embodiments of the subject invention can provide these results while employing identical staples in all of the rows.

In the description to follow, those staples **222** in the outermost rows **520**, **530** of staples (those staples formed using the outside staple drivers **370***a*, **370***b*) will be referred to hereinafter as staples **222'** and those staples in the innermost rows **522**, **524**, **526**, **528** of staples (those staples formed using the inside staple drivers **330***a*, **330***b*) will be referred to hereinafter as staples **222"**. It will be understood, however, that staples **222'** and **222"** are identical to each other prior to being formed by the various embodiments of the present invention. That is, staples **222'** and **222"** each have identical prong lengths "P" and widths "W".

Returning to FIGS. **14**A-**16**A and **21** and **22**, the above desired effects may be attained by altering the staple forming distances "A", "B", and "C" relative to each other and/or the sled cam heights "H" and "J". In one embodiment of the subject invention, for example, the height "H" of each of the inside sled cams **410** is substantially equal to the sled height "J" of each of the outside sled cams **420**. See FIGS. **21** and **22**. In this embodiment, the staple forming distances "A" and "B" are substantially equal to each other, but distances "A" and "B" are less than the staple forming distance "C". The distance "D" between the bottoms of the first staple-receiving grooves **345**, **347** and the bottom surface **342** of the primary driver base **342** is substantially equal to the distance "E" between the bottoms of the secondary staple-receiving grooves **356**, **357** and the bottom surface **352** of the secondary driver base portion **352**. See FIG. **15**. Also in this embodiment, the distance "F" between the bottoms of the second staple-receiving grooves **376** and **378** and the bottom surface **373** of the third base **372** of the outside drivers **370***a*, **370***b* (FIG. **16**) is less than distances "D" and "E" (FIG. **15**). Because the forming distance "C" is greater than the forming distances "A" and "B", the staples **222** supported and formed by the outside drivers **370***a*, **370***b* are not compressed as much as the staples supported and formed by the inside drivers **330***a*, **330***b*. It will be understood that similar results may be attained on the opposite side of the elongated slot **310** and the cut line **600** formed in the tissue by using the same arrangements and sizes of inside drivers **330***b* and outside drivers **370***b*. In an alternative embodiment, the same effect may be achieved by altering the depths of the forming pockets **202** corresponding to the drivers **330***a* and **370***b* such that forming distance "C" is greater than the forming distances "A" and "B". That is, the depth (distance "Z" in FIG. **16**A) of the forming pockets **202** corresponding to the outside drivers **370***a*. **370***b* may be greater than the depth (distance "Z" in FIG. **14**A) of the forming pockets **202** that correspond to the inside drivers **330***a*, **330***b*.

FIG. **29** illustrates the rows of staples formed on each side of a cut line **600** utilizing this embodiment of the present invention wherein the forming distances "A" and "B" are equal to each other and the forming distance "C" is greater than the forming distances "A" and "B". For example, if forming distance "C" is 0.020" greater than forming distances "A" and "B", the formed height of the outside staples **222'** (represented as dimension "L" in FIG. **30**) in rows **520** and **530** would be 0.020 inches is greater than the formed height of the inside staples **222"** (represented as dimension "M" in FIG. **31**) in rows **522**, **524**, **526**, **528**.

The same result may be achieved by utilizing another embodiment of the present invention wherein the forming distances "A", "B" and "C" are essentially equal. In this

US 8,317,070 B2

17                                                                          18

embodiment, however, the height of each of the inside sled cams 410 (distance "H" in FIG. 21) is greater than the height of each of the outside sled cams 420 (distance "J" in FIG. 22). Thus, because the height "H" of the inside sled cams 410 is greater than the height "J" of the outside sled cams 420, the inside sled cams 410 will drive the corresponding inside drivers 330a, 330b further towards the anvil than the outside sled cams 420 will drive the corresponding outside drivers 370a, 370b. Such driving action will cause the staples supported by the inside drivers 330a, 330b to be compressed to a greater extent than those staples supported by the outside drivers 370a, 370b. For example, if distance "H" is 0.020 inches greater than distance "J", the formed height of staples 222' in lines 520, 530 would be 0.020" greater than the formed height of staples 222" in lines 522, 524, 526, 528.

When employing yet another embodiment of the present invention, the outside rows 520, 530 of staples 222' and the inside rows 522, 528 of staples 222" may be formed with heights that are greater than the formed heights of the staples 222" in the inside rows 524, 526. See FIG. 32. This result is achieved by making the forming distances "C" greater than the forming distance "A" and making forming distance "A" greater than secondary forming distance "B".

Another embodiment of the present invention can be used to install staples where it is desirable for the formed heights of staples in a single row to vary. One such arrangement is depicted in FIG. 33. As can be seen in FIG. 33, the formed heights of the staples 222' in the outside rows 520, 530 increase when moving from the proximal ends 521, 531 of each row 520, 530, respectively to the distal ends 523, 533 of each row 520, 530, respectively. This effect may be accomplished by decreasing the forming distance "C" for each succeeding driver 370a, 370b. That is, the driver 370a closest the proximal end of the cartridge 300 would be sized to establish a forming distance "C" that is greater than the forming distance "C" achieved by the adjacent driver 370a and so on to achieve a condition wherein each succeeding staple 222' (moving in the direction from the proximal end to the distal end of the cartridge 300) would have larger formed heights. This result could also be attained in the staples 222" in rows 522, 524, 526, 528 by similarly altering the forming distances "A" and/or "B" attained by each driver 330a, 330b. Likewise, formed heights of the staples 222' in the outside rows 520, 530 could be made to decrease when moving from the proximal ends 521, 531 of each row 520, 530, respectively, to the distal ends 523, 533 of each row 520, 530, respectively. This result may be attained by increasing the forming distance of each succeeding driver 370a, 370b. That is, the driver 370a closest the proximal end of the cartridge 300 would have a forming distance "C" that is less than the forming distance "C" of the adjacent driver 370a and so on to achieve a condition wherein each succeeding staple 222' (moving in the direction from the proximal end to the distal end of the cartridge) would have smaller formed heights. See FIG. 34.

In use, the surgical stapling and severing instrument 10 is used as depicted in FIGS. 1-2 and 35-41. In FIGS. 1-2, the instrument 10 is in its start position, having had an unfired, fully loaded staple cartridge 300 snap-fitted into the distal end of the elongate channel 16. Both triggers 26, 28 are forward and the end effector 12 is open, such as would be typical after inserting the end effector 12 through a trocar or other opening into a body cavity. The instrument 10 is then manipulated by the clinician such that tissue 248 to be stapled and severed is positioned between the staple cartridge 300 and the anvil 18, as depicted in FIG. 35. With reference to FIGS. 36 and 37, the clinician then moves the closure trigger 26 proximally until positioned directly adjacent to the pistol grip 24, locking the handle portion 20 into the closed and clamped position. The retracted firing bar 14 in the end effector 12 does not impede the selective opening and closing of the end effector 12, but rather resides within the anvil pocket 40. With the anvil 18 closed and clamped, the E-beam firing bar 14 is aligned for firing through the end effector 12. In particular, the upper pin 38 is aligned with the anvil slot 42 and the channel member 16 is affirmatively engaged about the channel slot 45 by the middle pin 46 and the firing bar cap 44.

With reference to FIGS. 38 and 39, after tissue clamping has occurred, the clinician moves the firing trigger 28 proximally causing the firing bar 14 to move distally into the end effector 12. In particular, the middle pin 46 enters the staple cartridge 300 through the firing drive slot 47 to affect the firing of the staples 222 (not shown in FIGS. 38 and 39) via wedge sled 400 toward the anvil 18. The lowermost pin, or firing bar cap 44, cooperates with the middle pin 46 to slidingly position cutting edge 48 of the firing bar 14 to sever tissue. The two pins 44, 46 also position the upper pin 38 of the firing bar 14 within longitudinal anvil slot 42 of the anvil 18, affirmatively maintaining the spacing between the anvil 18 and the elongate channel 16 throughout its distal firing movement.

With reference to FIGS. 40 and 41, the clinician continues moving the firing trigger 28 until brought proximal to the closure trigger 26 and pistol grip 24. Thereby, all of the ends of the staples 222 are bent over as a result of their engagement with the anvil 18. The firing bar cap 44 is arrested against a firing bar stop 250 projecting toward the distal end of the channel slot 45. The cutting edge 48 has traversed completely through the tissue. The process is complete by releasing the firing trigger 28 and by then depressing the release button 30 while simultaneously squeezing the closure trigger 26 to open the end effector 12.

FIGS. 42-43 show the inside and outside sled cams 410, 420 of the sled 400 having different heights so that the staples, when formed, may have different formed heights. In particular, as shown in FIG. 42 the outside sled cam 420 may be shorter than the inside sled cam 410. That way, the outside staples may have a greater formed height than the inside staples. FIG. 42 is a perspective view of the sled 400 with the different heights for the inside and outside sled cams 410, 420. FIG. 43 is a side view of the end effector 12 showing various stages of driving the staples 222 with a sled 400 having different heights for the inside and outside sled cams 410, 420. As can be seen in FIG. 43, the formed staple 222b may have a greater formed height than the formed staple 222a because the staple 222b was driven by the outside cam sled 420 and the staple 222a was driven by the taller inside cam sled 410.

In another embodiment, as shown in FIG. 44, the heights of the driver portions 342, 352 of a double driver 330 may vary so that the staples, when formed, may have different heights. In particular, as shown in FIG. 44, the secondary driver portion 352 may be shorter (having height "E") than the primary driver portion 342 (having height "D"). That way, the staple 222a driven by the secondary driver portion 352 may have a greater formed height than the staple 222b driven by the primary driver portion 342. In various embodiments, some or all of the inside double drivers 330 could have primary and secondary driver portions 342 of different heights. Further, the heights differential need not be all the same. Different inside double drivers 330 could have different height differentials.

In addition, the height of the primary and secondary driver portions 342, 352 may be the same as or different from the height of the driver portions 372 of the outside staple drivers

US 8,317,070 B2

19 20

**370**. That is, in various embodiments, the driver height of the outside staple driver portion **372** may be (1) different from the height of both driver portions **342**, **352** of the inside double driver **330** when the driver portions **342**, **352** are the same height, (2) different from the height of both driver portions **342**, **352** when they are different heights, or (3) the same as the height for one of the driver portions **342**, **352** when the driver portions **342**, **352** have different heights. Also, the heights of the driver portions **372** of the outside staple drivers **370** need not be all the same. Different outside staple drivers **370** could have different heights.

FIG. **45** shows an embodiment having different height drivers (e.g., the primary driver portion **342** taller than the secondary driver portion **352**) and with different depth anvil pockets **202**. Varying the depth of the anvil pockets **202** can also affect the height of the formed staples. All things being equal, deeper pockets should result in longer formed staples. In the illustrated embodiment, the pockets **202** corresponding to the primary driver portion **342** are deeper than the pockets **202** corresponding to the secondary driver portion **352**. Some or all of the pockets **202** for each staple row **500-510** could be deeper. Also, the depth differentials need not be the same. A multitude of different depths could be used in a single row **500-510** or across rows **500-510**.

In addition, as shown in FIG. **46**, staples **222** with differing pre-formation prong heights ("P") may be used. In the illustrated embodiment, the longer staple **222a** is used with the shorter, secondary driver portion **352** of an inside double driver **330** in comparison with staple **222b** driven by the primary driver portion **342**. The pre-formation staple prong lengths may vary within a staple row **500-510** or across staple rows. That is, for example, all of the staples in the inside rows **504-506** could have the same pre-formation prong length x, all of the staples in the intermediate rows **502**, **508** could be longer (e.g., a length 1.10x), and all of the staples in the outer rows **500**, **510** could be still longer (e.g., a length of 1.20x). As shown in FIG. **47**, the anvil pockets **202** could have the same depth. In other embodiments, varying anvil pocket depths could be used.

FIG. **48** is a side view of the end effector **12** in an embodiment where the outside staple drivers **370** have different heights. In particular, in the illustrated embodiment, the first staple driver **370'** is taller than the second staple driver **370"**. In the illustrated embodiment, the staples **222** have the same pre-formation prong length and the corresponding anvil pockets **202** have the same depth. As such, the formed staple **222"** formed with the second outside staple driver **370"** is longer than the formed staple **222'** formed with the first outside staple driver **370'**.

FIG. **49** is a side view of the end effector **12** where the anvil **18** has pockets **202** of different depth for the staples **222** driven by a inside double driver **330**. In the illustrated embodiment, the pockets **202** corresponding to the primary driver portion **342** are deeper than the corresponding pockets **202** for the secondary driver portion **352**. In this embodiment, the primary and secondary driver portions **342**, **352** are the same height and the staples **222** have the same pre-formation prong length. The distance between the top of the primary driver portion **342** and the top of the corresponding anvil pockets **202** is height "A" and the corresponding height for the secondary portion **352** is height "B," where "A" is greater than "B" by a height differential "h". This should result in longer formed staples for the primary driver portion **342**, as shown in FIG. **50**.

FIGS. **51** and **60** show aspects of an end effector **12** according to other embodiments that can be used to produce staples of different formed lengths. In the illustrated embodiment,

the staple drivers **330**, **370** are driven in stages by a plurality of actuator wedge cams **709** at the distal end of a plurality of wedge band sets **710**, **712**, **714**. In the illustrated embodiment, each wedge band set comprise four wedge bands (shown best in FIG. **56**); two **720** for actuating the inner drivers **330a,b** and two **722** for actuating the outer drivers **370a,b**. The wedge bands of the wedge band sets **710**, **712**, **714** may be actuated in serial order and may ride on top of one another in a stack to drive the staple drivers **330a,b**, **370a,b** (and hence the staples **222**) in serial stages. For example, the wedge bands of the lowermost actuator wedge band set **710** may be fired (or actuated) first, and may partially deploy the staples **222**. The middle wedge band set **712**, which rides on top of the lowermost wedge band set **710** as shown in FIGS. **53-56**, may be actuated next, which may have the effect of beginning to form the staples **222**. Then the uppermost wedge band set **714**, which rides on the middle wedge band set **712**, may be actuated, which finishes the formation of the staples **222**. FIG. **56** illustrates this operation. In FIG. **56**, the lowermost wedge band sets **710** have been fired, the middle wedge band sets **712** have been partially fired, and the uppermost wedge band set **714** has not yet been fired. Thus, such an embodiment may comprise a plurality (in this case four) of stacked wedge band sets, each stack comprising a wedge band from the lowermost set **710**, the middle set **712**, and the uppermost set **714**.

The firing bar **716**, with the e-beam firing mechanism **14**, may then be fired to cut the tissue clamped by the end effector **12**. A hold down spring **718**, which may be connected to the frame **34** at a crossbar **719**, may engage and urge the firing bar **716** downward.

As can be seen best in FIGS. **54** and **56**, the cumulative height of the wedge band stacks of inner row **720** or may be greater than the cumulative height of the wedge band stacks of the outer row **722** (by a height differential h'). That way, the outer row of staples may have a greater formed length than the inner row of formed staples, as shown in the example of FIG. **55**, where the outer row staple **222a** has a greater formed length than the inner row staple **222b**. As shown the example of FIG. **61**, according to one embodiment, the wedge bands of the lowermost and middle wedge band sets **710**, **712** may be the same height, and the height of the wedge bands for the outer row **722** of the uppermost wedge band set **714** may be less than the height of the wedge bands of the inner row **720** of the uppermost wedge band set **714** to provide the height differential for the different wedge band stacks.

The end effector **12** in such an embodiment may still comprise a sled **400**, but without the sled cams **410**, **420**, to keep the firing mechanism **14** out of the lockout in the channel (see FIGS. **3-4** and related text).

The inner and outer wedge band stacks **720**, **722** may be tightly spaced within the frame **34**. Accordingly, the end effector **12** may further comprise an actuator wedge band respective guide **702** for spreading out the wedge band stacks **720**, **722** when they enter the end effector **12** to align with the staple drivers **330**, **370**. The wedge band guide **702** may include wedge band channels for each of the inner and outer wedge band stacks **720**, **722**. That is, in the illustrated embodiment, the wedge band guide **702** may comprise four wedge band channels—two of the inner rows **720** and two for the outer rows **722**. FIGS. **58-60** show one side of the wedge band guide **702** in more detail. As shown in FIG. **60**, the wedge band channels **730**, **732** may force the wedge band stacks **720**, **722** outward as they enter the end effector **12**. The inner wedge band channel **730** may direct the inner wedge band stack **720** so that the inner wedge band stack **720** aligns with the inner staple drivers **330** and the outer wedge band channel **732** may direct the outer row wedge band stack **722**

**A158**

US 8,317,070 B2

21

so that the outer wedge band stack aligns with the outer staple drivers **370**. In the illustrated embodiment, the channels **730**, **732** are straight. In other embodiments, one or both of the channels **730**, **732** may comprise curved portions.

FIG. **62** is a cross-sectional view of the shaft assembly **10** according to such an embodiment. As shown in FIG. **62**, each wedge band set **710-714** may have its own actuation (or firing) bar. The lowermost actuation bar **740** may actuate the wedge bands of the lowermost wedge band set **710**, the middle actuation bar **742** may actuate the wedge bands of the middle wedge band set **712**, and the uppermost actuation bar **744** may actuate the wedge bands of the uppermost wedge band set **714**. The firing bar **716** for actuating the cutting instrument **14** may be connected to the uppermost wedge band set **714** so that the cutting instrument **14** is actuated with the uppermost (last) wedge band set **714**. In other embodiments, the firing bar **716** may have its own actuation mechanism so that is may be actuated separately.

In practice, the clinician may choose (or select) to actuate less than all of the wedge band sets **710-714** before actuating the firing rod **716** to cut the tissue to thereby exercise some choice in the length of the staples to be formed. For example, in various embodiments, the clinician may select to actuate the lowermost and middle wedge band sets **710**, **712**—and not the uppermost wedge band set **714**—before cutting.

FIGS. **63-69** illustrate an embodiment of an open linear stapling and cutting device **800** that may use multiple stacked wedge band sets to produce staples of different formed lengths. In the illustrated embodiment, the anvil **810** is below the channel **809**. As such, the staples are driven down through tissue clamped in the end effector **12** as part of the stapling operation.

The device **800** may include an upper body piece **802** and a lower body piece **804**. The upper body piece **802** may include a channel **806** in which the staple cartridge **809** is inserted. The anvil **810** may be connected to the lower body piece **804** and face the staple cartridge **809** so that the staples **222** can be formed against the staple forming surface **812** of the anvil **810**. When the clinician is satisfied with the position of the tissue between the cartridge **809** and the anvil **810**, the clinician may lock the device **800** using a clamp lever **814** of a clamp lever assembly **816** connected to the upper body piece **802**.

The staple drivers **820** in the cartridge **809** may be actuated in stages using multiple staged wedge band stacks. Because the staples **222** are driven down in this embodiment, the wedge bands of the uppermost wedge band set **822** may be actuated first to partially deploy the staples **222**. Next, the wedge bands of the middle wedge band set **824**, which ride on the uppermost wedge band set **822**, may be actuated to begin forming the staples **222**. Then the wedge bands of the lowermost wedge band set **826**, which ride on the middle wedge band set **824**, may be actuated, which finishes the formation of the staples **222**.

In the illustrated embodiment, the firing bar **828**, with the knife **830** at its distal end, is connected to the lowermost wedge band set **826** and is fired with the lowermost wedge band set **826**. A hold down spring **832** may engage and urge the firing bar **828** upward. A knife retainer **834** may retain the firing bar **828** with the lowermost wedge band set **826**.

As best shown in FIGS. **67-68**, the clinician may actuate the wedge band sets using a three-part actuation slide bar **840**. The upper piece **842** may actuate the uppermost (initial) wedge band set **822**. The middle piece **844** may actuate the middle wedge band set **824**. The lower piece **846** may actuate the lowermost (last) wedge band set **826**.

22

To form staples of different formed heights, the staple pushers **820** may have different heights. For example, as shown in FIG. **66**, one set of staple pusher **820**a could be shorter than another set of staple pushers **820**b. As such, the formed staple **222**a, produced by the shorter staple pusher **820**a, may have a longer formed length than the formed staple **222**b, formed by the longer staple pusher **820**b. In other embodiments, the staples **222** may have different lengths or wire diameters to create different length formed staples, and/or the pockets **202** in the anvil **810** could have different depths to create different length formed staples. Also, the cumulative heights of the wedge band stacks could be different.

According to various embodiments of the present invention, the staple drivers could have a staple/driver interface that permits staples of varying wire diameter to be employed. For example, as shown in the embodiments of FIGS. **78-83**, the outside staple drivers **370**a,b may have a raised dimple configuration on its upper surface for supporting staples having differing wire diameters. The dimple configuration may comprise, as shown in the illustrated embodiment, two inner sets of outwardly protruding dimples (or convex bumps) **620**a,b, and two outer sets of dimples **622**a,b. Each set of dimples defines a receiving area where a staple **222** may sit in the upright position, as shown in FIGS. **81-83**. The dimples of the inner sets **620**a,b may be larger than the dimples of the outer dimple sets **622**a,b so that the receiving area of the inner sets **620**a,b is less than for the outer dimple sets **622**a,b. Nevertheless, due to the convex nature of the dimples, staples **222** of varying wire thicknesses may be accommodated, as shown in FIGS. **82** and **83**. For example, the dimples could be configured so that the staple drivers **370** can accommodate staples having a wire diameter of 0.006 inches to 0.012 inches, or some other range such as 0.004 inches to 0.008 inches or 0.006 inches to 0.008 inches, etc. As such, staples of different wire thicknesses could be used in a single cartridge **306**. Differing wire diameters would produce different formed staple heights all other things being equal (e.g., same drive/crush distance, same pocket depth, etc.). In addition, as shown best in FIG. **78**, the staple cradles for the inside drivers **330** may include sharp points **624** that may injure the tissue that is being stapled. The dimple configurations on the outside staple drivers **370** lack such sharp points, which would tend to minimize the trauma on the tissue being stapled.

In the illustrated embodiment, the outer staple drivers **370**a,b have the raised dimple configuration in order to accommodate staples of different wire diameters and the staple cradles of the inside staple drivers **342**, **352** can only support upright staples of one general wire diameter. In other embodiments, the one or both of the inside staple drivers **342**, **352** may also or alternatively have the raised dimple configuration. Also, rather than using the raised dimple configuration, a v-shaped staple channel **349**, **379** may be used. Such a v-shaped channel may also accommodate staples having different wire diameters. Also, staple pushers with staple interfaces that accommodate different staple wire diameters could be used with other types of staple drivers than the inside double and outside single staple drivers shown in FIGS. **78-83**.

FIGS. **70-77** are cross-sectional frontal views of the end effector **12** according to various embodiments of the present invention. In the embodiment shown in FIG. **70**, the anvil **18** is stepped, having a central portion **19** that is offset relative to (or not coplanar with) the two lateral side portions **21**, **23**. Also, the upper surface **306** of the cartridge **300** has a recessed central portion **307** and two lateral side portions **309** (see FIG. **19**A). All the staples **222** have the same pre-formation prong height and the corresponding anvil pockets **202** have the same

US 8,317,070 B2

23                                                                           24

depth. However, due to the stepped nature of the anvil **18**, the pockets **202** on the two lateral side portions **21**, **23** of the anvil **18** are offset from the pockets in the central portion **19** of the anvil. Offsetting the vertical position of the staple forming pockets **202** can affect the length of the formed staples **222**. All other things being equal, staples formed by staple forming pockets that are elevated will have a longer formed length than staples formed with pockets that are not elevated. Also in this embodiment, the primary and secondary driver portions **342**, **352** of the double inside drivers **330**$a$,$b$ are the same height, and the height of the driver portion **372** of the outside staple drivers **370**$a$,$b$ is greater than the height of the driver portions **342**, **352** of the double inside staple drivers **330**$a$,$b$. Also, the inside and outside sled cams **410**, **4120** are the same height in this embodiment.

FIG. **71** shows an embodiment where the end effector **12** has a stepped cartridge tray **224** at the bottom of the cartridge **300** to match the steps in the channel **16**. In particular, in the illustrated embodiment, the cartridge tray **224** has a central portion **602** on which the double inside staple drivers **330**$a$,$b$ rest and outer lateral portions **604** on which the outside staple drivers **370**$a$,$b$ rest. As can be seen in FIG. **71**, the central portion **602** of the cartridge tray **224** is elevated above the lateral portions **604**. As such, the sled **400** may be configured so that the outside sled cam **420** is positioned lower than the inside sled cam **410** so that the outside sled cam **420** can engage the lower outside driver portions **370**$a$,$b$.

The embodiment illustrated in FIG. **72** is similar to that shown in FIG. **71** except that in FIG. **72** the cartridge **300** does not include the cartridge tray **224**. Rather, the staple drivers **330**, **370** rest directly on the channel **16**. Such an embodiment may be beneficial because it may allow for more material (e.g., metal) in the channel **16** at points A and B than in a similar embodiment with the cartridge tray **224** (such as shown in FIG. **71**).

The embodiment illustrated in FIG. **73** is also similar to that shown in FIG. **71** except that in FIG. **73** the cartridge tray **224** is raised slightly relative to the bottom on the channel **16** in comparison with the embodiment shown in FIG. **71**. Such an embodiment may also allow for more material (e.g., metal) in the channel **16** at points A and B than in the embodiment shown in FIG. **71**. According to other embodiments, the height of the anvil **18** could be reduced to permit more material in the channel **16** at points A and B.

The embodiment of FIG. **74** is similar to that used in FIG. **73** except that no cartridge tray **224** is included in the embodiment of FIG. **74**.

The embodiment of FIG. **75** is similar to that of FIG. **70** except than in FIG. **75** the outer rows of pockets **202** are formed in a compliant material portion **610** of the anvil **18**. The compliant material portion **610** may be made from a material that is more compliant to the rest of the anvil **18**. For example, the compliant material portion **610** may be made from plastic or a plastic composite material and the rest of the pockets may be defined in a less-compliant material, such as stainless steel, of the anvil **18**. The less-compliant anvil portion is sometimes referred to herein as "non-compliant" to distinguish it from the compliant materials portion **610**, although it should be recognized that the so-called non-compliant material portion would be somewhat compliant, just less compliant than the compliant material portion **610**. All things being equal, staples formed with the outer pockets **202** formed in the compliant material portion **610** of the anvil **18** would be longer than stapled form in the non-compliant (e.g., metal) portion of the anvil **18** because the compliant material portion **610** would compress more during the staple formation process.

FIGS. **76** and **77** collectively show another embodiment. In this embodiment, the channel **16** includes a compliant material portion **612** under the outside drivers **370**. The complaint material portion **612** may be plastic or a composite plastic, for example. The inside drivers **330** may rest on the less-compliant (or "non-compliant") channel **16**, which may be made of metal (e.g., stainless steel). The outside sled cam **420** may slightly compress the compliant material portions **612** under the outside drivers **370** when forming the staples in relation to the inside drivers **330** on the channel **16**, thereby forming slightly longer staples in the outside rows. In other embodiments, the compliant material portions **612** could be under the inside drivers **330** if it was desired to make the inside staples have a greater formed length.

According to other embodiments, staples of different materials could be used to produce staples of different formed lengths. The different materials may have different modulus of elasticity so that they will be formed differently given the same driving force. Staples having a higher modulus of elasticity will tend to be deformed less given the same driving force, thereby tending to produce staples having a longer formed length. The different materials for the staples **222** may comprise titanium, stainless steel, alloys, etc.

The present invention is also directed to other types of surgical cutting devices that can create formed staples of different heights. For example, FIGS. **84-89** illustrate a circular stapler **900** that is capable of forming staples with different formed heights. As seen in FIG. **84**, the circular stapler **900** includes a head **902**, an anvil **904**, an adjustment knob assembly **906**, and a trigger **908**. The head **902** is coupled to a handle assembly **910** by an arcuate shaft assembly **912**. The trigger **908** is pivotally supported by the handle assembly **910** and acts to operate the stapler **900** when a safety mechanism (not shown) is released. When the trigger **908** is activated, a firing mechanism (not shown in FIG. **84**) operates within the shaft assembly **912** so that staples **914** are expelled from the head **902** into forming contact with the anvil **904**. Simultaneously, a knife **916** operably supported within the head **902** acts to cut tissue clamped between the head **902** and the anvil **904**. The stapler **900** is then pulled through the tissue leaving stapled tissue in its place.

FIGS. **85** and **86** illustrate one form of the anvil **904** and the head **902** that may be employed in connection with various embodiments of the subject invention. As can be seen in these figures, the anvil **904** may have a circular body portion **920** that has an anvil shaft **922** for attaching a trocar (not shown) thereto. The anvil body **920** has a staple forming surface **924** thereon and may also have a shroud **926** attached to the distal end thereof. The anvil **904** may be further provided with a pair of trocar retaining clips or leaf-type springs **928** that serve to releasably retain the trocar in retaining engagement with the anvil shaft **922**. A plastic knife board **930** may be fitted into a cavity **932** in the anvil body **904**.

The head **902** may comprise a casing member **940** that supports a cartridge supporting assembly in the form of a circular staple driver assembly **942** therein that is adapted to interface with a circular staple cartridge **944** and drive the staples **914** supported therein into forming contact with the staple forming surface **924** of the anvil **904**. The circular knife member **916** is also centrally disposed within the staple driver assembly **942**. The proximal end of the casing member **940** may be coupled to an outer tubular shroud **946** of the arcuate shaft assembly **912** by a distal ferrule member **948**. More details regarding circular staples may be found in U.S. patent application Ser. No. 11/541,151, entitled "Surgical Cutting and Stapling Device with Closure Apparatus for Limiting

**A160**

US 8,317,070 B2

<table>
<tr><td>25</td><td>26</td></tr>
</table>

Maximum Tissue Compression Force," by F. Shelton et al., filed Sep. 29, 2006, which is incorporated herein by reference.

As can be seen in FIGS. **85-89**, the staple driver assembly **942** may comprise an outer ring of staple drivers **950** and an inner ring of staple drivers **952**. Correspondingly, the anvil **904** may comprise two concentric rings of staple forming pockets **202**. Actuation of the firing trigger **908** of the handle assembly **910** cause a compression shaft (not shown) of the shaft assembly **912** to move distally thereby driving the staple driver assembly **942** distally to fire the staples **914** into forming contact with the staple forming surface **924** of the anvil **904**. Thus, the outer staple drivers **950**, when actuated by the drive mechanism of the stapler **900**, drive an outer ring of staples **914** into the clamped tissue and are formed by surface forming surface **924** of the anvil **904**. Similarly, the inner staple drivers **952**, when actuated by the drive mechanism of the stapler **900**, drive an outer ring of staples **914** into the clamped tissue and are formed by surface forming surface **924** of the anvil **904**.

The staple drivers **950**, **952** could be of different heights to thereby form different length formed staples (all other things being equal). For example, as shown in the illustrated embodiment, the outer staple drivers **950** may be shorter than the inner staple drivers **952** so that the outer formed staples are longer than the inner formed staples, as shown in FIG. **88**. Of course, in other embodiments, the inner staple drivers **952** could be shorter than the outer staple drivers **950**. Further, the outer staple drivers **950** may not be a uniform height; there could be height variation among the outer staple drivers **950**. Similarly, there could be height variation among the inner staple drivers **952**.

In addition, staples with different pre-formation prong heights could be used. Also, the staple forming pockets **202** in the surface forming surface **924** of the anvil **904** may have varying depths to thereby vary the length of the formed staples. Also, as described above, some or all of the staple drivers **950**, **952** may have a dimple configuration at their interface with the staples **914** to accommodate staples of different wire diameters or some other configuration that accommodates staples of different wire diameters (e.g., a v-shaped staple channel). Also, some of the pockets **202** in the anvil **1006** may be formed in a compliant material portion of the anvil **1006**. Also, the staples **914** could be made of materials that have a different modulus of elasticity.

In other embodiments, as shown in FIGS. **90-95**, the present invention is directed to a linear stapler **1000** that is capable of forming staples of different heights. FIGS. **90-95** focus on the end effector **1002** for such a linear stapler **1000**. The end effector **1002** may comprise a replaceable staple cartridge **1004** and a linear anvil **1006**. The cartridge **1004** comprises staples which are driven into and formed by the anvil **1006** when the device **1000** is actuated. Unlike the endocutters described before, the anvil **1006** may be non-rotatable in the linear stapler **1000**. To clamp tissue in the end effector **1002**, the user may squeeze a clamping trigger (not shown), which causes the cartridge **1004** to slide distally toward the anvil **1006** from a closed position to a closed position, More details regarding the operation and components of a liner stapler may be found in U.S. Pat. No. 5,697, 543, entitled "Linear Stapler With Improved Firing Stroke," by M. Burdorff ("the '543 patent"), which is incorporated herein by reference. Typically, such linear staplers do not comprise a cutting instrument.

FIGS. **92-93** show the end effector **1002** with the outer cover of the cartridge **1004** removed. As can be seen in these figures, the staple cartridge **1004** may comprise a staple driver

assembly **1010** comprising a row of inner staple drivers **1012** and a row of outer staple drivers **1014**. The staple drivers **1012**, **1014** could be of different heights to thereby form different length formed staples (all other things being equal). For example, as shown in the illustrated embodiment, the outer staple drivers **1014** may be shorter than the inner staple drivers **1012** so that the outer formed staples **222b** are longer than the inner formed staples **222a**, as shown in FIGS. **94-95**. Of course, in other embodiments, the inner staple drivers **1012** could be shorter than the outer staple drivers **1014**. Further, the outer staple drivers **1014** may not be a uniform height; there could be height variation among the outer staple drivers **1014**. Similarly, there could be height variation among the inner staple drivers **1012**. Also, the cartridge **1004** may comprise, for example, three rows of staples, where the outer two rows have shorter staple drivers and the inner row has longer staple drivers.

In addition, staples **1008** having different pre-formation prong heights could be used. Also, the staple forming pockets **202** in the surface forming surface **1016** of the anvil **1006** may have varying depths to thereby vary the length of the formed staples. Also, as described above, some or all of the staple drivers **1012**, **1014** may have a dimple configuration at their interface with the staples **1008** to accommodate staples of different wire diameters or some other configuration that accommodates staples of different wire diameters (e.g., a v-shaped staple channel). Also, some of the pockets **202** in the anvil **1006** may be formed in a compliant material portion of the anvil **1006**. Also, staples **1008** of different materials could be used.

In operation, as described in more detail in the '543 patent, when the clamping trigger is retracted by the user, the anvil **1006** is cause to slide proximally toward the staple cartridge **1004** into the closed position to clamp tissue in the end effector **102**. The cartridge **1004** may comprise a distally-extending tissue retaining pin **1020** that engages an opening **1022** in the anvil when the end effector **1002** is in the closed position to retain the tissue between the cartridge **1004** and the anvil **1002**. When the clinician retracts the separate firing trigger (not shown), a distally extending firing bar (not shown) is actuated, which actuates the staple drivers **1010** to drive the staples **1008**.

In another embodiment, the linear stapler **1000** could be configured so that the staple cartridge **1004** slides distally toward the anvil when the clamping trigger is actuated.

It should be recognized that stapling devices according to the present invention may combine some of the features described herein for creating staples of different formed lengths. For example, for embodiments having different staple crushing distances, the staples may all have the same pre-formation prong length or some staples may have different pre-formation prong lengths. Also, the staples may all be made out of the same material, or staples made of different materials, with different modulus of elasticity, could be used. Also, the staple wire diameters may all be the same or some of them could be different.

The devices disclosed herein can be designed to be disposed of after a single use, or they can be designed to be used multiple times. In either case, however, the device can be reconditioned for reuse after at least one use. Reconditioning can include any combination of the steps of disassembly of the device, followed by cleaning or replacement of particular pieces, and subsequent reassembly. In particular, the device can be disassembled, and any number of the particular pieces or parts of the device can be selectively replaced or removed in any combination. Upon cleaning and/or replacement of particular parts, the device can be reassembled for subsequent

US 8,317,070 B2

27

use either at a reconditioning facility, or by a surgical team immediately prior to a surgical procedure. Those skilled in the art will appreciate that reconditioning of a device can utilize a variety of techniques for disassembly, cleaning/replacement, and reassembly. Use of such techniques, and the resulting reconditioned device, are all within the scope of the present application.

Preferably, the various embodiments of the invention described herein will be processed before surgery. First, a new or used instrument is obtained and if necessary cleaned. The instrument can then be sterilized. In one sterilization technique, the instrument is placed in a closed and sealed container, such as a plastic or TYVEK bag. The container and instrument are then placed in a field of radiation that can penetrate the container, such as gamma radiation, x-rays, or high-energy electrons. The radiation kills bacteria on the instrument and in the container. The sterilized instrument can then be stored in the sterile container. The sealed container keeps the instrument sterile until it is opened in the medical facility.

It is preferred that the device is sterilized. This can be done by any number of ways known to those skilled in the art including beta or gamma radiation, ethylene oxide, steam.

While the present invention has been illustrated by description of several embodiments and while the illustrative embodiments have been described in considerable detail, it is not the intention of the applicant to restrict or in any way limit the scope of the appended claims to such detail. Additional advantages and modifications may readily appear to those skilled in the art. The various embodiments of the present invention represent vast improvements over prior staple methods that require the use of different sizes of staples in a single cartridge to achieve staples that have differing formed (final) heights.

Accordingly, the present invention has been discussed in terms of endoscopic procedures and apparatus. However, use herein of terms such as "endoscopic" should not be construed to limit the present invention to a surgical stapling and severing instrument for use only in conjunction with an endoscopic tube (i.e., trocar). On the contrary, it is believed that the present invention may find use in any procedure where access is limited to a small incision, including but not limited to laparoscopic procedures, as well as open procedures. Moreover, the unique and novel aspects of the various staple cartridge embodiments of the present invention may find utility when used in connection with other forms of stapling apparatuses without departing from the spirit and scope of the present invention.

What is claimed is:

**1**. A surgical stapling device comprising an end effector that comprises:

a circular anvil having a staple forming surface;

a plurality of staples facing the staple forming surface of the anvil, each staple comprising a main portion and two prongs, wherein the two prongs each comprise a first and a second end, wherein the first ends are connected to opposite ends of the main portion, and wherein the two prongs extend non-parallelly from the main portion; and

a staple driver assembly comprising a plurality of staple drivers, wherein each staple driver supports one of the plurality of staples and is configured such that, when the staple driver assembly is actuated, each staple driver drives the staple into the staple forming surface of the anvil, wherein a first quantity of the staples have a first pre-deformation height, measured from a lower surface of the main portion to the second end of the first prong, and a second quantity of the staples have a second pre-

28

deformation height, measured from a lower surface of the main portion to the second end of the first prong, wherein the first height is less than the second height, such that when the staple driver assembly is actuated, the first quantity of staples have a different formed staple length than the second quantity of staples.

**2**. The surgical stapling device of claim **1**, wherein the staple driver assembly comprises an outer ring of the staple drivers and an inner ring of the staple drivers.

**3**. The surgical stapling device of claim **1**, further comprising:

a handle assembly;

a shaft assembly connected to the handle assembly, wherein the end effector is connected to the shaft assembly.

**4**. The surgical stapling device of claim **1**, wherein all of the staples have the same wire diameter.

**5**. The surgical stapling device of claim **1**, wherein a first quantity of the plurality of staples have a first wire diameter and a second quantity of the plurality of staples have a second wire diameter, wherein the first wire diameter is less than the second wire diameter.

**6**. The surgical stapling device of claim **1**, wherein the staple forming undersurface of the anvil defines a plurality of staple forming pockets, each pocket aligned with an end of one of the plurality of staples, wherein a first quantity of the plurality of staple forming pockets has a first depth and a second quantity of the plurality of staple forming pockets has a second depth, wherein the first depth is greater than the second depth.

**7**. The surgical stapling device of claim **1**, wherein the end effector further comprises a knife for cutting tissue clamped by the end effector.

**8**. A surgical stapling device comprising:

a non-pivotable anvil having a staple forming surface; and

a staple cartridge facing the anvil, wherein the staple cartridge comprises:

a plurality of staples facing the staple forming surface of the anvil, each staple comprising a main portion and two prongs, wherein the two prongs each comprise a first end and a second end, wherein the first ends are connected to opposite ends of the main portion, and wherein the two prongs extend non-parallelly from the main portion; and

a plurality of staple drivers, wherein each staple driver supports one of the plurality of staples and is configured such that, when the staple drivers are actuated, each staple driver drives the staple into the staple forming surface of the anvil, wherein a first quantity of the staples have a first pre-deformation height, measured from a lower surface of the main portion to the second end of the first prong, and a second quantity of the staples have a second pre-deformation height, measured from a lower surface of the main portion to the second end of the first prong, wherein the first height is less than the second height, such that when the staple driver assembly is actuated, the first quantity of staples have a different formed staple length than the second quantity of staples.

**9**. The surgical stapling device of claim **8**, wherein the anvil is slideably moveable toward the staple cartridge to clamp tissue between the anvil and the staple cartridge.

**10**. The surgical stapling device of claim **8**, wherein the staple cartridge comprises at least two rows of staple drivers.

**11**. The surgical stapling device of claim **8**, wherein the staple cartridge further comprises a tissue retaining pin for

US 8,317,070 B2

29

engaging an opening the anvil when the staple cartridge moves toward the anvil into a closed position.

**12**. The surgical stapling device of claim **8**, wherein all of the staples have the same wire diameter.

**13**. The surgical stapling device of claim **8**, wherein a first quantity of the plurality of staples have a first wire diameter and a second quantity of the plurality of staples have a second wire diameter, wherein the first wire diameter is less than the second wire diameter.

30

**14**. The surgical stapling device of claim **8**, wherein the staple forming undersurface of the anvil defines a plurality of staple forming pockets, each pocket aligned with an end of one of the plurality of staples, wherein a first quantity of the plurality of staple forming pockets has a first depth and a second quantity of the plurality of staple forming pockets has a second depth, wherein the first depth is greater than the second depth.

\* \* \* \* \*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) and Federal Circuit Rule 32(b), the undersigned hereby certifies that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) and Federal Circuit Rule 32(b).

1.      Exclusive of the exempted portions of the brief, as provided in Federal Rule of Appellate Procedure 32(a)(7)(B) and Federal Circuit Rule 32(b), the brief contains 13,918 words.

2.      This brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman font.  As permitted by Federal Rule of Appellate Procedure 32(a)(7)(B), the undersigned has relied on the word count feature of this Microsoft Word in preparing this certificate, in addition to manually counting the words included in any figures.

Dated: November 26, 2014          /s/ Steven D. Maslowski
                                  Steven D. Maslowski

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing Brief for Appellant with the Clerk of the United States Court of Appeals for the Federal Circuit via the CM/ECF system this 26th day of November, 2014, and served a copy on counsel of record by the CM/ECF system and by electronic mail.

Dated:    November 26, 2014                    /s/  Steven D. Maslowski
                                               Steven D. Maslowski