Appeal No. 2014-1771

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

ETHICON ENDO-SURGERY, INC.,

*Appellant,*

v.

COVIDIEN LP,

*Appellee.*

Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in No. IPR2013-00209

**RESPONSE BRIEF OF APPELLEE COVIDIEN LP**

KATHLEEN A. DALEY
J. MICHAEL JAKES
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, LLP
901 NEW YORK AVENUE, NW
WASHINGTON, DC 20001
(202) 408-4000

J. DEREK MCCORQUINDALE
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, LLP
11955 FREEDOM DRIVE
RESTON, VA 20190
(571) 203-2700

March 23, 2015                *Attorneys for Appellee Covidien LP*

## CERTIFICATE OF INTEREST

Counsel for Covidien LP certify the following:

1.    The full name of every party or amicus represented by me is:

Covidien LP.

2.    The name of the real party in interest represented by me is:

Covidien LP.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:

Medtronic plc wholly owns and is the ultimate parent of Covidien LP, and no other publicly traded corporation owns 10% or more of its stock.

4.    The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or agency or are expected to appear in this Court are:

FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
J. Michael Jakes
Kathleen A. Daley
J. Derek McCorquindale
Naveen Modi (formerly with Finnegan)

# TABLE OF CONTENTS

**Page(s)**

STATEMENT OF RELATED CASES ................................................................ viii

I.    STATEMENT OF THE CASE ....................................................................1

II.   STATEMENT OF THE ISSUES ................................................................3

III.  STATEMENT OF FACTS ..........................................................................3

    A.   Background of the Technology ............................................................3

        1.   Prior-Art Surgical Staplers Use Staples with Non-parallel Legs and Different Leg Lengths ...................................3

            a.   Prior-Art Staplers Use Staples Having Different Leg Lengths to Form Staples of Different Heights ...............................................................4

                (1)   Viola ............................................................4

                (2)   Pruitt ...........................................................6

                (3)   Holsten........................................................7

            b.   Prior-Art Staplers Use Staples Having Non-parallel Legs....................................................................8

        2.   Ethicon's '070 Patent ...............................................10

    B.   The Inter Partes Review Proceeding Before the PTO.........................13

        1.   Covidien's Petition...................................................13

        2.   The PTO's Institution Decision ................................13

        3.   Patent Owner's Response and Covidien's Reply ....................14

        4.   The Board's Final Written Decision ........................................16

            a.   Obviousness Based on Prior-Art Combinations............17

            b.   Secondary Considerations ............................................19

i

(1)     Commercial Success ...........................................20

(2)     Long-Felt Need....................................................21

IV.     SUMMARY OF ARGUMENT.....................................................22

V.      ARGUMENT..................................................................23

A.      Standard of Review ..............................................23

B.      The Board Properly Instituted Review as a Procedural
Matter ...................................................................23

1.      Ethicon Waived Its Arguments Related to the Board's
Procedures by Not Raising Them Below..................24

2.      The Director Has Broad Delegation Authority.........26

3.      The Director Has Broad Authority Under the AIA to
Establish Regulations Governing Post-Grant
Proceedings .................................................30

4.      *Chevron* Deference Is Appropriate Here ...................32

a.      *Chevron* First Prong: Congress Has Not
Directly Spoken to the Precise Question at
Issue ...............................................33

b.      *Chevron* Second Prong: The PTO's
Interpretation Is Permissible...........................35

c.      AIA Legislative History Confirms the Board
Would Participate in Institution Decisions....................38

5.      There Are No Constitutional Concerns ...................40

C.      The Board Correctly Determined that All Claims Are
Unpatentable Under 35 U.S.C. § 103....................43

1.      Ethicon Waived Any Argument for a Presumption of
Nexus for Commercial Success ................................44

2.      The Board Properly Treated Ethicon's Commercial-
Success Evidence .......................................45

        a.     Ethicon Did Not Establish a Presumption of
Nexus ............................................................................45

        b.     Using Covidien's Staplers to Show Commercial
Success Is Improper in This Case...................................49

        c.     No Nexus Was Established.............................................52

    3.     The Board Properly Rejected Ethicon's Arguments on
Long-Felt Need ........................................................................53

    4.     The "Strong Case of Obviousness" Is Unaffected by
the Objective Evidence of Nonobviousness in This
Case .........................................................................................56

VI.   CONCLUSION..............................................................................58

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re Alappat*,
  33 F.3d 1526 (Fed. Cir. 1994) ....................................................29, 30

*Bender v. Dudas*,
  490 F.3d 1361 (Fed. Cir. 2007) ..........................................................32

*Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*,
  229 F.3d 1120 (Fed. Cir. 2000) ................................................*passim*

*Centillion Data Sys., LLC v. Convergys Corp.*,
  No. 1:04-cv-73, 2008 WL 687129 (S.D. Ind. Mar. 10, 2008)............................51

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
  467 U.S. 837 (1984)....................................................................*passim*

*Cooper Techs. Co. v. Dudas*,
  536 F.3d 1330 (Fed. Cir. 2008) ............................................27, 32, 35

*In re Cuozzo Speed Techs.*,
  2015 WL 448667, slip op. ........................................................*passim*

*In re DBC*,
  545 F.3d 1373 (Fed. Cir. 2008) ............................................24, 25, 26

*Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*,
  851 F.2d 1387 (Fed. Cir. 1988) ..........................................................48, 49

*Fleming v. Mohawk Wrecking & Lumber Co.*,
  331 U.S. 111 (1947)....................................................31, 34, 35, 36

*Gambro Lundia AB v. Baxter Healthcare Corp.*,
  110 F.3d 1573 (Fed. Cir. 1997) ..........................................................50

*In re Gleave*,
  560 F.3d 1331 (Fed. Cir. 2009) ....................................................23

*In re GPAC Inc.*,
  57 F.3d 1573 (Fed. Cir. 1995) ..........................................................46

iv

*Great N. Corp. v. Henry Molded Prods., Inc.*,
94 F.3d 1569 (Fed. Cir. 1996) ....................................................44, 45

*Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n*,
426 U.S. 482 (1976)...........................................................................41

*In re Huang*,
100 F.3d 135 (Fed. Cir. 1996) ...........................................................46

*In re Kotzab*,
217 F.3d 1365 (Fed. Cir. 2000) ........................................................23

*Kropat v. FAA*,
162 F.3d 129 (D.C. Cir. 1998)...........................................................40

*Mathews v. Eldridge*,
424 U.S. 319 (1976)...........................................................................40

*McManus v. District of Columbia*,
530 F. Supp. 2d 46 (D.D.C. 2007)....................................................40

*Media Technologies Licensing, LLC v. Upper Deck Co.*,
596 F.3d 1334 (Fed. Cir. 2010) ...................................................55, 56

*In re Mettke*,
570 F.3d 1356 (Fed. Cir. 2009) ........................................................23

*Murata Mfg. Co. v. Bel Fuse Ltd.*,
No. 03-c-2934, 2004 WL 1194740 (N.D. Ill. May 26, 2004) ............51

*NEC Corp. v. United States*,
151 F.3d 1361 (Fed. Cir. 1998) ...................................................41, 42

*Newell Cos. v. Kenney Manufacturing Co.*,
864 F.2d 757 (Fed. Cir. 1988) ..........................................................57

*Nycal Offshore Dev. Corp. v. United States*,
743 F.3d 837 (Fed. Cir. 2014) ..........................................................44

*Ormco Corp. v. Align Tech., Inc.*,
463 F.3d 1299 (Fed. Cir. 2006) ...................................................52, 54

*Richardson-Vicks, Inc. v. Upjohn Co.*,
    122 F.3d 1476 (Fed. Cir. 1997) ..........................................................56

*Simmons Fastener Corp. v. Ill. Tool Works, Inc.*,
    739 F.2d 1573 (Fed. Cir. 1984) ..........................................................46

*Singleton v. Wulff*,
    428 U.S. 106 (1976)................................................................24, 45

*SmithKline Beecham Corp. v. Apotex Corp.*,
    439 F.3d 1312 (Fed. Cir. 2006) ..........................................................45

*St. Jude Medical, Cardiology Division, Inc. v. Volcano Corp.*,
    749 F.3d 1373 (Fed. Cir. 2014) ..........................................................37

*Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*,
    723 F.3d 1363 (Fed. Cir. 2013) (vacated by *Teva Pharm. USA, Inc.
    v. Sandoz, Inc.*, 135 S. Ct. 831 (2015))................................................47

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
    876 F. Supp. 2d 295 (S.D.N.Y. 2012) ....................................................47

*Tokai Corp. v. Easton Enters., Inc.*,
    632 F.3d 1358 (Fed. Cir. 2011) ..........................................................53

*U.S. Telecom Ass'n v. FCC*,
    359 F.3d 554 (D.C. Cir. 2004)............................................................28

*In re Vamco Mach. & Tool, Inc.*,
    752 F.2d 1564 (Fed. Cir. 1985) ..........................................................54

*Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*,
    435 U.S. 519 (1978)......................................................................42

*Withrow v. Larkin*,
    421 U.S. 35 (1975)......................................................................41

## Statutes

35 U.S.C. § 2 ....................................................................26, 27, 35

35 U.S.C. § 3 ..............................................................................27

35 U.S.C. § 6 ................................................................25, 27, 28

35 U.S.C. § 7 ................................................................................28

35 U.S.C. § 102 ............................................................................13

35 U.S.C. § 103 ......................................................................*passim*

35 U.S.C. § 135 ............................................................................34

35 U.S.C. § 314 ......................................................................*passim*

35 U.S.C. § 316 ............................................................................31

**Regulations**

37 C.F.R. § 42.4 ....................................................................*passim*

37 C.F.R. § 42.107 .......................................................................25

37 C.F.R. § 42.108 .......................................................................31

37 C.F.R. § 42.120 .......................................................................25

**Other Authorities**

157 Cong. Rec. E1183-84 (daily ed. June 23, 2011) ...............................39

157 Cong. Rec. S1363 (daily ed. Mar. 8, 2011) .....................................38

157 Cong. Rec. S1377 (daily ed. Mar. 8, 2011) .....................................39

157 Cong. Rec. S952 (daily ed. Feb. 28, 2011) .....................................36

AIA Progress - AIA Monthly Filings,
     http://www.uspto.gov/sites/default/files/documents/031915_aia_
     stat_graph.pdf (last visited Mar. 23, 2015) ....................................36

*Changes to Implement Inter Partes Review Proceedings, Post-Grant
     Review Proceedings, and Transitional Program for Covered
     Business Method Patents*, 77 Fed. Reg. 48,680-01 (Aug. 14, 2012)
     (codified at 37 C.F.R. §§ 42.100 *et seq.*)........................................36

## STATEMENT OF RELATED CASES

No other appeal from this inter partes review of U.S. Patent No. 8,317,070 was previously before this or any other appellate court. Appellant's challenge to the U.S. Patent and Trademark Office's procedures could impact every post-grant proceeding instituted to date.

## I.    STATEMENT OF THE CASE

Covidien LP ("Covidien") is a leader in global healthcare, developing, manufacturing, and distributing a wide range of industry-leading products, including medical devices and supplies. Covidien's products are found in most hospitals in the United States. Covidien's endomechanical instruments, including surgical staplers such as the Tri-Staple™ stapler, are important technologies that enhance quality of life and improve outcomes for patients.

Covidien and its predecessors, U.S. Surgical Corporation and Tyco Healthcare Group, have been designing and developing surgical staplers for decades. Their prior-art patents were the reason the Patent Trial and Appeal Board ("Board" or "PTAB") cancelled Ethicon Endo-Surgery, Inc.'s ("Ethicon") U.S. Patent No. 8,317,070 ("the '070 patent") directed to a surgical stapler.

The '070 patent claims a surgical stapler that uses staples having different preformed leg lengths to form staples having different heights. But this was well known in the art, as the '070 patent itself acknowledges. Ethicon tried to distinguish the '070 patent from the prior art by also claiming staples having legs that are not parallel to each other. But that has been known even longer. U.S. Patent No. 3,494,533 to Green et al. ("Green"), which issued in 1970, teaches staples having non-parallel legs so that the legs will press against the side of a staple cartridge and not fall out. From the time Green issued, this simple and

1

effective way to retain staples in the staple cartridge—using staples with non-parallel legs, as opposed to parallel legs—has become the norm. In a final written decision, the Board held all claims of the '070 patent unpatentable as obvious over various combinations of prior art, finding a particularly "strong case of obviousness" here.

On its appeal of the obviousness determination, Ethicon challenges only the Board's analysis of secondary considerations, namely, commercial success and long-felt need. Ethicon does not challenge the Board's other determinations under the first three *Graham* factors. Indeed, Ethicon eventually admitted that all elements of the claims are found in the prior art, and the Board found a clear motivation to modify and combine the teachings of the prior art. The Board also considered the objective indicia of nonobviousness, i.e., secondary considerations, but found them lacking as a legal and factual matter to overcome the "strong case of obviousness."

On its appeal of procedural issues, Ethicon spends most of its brief arguing a novel theory that upends not only the decision in this case, but every inter partes review ("IPR"), covered business method ("CBM"), and post-grant review ("PGR") instituted to date. Ethicon challenges the U.S. Patent and Trademark Office ("PTO") regulation that provides: "The Board institutes the trial on behalf of the Director." 37 C.F.R. § 42.4(a). This regulation, however, is entitled to

deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), and Ethicon's procedural challenge fails.

Accordingly, the Board's decision should be affirmed.

## II.    STATEMENT OF THE ISSUES

1.    Did the PTO err in its institution and trial procedures?

2.    Did the Board err in finding that no nexus existed with commercial success and in not granting Ethicon a presumption of nexus of commercial success?

3.    Did the Board err in finding that no long-felt but unmet need existed?

4.    Did the Board err in finding that no objective evidence of nonobviousness, if it existed, weighed sufficiently to overcome a "strong case of obviousness"?

## III.    STATEMENT OF FACTS

### A.    Background of the Technology

#### 1.    Prior-Art Surgical Staplers Use Staples with Non-parallel Legs and Different Leg Lengths

Surgical staplers are used to compress and secure tissue in surgical procedures. Staplers generally include an end effector, having a staple cartridge for holding staples and a mechanism for ejecting the staples from the cartridge, and an anvil with pockets to form the staples. A staple has a backspan or crown with two legs extending from it. In use, the two legs of the staple are driven towards the

anvil, and the legs of the staples are turned inward toward the backspan by the pockets on the anvil to form a B-shape to secure tissue between the staple legs and the backspan.

Before the '070 patent was filed, it was well known to use staples having different leg lengths to form staples of different heights. *See, e.g.*, A149, 2:13-24; A250; A290; A275, 1:15-28. It was also known that forming staples having different heights allowed for varying tissue compression, which could improve the connection of tissue and the degree of hemostasis at the tissue interface. A250; A290.

Using staples having non-parallel legs has been known for forty-five years. A454, 3:65-73; A459, 13:71-14:4. Indeed, non-parallel staples have become the norm in the industry because biasing staple legs slightly outward provides a simple way to retain staples in a cartridge so that they do not fall out before or during delivery. A2033-35. References disclosing these staple and stapler features formed the core of the Board's unpatentability determination.

### a. Prior-Art Staplers Use Staples Having Different Leg Lengths to Form Staples of Different Heights

#### (1) Viola

Tyco Healthcare's International Publication No. WO 2003/094747 to Viola ("Viola") (A285-334) was used in some of the Board's rejections of the '070

claims. It discloses a surgical stapler with a staple cartridge (e.g., cartridge

assembly 222) and an anvil (e.g., the anvil fastened to first leg 224). Viola also

discloses using staples having different preformed heights to form staples having

different formed heights.



**FIG. 17**

A326, Fig. 17. In Figure 19B (shown below), Viola shows staples 221 having

different leg lengths. A326, Fig. 19B; A303-04 ("A plurality of slots 210 house

fasteners 221 of different sizes (see FIG. 19B showing three different-sized

fasteners 221 of the plurality of fasteners 221) and are configured to receive

distally extending fingers 276 of pusher bar 266.").



**FIG. 19B**

Viola teaches that by using different-sized staples, the tissue can be progressively compressed from an outer edge to a knife cut, which "provides short-term hemostasis and sealing, substantially reduces or prevents staple line bleeding, substantially decreases leakage rates in lung tissue, and provides short and long-term tissue strength, i.e., anastomotic strength, and hemostasis." A290; A296-97. When tissue is progressively compressed, it is squeezed to varying degrees by the staples, with staples that are clinched tighter, having a smaller height than staples that are clinched less tightly. A563-64.

### (2)    Pruitt

U.S. Surgical's U.S. Patent No. 4,941,623 to Pruitt ("Pruitt") (A262-84) was also used in some of the Board's rejections of the '070 claims. It too is directed to a surgical stapler that has an end effector (e.g., anvil 17' in anvil holder 17, cartridge holder 20, staple cartridge 19, and staple pushers 31). A265, Fig. 7; A266, Fig. 8; A267, Fig. 10; A268, Fig. 11; A279, 9:25-31, 9:62-66, 10:7-36.



FIG.10

6

A267, Fig. 10. Pruitt further discloses using staples having different pre-deformation heights to form staples having different formed heights. A275, 1:15-28; A276, 3:50-53; A277, 5:45-49; A279, 9:21-24, 10:48-54; A280, 12:8-14. Specifically, Pruitt describes a stapler with multiple rows of staples where the "prong lengths" of one row (e.g., staples 7) differ from the prong lengths of other rows (e.g., staples 6) to form staples having different heights as shown below in Figure 25:



A272, Fig. 25; A275, 1:15-28; A276, 3:50-53; A277, 5:45-49; A279, 9:21-24, 10:48-54; A280, 12:8-14.

### (3)    Holsten

Covidien's U.S. Patent Application Publication No. 2007/0034666 to Holsten et al. ("Holsten") (A233-61), while not relied on by the Board for a rejection, also discloses a surgical stapler that uses staples with different preformed heights to form staples with different formed heights. A249, Fig. 16; A480-86. For instance, Figure 16 of *Holsten* (shown below) depicts the formed staples 125a, 125b, and 125c having different formed heights. A249, Fig. 16; A255, ¶ 74.



*FIG. 16*

### b.    Prior-Art Staplers Use Staples Having Non-parallel Legs

U.S. Surgical's U.S. Patent No. 3,494,533 to Green (A437-63) was used in all of the Board's rejections. It is directed to a surgical stapler using staples having two prongs (e.g., legs 105) that extend non-parallelly relative to each other from the backspan or crown 104.



*FIG. 31.*

*See* A444, Fig. 31; A459, 13:71-14:4 (describing a staple that "comprises a back or connecting leg portion 104 and two outwardly flaring side legs 105"). Green teaches biasing the staple legs outward slightly so that the staple legs press against the side of the staple cartridge and stay in the cartridge without falling out as they might if the staple legs were parallel. For instance, Green describes:

> As a further aspect of preventing staples from extending
> outwardly of the cartridge slots, it is also important that

8

> the staples not fall out of said slots either during
> shipment of the cartridge assembly or during
> manipulation of the instrument. It is an object of this
> invention, therefore, to provide a staple shape whereby
> the staples themselves will resiliently press against the
> end walls which define the cartridge slots and thereby be
> firmly held therein.

A454, 3:65-73.

Since Green issued in 1970, the use of non-parallel staples has become the norm. The prevalency of non-parallel staples in the prior art is shown by other references since Green. For instance, U.S. Patent No. 4,304,236 to Conta et al. (A350-83), which issued in 1981, shows a non-parallel staple in Figure 61. A367. And U.S. Patent No. 7,824,426 to Racenet et al. (A2121-61) also discloses non-parallel staples. A2159-60, 8:65-9:9 (describing non-parallel staples "to retain the staple within the receiving slot of a staple cartridge"). Covidien's expert, Henry Bolanos, explained that using non-parallel staples was routine. He testified that during his time at Covidien and U.S. Surgical, when designing staplers, they started from the premise that they would be using non-parallel staples, i.e., staples with non-parallel legs. A2033-34. He explained that non-parallel staples were beneficial for retaining staples in the cartridge. A2034.

Likewise, in an earlier German litigation, Ethicon submitted an expert report from one of its principal design engineers. A2118. He testified that the "problem of keeping the staples in their pockets is generally solved, and has been generally

solved for many years, by bending the tips of the legs of the unloaded staples slightly outwardly, i.e. pre-stressing them." *Id.* He explained that the "frictional force between the staple legs and these inner side walls of the staple pockets provides for the required retaining force for the staples." *Id.* Even Ethicon's expert in this proceeding, Mark Ortiz, acknowledged that he uses non-parallel staples at Ethicon "50 or 75 percent of the time." A1818, 56:10-15.

### 2. Ethicon's '070 Patent

The '070 patent is a continuation-in-part of U.S. Application No. 11/216,562 ("the '562 application"), both of which are directed to surgical staplers. A59; A629; A149, 1:36-41; A629.

The '562 application admits that using staples with different lengths to form staples of different heights was known in the art. A630. Specifically, it states that "Pruitt disclose[s] surgical stapler and cartridge arrangements that employ staples that have different prong lengths to ultimately achieve lines of staples that have differing formed heights," and that Viola likewise "discloses a surgical stapler and cartridge that has six rows of staples wherein the outer two rows of staples comprise staples that are larger than the staples employed in the inner two rows and middle rows of staples." *Id.* Because this was well known, the '562 application identified the invention as using staples with the *same* leg length to form staples of different heights. A631 ("Consequently, a significant need exists for an improved

cartridge for a stapling instrument that can form lines of staples that have differing formed heights without the need to employ different sizes of staples in the same cartridge."). It did not identify the invention as using non-parallel staples or using staples with different preformed heights to form staples with different formed heights.

But just two weeks after Covidien's Holsten application was published, which disclosed staplers that use staples having *different* leg lengths, Ethicon filed a continuation-in-part application that led to the '070 patent. A59. Like the '562 application, the '070 patent admitted in the background of the invention that Pruitt and Viola disclose using staples that have legs with different lengths to form staples of different heights. A149, 2:14-24. But unlike the '562 application, the '070 patent states that the invention includes using staples having *different* leg lengths to form staples having different heights, and added claims to that. A162, 27:64-28:6, 28:50-60. And while never mentioning non-parallel staple legs or staples having legs that extend non-parallelly to each other, the '070 patent added figures that Ethicon asserts show staples having non-parallel legs. Much later during prosecution, Ethicon amended the claims to recite staples having legs that extend non-parallelly to the main portion.

The '070 patent issued with two independent claims—claims 1 and 8. Claim 1 is reproduced below:

11

1. A surgical stapling device comprising an end effector that comprises:

a circular anvil having a staple forming surface;

a plurality of staples facing the staple forming surface of the anvil, each staple comprising a main portion and two prongs, wherein the two prongs each comprise a first end and a second end, wherein the first ends are connected to opposite ends of the main portion, and *wherein the two prongs extend non-parallelly from the main portion*; and

a staple driver assembly comprising a plurality of staple drivers, wherein each staple driver supports one of the plurality of staples and is configured such that, when the staple driver assembly is actuated, each staple driver drives the staple into the staple forming surface of the anvil, *wherein a first quantity of the staples have a first pre-deformation height, measured from a lower surface of the main portion to the second end of the first prong, and a second quantity of the staples have a second pre-deformation height, measured from a lower surface of the main portion to the second end of the first prong, wherein the first height is less than the second height, such that when the staple driver assembly is actuated, the first quantity of staples have a different formed staple length than the second quantity of staples.*

A162, 27:50-28:6 (emphasis added). Claim 8 likewise claims staples having two prongs that extend non-parallelly from the main portion and have different preformed heights to form staples having different heights. *Id.*, 28:35-60. On appeal, Ethicon does not dispute that all of the claim elements are in the prior art.

### B.    The Inter Partes Review Proceeding Before the PTO

#### 1.    Covidien's Petition

Covidien petitioned for inter partes review, seeking cancellation of claims 1-14 of the '070 patent as unpatentable under 35 U.S.C. §§ 102 and 103. A171-75. The petition was based on eight prior-art references that the PTO did not have before it or did not fully consider during prosecution. A171-73.

Among other things, Covidien argued that non-parallel staples were well known in the art such that it would have been obvious to use non-parallel staples in the staplers of Viola or Pruitt. A10; A228. Covidien maintained that one of skill in the art would have been motivated to modify the staplers of Viola and Pruitt to use Green's staples with outwardly flaring legs to securely hold the staples within the staple cartridge. A229 (citing A459, 13:71-14:4; A575-76). Covidien demonstrated that combining the staplers of Viola or Pruitt with the non-parallel staples of Green would have merely been substituting one known element for another, and would have yielded predictable results. A228. Covidien supported its petition with the declaration of its expert, Mr. Bolanos, who had a long career in the design of surgical staplers. A470-71.

#### 2.    The PTO's Institution Decision

The PTO granted Covidien's petition, instituting inter partes review on six grounds, and including Viola, Pruitt, or Green. A24-47. Specifically, all

obviousness grounds were based on combinations of prior art that included at least Green in combination with one of Viola or Pruitt. A35-44.

For claim construction, the Board stated that all terms should be given their ordinary meaning, but made explicit the construction of the following terms: (1) "two prongs extend non-parallelly from the main portion" means "the non-parallel extension of those prongs is relative to each other" (A32); (2) "non-pivotable anvil" means "an anvil that does not rotate or swing about a short rod or shaft" (A34); and (3) "formed staple length" means "the distance or 'height' that the prongs extend from the main portion of the staple when the staple is formed" (A33).

### 3.    Patent Owner's Response and Covidien's Reply

After institution, Ethicon filed a response. *See* A823. Ethicon admitted that "non-parallel staples were known in the art for at least 35 years (from Green) along with staplers having staples of different preformed and formed heights for at least 15 years (from Pruitt)."[1] A870. The only part of the institution grounds that Ethicon challenged was the combination, i.e., whether it would have been obvious

---

[1] Despite that the '070 patent acknowledges that Viola discloses staples having different preformed lengths to form staples of different heights, Ethicon argued in its response that Viola "nowhere discloses that the *formed heights* of the staples will be different." A837. Ethicon took the exact opposite position before the European Patent Office, arguing there that Viola "achieve[s] the varying height of formed staples by starting with staples of differing sizes." A1981.

to use different-sized staples that have non-parallel legs in the same stapler. A870-72.

Specifically, Ethicon argued that (1) there was no reason to combine the prior art since non-parallel staples were not known to be beneficial, and (2) the prior art teaches away from the claimed invention because of the need for precise alignment when using staples having different leg lengths. A848; A2272-76. Ethicon also purported to offer evidence of commercial success and long-felt but unresolved need, arguing that, "even if a *prima facie* case of obviousness could be made . . . , the objective indicia of nonobviousness provide overwhelming evidence showing that the '070 Patent claims are not obvious." A829. Ethicon argued that the success of Covidien's own Tri-Staple™ stapler established a nexus with claims 8 and 10 of the '070 patent. Although Ethicon's expert made the conclusory statement that Covidien's staplers meet the claim language, he did not use the Board's construction of the term "non-pivotable anvil." A965, ¶ 130; A1119; A34. Ethicon also submitted some Covidien marketing material that referred to Covidien's staplers generally. A1100-18. For long-felt need, Ethicon cited only a Covidien marketing brochure that it argued suggested that "ENDO GIA Ultra Universal staplers have been developed with intent to fulfill the unmet needs of surgeons across different surgical specialties." A885 (emphasis omitted).

Covidien filed a reply. A1426-46. On whether Viola discloses forming staples having different heights, Covidien noted that Ethicon had taken a different position before the European Patent Office than it was taking before the PTO. A1431-32. Covidien also noted that Ethicon took a different position in an earlier German litigation than it was taking before the PTO on whether non-parallel staples are beneficial. A1434. There, Ethicon's expert testified that non-parallel staples had long been known to be beneficial for keeping staples in the pockets of staple cartridges. *Id.* Covidien also pointed out that Ethicon's expert admitted on cross-examination that he used non-parallel staples 50-75% of the time. A1433-34.

Covidien also demonstrated that the prior art does not teach away from the claimed invention, that there were no force or alignment concerns not easily handled by engineers with using non-parallel staples or staples having different leg lengths, and that Ethicon had not established a nexus between the '070 claims and any of the secondary considerations. A1435-43. Covidien also submitted the rebuttal declaration of its expert, Mr. Bolanos, in support of its reply. A2030-40.

### 4.    The Board's Final Written Decision

Following an oral hearing, the Board issued its final written decision. The Board determined that Covidien had shown by a preponderance of the evidence that all claims of the '070 patent are unpatentable under 35 U.S.C. § 103(a) over combinations of Pruitt, Viola, and Green.

### a.    Obviousness Based on Prior-Art Combinations

At the outset, the Board rejected Ethicon's argument that Viola does not disclose forming staples having different heights, noting that it was "contradictory to Patent Owner's characterization of Viola in a proceeding before the European Patent Office." A9. The Board cited instances where Ethicon had admitted that Viola discloses staples with different preformed heights to achieve different formed staple heights. *Id.* (citing Ex. 1024 (A1981) and Ex. 1027 (A2004)).

The Board also noted that, "during the oral hearing, counsel for Patent Owner admitted that all the recited elements of the patent claims are found in the asserted prior art." A9. The Board determined that, "[g]iven Patent Owner's admission regarding the prior art, there is no factual dispute that the cited references teach all of the recited elements." A9-10.

The Board further found that Covidien had established a reason to combine Pruitt or Viola with Green. A10-12. Specifically, the Board found that one of skill in the art would have been motivated to modify the staplers of Viola and Pruitt to use Green's staples with non-parallel legs to securely hold the staples within corresponding retention slots of the staple cartridge. *Id.* The Board considered Ethicon's arguments that there were problems using non-parallel staples and that any benefit of retaining staples in the cartridge were outweighed by the overall undesirability of non-parallel staples, but found them not credible. A11. The Board

discredited the testimony of Mr. Ortiz, Ethicon's expert, because he originally testified that one of ordinary skill in the art would not have been motivated to use staples having non-parallel legs, but admitted on cross-examination "that he himself used non-parallel staples in practice a majority of the time." A11-12. The Board noted that such frequent use by the expert himself undermined his earlier opinion. A15. The Board further noted that Mr. Ortiz's original testimony was inconsistent with the testimony of Ethicon's expert in the German litigation. A12. The Board concluded that, "[f]or all of these reasons, Petitioner has shown, with supporting evidence, that one of skill in the art would have had reason to combine the prior art to arrive at the claimed invention." *Id.*

The Board also considered Ethicon's argument that the prior art teaches away from the claimed invention, but found it not supported. A12-13. The Board noted that Ethicon argued that one of skill would have been led away from using non-parallel staples because of the need for precise alignment in surgical staples and because additional force is needed to fire non-parallel staples. A12. But the Board was not persuaded by those arguments. It noted that Covidien's expert testified that "alignment and the proper application of force were considerations commonly taken into account when designing staplers," and that "Mr. Ortiz, Patent Owner's expert, testified later, under cross-examination, that the alignment and force analysis he described in his declaration were known to one of skill in the art."

18

A12-13. The Board concluded that, "[a]lthough Viola and Pruitt do not teach the use of staples with non-parallel legs, the references do not teach away from the use of staples with non-parallel legs." A13.

Rather, the Board found that (1) "given the prevalence of non-parallel staples" in the prior art, and (2) the fact that those in the field had "but two choices for staples designs," it would have been "obvious to try non-parallel staples when designing stapling devices, such as those disclosed in Viola and Pruitt." A15. The Board also confirmed that "the limited choice of two staple designs further supports our finding that a person of skill in the art would have had reason to combine the non-parallel staple of Green with the stapling device in Viola and Pruitt." *Id.* The Board concluded that there was a particularly "strong case of obviousness." A19.

### b.    Secondary Considerations

Recognizing the need to fully consider any objective indicia of nonobviousness as part of its obviousness analysis, the Board performed a thorough, six-page review of secondary considerations under the fourth *Graham* factor. A15-21. The Board considered and discussed Ethicon's arguments for commercial success and satisfaction of long-felt but unresolved need, but found them lacking: "[T]he objective indicia argued by Patent Owner do not establish a nexus with the claimed subject matter." A16. Considering these secondary

considerations and the "strong case of obviousness established by Petitioner," the Board concluded that the claims of the '070 patent would have been obvious. A15-21; A19.

### (1)    Commercial Success

The Board noted that "Patent Owner has the burden of showing that the commercial success derives from the feature, in this case use of non-parallel staples and staples of different preformed and formed heights." A17. The Board determined there was no proof of nexus to establish that "the sales were a direct result of the unique characteristics of the claimed invention—as opposed to other economic and commercial factors unrelated to the quality of the patented subject matter." *Id.* The Board expressly reviewed but discounted Covidien's marketing literature that Ethicon suggested showed sales for the Tri-Staple™ devices increasing while sales for Covidien's "legacy devices" were decreasing. A18. The Board also did not accept Ethicon's argument that claims 8 and 10 read on the Tri-Staple™ device, further finding that Ethicon's expert, Mr. Ortiz, had not even examined Covidien's legacy products. *See* A18-19.

Accordingly, the Board found first that "Patent Owner has not shown sufficient credible evidence that the sales of the Tri-Staple devices are the result of the claimed invention, rather than other features of the Tri-Staple devices." A19. But the Board further found that, even if the objective evidence of commercial

success was credited, it still "does not overcome the strong case of obviousness established by Petitioner by a preponderance of the evidence." *Id.*

### (2)    Long-Felt Need

The Board also considered and rejected Ethicon's argument that a long-felt but unresolved need for the invention of the '070 patent indicates its nonobviousness. A20. Ethicon had pointed to only a Covidien marketing brochure, suggesting it shows that "ENDO GIA Ultra Universal staplers have been developed with intent to fulfill the unmet needs of surgeons across different surgical specialties." *Id.* (emphasis and citation omitted). The Board rejected Ethicon's argument because there was nothing indicating this purported unmet need was persistent or widespread. A21. This lack of evidence doomed the inquiry, as Ethicon could not direct the Board to any evidence of widespread efforts of skilled workers to find a solution. *Id.* Even considering the Covidien brochure, the Board found:

> [T]he brochure fails to establish the existence of a "long-felt and unresolved" need in the industry, because it does not indicate that the "unmet need" is a persistent one recognized by those of ordinary skill in the art. Thus, Petitioner's brochure does not support the assertion that there was a long-felt but unresolved need in the industry for Patent Owner's invention.

*Id.* (citation omitted). The Board concluded that Ethicon's "arguments concerning the long-felt but unresolved need for the invention in the '070 patent d[id] not overcome Petitioner's showing of obviousness." A19; A21.

## IV.   SUMMARY OF ARGUMENT

Ethicon has not established any flaws in the Board's institution procedures. The Director of the PTO has broad authority to manage the Office and delegate her authority in carrying out the duties of her position. Ethicon has not shown that the Director exceeded her authority in delegating the task of making institution decisions to the Board. In fact, the regulation delegating that authority is properly entitled to *Chevron* deference. Ethicon's constitutional-avoidance argument fares no better. Ethicon has not established a fundamental right to have different decision-makers on institution and final decision. Ethicon has not shown that, by deciding to institute an inter partes review, a panel of the Board is incapable of making an impartial final decision.

Ethicon also has not shown that the Board erred in its analysis of secondary considerations, the only aspect of the Board's obviousness analysis Ethicon challenges on appeal. Ethicon never argued for, let alone established, that it was entitled to a presumption of nexus of commercial success. Ethicon also failed to make out a prima facie case of nexus. Ethicon improperly relied on Covidien's stapler for commercial success and failed to demonstrate any nexus between the

sales of that product and the claims of the '070 patent. Ethicon also has not shown that the Board erred in finding that Ethicon's reliance on a couple of sentences from one Covidien brochure failed to establish a long-felt need. Most importantly, Ethicon has not shown that the Board erred in finding a strong case of obviousness, particularly where all of the claim elements are admittedly in the prior art, where there was a strong reason to combine the references, where the fact that there were only two choices for staple designs made it obvious to try non-parallel staples, and where even Ethicon's own expert admitted that he used non-parallel staples up to 75% of the time.

## V.    ARGUMENT

### A.    Standard of Review

Obviousness under 35 U.S.C. § 103(a) is a legal conclusion based on underlying findings of fact. *In re Mettke*, 570 F.3d 1356, 1358 (Fed. Cir. 2009). The Board's ultimate determination of obviousness is reviewed de novo. *In re Kotzab*, 217 F.3d 1365, 1369 (Fed. Cir. 2000). This Court reviews the Board's factual findings for substantial evidence. *In re Gleave*, 560 F.3d 1331, 1335 (Fed. Cir. 2009).

### B.    The Board Properly Instituted Review as a Procedural Matter

In a novel argument not raised before the Board, Ethicon argues that the PTO's institution procedure for IPRs requires reversal of the final written decision.

Br. 2-3, 22, 26-43. Ethicon's argument—alleging that the America Invents Act ("AIA") requires the Director of the PTO to institute all proceedings and the Board to separately conduct all trials—would undo *every* IPR instituted to date. According to Ethicon, this result is required because the Director may not delegate to the Board the task of determining whether to institute an IPR. As the Board has been performing this Director-delegated function since 2012, all AIA post-grant proceedings would be upset.

### 1.    Ethicon Waived Its Arguments Related to the Board's Procedures by Not Raising Them Below

The Court has consistently reminded that "a party generally may not challenge an agency decision on a basis that was not presented to the agency." *In re DBC*, 545 F.3d 1373, 1378 (Fed. Cir. 2008) (citing *Woodford v. Ngo*, 548 U.S. 81, 90 (2006) ("As a general rule . . . courts should not topple over administrative decisions unless the administrative body not only has erred, but has erred against objection made at the time appropriate under its practice.")). And an argument not presented to the agency is waived on appeal. *See Singleton v. Wulff*, 428 U.S. 106, 120 (1976) (citing *Hormel v Helvering*, 312 U.S. 552, 556 (1941)) (appellate courts do not normally consider claims that have not been raised first below).

Ethicon fully concedes that it did not raise its argument regarding the manner of institution below, justifying its omission because "the PTAB is bound

by the regulation and therefore could not alter that procedure." Br. 26 n.4. But that was not Ethicon's call to make. Had the arguments been timely presented, the PTO may well have addressed them.[2] *See In re DBC*, 545 F.3d at 1378 (enforcing waiver "gives [the] agency an opportunity to correct its own mistakes . . . before it is haled into federal court, and [thus] discourages disregard of [the agency's] procedures"(alterations in original) (quoting *Woodford*, 548 U.S. at 89)).

Ethicon has not established that the Director could not make the institution decision in consultation with the Board. In fact, the Director is a member of the Board. 35 U.S.C. § 6(a). Ethicon also has not established that the Director could not have taken any action in response to Ethicon's arguments. For example, had Ethicon raised its procedural concerns earlier, the Director could have participated in the institution decision or had different panels make the institution and final decision. Such remedial steps in this case would not have caused the PTO to alter its regulations or procedure. And it would have been far more efficient. *In re DBC*,

_____

[2] Ethicon argues that 37 C.F.R. § 42.120 did not provide "an opportunity to raise such a challenge." Br. 26 n.4. Section 42.120 governs a patent owner's response after institution and provides that a "patent owner may file a response to the petition addressing any ground for unpatentability not already denied." 37 C.F.R. § 42.120(a). Ethicon does not explain how the regulation would have precluded its statutory argument. And, under 37 C.F.R. § 42.107, which governs a patent owner's preliminary response to petition, Ethicon had a chance to set "forth the reasons why no *inter partes* review should be instituted under 35 U.S.C. 314." 37 C.F.R. § 42.107(a). Ethicon could have raised its procedural concerns then. Ethicon has given no legitimate reason for failing to signal its statutory and constitutional-avoidance arguments to the PTO in any of its papers.

545 F.3d at 1379 ("If DBC had objected to the Board, instead of to this court in the first instance, it could have obtained relief immediately, and thus avoided the unnecessary expenditure of the administrative resources of the original Board panel, the judicial resources of this court, and the substantial delay and costs incurred in prosecuting this appeal."). In a similar case, because appellant had not presented its challenge to the appointment of the administrative patent judges who presided over its patentability review to the Board, this Court found waiver as a threshold matter. *Id*. at 1378 ("As noted above, DBC did not raise its objection to the manner of appointment to the Board itself. The threshold question thus presented is whether its failure to do so resulted in a waiver of the challenge."). The result should be the same here.

By presenting its novel arguments only now, Ethicon effectively ensured the putatively "flawed" institution decision it now seeks to challenge. Those arguments are waived on appeal.

### 2.    The Director Has Broad Delegation Authority

The heads of most executive-branch agencies have very broad statutory authority to establish regulations and conduct proceedings. The PTO is no exception. Specifically, 35 U.S.C. § 2(b)(2)(A) provides, in relevant part, that "[t]he Office . . . (2) may establish regulations, not inconsistent with law, which— (A) shall govern the conduct of proceedings in the Office." As this Court has

explained, the PTO has authority under 35 U.S.C. § 2 to govern the conduct of proceedings in the Office, and that this "is 'the broadest of the Office's rulemaking powers'" and, "[b]y this grant of power we understand Congress to have 'delegated plenary authority over PTO practice . . .' to the Office." *Cooper Techs. Co. v. Dudas*, 536 F.3d 1330, 1335 (Fed. Cir. 2008) (alteration in original) (quoting *Stevens v. Tamai*, 366 F.3d 1325, 1333 (Fed. Cir. 2004)).

Title 35 further provides that the "powers and duties of the United States Patent and Trademark Office shall be vested in an Under Secretary of Commerce for Intellectual Property and Director of the Unites States Patent and Trademark Office (in this title referred to as the 'Director')." 35 U.S.C. § 3(a)(1). And 35 U.S.C. § 3(b)(3)(B) expressly allows the Director to delegate to "such officers and employees" "such of the powers vested in the Office as the Director may determine."

Ethicon argues that "such officers and employees" in 35 U.S.C. § 3(b)(3)(B) does not include members of the Board because 35 U.S.C. § 6 was amended in 2008 to provide that members of the Board are appointed by the "Secretary, in consultation with the Director," rather than directly by the Director. Br. 5, 29. But § 6 was amended due to concerns about whether appointments by the Director violated the Appointments Clause. Nothing in the legislative history surrounding

those changes, or additional ones made in connection with the AIA,[3] shows that Congress intended to limit the Director's authority to delegate responsibilities when it made the Secretary of Commerce ultimately responsible for appointments to the Board.

In any event, regardless of whether § 3 expressly provides that the Director may delegate authority to the Board, "[w]hen a statute delegates authority to a federal officer or agency, subdelegation to a subordinate federal officer or agency is presumptively permissible absent affirmative evidence of a contrary congressional intent." *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 565 (D.C. Cir. 2004). As a result, the Director presumptively can delegate her authority to subordinates, including members of the Board.

This Court also held that 35 U.S.C. § 7 (1988) gave the Commissioner, and thus now the Director, authority to designate the members of a panel to consider a

---

[3] Senator Kyl stated, "Section 6 of the [AIA] bill includes all provisions of the bill addressing the jurisdiction of the Patent Trial and Appeal Board and administrative and judicial appeals. In section 6(a), the recodification of section 6 of title 35 is modified so that all members of the PTAB can participate in all proceedings. Also, subsection (d) is added to the recodification of section 6 of title 35. By omitting this provision, the 2009 bill would have effectively repealed the APJ 'appointments fix' that had been enacted in 2008." 157 Cong. Rec. S1377.

request for reconsideration of a Board decision. *In re Alappat*, 33 F.3d 1526, 1531-32 (Fed. Cir. 1994).[4] The Court stated:

> There is no indication to the contrary in the statute, and we have found no legislative history indicating a clear Congressional intent that the Commissioner's authority to designate the members of a Board panel be limited to the designation of an original panel or that the Board be limited to exercising its rehearing authority only through the panel which rendered an original decision.

*Id*. at 1533. The *Alappat* court recognized the "broad supervisory authority that Congress has granted the Commissioner under Title 35 regarding the operation of the PTO." *Id*. at 1534-35. As a result, the Court gave the PTO wide latitude to create Board panels to advance the work of the agency, even when members of an original panel were called on again to make the reconsideration decision. *Id*. at 1531-36.

    *In re Alappat* also described the Commissioner's influence on the operations of the PTO. The Court noted that the Commissioner is a member of the Board, as

---

[4] The *Alappat* court considered the following language of 35 U.S.C. § 7(b) (1988): "Each appeal and interference shall be heard by at least three members of the Board of Patent Appeals and Interferences, who shall be designated by the Commissioner. Only the Board of Patent Appeals and Interferences has the authority to grant rehearings." 33 F.3d at 1531. The current corresponding statute has similar provisions that the Director designates at least three members of the Board to hear proceedings and that only the Board may grant rehearing. *See* 35 U.S.C. § 6(c).

the Director is now. *See id*. at 1532 (citing 35 U.S.C. § 7(a)). Further, the Court

explained:

> [T]he Commissioner is not bound by a Board decision
> that an applicant is entitled to a patent. Only a court can
> order the Commissioner to act, not the Board. Even
> though Board members serve an essential function, . . .
> the ultimate authority regarding the granting of patents
> lies with the Commissioner. For example, if the Board
> rejects an application, the Commissioner can control the
> PTO's position in any appeal through the Solicitor of the
> PTO . . . . The Commissioner has an obligation to refuse
> to grant a patent if he believes that doing so would be
> contrary to law. The foregoing evidences that . . . . the
> Board operates subject to the Commissioner's overall
> ultimate authority and responsibility.

*Id*. at 1535 (footnote omitted). Although analyzing the prior statutory regime, this

is still true with respect to the Director's role at the PTO. Thus, Ethicon's

suggestion that "[t]he Director abrogated Congress's intended decisional

separation by delegating her duty to institute review," Br. 6, fails to acknowledge

that the Director may exercise her influence where necessary.

### 3.    The Director Has Broad Authority Under the AIA to Establish Regulations Governing Post-Grant Proceedings

The AIA itself "conveys rulemaking authority to the PTO." *In re Cuozzo*

*Speed Techs. LLC*, No. 2014-1301, 2015 WL 448667, at *5 (Fed. Cir. Feb. 4,

2015). The statute provides that "[t]he Director shall prescribe regulations," inter

alia, "establishing and governing inter partes review . . . and the relationship of

such review to other proceedings." 35 U.S.C. § 316(a)(4). The AIA further mandates: "In prescribing regulations under this section, the Director shall consider the effect of any such regulation on the economy, the integrity of the patent system, the efficient administration of the Office, and the ability of the Office to timely complete proceedings instituted under this chapter." 35 U.S.C. § 316(b).

This Court recently recognized that "the AIA granted new rulemaking authority to the PTO." *In re Cuozzo*, 2015 WL 448667, at *17; *see also Fleming v. Mohawk Wrecking & Lumber Co.*, 331 U.S. 111, 121-22 (1947) ("[R]ule-making power may itself be an adequate source of authority to delegate a particular function[.]"). In discussing the Director's statutory powers under the AIA, including § 316(a)(4), the Court noted that "[t]hese provisions expressly provide the PTO with authority to establish regulations setting the 'standards' for instituting review and regulating IPR proceedings." *In re Cuozzo*, 2015 WL 448667, at *7.

Pursuant to these express grants of authority, the PTO has promulgated regulations governing IPRs, including regulations delegating the institution decision to the Board. According to 37 C.F.R. § 42.4(a), "[t]he Board institutes the trial on behalf of the Director." *See also* 37 C.F.R. § 42.108. It is this regulation that Ethicon challenges on appeal.

31

### 4.     *Chevron* **Deference Is Appropriate Here**

"Because Congress authorized the PTO to prescribe regulations, the validity of the regulation is analyzed according to the familiar *Chevron* framework." *In re Cuozzo*, 2015 WL 448667, at *8 (citing *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001); *Wilder v. Merit Sys. Prot. Bd.*, 675 F.3d 1319, 1322 (Fed. Cir. 2012)); *see also Bender v. Dudas*, 490 F.3d 1361, 1368 (Fed. Cir. 2007); *Cooper*, 536 F.3d at 1337 ("Because the Patent Office is specifically charged with administering statutory provisions relating to 'the conduct of proceedings in the Office,' [this Court] give[s] *Chevron* deference to its interpretations of those provisions.") (citation omitted). Ethicon has not shown that the regulation allowing the Board to institute trial on behalf of the Director, 37 C.F.R. § 42.4(a), is not entitled to deference under *Chevron*. In fact, Ethicon hardly discusses *Chevron* at all. *See* Br. 42-43.

Under the rubric established by *Chevron*, the first question is "whether Congress has directly spoken to the precise question at issue." 467 U.S. at 842; *accord Cooper*, 536 F.3d at 1337 (quoting *Hawkins v. United States*, 469 F.3d 993, 1000 (Fed. Cir. 2006)). If the statute is ambiguous, the second question is "whether the agency's interpretation is based on a permissible construction of the statutory language at issue." *Cooper*, 536 F.3d at 1338 (quoting *Hawkins*, 469 F.3d at 1000).

The answers to both questions lead to the conclusion that the regulation, 37 C.F.R. § 42.4, is entitled to deference.

### a. *Chevron* First Prong: Congress Has Not Directly Spoken to the Precise Question at Issue

Congress has not directly spoken to whether the Director can delegate the authority to institute an IPR proceeding to the Board, as provided in 37 C.F.R. § 42.4(a). Nothing in Title 35, including the AIA, prohibits the Director from delegating institution authority to the Board.

Ethicon only briefly addresses *Chevron*, stating summarily that, because "'Congress has directly spoken to the precise question at issue,' this Court 'must give effect to the unambiguously expressed intent of Congress.'" Br. 42 (quoting *Chevron*, 467 U.S. at 842-43). Ethicon, however, does not explain how Congress expressed its unambiguous intent. *See id.* at 42-43.

Congress enacted 35 U.S.C. § 314(a), giving the Director authority to institute an IPR. That section *does not* restrict delegation of the institution decision in any way:

> a) Threshold— The Director may not authorize an inter partes review to be instituted unless the Director determines that the information presented in the petition filed under section 311 and any response filed under section 313 shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition.

35 U.S.C. § 314(a). Thus, Congress never expressly stated that the Director alone must make the institution decision, nor did Congress prohibit delegating institution authority to the Board. *See Fleming*, 331 U.S. at 121-22 ("There is no provision in the present Act negativing the existence of such authority [to delegate] . . . . Nor can the absence of such authority be fairly inferred from the history and content of the Act."). And nothing else in Title 35 expressly prohibits the Director from delegating her institution authority to the Board. *See supra* Section V.B.2.

To the contrary, in connection with another proceeding created by the AIA—a derivation proceeding—Congress showed that a recitation that the Director shall institute a proceeding can also include the Board making that determination. In particular, 35 U.S.C. § 135(a), provides that "[w]henever the Director determines that a petition filed under this subsection demonstrates that the standards for instituting a derivation proceeding are met, the Director may institute a derivation proceeding." Yet 35 U.S.C. § 135(c) states that the "Patent Trial and Appeal Board also may defer action on a petition for a derivation proceeding, or stay the proceeding after it has been instituted," showing that Congress expected the Board to be acting on the petition.

The most that could be said here is that the statute is ambiguous on delegation, so the second prong of *Chevron* will be addressed. *See In re Cuozzo*, 2015 WL 448667, at *8.

### b. *Chevron* Second Prong: The PTO's Interpretation Is Permissible

The regulation here, 37 C.F.R. § 42.4(a), permitting the Board to institute trial on behalf of the Director, presents a reasonable interpretation of the statute. It has long been recognized that the PTO's authority to govern the conduct of proceedings under 35 U.S.C. § 2 "is 'the broadest of the Office's rulemaking powers.'" *Cooper*, 536 F.3d at 1335. "[B]y this grant of power we understand Congress to have 'delegated plenary authority over PTO practice . . .' to the Office." *Id.* Such statements by this Court suggest that the PTO has the prerogative to fashion its own institution procedures in IPRs. And nothing in the statute or legislative history of the AIA can be read as showing that Congress intended the Director to *personally* decide whether to institute every IPR, CBM, PGR, and derivation petition filed.

From a practical standpoint, the ability of the Director to delegate the institution decision to the Board is absolutely necessary "in view of the magnitude of the task." *Fleming*, 331 U.S. at 122-23 ("Certainly so far as the investigative functions were concerned, he could hardly be expected . . . . to exercise his personal discretion in determining whether a particular investigation should be launched. Delay might do injury beyond repair." (footnote omitted)). Unlike inter partes reexaminations, an IPR permits a response by the patent owner that must be considered, if submitted, before institution. *See* 35 U.S.C. § 314(a).

In practice, therefore, the Director could potentially have hundreds of pages of substantive technical and legal arguments to review for each institution decision. Since the Director cannot by herself review and decide every IPR, CBM, and PGR petition, the statute cannot reasonably be read as limiting every institution decision to the Director personally. *Fleming*, 331 U.S. at 122 ("We would hesitate to conclude that all the various functions granted the Administrator need be performed personally by him or under his personal direction."). That reading would be absurd given the volume of post-grant proceedings—the PTO's statistics show that by March 19, 2015, over 2,950 petitions for AIA post-grant proceedings have been filed. AIA Progress - AIA Monthly Filings, http://www.uspto.gov/sites/default/files/documents/031915_aia_ stat_graph.pdf (last visited Mar. 23, 2015). And Congress had to be aware of these exigencies, particularly given its stated desire for a "faster, less costly alternative[] to civil litigation to challenge patents." 157 Cong. Rec. S952 (daily ed. Feb. 28, 2011) (statement by Sen. Grassley); *see also Changes to Implement Inter Partes Review Proceedings, Post-Grant Review Proceedings, and Transitional Program for Covered Business Method Patents*, 77 Fed. Reg. 48,680-01 (Aug. 14, 2012) (codified at 37 C.F.R. §§ 42.100 *et seq.*) (Congress's goal in passing the expedited IPR procedure was to "establish a more efficient and streamlined patent system

that will improve patent quality" and "create a timely, cost-effective alternative to litigation").

In fact, Ethicon itself acknowledges that "the Director need not review every IPR petition personally" and can delegate her institution authority. Br. 29. But Ethicon does not show how delegating that authority to the Board, a tribunal as qualified as any in the PTO to make institution decisions, is unreasonable.

Had Congress thought the Board unsuitable for making institution decisions, it could have expressed that directly. In other words, against the backdrop of known delegation authority and the desire for speed and efficiency, Congress could have created a special body to institute post-grant proceedings. But neither the statute nor the legislative history shows any intent to install separate decision-makers for institution and final decision.[5]

---

[5] Ethicon argues that the Court in *St. Jude Medical, Cardiology Division, Inc. v. Volcano Corp.*, 749 F.3d 1373, 1375 (Fed. Cir. 2014), found it significant that the statute separates the Director's decision to institute the review from the Board's conduct of the review after institution. Br. 30. The *St. Jude* court, however, was focused on the different question of what decisions could be appealed, not which decision-makers could be involved. Indeed, the *St. Jude* court noted that the "Director, by regulation, has delegated to the Board the authority under section 314 to decide whether to institute an *inter partes* review." *St. Jude*, 749 F.3d at 1375 n.1. The Court did not suggest that the statute prohibited such delegation. Moreover, the fact that § 314(d) provides that the "determination by the Director whether to institute an inter partes review under this section shall be final and nonappealable," 35 U.S.C. § 314(d), shows even more the discretion placed in the Director. *Cf. In re Cuozzo*, 2015 WL 448667, at *3 ("We conclude that
(continued…)

Permitting delegation to the Board is a reasonable interpretation of the statute. Because 37 C.F.R. § 42.4(a) reflects a permissible construction of the language in 35 U.S.C. § 314(a), the institution procedure was properly adopted by the PTO and the regulation is entitled to deference.

### c.     AIA Legislative History Confirms the Board Would Participate in Institution Decisions

Nothing in the AIA or its legislative history shows that Congress intended to limit the Director's ability to delegate the institution decision. In fact, the legislative history of the AIA only supports the PTO's regulation delegating institution authority to the Board. For instance, the legislative history repeatedly refers to the "PTO" or "Office" rather than the "Director," often using the terms in the context of institution and trial proceedings interchangeably. Some examples are provided.

- "If a petitioner provides evidence to the PTO and the PTO determines that the patent is on a 'covered business method patent' then *the PTO would institute* a post-grant review of that patent. *In this review, the PTO could consider any challenge that could be heard in court*." 157 Cong. Rec. S1363 (daily ed. Mar. 8, 2011) (statement of Sen. Leahy) (emphasis added)

---

(…continued)
§ 314(d) prohibits review of the decision to institute IPR even after a final decision.").

- "[T]he *Office* is required to implement the inter partes and post-grant review thresholds via regulations, and . . . the *Office* is required to take into account, among other things, the Office's ability to 'timely complete proceedings instituted under' those chapters." 157 Cong. Rec. S1377 (daily ed. Mar. 8, 2011) (statement of Sen. Kyl) (emphasis added).

- "[I]t is better that the *Office* turn away some petitions that otherwise satisfy the threshold for instituting an inter partes or post-grant review than it is to allow the Office to develop a backlog of instituted reviews that precludes the *Office* from timely completing all proceedings." *Id*. (statement of Sen. Kyl) (emphasis added).

Further, there is at least one specific mention of administrative patent judges actually making the institution decisions in a similar post-grant context. During House consideration in June 2011, only a few months before the AIA was enacted, Representative Lamar Smith said:

> [I]t bears repeating that defendants cannot even start this program unless they can persuade *a panel of judges* at the outset of the proceeding that it is more likely than not that the patent is invalid.

157 Cong. Rec. E1183-84 (daily ed. June 23, 2011) (statement of Rep. Smith) (emphasis added). This was not a slip of the tongue. The need to pass before technically trained administrative patent judges before institution was seen as a salutary feature for the protection of patent owners. *See id*.

### 5.    There Are No Constitutional Concerns

Ethicon argues that the PTO's institution procedure risks denying "Ethicon of its due process right to an impartial decision-maker." Br. 35. Ethicon focuses its argument on the risk that the PTO procedures "fall[] short of the constitutional mark," rather than on an actual due process violation. Br. 41. But no serious risk has been established.

The Due Process Clause of the Fifth Amendment requires that no person be deprived of his or her property without due process of law. *Mathews v. Eldridge*, 424 U.S. 319, 332-33 (1976). The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner." *Id.* at 333 (citation omitted). The Fifth Amendment only requires that a person receive his or her due process, not every procedural device that he or she may claim or desire. *Kropat v. FAA*, 162 F.3d 129, 132 (D.C. Cir. 1998). Demonstrating a lack of opportunity to be heard is an essential element of a procedural due process claim. *McManus v. District of Columbia*, 530 F. Supp. 2d 46, 73 (D.D.C. 2007). There is no question that, in submitting briefing and participating at an oral hearing before the Board, a patent owner has a meaningful opportunity to be heard on the question of patentability.

Ethicon also has not established that a Board panel is necessarily biased merely because it makes the institution decision and the final decision. Ethicon

must meet a high bar to overcome "the presumption of honesty and integrity" that

applies in determining whether due process requires a different decision-maker.

*Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n*, 426 U.S. 482, 496-97

(1976). As the Supreme Court stated in *Hortonville*:

> Mere familiarity with the facts of a case gained by an
> agency in the performance of its statutory role does not,
> however, disqualify a decisionmaker. Nor is a
> decisionmaker disqualified simply because he has taken a
> position, even in public, on a policy issue related to the
> dispute, in the absence of a showing that he is not
> "capable of judging a particular controversy fairly on the
> basis of its own circumstances."

*Id*. at 493 (quoting *United States v. Morgan*, 313 U.S. 409, 421 (1941), and citing

*Withrow v. Larkin*, 421 U.S. 35, 47 (1975); *FTC v. Cement Inst.*, 333 U.S. 683,

700-03 (1948)).

   In other words, Ethicon has not established that a panel who makes an

institution decision is "not 'capable of judging a particular controversy fairly'"

when making a final decision. *See NEC Corp. v. United States*, 151 F.3d 1361,

1373 (Fed. Cir. 1998) (quoting *Hortonville*, 426 U.S. at 493); Br. 41. There are

many examples where the same decision-maker makes an initial decision and the

final decision, particularly in an administrative context. *Withrow v. Larkin*, 421

U.S. at 56 ("It is also very typical for the members of administrative agencies to

receive the results of investigations, to approve the filing of charges or formal

complaints instituting enforcement proceedings, and then to participate in the

ensuing hearings. This mode of procedure . . . does not violate due process of law."). As the *NEC* court recognized, Commerce makes both a preliminary and final determination as to whether a product is being sold at less than fair market value in an antidumping investigation. 151 F.3d at 1373. And district court judges routinely make decisions on preliminary injunctions and the likelihood that a party will succeed, and then make the final decision on whether that party succeeds.

Ethicon has not shown that the PTO's procedure is fundamentally flawed and so unfair as to present a serious risk of a due process violation. An agency's freedom to fashion its own procedural rules is "the very basic tenet of administrative law," and the Supreme Court has been clear that a reviewing court may not impose procedural requirements on an agency beyond those set forth by Congress or the agency itself. *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 524, 543-44, 549 (1978). Congress did not expressly require different decision-makers such that no delegation to the Board was possible; in fact, it appears that this arrangement was contemplated in the legislative history. *See supra* Section V.B.1-4. And the PTO has set forth procedures that satisfy *Chevron*, particularly in view of the timing exigencies imposed. *See supra* Section V.B.4.

### C.    The Board Correctly Determined that All Claims Are Unpatentable Under 35 U.S.C. § 103

The only merits issue that Ethicon raises on appeal is the Board's handling of secondary considerations.

Ethicon does not challenge the Board's findings that all of the '070 claim elements are found in the prior art (A9-10) or that "one of skill in the art would have had reason to combine the prior art to arrive at the claimed invention," namely, using non-parallel staples to help retain the staples in the cartridge (A10-12). Likewise, Ethicon does not challenge the Board's finding that it would have been obvious to try using non-parallel staples in the staplers of Pruitt and Viola "given the prevalence of non-parallel staples, and the fact that those in the field had but two choices for staple designs" (A15), or its finding that the prior art does not teach away from the claimed combination (A13). In fact, Ethicon does not even challenge the Board's determination that all of these findings lead to a "strong case of obviousness." A19.

Ethicon only argues that the Board legally erred in its treatment of secondary considerations. But the Board determined that Ethicon did not provide sufficient evidence showing the secondary considerations it raised—commercial success and long-felt but unmet need—were attributable to the product's features claimed in the '070 patent. A15-21. Those findings are supported by substantial evidence, and the Board's analysis was proper.

### 1.    Ethicon Waived Any Argument for a Presumption of Nexus for Commercial Success

Ethicon's primary argument on appeal on obviousness is that it was entitled to a presumption of nexus to commercial success. Br. 44-50. Ethicon even argues that, "[c]ontrary to Ethicon's urging, the panel did not apply the presumption of nexus," and that "in its final written decision the panel did not even acknowledge that this law existed." *Id.* at 48. Yet from all of its papers before the Board, Ethicon points to *just one sentence* as allegedly raising the "presumption of nexus" argument before the Board. *See id.* (citing only A877). Ethicon did not otherwise argue for or provide any substantive analysis on whether a presumption of nexus should have been applied. *See* A877-85 (lacking any substantive discussion of the presumption of nexus); *see also* A2250 (same).

Ethicon is essentially making a new argument on appeal, one that was not properly presented to the Board so that they could decide it. A16-19. The facts and law underlying the presumption of nexus were not fairly raised below. *Great N. Corp. v. Henry Molded Prods., Inc.*, 94 F.3d 1569, 1573 (Fed. Cir. 1996) (stating that the general waiver rule is essential in order that all parties may have the opportunity to offer all the evidence relevant to the issues and so that parties are not surprised on appeal). At bottom, Ethicon's cursory treatment constitutes waiver. *See Nycal Offshore Dev. Corp. v. United States*, 743 F.3d 837, 847 (Fed. Cir. 2014) ("There are several flaws in this argument. To begin with, it

was waived below, as the trial court noted. There is only the barest hint of the 'takings' argument in the record below . . . ." (citation omitted)); *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006) (citing *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("A skeletal 'argument,' really nothing more than an assertion, does not preserve a claim. . . . Judges are not like pigs, hunting for truffles buried in briefs.")). Waiver rules are designed to prevent gamesmanship. *Great N. Corp.*, 94 F.3d at 1573 (stating that the general rule is essential in order that all parties may have the opportunity to offer all the evidence relevant to the issues and so that parties are not surprised on appeal). Accordingly, Ethicon's "presumption of nexus" argument on appeal is waived. *See Singleton*, 428 U.S. at 120 (appellate courts do not normally consider claims that have not been raised first below).

### 2. The Board Properly Treated Ethicon's Commercial-Success Evidence

Even considering Ethicon's arguments for a presumption of nexus, its commercial success arguments still fail.

### a. Ethicon Did Not Establish a Presumption of Nexus

Ethicon argues throughout its brief that it was entitled to a "presumption of nexus" to commercial success. Br. 24. In making its arguments, Ethicon appears to conflate what is required for a presumption of nexus (which it does not get) as

opposed to showing prima facie nexus in the ordinary course (which it did not do). *See id.* at 43-52.

Before secondary considerations are given substantial weight, there must be a demonstrated "nexus between the merits of the claimed invention and the evidence of secondary considerations." *Simmons Fastener Corp. v. Ill. Tool Works, Inc.*, 739 F.2d 1573, 1575 (Fed. Cir. 1984). To establish nexus for commercial success, the patent owner must offer "proof that the sales were a direct result of the unique characteristics of the claimed invention—as opposed to other economic and commercial factors unrelated to the quality of the patented subject matter." *In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996); *see also In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995) (indicating that the patent owner must demonstrate that the commercial success resulted directly from the claimed subject matter). The burden of showing a nexus resides with the patentee. *See In re GPAC*, 57 F.3d at 1580.

To obtain an inference that nexus exists—i.e., a "presumption of nexus"— the commercially successful product or method must: (i) embody the claims, and (ii) be coextensive with the claims. *See Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120, 1130 (Fed. Cir. 2000) ("[I]f the marketed product *embodies the claimed features*, *and is coextensive with them*, then a nexus

is presumed and the burden shifts to the party asserting obviousness to present evidence to rebut the presumed nexus." (emphasis added)).

In its arguments on appeal, Ethicon ignores that the product must be "coextensive" with the claim, in addition to embodying the claimed features, to get a presumption of nexus. Br. 44-50. Citing *Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*, 723 F.3d 1363, 1372 (Fed. Cir. 2013) (vacated by *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831 (2015)), Ethicon asserts that a "patentee demonstrates that a product is coextensive with its claims by presenting expert testimony that the product meets the claim limitations." Br. 45. But even *Teva* shows that for a product to be coextensive with a claim, more than merely showing it meets the claim limitations is required. There, this Court noted that the district court "found that 'Copaxone® is coextensive with the asserted claims,' triggering a presumption of a nexus between the drug's commercial success and the claimed invention." *Teva*, 723 F.3d at 1372 (quoting *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 876 F. Supp. 2d 295, 406 (S.D.N.Y. 2012), and citing *Brown & Williamson*, 229 F.3d at 1130). The district court had made it clear that a "successful product is 'coextensive' with the claimed invention when it is commensurate in scope with the patented invention." *Teva*, 876 F. Supp. 2d at 416.

The additional "coextensive" requirement for securing a presumption of nexus makes perfect sense—when the marketed product *embodies* and is

*coextensive* with the claimed features, there is little risk that any demonstrable commercial success is attributable to *unclaimed* features—instead, every feature of the product is necessarily claimed. Only in such circumstances where the claimed invention is coextensive with the product is a *presumption of nexus* available. When no coextensiveness is shown, there can be no presumption and the patentee must show an ordinary prima facie nexus to shift the burden. *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988) ("When the thing that is commercially successful is not coextensive with the patented invention—for example, if the patented invention is only a component of a commercially successful machine or process—the patentee must show prima facie a legally sufficient relationship between that which is patented and that which is sold.").

Ethicon did not attempt to show coextensiveness before the Board and does not on appeal. In fact, at no point does Ethicon argue that the Tri-Staple™ stapler is *coextensive* with any claim of the '070 patent. *See generally* Br. 44-52. Ethicon's arguments to the Court never state that the product itself *is* the entire invention such that it is legally "coextensive."

And, as a factual matter, Covidien's Tri-Staple™ stapler is not coextensive with the claims, as Covidien has always argued. There are many unclaimed features in the Tri-Staple™ stapler, "such as ergonomic design, precise

articulation, and reloads that provide simpler selection and reduced inventory." A19 (citing A1443). These unclaimed features were openly touted in the marketing material Ethicon relies on. A1144-45; A1287-97. The Board agreed that these "other features of the Tri-Staple devices" existed as unclaimed components. *See* A19.

Thus, because Covidien's commercially successful Tri-Staple™ stapler is not coextensive with the patent claims, Ethicon could not invoke any "presumption of nexus" and was instead required to show prima facie nexus in the ordinary manner. *Demaco*, 851 F.2d at 1392 ("When the thing that is commercially successful is not coextensive with the patented invention . . . the patentee must show prima facie a legally sufficient relationship between that which is patented and that which is sold.").

### b.    Using Covidien's Staplers to Show Commercial Success Is Improper in This Case

As the basis for its nexus arguments, Ethicon contends that the '070 claims are not obvious because Covidien's Tri-Staple™ staplers, allegedly covered by '070 claims 8 and 10, are commercially successful. This is incorrect as a matter of law and fact.

In support of its position, Ethicon stated that "[s]ales of infringing products are included in determining commercial success." A876 (citing *Brown & Williamson*, 229 F.3d at 1130). While this Court has said that "case law provides

that the success of an infringing product is considered to be evidence of the commercial success of the claimed invention," *Brown & Williamson*, 229 F.3d at 1130 (citing *Gambro Lundia AB v. Baxter Healthcare Corp.*, 110 F.3d 1573, 1579 (Fed. Cir. 1997) (considering the commercial success of the infringing product as evidence of the commercial success of the claimed invention)), that precept cannot be used in Ethicon's favor here. Ethicon cannot rely on Covidien's Tri-Staple™ stapler to establish commercial success for the simple reason that no "infringing product" has been shown to exist.

Ethicon summarily declares that "Covidien's Tri-Staple device embodies the invention of the '070 patent" (Br. 44), but there has been no finding to this effect. Ethicon improperly assumes that the '070 claims cover Covidien's staplers and skips directly to the commercial-success arguments based on Covidien's sales. This is legally flawed.

In all of the cases that Ethicon cites, the courts using commercial success of *competitor products* had already determined that the products infringe. *See, e.g.*, *Brown & Williamson*, 229 F.3d at 1122, 1130 ("[T]he district court found the VSSS [Virginia Slims SuperSlims cigarette] to infringe[.]"); *Gambro Lundia AB*, 110 F.3d at 1582 ("The district court found that the Baxter SPS 550 literally infringed claim 1 of Gambro's patent."). Ethicon cites no case where the commercial-success analysis *based on a competitor's products* is decoupled from a

finding of infringement. In fact, courts routinely recognize that an infringement

determination is a condition to relying on the commercial success of a competitor's

product. *See, e.g.*, *Brown & Williamson*, 229 F.3d at 1130 (finding that the trial

court should have considered the commercial success of the competing product "*in

light of the fact that the district court found the VSSS to infringe the Luke patent*"

(emphasis added)); *Centillion Data Sys., LLC v. Convergys Corp.*, No. 1:04-cv-73,

2008 WL 687129, at *3 (S.D. Ind. Mar. 10, 2008) ("*In the event that Qwest's

accused products are found to infringe*, Qwest's success at selling or licensing

those products . . . will be relevant [to the commercial-success analysis]."

(emphasis added)); *Murata Mfg. Co. v. Bel Fuse Ltd.*, No. 03-c-2934, 2004 WL

1194740, at *2 (N.D. Ill. May 26, 2004) (a competitor's commercial success "*may

become relevant if* Murata shows that Bel Fuse's product infringes Murata's

patent" (emphasis added)).

Ethicon's assertion that claims are "embodied" in a competitor's product

without any prior determination to that effect is insufficient. This is not an

infringement case. And, as Covidien argued below, the '070 claims do not cover

the Tri-Staple™ stapler and no tribunal has ever held that they do. *See* A1441-42.

Ethicon purports to rely on its expert, Mr. Ortiz, as having established that

Covidien's product "has the claimed features." Br. 45. But even his analysis was

conclusory and did not establish infringement. A965, ¶ 130. Mr. Ortiz did not

acknowledge, let alone attempt to apply, the Board's construction of claim terms such as "a non-pivotable anvil having a staple forming surface."[6] *See* A34; A1119. As a result, Mr. Ortiz's testimony is legally insufficient to show infringement.

### c.    No Nexus Was Established

Ethicon also did not establish a prima facie case of nexus. A16 ("[A]s discussed below, the objective indicia argued by Patent Owner do not establish a nexus with the claimed subject matter."); A19 ("Patent Owner has not shown sufficient credible evidence that the sales of the Tri-Staple devices are the result of the claimed invention, rather than other features of the Tri-Staple devices."). Ethicon claimed that the commercial success was due to the claimed combination, "which includes non-parallel staples and different preformed and formed heights." A879-80. But, as the Board held, using non-parallel staples and staples with different pre-deformation heights and different formed heights were known in the prior art. A13. If the features leading to the commercial success were known in the prior art, no nexus can be shown. *See Ormco Corp. v. Align Tech., Inc.*, 463 F.3d

---

[6] Ethicon argues that Covidien's Tri-Staple™ stapler meets this limitation because a Covidien brochure refers to a "fixed anvil." Br. 46 (citing A1102). But the claim recites a "non-pivotable anvil," not a "fixed anvil." A162, 28:36. And the Board construed "non-pivotable anvil" to mean "an anvil that does not rotate or swing about a short rod or shaft." A34. Ethicon did not challenge that construction before the Board and does not challenge it on appeal. And the Covidien brochure that Ethicon and its expert rely on shows that the device has a hinge that permits the "fixed anvil" to rotate or swing about a short rod or shaft, so it is not a "non-pivotable anvil." A1119; A1102.

1299, 1311-12 (Fed. Cir. 2006); *Tokai Corp. v. Easton Enters., Inc.*, 632 F.3d 1358, 1369 (Fed. Cir. 2011). The Board also noted that Ethicon did not provide "sufficient credible evidence that the sales of the Tri-Staple devices are the result of the claimed invention, rather than other features of the Tri-Staple devices." A19.

Further, the Board determined that the expert testimony of Mr. Ortiz, Ethicon's expert, was not credible on nexus. A18-19. It noted, for example, that despite his assertion that he compared the Tri-Staple™ stapler to Covidien's legacy staplers, in reality, "Mr. Ortiz did not testify that he examined Petitioner's legacy products." *Id.* The Board properly discounted his testimony after reviewing it "in detail." A19. Ethicon has not shown that any of these findings are unsupported by substantial evidence.

### 3. The Board Properly Rejected Ethicon's Arguments on Long-Felt Need

Ethicon points to one Covidien document as suggesting a "long-felt but unresolved need for the invention of the '070 patent." A20. That marketing brochure states:

> With significant investments into research and development over the years, *Endo GIA Reloads with Tri-Staple Technology and ENDO GIA Ultra Universal staplers have been developed with intent to fulfill the unmet needs of surgeons across different surgical specialties.* Covidien's revolutionary new Endo Stapling system enables surgeons to operate with confidence to handle a broader range of tissue thickness and applications with outstanding clinical performance.

A20 (quoting A1287-97). This single passage, and Ethicon's self-serving expert testimony pertaining to it, are the only evidence cited in support of long-felt need. *See* Br. 57 (citing A20, A972-73, and A1288, which are all directed to the same passage); *see also* A885-86. This was not sufficient to establish a long-felt need for what is claimed in the '070 patent.

The Board found this brochure was not evidence that "widespread efforts of skilled workers having knowledge of the prior art had failed to find a solution to the problem." A21 (citing the requirements of *In re Allen*, 324 F.2d 993, 997 (CCPA 1963), and *Toledo Pressed Steel Co. v. Standard Parts, Inc.*, 307 U.S. 350, 356 (1939)). The Board added that the Covidien brochure never indicates that the purported "unmet need" is a "persistent one recognized by those of ordinary skill in the art." *Id.* (citing *In re Gershon*, 372 F.2d 535, 539 (CCPA 1967)).

The Board also found there was no nexus linking the purported long-felt need of surgeons to the claimed features of the '070 patent. A16 ("[T]he objective indicia argued by Patent Owner do not establish a nexus with the claimed subject matter."). These failures of evidence meant that no weight could be given to this secondary consideration. *Ormco*, 463 F.3d at 1313 (holding that claims were prima facie obvious in view of the prior art and that the patent owner failed to submit "probative evidence that claimed and novel features met a long-felt but unresolved need"); *In re Vamco Mach. & Tool, Inc.*, 752 F.2d 1564, 1577 (Fed. Cir. 1985).

Ethicon argues that the Board articulated the long-felt need too narrowly by tying it too closely to the claimed invention. *See* Br. 57. But this Court has rejected attempts to redefine the long-felt need more broadly. In *Media Technologies Licensing, LLC v. Upper Deck Co.*, 596 F.3d 1334, 1338-39 (Fed. Cir. 2010), for example, a patent owner's attempt to rely on success in solving an unmet need failed because its definition of the need was too broad and its definition of success in meeting the need was too narrow where the older technology was still in wide use. The Court stated:

> [The patent owner] cannot have it both ways with: (1) an overbroad "long felt but unsolved need" . . . ; and (2) an exceedingly narrow definition of success that requires . . . levels achieved by the alleged-infringing products. We reject both [the patent owner's] overbroad "long felt but unsolved need," and its overly narrow definition of success.

*Id.*

The Court should reject Ethicon's attempt to broaden the long-felt need analysis beyond the claimed invention. On the one hand, Ethicon tries to frame the long-felt need broadly as any "stapl[ing] tissues of different thicknesses." Br. 57. That was well known before. On the other hand, Ethicon tries to define success narrowly by suggesting that only the Tri-Staple™ staplers satisfy the need. *Id.* at 57-58. But even Ethicon admits that the Covidien "legacy" staplers still sell over 100,000 units a month. *See id.* at 55 ("Endocutter Trends . . . since launch of Tri-

Staple" (citing A971; A1299)); *Media Techs. Licensing*, 596 F.3d at 1338 ("Inserts that are still in use because they generate interest are successful—and do not demonstrate failure of others."). Ethicon cannot have it both ways.

### 4. The "Strong Case of Obviousness" Is Unaffected by the Objective Evidence of Nonobviousness in This Case

Even if Ethicon had provided proper objective evidence under *Graham*'s fourth factor, that does not mean the Board must accept it as dispositive on obviousness. Rather, the ultimate determination of whether an invention would have been obvious is a legal question based on the totality of the evidence. *Richardson-Vicks, Inc. v. Upjohn Co.*, 122 F.3d 1476, 1483 (Fed. Cir. 1997).

In this case, the totality of evidence includes the evidence supporting the Board's findings that Ethicon does not challenge on appeal: (1) all limitations of the '070 patent's claims are in the prior art; (2) the strong motivation to combine the references to help retain the staples in the cartridge; (3) the prevalence of non-parallel staples in the prior art and the fact that only two choices existed for staple design, making it obvious to try non-parallel staples when designing staplers; and (4) the testimony of Ethicon's experts that those skilled in the art knew of and frequently used non-parallel staples up to 75% of the time. A4-21. These facts, among others, constitute overwhelming evidence of obviousness. Accordingly, the

Board was on firm ground holding that Covidien had established a "strong case of obviousness." A19.

Even assuming that Ethicon showed some objective evidence of nonobviousness, the Board was still justified in its conclusion of unpatentability under § 103. For example, in *Brown & Williamson*, the Court found that commercial success was established, but it held the patent claim invalid for obviousness notwithstanding. 229 F.3d at 1131. Similarly, in *Newell Cos. v. Kenney Manufacturing Co.*, the Court affirmed that, "although [secondary considerations] must be considered, they do not control the obviousness conclusion." 864 F.2d 757, 768 (Fed. Cir. 1988). In *Newell*, the Court held that, even in the face of "a highly successful product," the record could also establish such a strong case of obviousness "that the objective evidence of nonobviousness does not persuade us to reach a contrary conclusion." *Id*. at 769.

That is the case here. The Board clearly understood this principle, holding first and foremost that sufficient credible evidence of nexus was lacking. A16. But the Board also held that, even if the objective evidence cited by Ethicon is considered, its weakness "does not overcome the strong case of obviousness established by Petitioner by a preponderance of the evidence." *See* A19.

## VI.    CONCLUSION

For the foregoing reasons, the Court should affirm the Board's final

determination holding all claims of the '070 patent unpatentable.


Date: March 23, 2015                    Respectfully submitted,


  /s/ Kathleen A. Daley
Kathleen A. Daley
J. Michael Jakes
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001-4413
(202) 408-4000

J. Derek McCorquindale
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
11955 Freedom Drive
Reston, VA 20190
(571) 203-2700

Attorneys for Appellee Covidien LP

## CERTIFICATE OF SERVICE

I hereby certify that on March 23, 2015, this Response Brief of Appellee

Covidien LP was filed electronically using the CM/ECF system and served via the

CM/ECF system on registered counsel for Appellant and Intervenor as follows:

> Steven D. Maslowski
> Akin, Gump, Strauss, Hauer & Feld, LLP
> Two Commerce Square, Suite 4100
> 2001 Market Street
> Philadelphia, PA 19103
>
> Mark R. Freeman
> Appellate Staff, Civil Division, U.S. Department of Justice
> 950 Pennsylvania Ave. N.W., Room 7228
> Washington, DC 20530
>
> Nathan K. Kelley
> Scott C. Weidenfeller
> Solicitor's Office – U.S. Patent and Trademark Office
> Mail Stop 8, P.O. Box 1450
> Alexandria, VA 22313-1450

> /s/ Kathleen A. Daley
> Kathleen A. Daley

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing Response Brief of Appellee Covidien LP contains 13,212 words as measured by the word processing software used to prepare this brief.


Dated: March 23, 2015                Respectfully submitted,


                                       /s/ Kathleen A. Daley
                                      Kathleen A. Daley